## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

_____

| | |
|---|---|
| STATE OF TEXAS, | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § |
| | § |
| 3M COMPANY; CORTEVA, INC., DUPONT | § |
| DE NEMOURS, INC., and EIDP, INC. F/K/A | § |
| E. I. DU PONT DE NEMOURS AND | § |
| COMPANY, | § |
| | § |
| *Defendants*. | § |

Civil Action No. 3:25-cv-00122-K

## APPENDIX OF SUPPORTING MATERIALS

Pursuant to Local Rule 7.1(h)(i), Plaintiff the State of Texas submits this Appendix of

Supporting Materials in support of its Opposition to Defendants' Motion to Dismiss under Fed.

R. Civ. P. 12(b)(2).

| EXHIBIT LETTER | DESCRIPTION | APP. |
|---|---|---|
| -- | Declaration of Glenn Graham, Esq. | APP. 001 – APP. 002 |
| A | Excerpts from the Separation and Distribution Agreement by and among Corteva, Inc., Dow Inc., and DowDupont Inc., dated April 1, 2019 | APP. 003 – APP. 093 |
| B | Published opinion in *State of North Carolina ex rel. Joshua H. Stein, Attorney General v. E.I. Du Pont De Nemours and Company et al.,* 879 S.E.2d 537 (N.C. 2022) | APP. 094 – APP. 122 |
| C | Unpublished opinion in *State of New Hampshire v. 3M Company*, No. 216-2019-CV-0045 (Sup. Ct., Merrimack Co. July 8, 2021) | APP. 123 – APP. 148 |
| D | Unpublished opinion in *State of Ohio ex rel. DeWine v. E.I. du Pont de Nemours and Co.,* No. 180T32 (Ct. Common Pleas, Wash. Co. Aug. 4, 2021) | APP. 149 – APP. 150 |
| E | Unpublished opinion in *Suez Water New Jersey, Inc. v. E.I. DuPont de Nemours, et al.,* No. 2:20-cv-199906 (D.N.J. Oct. 14, 2021) | APP. 151 – APP. 160 |
| F | Letter Agreement by and among Corteva, Inc. and DowDuPont Inc. dated June 1, 2019 | APP. 161 – APP. 182 |

Dated:  March 11, 2025                                    Respectfully Submitted,

**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

**BRENT WEBSTER**
FIRST ASSISTANT ATTORNEY GENERAL

**RALPH MOLINA**
DEPUTY FIRST ASSISTANT ATTORNEY
GENERAL

**AUSTIN KINGHORN**
DEPUTY ATTORNEY GENERAL FOR CIVIL
LITIGATION

_/s/ Katie B. Hobson_____

**KELLIE E. BILLINGS-RAY**
CHIEF, ENVIRONMENTAL PROTECTION DIVISION

_/s/ Jennifer Roscetti_____

**JONATHAN STONE**
CHIEF, CONSUMER PROTECTION DIVISION

**Jennifer Roscetti**
State Bar No. 24066685
**Kelley Owens**
State Bar No. 24118105
Assistants Attorney General
Jennifer.roscetti@oag.texas.gov
Kelley.owens@oag.texas.gov

OFFICE OF THE TEXAS ATTORNEY GENERAL
Consumer Protection Division
P.O. Box 12548, MC-010
Austin, Texas 78711-2548
Tel: (512) 463-2185
Fax: (512) 473-8301

**Katie B. Hobson**
State Bar No. 24082680
**Brittany E. Wright**
State Bar No. 24130011
**Jake Marx**
State Bar No. 24087989
Assistants Attorney General
Katie.hobson@oag.texas.gov
Brittany.wright@oag.texas.gov
Jake.marx@oag.texas.gov

OFFICE OF THE TEXAS ATTORNEY GENERAL
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911

*/s/ Bill Jackson*

**WILLIAM J. JACKSON**
**JENNIFER C. BARKS**
**LAUREN H. SHAH**
**MARIA F. PIMIENTA**
**KELLEY DRYE & WARREN LLP**
515 Post Oak Blvd., Suite 900
Houston, Texas 77027
Tel: (713) 355-5000
Fax: (713) 355-5001
bjackson@kelleydrye.com
jbarks@kelleydrye.com
lshah@kelleydrye.com
mpimienta@kelleydrye.com

*/s/ Glenn Graham*

**DAVID I. ZALMAN**
**GLENN GRAHAM**
**ELIZABETH N. KRASNOW**
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
dzalman@kelleydrye.com
ggraham@kelleydrye.com
ekrasnow@kelleydrye.com

Mark Lanier
Alex Brown
**THE LANIER  LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N., Suite 100
Houston, Texas 77054
Tel: (713) 659-5200
Fax: (713) 659-2204
mark.lanier@lanierlawfirm.com
alex.brown@lanierlawfirm.com

*/s/ Scotty MacLean*

Scotty MacLean
**MACLEAN LAW FIRM, P.C.**
State Bar No. 00787942
4916 Camp Bowie Blvd.
Fort Worth, Texas 76107
Tel: 817-529-1000
Fax: 817-698-9401
smaclean@macleanfirm.com

**ATTORNEYS FOR THE STATE OF TEXAS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 11th day of March 2025, a true and correct copy of the foregoing

document was served by email and/or by electronic filing service on all counsel of record.


*/s/        Glenn Graham*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | Civil Action No. 3:25-cv-00122-K |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| 3M COMPANY; CORTEVA, INC., DUPONT | § | |
| DE NEMOURS, INC., and EIDP, INC. F/K/A | § | |
| E. I. DU PONT DE NEMOURS AND | § | |
| COMPANY, | § | |
| | § | |
| *Defendants.* | § | |

**<u>DECLARATION OF GLENN GRAHAM IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO DUPONT DEFENDANTS' MOTION TO DISMISS</u>**

I, Glenn Graham, declare as follows:

1.  I am an attorney licensed to practice in the State of New Jersey, admitted *pro hac vice* in
    the above-referenced case, and am a partner at the law firm of Kelley Drye & Warren
    LLP, counsel for Plaintiff State of Texas.

2.  Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of excerpts from the Separation
    and Distribution Agreement by and among Corteva, Inc., Dow Inc., and DowDuPont
    Inc., dated April 1, 2019, as filed with the SEC, publicly available at:

    https://www.sec.gov/Archives/edgar/data/1666700/000119312519095042/d725044dex21
    .htm

3.  Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of the November 4, 2022
    published opinion by the North Carolina Supreme Court in *State of North Carolina ex*

1

*rel. Joshua H. Stein, Attorney General v. E.I. Du Pont De Nemours and Company et al.,*
879 S.E.2d 537 (N.C. 2022).

4.  Attached hereto as **Exhibit C** is a true and correct copy of the July 8, 2021 unpublished
    and redacted opinion by the New Hampshire Superior Court in *State of New Hampshire
    v. 3M Company*, No. 216-2019-CV-0045 (Sup. Ct., Merrimack Co. July 8, 2021)

5.  Attached hereto as **Exhibit D** is a true and correct copy of the August 4, 2021
    unpublished opinion by the Ohio Court of Common Pleas in *State of Ohio ex rel. DeWine
    v. E.I. du Pont de Nemours and Co.*, No. 180T32 (Ct. Common Pleas, Wash. Co. Aug. 4,
    2021).

6.  Attached hereto as **Exhibit E** is a true and correct copy of the October 14, 2021
    unpublished opinion by the District Court of New Jersey in *Suez Water New Jersey, Inc.
    v. E.I. DuPont de Nemours, et al.*, No. 2:20-cv-199906 (D.N.J. Oct. 14, 2021)

7.  Attached hereto as **Exhibit F** is a true and correct copy of the Letter Agreement entered
    into by and among Corteva, Inc. and DowDuPont Inc., dated June 1, 2019, as filed with
    the SEC, publicly available at:

    https://www.sec.gov/Archives/edgar/data/1666700/000119312519163322/d715311dex10
    2.htm

    I declare under penalty of perjury that the foregoing is true and correct. Executed
on March 11, 2025, in Parsippany, New Jersey.

Glenn Graham

2

# EXHIBIT A

EX-2.1 2 d725044dex21.htm EX-2.1

**Exhibit 2.1**

**EXECUTION VERSION**

# SEPARATION AND DISTRIBUTION AGREEMENT

**by and among**

**CORTEVA, INC.,**

**DOW INC.,**

**and**

**DOWDUPONT INC.**

**Dated as of April 1, 2019**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| ARTICLE I | | |
| DEFINITIONS AND INTERPRETATION | | |
| Section 1.1 | General | 2 |
| Section 1.2 | References; Interpretation | 74 |
| Section 1.3 | Effective Time; Suspension | 74 |
| ARTICLE II | | |
| THE SEPARATION | | |
| Section 2.1 | General | 75 |
| Section 2.2 | Transfer of Assets; Assumption and Satisfaction of Liabilities | 75 |
| Section 2.3 | Intergroup Accounts; Intercompany Accounts | 81 |
| Section 2.4 | Limitation of Liability; Intergroup Contracts | 83 |
| Section 2.5 | Transfers Not Effected On or Prior to the Effective Time; Transfers Deemed Effective as of the Effective Time | 84 |
| Section 2.6 | Wrong Pockets; Mail & Other Communications; Payments | 86 |
| Section 2.7 | Conveyancing and Assumption Instruments | 90 |
| Section 2.8 | Further Assurances | 91 |
| Section 2.9 | Novation of Liabilities | 91 |
| Section 2.10 | Guarantees | 93 |
| Section 2.11 | Disclaimer of Representations and Warranties | 96 |
| ARTICLE III | | |
| CERTAIN ACTIONS AT OR PRIOR TO THE DISTRIBUTIONS | | |
| Section 3.1 | Certificate of Incorporation; Bylaws | 96 |
| Section 3.2 | Directors | 97 |
| Section 3.3 | Officers | 97 |
| Section 3.4 | Resignations | 97 |
| Section 3.5 | Delayed Partial Cash Sweep | 98 |
| Section 3.6 | Certain Wires | 98 |
| Section 3.7 | Certain Bank Accounts and Instructions | 99 |
| Section 3.8 | Certain Payroll Balances Payable in the Ordinary Course of Business Prior to April 1, 2019 | 101 |
| Section 3.9 | Ancillary Agreements | 103 |

i

ARTICLE IV

THE DISTRIBUTIONS

Section 4.1    Stock Dividends to DowDuPont                                                                    103
Section 4.2    Fractional Shares                                                                               104
Section 4.3    Sole Discretion of DowDuPont                                                                    105
Section 4.4    Conditions to Distributions                                                                     105
Section 4.5    Effectiveness of Distributions                                                                  109

ARTICLE V

CERTAIN COVENANTS

Section 5.1    Auditors and Audits; Annual and Quarterly Financial Statements and Accounting                   109
Section 5.2    Separation of Information                                                                        112
Section 5.3    Nonpublic Information                                                                            115
Section 5.4    Cooperation                                                                                     115
Section 5.5    Permits and Financial Assurance                                                                 116
Section 5.6    Non-Competition                                                                                 118
Section 5.7    Inventor Remuneration                                                                           124

ARTICLE VI

SPECIFIED DOWDUPONT SHARED ASSETS AND SPECIFIED DOWDUPONT SHARED LIABILITIES

Section 6.1    Specified DowDuPont Shared Assets and Specified DowDuPont Shared Liabilities                     125
Section 6.2    Management of Specified DowDuPont Shared Assets and Specified DowDuPont Shared Liabilities        127
Section 6.3    Access to Information; Certain Services; Expenses                                                131
Section 6.4    Contingent Claim Committee                                                                       131
Section 6.5    Notice Relating to Specified DowDuPont Shared Assets and Specified DowDuPont Shared Liabilities   133
Section 6.6    Cooperation with Governmental Entity                                                             134
Section 6.7    Default                                                                                         134

ARTICLE VII

SHARED HISTORICAL DUPONT ASSETS AND SHARED HISTORICAL DUPONT LIABILITIES

Section 7.1    Management of Shared Historical DuPont Assets and Shared Historical DuPont Liabilities           134
Section 7.2    Shared Historical DuPont Claim Committee                                                         137
Section 7.3    Access; Reimbursement; Limitation on Liability                                                  142
Section 7.4    Cooperation with Governmental Entities                                                          143
Section 7.5    Default                                                                                         144
Section 7.6    No Effect on MatCo                                                                              144

ii

ARTICLE VIII

INDEMNIFICATION

| Section 8.1 | Release of Pre-Distribution Claims | 144 |
| Section 8.2 | Indemnification by SpecCo | 147 |
| Section 8.3 | Indemnification by MatCo | 147 |
| Section 8.4 | Indemnification by AgCo | 147 |
| Section 8.5 | Procedures for Third Party Claims | 148 |
| Section 8.6 | Procedures for Direct Claims. | 151 |
| Section 8.7 | Cooperation In Defense and Settlement | 151 |
| Section 8.8 | Indemnification Payments | 153 |
| Section 8.9 | Indemnification Obligations Net of Insurance Proceeds and Other Amounts | 154 |
| Section 8.10 | Additional Matters; Survival of Indemnities | 155 |
| Section 8.11 | Environmental Matters | 155 |
| Section 8.12 | Closure of Discontinued Operations | 159 |
| Section 8.13 | Certain Other Limits on Indemnification | 161 |

ARTICLE IX

CONFIDENTIALITY; ACCESS TO INFORMATION

| Section 9.1 | Preservation of Corporate Records | 167 |
| Section 9.2 | Provision of Corporate Records | 168 |
| Section 9.3 | Disposition of Information | 172 |
| Section 9.4 | Witness Services | 173 |
| Section 9.5 | Reimbursement; Other Matters | 173 |
| Section 9.6 | Confidentiality; Non-Use | 174 |
| Section 9.7 | Privileged Matters | 176 |
| Section 9.8 | Conflicts Waiver | 179 |
| Section 9.9 | Ownership of Information | 180 |
| Section 9.10 | Prior Contracts | 181 |

ARTICLE X

DISPUTE RESOLUTION

| Section 10.1 | Negotiation and Arbitration | 181 |
| Section 10.2 | Continuity of Service and Performance | 185 |

ARTICLE XI

INSURANCE

| Section 11.1 | Insurance Matters | 185 |
| Section 11.2 | Liability Policies | 193 |

iii

| Section 11.3 | Coverage After Transfer of Assets and Liabilities | 196 |
| Section 11.4 | Cooperation | 197 |
| Section 11.5 | Captive Insurance Matters | 198 |
| Section 11.6 | No Assignment of Entire Insurance Policies | 199 |
| Section 11.7 | Agreement for Waiver of Conflict and Shared Defense | 199 |
| Section 11.8 | Certain Matters Relating to Organizational Documents | 200 |
| Section 11.9 | Directors and Officers Liability Insurance | 200 |

ARTICLE XII

MISCELLANEOUS

| Section 12.1 | Complete Agreement; Construction | 202 |
| Section 12.2 | Ancillary Agreements | 203 |
| Section 12.3 | Counterparts | 203 |
| Section 12.4 | Survival of Agreements | 203 |
| Section 12.5 | Expenses | 203 |
| Section 12.6 | Notices | 204 |
| Section 12.7 | Waivers | 206 |
| Section 12.8 | Amendments | 207 |
| Section 12.9 | Assignment | 207 |
| Section 12.10 | Successors and Assigns | 207 |
| Section 12.11 | Certain Termination and Amendment Rights | 207 |
| Section 12.12 | Payment Terms | 208 |
| Section 12.13 | No Circumvention | 208 |
| Section 12.14 | Subsidiaries | 209 |
| Section 12.15 | Third Party Beneficiaries | 209 |
| Section 12.16 | Title and Headings | 209 |
| Section 12.17 | Exhibits and Schedules | 209 |
| Section 12.18 | Governing Law | 209 |
| Section 12.19 | Specific Performance | 209 |
| Section 12.20 | Severability | 210 |
| Section 12.21 | No Duplication; No Double Recovery | 210 |
| Section 12.22 | Public Announcements. | 210 |
| Section 12.23 | Tax Treatment of Payments | 210 |

**Exhibits**

| Exhibit A | Internal Reorganization Steps Plan |
| Exhibit B | Form of DowDuPont Bylaws (Following MatCo Distribution) |
| Exhibit C | Industrial Real Property Transfer Provisions |

iv

## SEPARATION AND DISTRIBUTION AGREEMENT

SEPARATION AND DISTRIBUTION AGREEMENT (this "Agreement"), dated as of April 1, 2019, by and among DowDuPont Inc., a Delaware corporation ("DowDuPont" or "SpecCo"), Dow Inc., a Delaware corporation ("MatCo") and Corteva, Inc., a Delaware corporation ("AgCo"). Each of SpecCo, MatCo and AgCo is sometimes referred to herein as a "Party" and collectively, as the "Parties."

## W I T N E S S E T H :

**WHEREAS,** DowDuPont, acting through its direct and indirect Subsidiaries, currently conducts (i) the Agriculture Business (as defined herein), (ii) the Materials Science Business (as defined herein) and (iii) the Specialty Products Business (as defined herein);

**WHEREAS,** the Board of Directors of DowDuPont (the "Board") has determined that it is appropriate, desirable and in the best interests of DowDuPont and its stockholders to separate DowDuPont into three separate, publicly traded companies, one for each of (i) the Agriculture Business, which shall be owned and conducted, directly or indirectly, by AgCo, (ii) the Materials Science Business, which shall be owned and conducted, directly or indirectly, by MatCo and (iii) the Specialty Products Business, which shall be owned and conducted, directly or indirectly, by SpecCo;

**WHEREAS,** in order to effect such separation, the Board has determined that it is appropriate, desirable and in the best interests of DowDuPont and its stockholders (i) to enter into a series of transactions whereby (A) SpecCo and/or one or more members of the SpecCo Group will, collectively, own all of the Specialty Products Assets, assume (or retain) all of the Specialty Products Liabilities and, except as provided in any Ancillary Agreement, operate the Specialty Products Business, (B) MatCo and/or one or more members of the MatCo Group will, collectively, own all of the Materials Science Assets, assume (or retain) all of the Materials Science Liabilities and, except as provided in any Ancillary Agreement, operate the Materials Science Business and (C) AgCo and/or one or more members of the AgCo Group will, collectively, own all of the Agriculture Assets, assume (or retain) all of the Agriculture Liabilities and, except as provided in any Ancillary Agreement, operate the Agriculture Business and (ii) for DowDuPont to distribute to the holders of DowDuPont Common Stock by way of a pro rata dividend (in each case without consideration being paid by such stockholders) (A) all of the then issued and outstanding shares of common stock, par value $0.01 per share, of MatCo (the "MatCo Common Stock") and (B) all of the then issued and outstanding shares of common stock, par value $0.01 per share, of AgCo (the "AgCo Common Stock");

**WHEREAS,** in order to effect such separation, the Board has determined that it is appropriate, desirable and in the best interests of DowDuPont and its stockholders for DowDuPont to undertake the Internal Reorganization;

**WHEREAS,** it is the intention of the Parties that the MatCo Spin Contribution and the MatCo Distribution, taken together, will qualify as a transaction that is tax-free for U.S. federal income tax purposes under Section 355 and Section 368(a)(1)(D) of the Internal Revenue Code of 1986, as amended (the "Code");

1

**WHEREAS,** it is the intention of the Parties that the AgCo Spin Contribution and the AgCo Distribution, taken together, will qualify as a transaction that is tax-free for U.S. federal income tax purposes under Section 355 and Section 368(a)(1)(D) of the Code; and

**WHEREAS,** each of SpecCo, MatCo and AgCo has determined that it is necessary and desirable to agree to the principal corporate transactions required to effect the Internal Reorganization (to the extent not already effected prior to the date hereof) and each of the MatCo Distribution and the AgCo Distribution and to agree to other agreements that will govern certain other matters following the Effective Time.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual agreements, provisions and covenants contained in this Agreement, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 1.1 <u>General</u>. As used in this Agreement, the following terms shall have the following meanings:

(1) "<u>2018/2019 Internal Control Audit and Management Assessments</u>" shall have the meaning set forth in <u>Section 5.1(b)</u>.

(2) "<u>AAA</u>" shall have the meaning set forth in <u>Section 10.1(c)</u>.

(3) "<u>Acceptable Alternative Arrangement</u>" shall have the meaning set forth in <u>Section 2.2(d)(i)</u>.

(4) "<u>Action</u>" shall mean any demand, action, claim, cause of action, suit, countersuit, arbitration, inquiry, case, litigation, subpoena, proceeding or investigation (whether civil, criminal or administrative) by or before any court or grand jury, any Governmental Entity or any arbitration or mediation tribunal or authority.

(5) "<u>Affiliate</u>" shall mean, when used with respect to a specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person. For the purposes of this definition, "control" (including the terms "controlled by" and "under common control with"), when used with respect to any specified Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interests, by Contract or otherwise. It is expressly agreed that no Party or member of any Group shall be deemed to be an Affiliate of another Party or member of such other Party's Group solely by reason of having one or more directors in common or by reason of having been under common control of DowDuPont or DowDuPont's stockholders prior to, or in case of SpecCo's stockholders, after the Effective Time.

(6) "<u>AgCo</u>" shall have the meaning set forth in the preamble.

(7) "<u>AgCo Common Stock</u>" shall have the meaning set forth in the recitals hereto.

2

APP. 010

(8) "AgCo CSIs" shall have the meaning set forth in Section 2.10(d).

(9) "AgCo Designated Dow DDOB Deductible Amount" shall have the meaning set forth in Section 8.13(b)(i).

(10) "AgCo Distribution" shall mean the distribution on the AgCo Distribution Date to holders of shares of DowDuPont Common Stock as of the AgCo Distribution Record Date of the AgCo Common Stock on the basis of a to-be-determined number of shares of AgCo Common Stock (to be determined by the board of directors of DowDuPont prior to the AgCo Distribution) for every one (1) outstanding share of DowDuPont Common Stock.

(11) "AgCo Distribution Date" shall mean the date, as shall be determined by the Board, on which DowDuPont distributes all of the issued and outstanding shares of AgCo Common Stock to the holders of DowDuPont Common Stock.

(12) "AgCo Distribution Record Date" shall mean such date as may be determined by the Board as the record date for determining the holders of DowDuPont Common Stock entitled to receive AgCo Common Stock in the AgCo Distribution.

(13) "AgCo Group" shall mean AgCo and each Person (other than any member of the SpecCo Group or the MatCo Group) that is a direct or indirect Subsidiary of AgCo immediately after the Tower Realignment Time, and each Person that becomes a Subsidiary of AgCo after the Tower Realignment Time, which, for the avoidance of doubt, shall include those Persons identified as such on Schedule 1.1(13) (and shall not include the Persons on Schedule 1.1(180) or Schedule 1.1(288)).

(14) "AgCo Group DuPont Divested Business Liability Basket" shall have the meaning set forth in Section 8.13(a)(i).

(15) "AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities" shall mean (i) any and all DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the AgCo Group other than (w) Agriculture Related DuPont Discontinued and/or Divested Operations and Business Liabilities, (x) AgCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities, (y) Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liabilities and (z) SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities, including those set forth on Schedule 1.1(15) and, solely to the extent in excess of the amount set forth therefor on Schedule 1.1(18), those set forth on Schedule 1.1(18); provided, however, in the case of this clause (i), that from and after the time that both the SpecCo Hurdle (as defined in Section 8.13(a)(i)) and the AgCo Hurdle (as defined in Section 8.13(a)(ii)) have been met, "AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities" shall mean, with respect to additional DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the AgCo Group or SpecCo Group, the Agriculture Shared Historical DuPont Percentage of any and all DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the AgCo Group or SpecCo Group other than (W) Agriculture Related DuPont Discontinued and/or Divested Operations and Business Liabilities, (X) AgCo Group Specified DuPont Discontinued

3

and/or Divested Operations and Business Liabilities, (Y) Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liabilities and (Z) SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities and (ii) the Agriculture Shared Historical DuPont Percentage of any and all DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the MatCo Group other than (w) Agriculture Related DuPont Discontinued and/or Divested Operations and Business Liabilities, (x) AgCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities, (y) Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liabilities and (z) SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities.

(16) "AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement" shall have the meaning set forth in Section 7.1(f).

(17) "AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement Objection Notice" shall have the meaning set forth in Section 7.1(f).

(18) "AgCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities" shall mean any and all DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the AgCo Group set forth on Schedule 1.1(18), but, in each case, solely to the extent of the amount therefor set forth on Schedule 1.1(18).

(19) "AgCo Hurdle" shall have the meaning set forth in Section 8.13(a)(ii)

(20) "AgCo Indemnitees" shall mean each member of the AgCo Group and each of their Affiliates from and after the Effective Time and each member of the AgCo Group's and their respective current, former and future Affiliates' respective directors, officers, employees and agents and each of the heirs, executors, successors and assigns of any of the foregoing.

(21) "AgCo Information Statement" shall mean the Information Statement attached as an exhibit to the Agriculture Form 10 sent to the holders of shares of DowDuPont Common Stock in connection with the AgCo Distribution, including any amendment or supplement thereto.

(22) "AgCo Knowledge Group" shall mean the individuals specified on Schedule 1.1(22).

(23) "AgCo Liability Policies" shall have the meaning set forth in Section 11.2(b).

(24) "AgCo Representative" shall have the meaning set forth in Section 6.4(a).

(25) "AgCo Spin Contribution" means any contribution to AgCo by DowDuPont in connection with, or in anticipation of, the AgCo Distribution.

(26) "Agent" shall mean Computershare Trust Company, N.A.

4

(38) "<u>Agriculture Liabilities</u>" shall mean any and all Liabilities of (x) any member of the MatCo Group at the applicable Relevant Time, (y) any member of the AgCo Group at the applicable Relevant Time and/or (z) any member of the SpecCo Group at the applicable Relevant Time, in the following categories, in each case, regardless of (i) when or where such Liabilities arose or arise, (ii) where or against whom such Liabilities are asserted or determined, (iii) regardless of whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of Law, fraud or misrepresentation by any member of the AgCo Group, MatCo Group or SpecCo Group, as the case may be, or any of their past or present respective directors, officers, employees, agents, Subsidiaries or Affiliates and (iv) which entity is named in any Action associated with any Liability (except for Liabilities related to Taxes which are governed exclusively by the Tax Matters Agreement, and Liabilities (other than those to the extent related to, resulting from or arising out of Discontinued and/or Divested Operations and Businesses (except for Liabilities allocated pursuant to Section 1.10(a)-(c) of the Employee Matters Agreement and Section 2.07 of the Employee Matters Agreement)) allocated pursuant to the Employee Matters Agreement, which are governed exclusively thereby):

(i) any and all Liabilities that are expressly assumed by or allocated to the AgCo Group pursuant to this Agreement, including any obligations and Liabilities of any member of the AgCo Group under this Agreement, including those pursuant to <u>Section 12.5</u> hereof;

(ii) any and all Liabilities (including under applicable federal and state securities Laws) relating to, arising out of or resulting from the Distribution Disclosure Documents, including the Agriculture Form 10, in each case relating to, arising out of or resulting from occurrences prior to, the AgCo Distribution, but excluding any statements or omissions made or incorporated by reference in the Distribution Disclosure Documents based on information supplied by Historical Dow;

(iii) any and all Liabilities arising out of Inventor Remuneration to the extent related to (i) the Intellectual Property constituting an Agriculture Asset (other than any discrete and reasonably identifiable part thereof solely attributable to the use or sublicense of such Intellectual Property by members of the MatCo Group or SpecCo Group as Licensees (as such term is defined in the Intellectual Property Cross-License Agreements) under the Intellectual Property Cross-License Agreements), or (ii) the discrete and reasonably identifiable part thereof solely attributable to the use or sublicense of Intellectual Property constituting a Materials Science Asset or a Specialty Products Asset by a member of the AgCo Group as Licensees (as such term is defined in the Intellectual Property Cross-License Agreements) under the Intellectual Property Cross-License Agreements;

(iv) the Agriculture Shared Historical DuPont Percentage of Liabilities relating to, arising out of or resulting from any statements or omissions made or incorporated by reference in the Distribution Disclosure Documents and relating to, arising out of or resulting from occurrences prior to, the MatCo Distribution based on information supplied by Historical DuPont;

14

(v) the Agriculture Shared Historical DuPont Percentage of any and all costs, fees and expenses, including legal fees and costs, in connection with (A) the Transfer of Materials Science Assets of Historical DuPont (but only for Transfers prior to the Tower Realignment Time or pursuant to Sections 2.5 and 2.6) and/or (B) the Transfer of Agriculture Assets or Specialty Products Assets of Historical DuPont (but only for Transfers prior to the AgCo Distribution or pursuant to Sections 2.5 and 2.6);

(vi) the Applicable Agriculture Percentage of any Specified DowDuPont Shared Liability;

(vii) any of the Liabilities set forth on Schedule 1.1(38)(vii);

(viii) the Agriculture Shared Historical DuPont Percentage of any Materials Science Known Undisclosed Liabilities (other than those described in any Corporate Risk Management Document of DuPont) in excess of $125,000,000 in the aggregate, and the Agriculture Shared Historical DuPont Percentage of any Materials Science Known Undisclosed Liabilities described in any Corporate Risk Management Document of DuPont;

(ix) (a) any and all Agriculture DuPont Discontinued and/or Divested Operations and Business Liabilities that constitute Environmental Liabilities, (b) Environmental Liabilities set forth on Schedule 1.1(38)(ix)(b), (c) any and all Off-Site Environmental Liabilities of Historical DuPont (that do not constitute Agriculture DuPont Discontinued and/or Divested Operations and Business Liabilities of Historical DuPont) that are Related to the Agriculture Business, including those set forth on Schedule 1.1(38)(ix)(c), (d) the Agriculture Shared Historical DuPont Percentage of any and all Off-Site Environmental Liabilities of Historical DuPont (that do not constitute Agriculture DuPont Discontinued and/or Divested Operations and Business Liabilities of Historical DuPont) that are (I) Related to the Materials Science Business, including those set forth on Schedule 1.1(38)(ix)(d)(I) or (II) not related to any Business (other than in a de minimis respect), including those set forth on Schedule 1.1(38)(ix)(d)(II), (e) any and all Environmental Liabilities of Historical DuPont to the extent related to or arising out of occurrences prior to the Relevant Time that do not constitute Off-Site Environmental Liabilities or DuPont Discontinued and/or Divested Operations and Business Liabilities which are not related to any Business (other than in a de minimis respect) to the extent arising out of or related to any Agriculture Real Property, Agriculture Specified Owned Real Property or Agriculture Specified Leased Real Property owned by Historical DuPont prior to the AgCo Distribution Date and (f) the Agriculture Shared Historical DuPont Percentage of any and all Environmental Liabilities of Historical DuPont to the extent arising out of or related to occurrences prior to the Relevant Time that do not constitute Off-Site Environmental Liabilities or DuPont Discontinued and/or Divested Operations and Business Liabilities which are not related to any Business (other than in a de minimis respect) to the extent arising out of or related to any Materials Science Real Property, Materials Science Specified Owned Real Property or Materials Science Specified Leased Real Property owned by Historical DuPont prior to the Tower Realignment Time; provided, in each case (clauses (a)-(f)), that they shall be subject to Section 8.11;

15

(x) any and all Agriculture DuPont Discontinued and/or Divested Operations and Business Liabilities which do not constitute Environmental Liabilities;

(xi) any and all Liabilities (other than Materials Science Trade Payables and Historical DuPont Trade Payables) primarily related to, arising out of or resulting from the Specified Agriculture DuPont Corporate Contracts;

(xii) any and all Liabilities for Indebtedness of the type described in clauses (i), (iv) and (vii) (but in case of clause (vii) solely with respect to clauses (i) and (iv)) of the definition of Indebtedness of Historical DuPont that was incurred by any member of the AgCo Group (and any such Indebtedness guaranteed by any member of Historical DuPont that is a member of the AgCo Group), including those set forth on <u>Schedule 1.1(38)</u> <u>(xii)</u>;

(xiii) the Agriculture Shared Historical DuPont Percentage of any and all Indebtedness of the type described in clauses (i), (iv) and (vii) (but in case of clause (vii) solely with respect to clauses (i) and (iv)) of the definition of Indebtedness of Historical DuPont that was incurred by any member of the MatCo Group prior to the time such entity became a Subsidiary of MatCo (and any such Indebtedness guaranteed by any member of Historical DuPont that is a member of the MatCo Group), but is not set forth on <u>Schedule 1.1(198)(xiii)</u>, if any (clauses (i)-(xiii) of this <u>Section 1.1(38)</u>, the "<u>Specified Agriculture Liabilities</u>");

(xiv) unless constituting a Specified Materials Science Liability or a Specified Specialty Products Liability,

(a) (i) any and all checks issued but not drawn and accounts payable to the extent related (other than in de minimis respects) to the Agriculture Business (<u>provided</u>, <u>however</u>, that any such accounts payable represented by an invoice of less than $1,000,000 shall not constitute Agriculture Liabilities pursuant to this clause (a) if the aggregate amount of accounts payable represented by such invoice is Related to the Materials Science Business or the Specialty Products Business), and (ii) all accounts payable represented by an invoice of less than $1,000,000 if the aggregate amount of accounts payable represented by such invoice is Related to the Agriculture Business (except for any such accounts payable represented by such invoice that are not related to any Business in more than a de minimis respect); and

(b) the Agriculture Shared Historical DuPont Percentage of the Liabilities of Historical DuPont for any and all checks issued but not drawn and accounts payable of Historical DuPont (including such Liabilities of any member of the MatCo Group which was a part of Historical DuPont as of immediately prior to the Tower Realignment Time), which are not related to any Business (other than in a de minimis respect) (the "<u>Historical DuPont Trade Payables</u>");

16

(xv) unless constituting a Specified Materials Science Liability or a Specified Specialty Products Liability, the Agriculture Shared Historical DuPont Percentage of any and all Liabilities to the extent relating to, arising out of or resulting from a general corporate matter of Historical DuPont or any of its Subsidiaries (which Subsidiaries were Subsidiaries of Historical DuPont immediately prior to the Tower Realignment Time, but only while such Subsidiaries were Subsidiaries of Historical DuPont) incurred on or prior to the AgCo Distribution, including any Liabilities (including under applicable federal and state securities Laws) to the extent relating to, arising out of or resulting from:

(a) claims made by or on behalf of holders of any of Historical DuPont's securities (including debt securities), in their capacities as such;

(b) any form, report, statement, certifications or other document (including all exhibits, amendments and supplements thereto) (other than a Distribution Disclosure Document) filed by DuPont or any of its Subsidiaries with the Commission on or prior to the AgCo Distribution, including the financial statements included therein (other than for Liabilities related to any such forms, reports, statements, certifications or other documents, in each case filed in connection with the Internal Reorganization, specifically relating to the Agriculture Business, the Materials Science Business or the Specialty Products Business, as the case may be);

(c) the maintenance of Historical DuPont's books and records, Historical DuPont's corporate compliance and other corporate-level actions and oversight of Historical DuPont; and

(d) (x) indemnification obligations to any current or former director or officer of Historical DuPont in their capacity as such in respect of occurrences prior to the AgCo Distribution Date or (y) any claims for breach of fiduciary duties brought against any current or former directors or officers of Historical DuPont, in their capacities as such, in respect of occurrences prior to the AgCo Distribution Date, in each case, relating to any acts, omissions or events on or prior to the Final Separation Date;

(xvi) any and all Liabilities Related to the Agriculture Business, including in the following categories and including those set forth on Schedule 1.1(38)(xvi), but in each case, excluding the Specified Materials Science Liabilities, the Specified Specialty Products Liabilities, the Liabilities described in clauses (xiv) and (xv) of each of the definitions of Agriculture Liabilities and Materials Science Liabilities and the Liabilities described in clauses (xiii) and (xiv) of the definition of Specialty Products Liabilities:

(a) any and all Liabilities arising out of or resulting from any Action Related to the Agriculture Business, including such Actions listed on Schedule 1.1(38)(xvi)(a);

17

(b) any and all Liabilities arising under any of the Agriculture Contracts (except in the case of a Contract constituting an Agriculture Contract because it is exclusively related to an Agriculture Asset, any such Liabilities Related to the Materials Science Business or Specialty Products Business); and

(c) any Environmental Liability that is Related to the Agriculture Business, including those set forth on Schedule 1.1(38)(xvi)(c); provided, that any such Environmental Liability shall be subject to Section 8.11.

In the event of any inconsistency or conflict which may arise in the application or interpretation of any of the foregoing provisions and the provisions of the definition of Materials Science Liabilities and Specialty Products Liabilities, such inconsistency shall be resolved using the following order of precedence: (i) any Specified Agriculture Liability listed on Schedules 1.1(15), 1.1(18), 1.1(38)(vii), 1.1(38)(ix)(b) and (c), 1.1(38)(xii) and 1.1(39) constitutes an Agriculture Liability (in the case of Schedules 1.1(15) and 1.1(18), subject to the proviso in Section 1.1(15)), (ii) the Agriculture Shared Historical DuPont Percentage of any Specified Specialty Products Liability listed on Schedules 1.1(38)(ix)(d)(I) and (II) constitutes an Agriculture Liability and (iii) any Liability listed on Schedules 1.1(38)(xvi), 1.1(38)(xvi)(a) and 1.1(38)(xvi)(c) shall give rise to a rebuttable presumption in favor of MatCo and SpecCo that such Liability Relates to the Agriculture Business and/or the Agriculture Assets. In addition, the allocation set forth in clauses (ix) and (xvi)(c) is not intended to affect or impact the share of any such Environmental Liability attributable to third parties.

(39) "Agriculture Related DuPont Discontinued and/or Divested Operations and Business Liabilities" shall mean any and all DuPont Discontinued and/or Divested Operations and Business Liabilities that are primarily related to the conduct prior to the Measurement Date of the Agriculture Business of Historical DuPont (for purposes of measuring such relationship only, viewing the Agriculture Business as it was conducted on or after January 1, 2015 but prior to the Measurement Date), including those set forth on Schedule 1.1(39).

(40) "Agriculture Shared Contracts" shall mean (i) any and all Shared Contracts that are primarily related to the Agriculture Business including those set forth on Schedule 1.1(40), but excluding any Specified Agriculture DuPont Corporate Contract, any Specified Specialty Products DuPont Corporate Contract or any Dow Corporate Contract and (ii) prior to the AgCo Distribution Date, any and all Contracts (and any amendments, extensions or replacements thereof) entered into by a member of the AgCo Group while such member was a subsidiary of Historical DuPont that are not related in any respect (other than in a de minimis respect) to any Business ("AgCo Group DuPont Corporate Contracts"), but excluding any Specified Agriculture DuPont Corporate Contract, any Specified Specialty Products DuPont Corporate Contract or any Dow Corporate Contract; provided, however, such AgCo Group DuPont Corporate Contract shall not be deemed to inure to the benefit or burden of the MatCo Group, except for such AgCo Group DuPont Corporate Contracts set forth on Schedule 1.1(40)(iii).

(41) "Agriculture Shared Historical DuPont Percentage" shall mean twenty nine percent (29%).

18

specifically set forth herein or in the Tax Matters Agreement or the Employee Matters Agreement, the rights and obligations of the Parties with respect to (a) Taxes shall be governed by the Tax Matters Agreement and (b) any assets of the nature described in the preceding sentence of this definition that are allocated pursuant to the Employee Matters Agreement shall be governed by the Employee Matters Agreement, and, therefore, Taxes (including any Tax items, attributes or rights to receive any Tax Refunds (as defined in the Tax Matters Agreement)) and such assets shall not be treated as Assets.

(50) "Assume" shall have the meaning set forth in Section 2.2(c).

(51) "Audited Party" shall have the meaning set forth in Section 5.1(c).

(52) "Board" shall have the meaning set forth in the recitals hereto.

(53) "Business" shall mean (i) with respect to AgCo, the Agriculture Business, (ii) with respect to MatCo, the Materials Science Business or (iii) with respect to SpecCo, the Specialty Products Business.

(54) "Business Day" shall mean any day that is not a Saturday, a Sunday or any other day on which banks are required or authorized by Law to be closed in The City of New York.

(55) "Business Entity" shall mean any corporation, partnership, limited liability company, joint venture or other entity which may legally hold title to Assets.

(56) "Cap" shall have the meaning set forth in Section 6.2(j).

(57) "Cash and Cash Equivalents" shall mean (i) cash and (ii) checks, certificates of deposit having a maturity of less than one year, money orders, marketable securities, money market funds, commercial paper, short-term instruments, funds in time and demand deposits or similar accounts, and any evidence of indebtedness issued or guaranteed by any Governmental Entity, minus the amount of any outbound checks, plus the amount of any deposits in transit.

(58) "Change of Control" shall mean, as applicable, the occurrence after the MatCo Distribution of any of the following: (A) the sale, conveyance, transfer or other disposition (however accomplished), in one or a series of related transactions, of all or substantially all of the assets of such party's Group to a third Person that is not an Affiliate of such party prior to such transaction or the first of such related transactions; (B) the consolidation, merger or other business combination of such party with or into any other entity, immediately following which the stockholders of such party immediately prior to such transaction fail to own in the aggregate at least a majority of the voting power in the election of directors of all the outstanding voting securities of the surviving party in such consolidation, merger or business combination or of its ultimate publicly traded parent entity; (C) a transaction or series of transactions in which any Person or "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) acquires at least thirty-five percent (35%) of the outstanding voting securities of such party and effective control of such party (other than (I) a reincorporation, holding company merger or similar corporate transaction in which each of such party's stockholders owns, immediately thereafter, interests in the new parent company in substantially the same percentage as such stockholder owned in such party immediately prior to such transaction, or (II) in connection with

20

(76) "Credit Support Instruments" shall mean any letters of credit, performance bonds, surety bonds, bankers acceptances, or other similar arrangements.

(77) "Damages" shall mean any loss, damage, injury, claim, demand, settlement, judgment, award, fine, penalty, Tax, fee (including reasonable out of pocket attorneys' or advisors' fees), charge, cost (including reasonable costs of investigation) or expense of any nature, including any incidental, indirect, special, exemplary, punitive or consequential damages (including lost revenues or profits), and including amounts paid or payable to third parties in respect of any third-party claim for which indemnification hereunder is otherwise required.

(78) "De Minimis Amount" shall have the meaning set forth in Section 8.13(c)(i).

(79) "De Minimis Threshold" shall have the meaning set forth in Section 8.13(a)(iii).

(80) "Decision on Interim Relief" shall have the meaning set forth in Section 10.1(c)(viii).

(81) "Designated Ancillary Agreements" shall mean the Employee Matters Agreement, the Intellectual Property Cross-License Agreements, the Transitional House Marks Trademark License Agreements, the Products Marks Trademark License Agreements, the Regulatory Transfer and Support Agreements and the Regulatory Cross License Agreements.

(82) "Designated DDOB De Minimis Threshold" shall have the meaning set forth in Section 8.13(b)(i).

(83) "Designated Dow DDOB Liabilities" shall mean any Dow Discontinued and/or Divested Operations and Business Liabilities (other than Off-Site Environmental Liabilities) which arise out of or relate to the abandonment, closure, discontinuation or other cessation (other than from a sale, transfer or other conveyance) at any time prior to Measurement Date; provided, however, that any Dow Discontinued and/or Divested Operations and Business Liabilities set forth on Schedule 1.1(97) or otherwise constituting Materials Science Liabilities pursuant to any clause of the definition of "Materials Science Liability" (other than Section 1.1(198)(x)(a) or Section 1.1(198)(xi)) shall not constitute a Designated Dow DDOB Liability.

(84) "Designated DuPont DDOB Liabilities" shall mean any DuPont Discontinued and/or Divested Operations and Business Liabilities (other than Off-Site Environmental Liabilities) which arise out of or relate to the abandonment, closure, discontinuation or other cessation (other than from a sale, transfer or other conveyance) at any time prior to Measurement Date; provided, however, that any DuPont Discontinued and/or Divested Operations and Business Liabilities set forth on Schedules 1.1(15), 1.1(18), 1.1(39), 1.1(291), 1.1(293) and 1.1(310) or otherwise constituting Agriculture Liabilities pursuant to any clause of the definition of "Agriculture Liability" (other than Section 1.1(38)(ix)(a) or Section 1.1(38)(x)) or Specialty Products Liabilities pursuant to any clause of the definition of "Specialty Products Liability" (other than Section 1.1(309)(viii)(a) or Section 1.1(309)(ix)) shall not constitute a Designated DuPont DDOB Liability.

(85) "Designated Managing Party" shall have the meaning set forth in Section 6.2(c).

23

(86) "<u>Discontinued and/or Divested Operations and Businesses</u>" shall mean any (1)(v) company, (w) business, (x) business unit, (y) product line or (z) business operation operated or conducted, and (2) any site or plant (and in each case (clauses (1)(v) through (z) and (2)) any portion thereof) that was owned, leased, occupied or otherwise used by (or on behalf of) any member of any Group (or any predecessor thereto) or any former Subsidiary thereof (or for which any member of any Group has become liable other than to the extent related to the conduct of the Agriculture Business, Specialty Products Business and Materials Science Business) at any time prior to September 1, 2017 (but, in the case of clauses (i)(B) and (i)(C) in the definition of the Specialty Products Business, but not for the Dow Electronic Materials portion thereof, June 30, 2018) (such date, as applicable, the "<u>Measurement Date</u>") and that was not owned, operated or conducted or, with respect to plants and sites, used by (or on behalf of) a member of a Group in the active conduct of the Agriculture Business, Specialty Products Business or Materials Science Business as of the Measurement Date, in each case, whether as a result of sale, transfer, conveyance or other disposition or abandonment, closure, discontinuation or other cessation (other than (i) any temporary cessation or closure set forth on <u>Schedule 1.1(86)</u> and any temporary cessation or closure of a site (or any portion thereof) that has been resolved by the placement of such site or portion thereof back into active use by the Group to which such Asset has been allocated pursuant to this Agreement (but in the case of Assets subject to an Intergroup Lease, by the Lessee Party) prior to the MatCo Distribution (as evidenced in writing prior to the MatCo Distribution) (or that was, prior to the Measurement Date, the subject of (1) a definitive agreement to be sold, transferred or otherwise conveyed to a third party that was subsequently consummated, or (2) an order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity of competent jurisdiction requiring a sale, transfer or other conveyance to a third party) of any (1) (v) company, (w) business, (x) business unit, (y) product line or (z) business operation operated or conducted and (2) any site or plant (and in each case (clauses (1)(v) through (z) and (2)) any portion thereof) and (ii) any Discontinued Closely Linked Product).

(87) "<u>Discontinued Buildings and Related Improvements</u>" shall have the meaning set forth in <u>Section 8.12(a)</u>.

(88) "<u>Discontinued Closely Linked Product</u>" shall mean any product that (i) was sold, manufactured or otherwise commercialized by (or on behalf of) any member of any Group (or any predecessor thereto) or any former Subsidiary thereof (or for which any member of any Group has become liable other than to the extent related to the conduct of the Agriculture Business, Specialty Products Business and Materials Science Business) at any time prior to the Measurement Date, (ii) was not sold, manufactured or otherwise commercialized by (or on behalf of) a member of a Group in the conduct of the Agriculture Business, Specialty Products Business or Materials Science Business as of the Measurement Date as a result of any abandonment, closure, discontinuation or other cessation (other than (x) from a sale, transfer, conveyance or other disposition and (y) any temporary cessation or closure set forth on <u>Schedule 1.1(86)</u>) of such product, and (iii) with respect to which another product was sold, manufactured or otherwise commercialized in the conduct of the Agriculture Business, Specialty Products Business or Materials Science Business as of the Measurement Date that (as of the Measurement Date) was (A) identical in composition (other than immaterial differences), (B) sold in substantially similar end markets for substantially similar uses, (C) had the equivalent impact on the environment, health and safety (other than immaterial differences) and (D) had the equivalent

24

(99) "DowDuPont" shall have the meaning set forth in the preamble.

(100) "DowDuPont Common Stock" shall mean the issued and outstanding shares of common stock, par value $0.01 per share, of DowDuPont.

(101) "DuPont" shall mean E. I. du Pont de Nemours and Company, a Delaware corporation.

(102) "DuPont Discontinued and/or Divested Operations and Business Liabilities" shall mean any and all Liabilities to the extent arising out of or related to any Discontinued and/or Divested Operations and Businesses of any member (at any point in time) of Historical DuPont (or any of their respective predecessors), including those set forth on Schedules 1.1(15), 1.1(18), 1.1(39), 1.1(291), 1.1(293) and 1.1(310).

(103) "Effective Time" shall mean 12:00 a.m., New York City Time on April 1, 2019.

(104) "Emergency Arbitrator" shall mean an emergency arbitrator appointed by the AAA in accordance with the AAA Rules, as specified in Section 10.1.

(105) "Employee Matters Agreement" shall mean the Employee Matters Agreement effective as of April 1, 2019, by and among SpecCo, MatCo and AgCo.

(106) "Employee Records" shall have the meaning set forth in Section 1.15 of the Employee Matters Agreement.

(107) "Engineering Models and Databases" shall mean (a) physical property databases, (b) empirical or mathematical dynamic or steady state models of processes, equipment and/or reactions and databases containing data resulting from such models, (c) computations of equipment or unit operation operating conditions including predictive or operational behavior and (d) databases with historical operational data.

(108) "Environmental Laws" shall mean all Laws relating to pollution or protection of the environment or, as such relates to exposure to Hazardous Substances, to human health or safety, including Laws relating to the exposure to, or Release, threatened Release or the presence of Hazardous Substances, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, transport or handling of Hazardous Substances and all Laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Substances, and all Laws relating to endangered or threatened species of fish, wildlife and plants and damage to and the protection of natural resources.

(109) "Environmental Liabilities" shall mean any Liabilities, arising out of or resulting from any Environmental Law, Contract or agreement relating to the environment, Hazardous Substances or human exposure to Hazardous Substances, including (a) fines, penalties, judgments, awards, settlements, claims, demands, complaints, Damages, losses, costs or expenses, including fees and expenses of counsel, whether or not arising out of, relating to or in

26

(144) "Indemnifiable Loss" and "Indemnifiable Losses" shall mean any and all Damages, losses, deficiencies, Liabilities, obligations, penalties, judgments, settlements, claims, payments, fines, interest, costs and expenses (including the costs and expenses of any and all Actions and demands, assessments, judgments, settlements and compromises relating thereto and the reasonable costs and expenses of attorneys', accountants', consultants' and other professionals' fees and expenses incurred in the investigation or defense thereof or the enforcement of rights hereunder).

(145) "Indemnification Notice" shall mean any notice delivered to the Indemnifying Party by the Indemnitee pursuant to Section 8.5(a) or Section 8.6.

(146) "Indemnifying Party" shall have the meaning set forth in Section 8.5(a).

(147) "Indemnitee" shall have the meaning set forth in Section 8.5(a).

(148) "Indemnity Payment" shall have the meaning set forth in Section 8.9(a).

(149) "Industrial Purpose" shall mean any of the following purposes: (a) manufacturing or fabrication of any nature (whether or not with respect to chemicals), (b) distribution, sale or use of chemicals or chemical products, (c) treatment, storage or disposal of hazardous waste or industrial waste or wastewater, (d) production, refining or sale of petroleum or its products (or any component of such activities), (e) servicing, refueling or maintenance of motorized vehicles (or any component of such activities), or (f) research in respect of any of the activities described in the foregoing clauses (a) through (e); provided, however, that, for the avoidance of doubt, any of the following purposes shall not be considered an Industrial Purpose: (i) office use (including use of custodial chemicals or office or consumer chemicals in a manner consistent with normal office activities), or (ii) agricultural use (including any use of chemicals or fuels in a manner consistent with normal agricultural activities, but excluding agricultural research involving experimental products).

(150) "Industrial Real Property Restrictions" shall have the meaning set forth in Section 2.7(b).

(151) "Information" shall mean information, content, and data in written, oral, electronic, computerized, digital or other tangible or intangible media, including (i) books and records, whether accounting, legal or otherwise; ledgers, studies, reports, surveys, designs, specifications, drawings, blueprints, diagrams, models, prototypes, samples and flow charts; marketing plans, customer names and information (including prospects); technical information, including such information relating to the design, operation, maintenance, testing, test results, development, and manufacture of any Party's or its Group's product or facilities (including product or facility specifications and documentation; engineering, design, and manufacturing drawings, diagrams, layouts, maps and illustrations; formulations and material specifications; laboratory studies and benchmark tests; quality assurance policies procedures and specifications; maintenance and inspection procedures and records; evaluation and/validation studies; process control and/or shop-floor control strategy, logic or algorithms; assembly code, Software, firmware, programming data, databases, and all information referred to in the same); product costs, margins and pricing; product marketing studies and strategies; product stewardship and

30

(157) "Intergroup Leases" shall mean the Ground Leases and the Space Leases.

(158) "Interim Relief" shall have the meaning set forth in Section 10.1(c)(viii)

(159) "Internal Reorganization" shall mean the allocation and transfer or assignment of Assets and Liabilities, including by means of the Conveyancing and Assumption Instruments, resulting in (i) the AgCo Group owning and operating the Agriculture Business and Agriculture Assets and assuming the Agriculture Liabilities, (ii) the MatCo Group owning and operating the Materials Science Business and Materials Science Assets and assuming the Materials Science Liabilities and (iii) the SpecCo Group owning and operating the Specialty Products Business and the Specialty Products Assets and assuming the Specialty Products Liabilities, in each case, clauses (i)–(iii), as described in the Steps Plan.

(160) "Inventor Remuneration" means any employee inventor consideration, remuneration or compensation that is required under applicable law for work-for-hire inventions acquired by the employer. Examples may include employee inventions arising in Germany, France, China, Japan, and Korea.

(161) "IT Assets" shall mean all (i) Software (including any Copyrights therein), computer systems, public Internet protocol address blocks, telecommunications equipment and other information technology infrastructure (including servers and server equipment, computers (including laptop computers), computer equipment and hardware, printers, telephones (including cell phones and smartphones) and telephone equipment (including headsets), network devices and equipment (including routers, wireless access points, switches and hubs), fiber and backbone cabling and other telecommunications wiring, demarcation points and rooms, computer rooms and telecommunications closets), (ii) documentation, reference, resource and training materials to the extent relating thereto, and (iii) Contracts to the extent relating to any of the foregoing clauses (i) and (ii) (including Software license agreements, source code escrow agreements, support and maintenance agreements, electronic database access contracts, domain name registration agreements, public Internet protocol address block agreements, website hosting agreements, Software or website development agreements, outsourcing agreements, service provider agreements, interconnection agreements and telecommunications agreements); provided, that, notwithstanding the foregoing, IT Assets shall exclude Know-How contained or stored in any of the items described in the foregoing subsections (i) through (iii) and Patents that claim any such Know-How.

(162) "Joint SpecCo/AgCo Representative" shall have the meaning set forth in Section 6.4(a).

(163) "Law" shall mean any U.S. or non-U.S. federal, national, supranational, state, provincial, local or similar statute, constitution, law, ordinance, regulation, rule, code, income tax treaty, order, requirement or rule of law (including common law) or other binding directives promulgated, issued, entered into or taken by any Governmental Entity.

(164) "Liabilities" shall mean any and all Indebtedness, liabilities, costs, expenses, interest and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, reserved or unreserved, or determined or

32

determinable, including those arising under any Law (including Environmental Law), Action, whether asserted or unasserted, or order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity and those arising under any Contract or any fines, Damages or equitable relief which may be imposed and including all costs and expenses related thereto. Except as otherwise specifically set forth herein or in the Tax Matters Agreement or Employee Matters Agreement, the rights and obligations of the Parties with respect to Taxes and with respect to liabilities of the nature described in the preceding sentence of this definition that are allocated pursuant to the Employee Matters Agreement (for the avoidance of doubt, the Employee Matters Agreement does not allocate any Liabilities arising out of, related to, or resulting from any Discontinued and/or Divested Business or Operation (except for Liabilities allocated pursuant to Section 1.10(a)-(c) of the Employee Matters Agreement and Section 2.07 of the Employee Matters Agreement)) ("Employee Related Liabilities") shall be governed by the Tax Matters Agreement and Employee Matters Agreement, respectively, and, therefore, Taxes and Employee Related Liabilities shall not be treated as Liabilities governed by this Agreement other than for purposes of indemnification related to the Distribution Disclosure Documents.

(165) "Liable Party" shall have the meaning set forth in Section 2.9(b).

(166) "Litigation Hold" shall have the meaning set forth in Section 9.1(b).

(167) "Managing Party" shall have the meaning set forth in Section 6.2(a) and Section 7.1(a).

(168) "Managing Party Claimant" shall have the meaning set forth in Section 6.2(c).

(169) "Managing Party Determination Notice" shall have the meaning set forth in Section 7.2(c)(i).

(170) "Managing Party First Discussion" shall have the meaning set forth in Section 6.2(c).

(171) "Managing Party Negotiation Period" shall have the meaning set forth in Section 7.2(c)(i).

(172) "Managing Party Notice" shall have the meaning set forth in Section 6.2(c).

(173) "Manufacturing Product Agreements" shall mean the Manufacturing Product Agreements set forth on Schedule 1.1(173).

(174) "MatCo" shall have the meaning set forth in the preamble.

(175) "MatCo Common Stock" shall have the meaning set forth in the recitals hereto.

(176) "MatCo CSIs" shall have the meaning set forth in Section 2.10(d).

(177) "MatCo Distribution" shall mean the distribution on the MatCo Distribution Date to holders of shares of DowDuPont Common Stock as of the MatCo Distribution Record Date of the MatCo Common Stock on the basis of one (1) share of MatCo Common Stock for every three (3) outstanding shares of DowDuPont Common Stock.

33

Undisclosed Liability pursuant to clauses (ii)(a)(y) or (ii)(b) – (ii)(d) of this definition and whether such Liability does not constitute a Materials Science Known Undisclosed Liability pursuant to clauses (A)-(C) of the proviso to this definition shall be determined based on the MatCo Unaccrued Portion and the facts and circumstances underlying the MatCo Unaccrued Portion.

(198) "Materials Science Liabilities" shall mean any and all Liabilities of (x) any member of the MatCo Group at the time of the MatCo Distribution, (y) any member of the AgCo Group at the time of the MatCo Distribution and/or (z) any member of the SpecCo Group at the time of the MatCo Distribution, in the following categories, in each case, regardless of (i) when or where such Liabilities arose or arise, (ii) where or against whom such Liabilities are asserted or determined, (iii) regardless of whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of Law, fraud or misrepresentation by any member of the AgCo Group, MatCo Group or SpecCo Group, as the case may be, or any of their past or present respective directors, officers, employees, agents, Subsidiaries or Affiliates and (iv) which entity is named in any Action associated with any Liability (except for Liabilities related to Taxes which are governed exclusively by the Tax Matters Agreement, and Liabilities (other than those to the extent related to, resulting from or arising out of Discontinued and/or Divested Operations and Businesses (except for Liabilities allocated pursuant to Section 1.10(a)-(c) of the Employee Matters Agreement and Section 2.07 of the Employee Matters Agreement)) allocated pursuant to the Employee Matters Agreement, which are governed exclusively thereby):

(i) any and all Liabilities that are expressly assumed by or allocated to the MatCo Group pursuant to this Agreement, including any obligations and Liabilities of any member of the MatCo Group under this Agreement, including those pursuant to Section 12.5 hereof;

(ii) any and all Liabilities (including under applicable federal and state securities Laws) relating to, arising out of or resulting from the Distribution Disclosure Documents, including the Materials Science Form 10, in each case relating to, arising out of or resulting from occurrences prior to the MatCo Distribution, but excluding any statements or omissions made or incorporated by reference in the Distribution Disclosure Documents based on information supplied by Historical DuPont;

(iii) any and all Liabilities arising out of Inventor Remuneration to the extent related to (i) the Intellectual Property constituting a Materials Science Asset (other than any discrete and reasonably identifiable part thereof solely attributable to the use or sublicense of such Intellectual Property by members of the AgCo Group or SpecCo Group as Licensees (as such term is defined in the Intellectual Property Cross-License Agreements) under the Intellectual Property Cross-License Agreements), or (ii) the discrete and reasonably identifiable part thereof solely attributable to the use or sublicense of Intellectual Property constituting an Agriculture Asset or a Specialty Products Asset by a member of the MatCo Group as Licensees (as such term is defined in the Intellectual Property Cross-License Agreements) under the Intellectual Property Cross-License Agreements;

43

(iv) any and all Liabilities relating to, arising out of or resulting from any statements or omissions made or incorporated by reference in the Distribution Disclosure Documents and relating to, arising out of or resulting from occurrences prior to, the AgCo Distribution based on information supplied by Historical Dow (but with respect to any member of Historical Dow that is a member of the AgCo Group or the SpecCo Group, only in respect of information supplied prior to the MatCo Distribution Date);

(v) any and all costs, fees and expenses, including legal fees and costs, incurred in connection with (A) the Transfer of Agriculture Assets of Historical Dow to AgCo or another member of the AgCo Group by Historical Dow (but only for Transfers prior to the Tower Realignment Time or pursuant to Sections 2.5 and 2.6), (B) the Transfer of Specialty Products Assets of Historical Dow to SpecCo or another member of the SpecCo Group by Historical Dow (but only for Transfers prior to the Tower Realignment Time or pursuant to Sections 2.5 and 2.6) and/or (C) the Transfer of Materials Science Assets of Historical Dow to MatCo or another member of the MatCo Group by Historical Dow (but only for Transfers prior to the Tower Realignment Time or pursuant to Sections 2.5 and 2.6);

(vi) the Applicable Materials Science Percentage of any Specified DowDuPont Shared Liability;

(vii) any of the Liabilities set forth on Schedule 1.1(198)(vii);

(viii) any Agriculture Known Undisclosed Liabilities (other than those described in any Corporate Risk Management Document of Dow) in excess of $125,000,000 in the aggregate, and any Agriculture Known Undisclosed Liabilities described in any Corporate Risk Management Document of Dow;

(ix) any Specialty Products Known Undisclosed Liabilities (other than those described in any Corporate Risk Management Document of Dow) in excess of $125,000,000 in the aggregate, and any Specialty Products Known Undisclosed Liabilities described in any Corporate Risk Management Document of Dow;

(x) (a) any and all Dow Discontinued and/or Divested Operations and Business Liabilities that constitute Environmental Liabilities, (b) Environmental Liabilities set forth on Schedule 1.1(198)(x)(b), (c) any and all Off-Site Environmental Liabilities of Historical Dow that do not constitute Dow Discontinued and/or Divested Operations and Business Liabilities, including those set forth on Schedule 1.1(198)(x)(c) and (d) any and all Environmental Liabilities of Historical Dow to the extent related to or arising out of occurrences prior to the MatCo Distribution Date that do not constitute Off-Site Environmental Liabilities or Dow Discontinued and/or Divested Operations and Business Liabilities which are not related to any Business (other than in a de minimis respect); provided, in each case (clauses (a)-(d)), that they shall be subject to Section 8.11;

(xi) any and all Dow Discontinued and/or Divested Operations and Business Liabilities which do not constitute Environmental Liabilities;

44

(xii) any and all Liabilities (other than Materials Science Trade Payables and Historical DuPont Trade Payables) primarily related to, arising out of or resulting from any Dow Corporate Contract;

(xiii) any and all Liabilities for Indebtedness of the type described in clauses (i), (iv) and (vii) (but in case of clause (vii) solely with respect to clauses (i) and (iv)) of the definition of Indebtedness of Historical Dow which was incurred by any member of the AgCo Group, SpecCo Group or the MatCo Group (or any such Indebtedness guaranteed by any member of Historical Dow which is a member of the AgCo Group, SpecCo Group or MatCo Group, as applicable) while such member was a Subsidiary of Historical Dow (including that set forth on <u>Schedule 1.1(198) (xiii)</u>) (clauses (i)-(xiii), the "<u>Specified Materials Science Liabilities</u>");

(xiv) unless constituting a Specified Agriculture Liability or a Specified Specialty Products Liability,

(a) (i) any and all checks issued but not drawn and accounts payable to the extent related (other than in de minimis respects) to the Materials Science Business (<u>provided</u>, <u>however</u>, that any such accounts payable represented by an invoice of less than $1,000,000 shall not constitute Materials Science Liabilities pursuant to this clause (a) if the aggregate amount of accounts payable represented by such invoice is Related to the Agriculture Business or the Specialty Products Business), and (ii) all accounts payable represented by an invoice of less than $1,000,000 if the aggregate amount of accounts payable represented by such invoice is Related to the Materials Science Business (except for any such accounts payable represented by such invoice that are not related to any Business in more than a de minimis respect); and

(b) Liabilities for any and all checks issued but not drawn and accounts payable of Historical Dow or its Subsidiaries, which are not related to any Business (other than in a de minimis respect) (the "<u>Materials Science Trade Payables</u>");

(xv) unless constituting a Specified Agriculture Liability or a Specified Specialty Products Liability, any and all Liabilities to the extent relating to, arising out of or resulting from a general corporate matter of Historical Dow or any of its Subsidiaries (which Subsidiaries were Subsidiaries of Historical Dow immediately prior to the Tower Realignment Time, but only while such Subsidiaries were Subsidiaries of Historical Dow) incurred on or prior to the MatCo Distribution Date, including any Liabilities (including under applicable federal and state securities Laws) to the extent relating to, arising out of or resulting from:

(a) claims made by or on behalf of holders of any of Historical Dow's securities (including debt securities), in their capacities as such;

(b) any form, report, statement, certifications or other document (including all exhibits, amendments and supplements thereto) (other than a

45

Distribution Disclosure Document) filed by Dow or any of its Subsidiaries with the Commission on or prior to the MatCo Distribution, including the financial statements included therein (other than for Liabilities related to any such forms, reports, statements, certifications or other documents, in each case filed in connection with the Internal Reorganization, specifically relating to the Agriculture Business, the Materials Science Business or the Specialty Products Business, as the case may be);

(c) the maintenance of Historical Dow's books and records, Historical Dow's corporate compliance and other corporate-level actions and oversight of Historical Dow;

(d) (x) indemnification obligations to any current or former director or officer of Historical Dow in their capacity as such in respect of occurrences prior to the MatCo Distribution Date or (y) any claims for breach of fiduciary duties brought against any current or former directors or officers of Historical Dow, in their capacities as such, in respect of occurrences prior to the MatCo Distribution Date, in each case, relating to any acts, omissions or events on or prior to the Final Separation Date;

(xvi) any and all Liabilities Related to the Materials Science Business, including in the following categories and including those set forth on Schedule 1.1(198)(xvi), but in each case, excluding the Specified Agriculture Liabilities, the Specified Specialty Products Liabilities, the Liabilities described in clauses (xiv) and (xv) of each of the definitions of Agriculture Liabilities and Materials Science Liabilities and the Liabilities described in clauses (xiii) and (xiv) of the definition of the Specialty Products Liabilities:

(a) any and all Liabilities arising out of or resulting from any Action Related to the Materials Science Business, including such Actions listed on Schedule 1.1(198)(xvi)(a);

(b) any and all Liabilities arising under any of the Materials Science Contracts (except in the case of a Contract constituting a Materials Science Contract because it is exclusively related to a Materials Science Asset, any such Liabilities Related to the Agriculture Business or Specialty Products Business); and

(c) any Environmental Liability that is Related to the Materials Science Business, including those set forth on Schedule 1.1(198)(xvi)(c); provided, that any such Environmental Liability shall be subject to Section 8.11.

In the event of any inconsistency or conflict which may arise in the application or interpretation of any of the foregoing provisions and the provisions of the definition of Agriculture Liabilities and Specialty Products Liabilities, such inconsistency shall be resolved using the following order of precedence: (i) any Specified Materials Science Liability listed on Schedules 1.1(97), 1.1(198)(vii), 1.1(198)(x)(b) and (c) and 1.1(198)(xiii) constitutes a Materials Science Liability and (ii) any Liability listed on Schedules 1.1(198)(xvi), 1.1(198)(xvi)(a) and 1.1(198)(xvi)(c)

46

shall give rise to a rebuttable presumption in favor of AgCo and SpecCo that such Liability Relates to the Materials Science Business and/or the Materials Science Assets. In addition, the allocation set forth in clauses (x) and (xvi)(c) is not intended to affect or impact the share of any such Environmental Liability attributable to third parties.

(199) "Materials Science Shared Contract" shall mean any and all Shared Contracts that are primarily related to the Materials Science Business including those set forth on Schedule 1.1(199), but excluding any Specified Agriculture DuPont Corporate Contract, any Specified Specialty Products DuPont Corporate Contract or any Dow Corporate Contract; provided, however, such Dow Corporate Contracts set forth on Schedule 1.1(199)(i) shall constitute a Materials Science Shared Contract.

(200) "Materials Science Specified Permitted Activities" shall mean the matters set forth on Schedule 1.1(200).

(201) "Measurement Date" shall have the meaning set forth in Section 1.1(86).

(202) "MOD 5 (ROFAN) License Agreements" shall mean the MOD 5 Computerized Process Control Software Agreement License and Services, (i) effective as of April 1, 2019, by and between Rofan Services LLC and a member of the AgCo Group and (ii) effective as of April 1, 2019, by and between Rofan Services LLC and a member of the SpecCo Group.

(203) "Negotiation Period" shall mean (i) the General Negotiation Period, (ii) the Second Non-Compete Discussion Period, (iii) the Shared Liability Escalation Discussions, (iv), the Second Shared Historical DuPont Escalation Negotiation Period, (v) the Managing Party Negotiation Period, (vi) the Shared Historical DuPont Assets and Liabilities Determination Period or (vii) the Privilege Waiver Negotiation Period, as applicable.

(204) "New Shared Matter" shall have the meaning set forth in Section 6.2(a).

(205) "New Shared Matter Notice" shall have the meaning set forth in Section 6.2(b).

(206) "Non-Assumable Third Party Claims" shall have the meaning set forth in Section 8.5(b).

(207) "Non-Compete Dispute Notice" shall have the meaning set forth in Section 5.6(i).

(208) "Non-Compete Escalation Notice" shall have the meaning set forth in Section 5.6(i).

(209) "Non-Compete Period" shall have the meaning set forth in Section 5.6(a).

(210) "Non-Performing Impacted Party" shall have the meaning set forth in Section 8.11(c)(i).

(211) "Non-Performing Site Controller" shall have the meaning set forth in Section 8.11(c)(ii).

47

(287) "SpecCo Designated Dow DDOB Deductible Amount" shall have the meaning set forth in Section 8.13(b)(i).

(288) "SpecCo Group" shall mean SpecCo and each Person (other than any member of the MatCo Group or the AgCo Group) that is a direct or indirect Subsidiary of SpecCo immediately after the Tower Realignment Time, and each Business Entity that becomes a Subsidiary of SpecCo after the Tower Realignment Time, which, for the avoidance of doubt, shall include those entities identified as such on Schedule 1.1(288) (and shall not include the entities on Schedule 1.1(13) or Schedule 1.1(180)).

(289) "SpecCo Group DuPont Corporate Contracts" shall have the meaning set forth in Section 1.1(311).

(290) "SpecCo Group DuPont Divested Business Liability Basket" shall have the meaning set forth in Section 8.13(a)(ii).

(291) "SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities" shall mean (i) any and all DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the SpecCo Group other than (w) Agriculture Related DuPont Discontinued and/or Divested Operations and Business Liabilities, (x) AgCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities, (y) Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liabilities and (z) SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities, including those set forth on Schedule 1.1(291) and, solely to the extent in excess of the amount set forth therefor on Schedule 1.1(293), those set forth on Schedule 1.1(293); provided, however, in the case of this clause (i), that from and after the time that both the SpecCo Hurdle (as defined in Section 8.13(a)(i)) and the AgCo Hurdle (as defined in Section 8.13(a)(ii)) have been met, "SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities" shall mean, with respect to additional DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the AgCo Group or SpecCo Group, the Specialty Products Shared Historical DuPont Percentage of any and all DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the AgCo Group or SpecCo Group other than (W) Agriculture Related DuPont Discontinued and/or Divested Operations and Business Liabilities, (X) AgCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities, (Y) Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liabilities and (Z) SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities and (ii) the Specialty Products Shared Historical DuPont Percentage of any and all DuPont Discontinued and/or Divested Operations and Business Liabilities of any member of the MatCo Group other than (w) Agriculture Related DuPont Discontinued and/or Divested Operations and Business Liabilities, (x) AgCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities, (y) Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liabilities and (z) SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities.

(292) "SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement" has the meaning set forth in Section 7.1(f).

55

(305) "<u>Specialty Products Contracts</u>" shall mean Contracts to which DowDuPont or any of its Subsidiaries is a party or by which it or any of its Subsidiaries or any of their respective Assets is bound, whether or not in writing, which fall within any of the following categories:

(i) any and all Contracts that relate exclusively to the Specialty Products Business, the Specialty Products Assets and/or the Specialty Products Liabilities and are not related (other than in a de minimis respect) to any other Business, any Agriculture Asset, any Materials Science Asset, any Agriculture Liability or any Materials Science Liability, including those set forth on <u>Schedule 1.1(305)(i)</u>;

(ii) any and all Contracts to which Historical DuPont or any of its Subsidiaries was a party as of the Relevant Time (and any amendments, extensions or replacements thereof) that are not related in any respect (other than in a de minimis respect) to any Business and are set forth on <u>Schedule 1.1(305)(ii)</u> (the "<u>Specified Specialty Products DuPont Corporate Contracts</u>"); and

(iii) any and all Contracts to which DowDuPont was a party as of the Relevant Time (and any amendments, extensions or replacements thereof) that are not related in any respect to any Business (other than in a de minimis respect).

(306) "<u>Specialty Products DuPont Discontinued and/or Divested Operations and Business Liabilities</u>" shall mean, collectively, (a) the Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liabilities, (b) the SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities and (c) the SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities.

(307) "<u>Specialty Products Environmental Liabilities</u>" shall mean the Liabilities described in clauses (viii) and (xv)(c) of the definition of Specialty Products Liabilities.

(308) "<u>Specialty Products Known Undisclosed Liabilities</u>" shall mean any Liability (or Liabilities arising from the same or substantially similar facts underlying such Liability) (other than ordinary course trade payables and ordinary course commercial obligations, in each case incurred on or after the Measurement Date) of Historical Dow (i) that is Related to the Specialty Products Business but is not a Specified Specialty Products Liability or described in clauses (xiii)-(xiv) of the definition of Specialty Products Liabilities, and (ii) (a) for which a member of Historical Dow (x) has recorded an accrual prior to the MatCo Distribution (other than actual accruals by a member of Historical Dow recorded in the manner described on <u>Schedule 1.1(308)(ii)(a)</u> (1) as of or prior to December 31, 2018 or (2) in the ordinary course of business after December 31, 2018 and prior to the MatCo Distribution (the amount of such accrual for a particular Liability or Liabilities arising from the same or substantially similar facts underlying such Liability, the "<u>Specialty Products Accrued Amount</u>")), or (y) (other than the Specialty Products Accrued Amount therefor, if any) has not recorded an accrual, but in accordance with GAAP was required to have recorded an accrual, prior to the MatCo Distribution, (b) that is described in any Corporate Risk Management Document of Dow (but not the Specialty Products Accrued Amount therefor, if any), (c) in respect of which, to the actual knowledge (as of the MatCo Distribution Date) of any member of the Historical Dow Knowledge Group, Historical

64

Dow is (or based on the actual knowledge (as of the MatCo Distribution Date) of the Historical Dow Knowledge Group, would be) required by applicable Law to retain or otherwise preserve any Information, Records, tangible material or other evidence (but not the Specialty Products Accrued Amount therefor, if any), or (d) in respect of which, to the actual knowledge (as of the MatCo Distribution Date) of any member of the Historical Dow Knowledge Group, there is (as of the MatCo Distribution Date) a reasonably apparent and significant danger to human health or safety that would reasonably be expected to manifest by the date that is two (2) years after the MatCo Distribution Date (but not the Specialty Products Accrued Amount therefor, if any); provided, however, that Specialty Products Known Undisclosed Liabilities shall not include any such Liability (A) that has been disclosed (or for which the facts and circumstances underlying such Liability have been disclosed) on Schedule 1.1(308)(A) or on any of the Schedules described in Section 1.1(308), (B) in respect of which, to the actual knowledge (as of the MatCo Distribution Date) of any member of the SpecCo Knowledge Group, Historical Dow is (or based on the actual knowledge (as of the MatCo Distribution Date) of the SpecCo Knowledge Group, would be) required by applicable Law to retain or otherwise preserve any Information, Records, tangible material or other evidence, or (C) to the actual knowledge (as of the MatCo Distribution Date) of any member of the SpecCo Knowledge Group, there is (as of the MatCo Distribution Date) a reasonably apparent and significant danger to human health or safety that would reasonably be expected to manifest by the date that is two (2) years after the MatCo Distribution Date; provided, further, that any Liability that would constitute a Specialty Products Known Undisclosed Liability but in respect of which (or in respect of a Liability arising from the same or substantially similar facts) an Indemnification Notice has not been provided on or prior to the date that is the third (3rd) anniversary of the MatCo Distribution Date shall be deemed to not constitute a Specialty Products Known Undisclosed Liability. For the avoidance of doubt, Specialty Products Known Undisclosed Liabilities shall exclude the Specialty Products Accrued Amount therefor (if any), and if the actual aggregate amount of Indemnifiable Losses resulting from a Liability exceeds the applicable Specialty Products Accrued Amount therefor (if any) (the amount of such excess, the "SpecCo Unaccrued Portion"), whether such Liability constitutes a Specialty Products Known Undisclosed Liability pursuant to clauses (ii)(a)(y) or (ii)(b) – (ii)(d) of this definition and whether such Liability does not constitute a Specialty Products Known Undisclosed Liability pursuant to clauses (A)-(C) of the proviso to this definition shall be determined based on the SpecCo Unaccrued Portion and the facts and circumstances underlying the SpecCo Unaccrued Portion.

(309) "Specialty Products Liabilities" shall mean any and all Liabilities of (x) any member of the MatCo Group at the applicable Relevant Time, (y) any member of the AgCo Group at the applicable Relevant Time and/or (z) any member of the SpecCo Group at the applicable Relevant Time, in the following categories, in each case, regardless of (i) when or where such Liabilities arose or arise, (ii) where or against whom such Liabilities are asserted or determined, (iii) regardless of whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of Law, fraud or misrepresentation by any member of the AgCo Group, MatCo Group or SpecCo Group, as the case may be, or any of their past or present respective directors, officers, employees, agents, Subsidiaries or Affiliates and (iv) which entity is named in any Action associated with any Liability (except for Liabilities related to Taxes which are governed exclusively by the Tax Matters Agreement, and Liabilities (other than those to the extent related to, resulting from or arising out of Discontinued and/or Divested Operations and Businesses (except for Liabilities allocated pursuant to Section 1.10(a)-(c) of the Employee Matters Agreement and Section 2.07 of the Employee Matters Agreement)) allocated pursuant to the Employee Matters Agreement, which are governed exclusively thereby):

65

(i) any and all Liabilities that are expressly assumed by or allocated to the SpecCo Group pursuant to this Agreement, including any obligations and Liabilities of any member of the SpecCo Group under this Agreement, including those pursuant to Section 12.5 hereof;

(ii) the Specialty Products Shared Historical DuPont Percentage of Liabilities relating to, arising out of or resulting from any statements or omissions made or incorporated by reference in the Distribution Disclosure Documents and relating to, arising out of or resulting from occurrences prior to, the MatCo Distribution based on information supplied by Historical DuPont;

(iii) any and all Liabilities arising out of Inventor Remuneration to the extent related to (i) the Intellectual Property constituting a Specialty Products Asset (other than any discrete and reasonably identifiable part thereof solely attributable to the use or sublicense of such Intellectual Property by members of the AgCo Group or MatCo Group as Licensees (as such term is defined in the Intellectual Property Cross-License Agreements) under the Intellectual Property Cross-License Agreements), or (ii) the discrete and reasonably identifiable part thereof solely attributable to the use or sublicense of Intellectual Property constituting an Agriculture Asset or a Materials Science Asset by a member of the SpecCo Group as Licensees (as such term is defined in the Intellectual Property Cross-License Agreements) under the Intellectual Property Cross-License Agreements;

(iv) the Specialty Products Shared Historical DuPont Percentage of any and all costs, fees and expenses, including legal fees and costs, in connection with (A) the Transfer of Materials Science Assets of Historical DuPont (but only for Transfers prior to the Tower Realignment Time or pursuant to Sections 2.5 and 2.6) and/or (B) the Transfer of Agriculture Assets or Specialty Products Assets of Historical DuPont (but only for Transfers prior to the AgCo Distribution or pursuant to Sections 2.5 and 2.6);

(v) the Applicable Specialty Products Percentage of any Specified DowDuPont Shared Liability;

(vi) any of the Liabilities set forth on Schedule 1.1(309)(vi);

(vii) the Specialty Products Shared Historical DuPont Percentage of any Materials Science Known Undisclosed Liabilities (other than those described in any Corporate Risk Management Document of DuPont) in excess of $125,000,000 in the aggregate, and the Specialty Products Shared Historical DuPont Percentage of any Materials Science Known Undisclosed Liabilities described in any Corporate Risk Management Document of DuPont;

66

(viii) (a) any and all Specialty Products DuPont Discontinued and/or Divested Operations and Business Liabilities that constitute Environmental Liabilities, (b) Environmental Liabilities set forth on Schedule 1.1(309)(viii)(b), (c) any and all Off-Site Environmental Liabilities of Historical DuPont (that do not constitute Specialty Products DuPont Discontinued and/or Divested Operations and Business Liabilities of Historical DuPont) that are Related to the Specialty Products Business, including those set forth on Schedule 1.1(309)(viii)(c), (d) the Specialty Products Shared Historical DuPont Percentage of any and all Off-Site Environmental Liabilities of Historical DuPont (that do not constitute Specialty Products DuPont Discontinued and/or Divested Operations and Business Liabilities of Historical DuPont) that are Related to the Materials Science Business, including those set forth on Schedule 1.1(38)(ix)(d)(I) or (II) not related to any Business (other than in a de minimis respect), including those set forth on Schedule 1.1(38)(ix)(d)(II), (e) any and all Environmental Liabilities of Historical DuPont to the extent related to or arising out of occurrences prior to the Relevant Time that do not constitute Off-Site Environmental Liabilities or DuPont Discontinued and/or Divested Operations and Business Liabilities which are not related to any Business (other than in a de minimis respect) to the extent arising out of or related to any Specialty Products Real Property, Specialty Products Specified Owned Real Property or Specialty Products Specified Leased Real Property owned by Historical DuPont prior to the AgCo Distribution Date and (f) the Specialty Products Shared Historical DuPont Percentage of any and all Environmental Liabilities of Historical DuPont to the extent arising out of or related to occurrences prior to the Relevant Time that do not constitute Off-Site Environmental Liabilities or DuPont Discontinued and/or Divested Operations and Business Liabilities which are not related to any Business (other than in a de minimis respect) to the extent arising out of or related to any Materials Science Real Property, Materials Science Specified Owned Real Property or Materials Science Specified Leased Real Property owned by Historical DuPont prior to the Tower Realignment Time; provided, in each case (clauses (a)-(f)), that they shall be subject to Section 8.11;

(ix) any and all Specialty Products DuPont Discontinued and/or Divested Operations and Business Liabilities which do not constitute Environmental Liabilities;

(x) any and all Liabilities (other than Materials Science Trade Payables and Historical DuPont Trade Payables) primarily related to, arising out of or resulting from the Specified Specialty Products DuPont Corporate Contracts;

(xi) any and all Liabilities for Indebtedness of the type described in clauses (i), (iv) and (vii) (but in case of clause (vii) solely with respect to clauses (i) and (iv)) of the definition of Indebtedness of (A) Historical DuPont that was incurred by any member of the SpecCo Group (and any such Indebtedness guaranteed by any member of Historical DuPont that is a member of the SpecCo Group), including those set forth on Schedule 1.1(309)(xi)(A) or (B) of DowDuPont set forth on Schedule 1.1(309)(xi)(B) or incurred by DowDuPont after the MatCo Distribution;

(xii) the Specialty Products Shared Historical DuPont Percentage of any and all Indebtedness of the type described in clauses (i), (iv) and (vii) (but in case of clause (vii) solely with respect to clauses (i) and (iv)) of the definition of Indebtedness of Historical DuPont that was incurred by any member of the MatCo Group prior to the time such entity became a Subsidiary of MatCo (and any such Indebtedness guaranteed by any member of Historical DuPont that is a member of the MatCo Group), but is not set forth on Schedule 1.1(198)(xiii), if any (clauses (i)-(xii) of this Section 1.1(309), the "Specified Specialty Products Liabilities");

67

(xiii) unless constituting a Specified Agriculture Liability or a Specified Materials Science Liability,

(a) (i) any and all checks issued but not drawn and accounts payable to the extent related (other than in de minimis respects) to the Specialty Products Business (provided, however, that any such accounts payable represented by an invoice of less than $1,000,000 shall not constitute Specialty Products Liabilities pursuant to this clause (a) if the aggregate amount of accounts payable represented by such invoice is Related to the Agriculture Business or the Materials Science Business), and (ii) all accounts payable represented by an invoice of less than $1,000,000 if the aggregate amount of accounts payable represented by such invoice is Related to the Specialty Products Business (except for any such accounts payable represented by such invoice that are not related to any Business in more than a de minimis respect); and

(b) the Specialty Products Shared Historical DuPont Percentage of the Liabilities of Historical DuPont for Historical DuPont Trade Payables;

(xiv) unless constituting a Specified Agriculture Liability or a Specified Materials Science Liability, the Specialty Products Shared Historical DuPont Percentage of any and all Liabilities to the extent relating to, arising out of or resulting from a general corporate matter of Historical DuPont or any of its Subsidiaries (which Subsidiaries were Subsidiaries of Historical DuPont immediately prior to the Tower Realignment Time, but only while such Subsidiaries were Subsidiaries of Historical DuPont) incurred on or prior to the AgCo Distribution, including any Liabilities (including under applicable federal and state securities Laws) to the extent relating to, arising out of or resulting from:

(a) claims made by or on behalf of holders of any of Historical DuPont's securities (including debt securities), in their capacities as such;

(b) any form, report, statement, certifications or other document (including all exhibits, amendments and supplements thereto) (other than a Distribution Disclosure Document) filed by DuPont or any of its Subsidiaries with the Commission on or prior to the AgCo Distribution, including the financial statements included therein (other than for Liabilities related to any such forms, reports, statements, certifications or other documents, in each case filed in connection with the Internal Reorganization, specifically relating to the Agriculture Business, the Materials Science Business or the Specialty Products Business, as the case may be);

(c) the maintenance of Historical DuPont's books and records, Historical DuPont's corporate compliance and other corporate-level actions and oversight of Historical DuPont; and

68

(d) (x) indemnification obligations to any current or former director or officer of Historical DuPont in their capacity as such in respect of occurrences prior to the AgCo Distribution Date or (y) any claims for breach of fiduciary duties brought against any current or former directors or officers of Historical DuPont, in their capacities as such in respect of occurrences prior to the AgCo Distribution Date, in each case, relating to any acts, omissions or events on or prior to the Final Separation Date;

(xv) any and all Liabilities Related to the Specialty Products Business, including in the following categories and including those set forth on Schedule 1.1(309)(xv), but in each case, excluding the Specified Materials Science Liabilities, the Specified Agriculture Liabilities, the Liabilities described in clauses (xiv) and (xv) of each of the definitions of Agriculture Liabilities and Materials Science Liabilities and the Liabilities described in clauses (xiii) and (xiv) of the definition of Specialty Products Liabilities:

(a) any and all Liabilities arising out of or resulting from any Action Related to the Specialty Products Business, including such Actions listed on Schedule 1.1(309)(xv)(a);

(b) any and all Liabilities arising under any of the Specialty Products Contracts (except in the case of a Contract constituting a Specialty Products Contract because it is exclusively related to a Specialty Products Asset, any such Liabilities Related to the Agriculture Business or Materials Science Business); and

(c) any Environmental Liability that is Related to the Specialty Products Business, including those set forth on Schedule 1.1(309)(xv) (c); provided, that any such Environmental Liability shall be subject to Section 8.11.

In the event of any inconsistency or conflict which may arise in the application or interpretation of any of the foregoing provisions and the provisions of the definition of Materials Science Liabilities and Agriculture Liabilities, such inconsistency shall be resolved using the following order of precedence: (i) any Specified Specialty Products Liability listed on Schedules 1.1(291), 1.1(293), 1.1(309)(vi), 1.1(309)(viii)(b) and (c), 1.1(309)(xi)(A) and (B), and 1.1(310) constitutes a Specialty Products Liability (in the case of Schedules 1.1(291) and 1.1(293), subject to the proviso in Section 1.1(291)), (ii) the Specialty Products Shared Historical DuPont Percentage of any Specified Specialty Products Liability listed on Schedules 1.1(38)(ix)(d)(I) and (II) constitutes a Specialty Products Liability and (iii) any Liability listed on Schedules 1.1(309)(xv), 1.1(309)(xv)(a) and 1.1(309)(xv)(c) shall give rise to a rebuttable presumption in favor of AgCo and MatCo that such Liability Relates to the Specialty Products Business and/or the Specialty Products Assets. In addition, the allocation set forth in clauses (viii) and 1.1(309)(xv)(c) is not intended to affect or impact the share of any such Environmental Liability attributable to third parties.

69

(310) "Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liabilities" shall mean any and all DuPont Discontinued and/or Divested Operations and Business Liabilities that are primarily related to the conduct prior to the Measurement Date of the Specialty Products Business of Historical DuPont (for purposes of measuring such relationship only, viewing the Specialty Products Business as it was conducted on or after January 1, 2015 but prior to the Measurement Date), including those set forth on Schedule 1.1(310).

(311) "Specialty Products Shared Contracts" shall mean (i) any and all Shared Contracts that are primarily related to the Specialty Products Business including those set forth on Schedule 1.1(311), but excluding any Specified Agriculture DuPont Corporate Contract, any Specified Specialty Products DuPont Corporate Contract or any Dow Corporate Contract, (ii) prior to the AgCo Distribution Date, any and all Contracts (and any amendments, extensions or replacements thereof) entered into by a member of the SpecCo Group while such member was a subsidiary of Historical DuPont that are not related in any respect (other than in a de minimis respect) to any Business ("SpecCo Group DuPont Corporate Contracts"), but excluding any Specified Agriculture DuPont Corporate Contract, any Specified Specialty Products DuPont Corporate Contract or any Dow Corporate Contract and (iii) prior to the AgCo Distribution Date, any and all Contracts (and any amendments, extensions or replacements thereof) entered into by a member of the MatCo Group while such member was a subsidiary of Historical DuPont that are not related in any respect (other than in a de minimis respect) to any Business ("MatCo Group DuPont Corporate Contracts"), but excluding any Specified Agriculture DuPont Corporate Contract, any Specified Specialty Products DuPont Corporate Contract or any Dow Corporate Contract; provided, however, in each case (clauses (ii) and (iii)), such SpecCo Group DuPont Corporate Contract and MatCo Group DuPont Corporate Contract shall be deemed to not inure to the burden or benefit of the MatCo Group, except for such SpecCo Group DuPont Corporate Contracts and MatCo Group DuPont Corporate Contracts set forth on Schedule 1.1(311)(iii).

(312) "Specialty Products Shared Historical DuPont Percentage" shall mean seventy one percent (71%).

(313) "Specified Contingent Governmental Action" shall have the meaning set forth in Section 6.2(f).

(314) "Specified DowDuPont Shared Asset" shall mean the Assets set forth on Schedule 1.1(314).

(315) "Specified DowDuPont Shared Liabilities" shall mean:

(i) any and all Liabilities set forth on Schedule 1.1(315)(i);

(ii) any and all Liabilities of DowDuPont to the extent relating to, arising out of or resulting from a general corporate matter of DowDuPont related to occurrences on or prior to the Final Separation Date, including any such Liabilities (including under applicable federal and state securities Laws) to the extent relating to, arising out of or resulting from:

(a) claims made by or on behalf of holders of any of DowDuPont's securities, in their capacities as such;

70

(b) Notwithstanding <u>Section 1.3(a)</u> above, solely as between any of the Parties that are Affiliates, the provisions of, and the obligations under, this Agreement shall be suspended as between such Parties until the applicable Relevant Time, other than for <u>Sections 2.1</u>, <u>2.2</u>, <u>2.3</u> and <u>2.8</u> each of which will be effective as of the Effective Time.

## ARTICLE II

## THE SEPARATION

Section 2.1 <u>General</u>. Subject to the terms and conditions of this Agreement, each Party shall use, and shall cause the other members of its Group and its respective then-Affiliates to use, their respective reasonable best efforts to consummate the transactions contemplated hereby (including the Internal Reorganization), a portion of which have already been implemented prior to the date hereof.

Section 2.2 <u>Transfer of Assets; Assumption and Satisfaction of Liabilities</u>.

(a) Prior to the Effective Time, the Parties shall and shall cause the other members of its Group and its respective then-Affiliates to complete the Internal Reorganization (other than as set forth on <u>Schedule 2.2</u>).

(b) Prior to the applicable Relevant Time and, in each case, in accordance with the Steps Plan and pursuant to the Conveyancing and Assumption Instruments and, in connection with the Internal Reorganization:

(i) Subject to <u>Section 2.5</u> (Transfers Not Effected On or Prior to the Effective Time; Transfers Deemed Effective as of the Effective Time) and <u>Section 2.2(d)</u> (Treatment of Shared Contracts), SpecCo shall, and shall cause the other members of its Group to, as applicable, transfer, contribute, assign and/or convey or cause to be transferred, contributed, assigned and/or conveyed ("<u>Transfer</u>") to (i) MatCo or another member of the MatCo Group all of its and the other members of its Group's right, title and interest in and to the Materials Science Assets and (ii) AgCo or another member of the AgCo Group all of its and the other members of its Group's right, title and interest in and to the Agriculture Assets and the applicable member(s) of the MatCo Group and/or AgCo Group, as applicable, shall accept from SpecCo and the applicable members of the SpecCo Group, all of SpecCo's and the other members of the SpecCo Group's respective direct or indirect rights, title and interest in and to the Materials Science Assets and the Agriculture Assets, respectively;

(ii) Subject to <u>Section 2.5</u> (Transfers Not Effected On or Prior to the Effective Time; Transfers Deemed Effective as of the Effective Time) and <u>Section 2.2(d)</u> (Treatment of Shared Contracts), MatCo shall, and shall cause the other members of its Group to, as applicable, Transfer to (i) SpecCo or another member of the SpecCo Group all of its and the other members of its Group's right, title and interest in and to the Specialty Products Assets and (ii) AgCo or another member of the AgCo Group all of its and the other members of its Group's right, title and interest in and to the Agriculture Assets and the applicable member(s) of the SpecCo Group and/or AgCo Group, as

75

applicable, shall accept from MatCo and the applicable members of the MatCo Group, all of MatCo's and the other members of the MatCo Group's respective direct or indirect rights, title and interest in and to the Specialty Products Assets and the Agriculture Assets, respectively; and

(iii) Subject to Section 2.5 (Transfers Not Effected On or Prior to the Effective Time; Transfers Deemed Effective as of the Effective Time) and Section 2.2(d) (Treatment of Shared Contracts), AgCo shall, and shall cause the other members of its Group to, as applicable, Transfer to (i) MatCo or another member of the MatCo Group all of its and the other members of its Group's right, title and interest in and to the Materials Science Assets and (ii) SpecCo or another member of the SpecCo Group all of its and the other members of its Group's right, title and interest in and to the Specialty Products Assets and the applicable member(s) of the MatCo Group and/or SpecCo Group, as applicable, shall accept from AgCo and the applicable members of the AgCo Group, all of AgCo's and the other members of the AgCo Group's respective direct or indirect rights, title and interest in and to the Materials Science Assets and the Specialty Products Assets, respectively.

(c) Assumption of Liabilities. Subject to Section 2.5 (Transfers Not Effected On or Prior to the Effective Time; Transfers Deemed Effective as of the Effective Time) and Section 2.2(d) (Treatment of Shared Contracts), (a) SpecCo shall, or shall cause a member of the SpecCo Group to, accept, assume (or, as applicable, retain) and perform, discharge and fulfill, in accordance with their respective terms ("Assume"), all of the Specialty Products Liabilities, (b) MatCo shall, or shall cause a member of the MatCo Group to, Assume all of the Materials Science Liabilities and (c) AgCo shall, or shall cause a member of the AgCo Group to, Assume all of the Agriculture Liabilities.

(d) Treatment of Shared Contracts. Without limiting the generality of the obligations set forth in Section 2.2(b):

(i) Unless the benefits of a Shared Contract are conveyed to the applicable Party (or member of its Group) pursuant to an Ancillary Agreement, (A) any Contract that is a Shared Contract, shall be assigned in part to the applicable member(s) of the applicable Group, if so assignable, or appropriately amended, bifurcated, replicated or otherwise modified prior to, on or after the Effective Time, so that each Party or the members of their respective Groups shall be entitled to the rights and benefits, and shall Assume the related portion of any Liabilities, inuring to their respective Businesses (each, a "Partial Assignment"); provided, however, that (x) in no event shall any member of any Group be required to assign (or amend) any Shared Contract in its entirety or to assign a portion of any Shared Contract (including any Policy) which is not assignable (or cannot be amended or otherwise modified) by its terms (including any terms imposing Consents or conditions on an assignment where such Consents or conditions have not been obtained or fulfilled) (including those set forth on Schedule 2.2(d)) or under applicable Law and (y) if any Shared Contract cannot be so partially assigned by its terms or otherwise, cannot be amended or otherwise modified or if such assignment or amendment or modification would impair the benefit the parties thereto derive from such Shared Contract, (A) the Parties shall, and shall cause each of

76

their respective Subsidiaries to, take such other reasonable and permissible actions to cause a member of the SpecCo Group, the MatCo Group or the AgCo Group as the case may be, to, in each case, (I) receive the benefit of that portion of each Shared Contract that relates to the Agriculture Business, the Materials Science Business or the Specialty Products Business, as the case may be (in each case, to the extent so related) as if such Shared Contract had been assigned to (or amended or otherwise modified for the benefit of) a member of the applicable Group pursuant to this Section 2.2(d) (including, enforcing on the applicable Group's behalf any and all of such Group's rights against such third party under such Shared Contract solely to the extent related to the applicable Group's respective Business (or applicable portion thereof)) and (II) bear the burden of the corresponding Liabilities (including any Liabilities that may arise by reason of such arrangement) as if such Liabilities had been Assumed by a member of the applicable Group pursuant to this Section 2.2(d), including expenses related to enforcing rights under such Shared Contract against the third party counterparty thereto solely to the extent related to the applicable Group's respective Business (or applicable portion thereof); and indemnifying each other Group against all Indemnifiable Losses to the extent arising out of any actions (or omissions to act) taken by such other Group with respect to such Shared Contract at the direction of such first Party (except to the extent arising out of or related to gross negligence, fraud or willful misconduct by such other Group) (for the avoidance of doubt, in the event that any rights in connection with a Force Majeure Event or similar event are exercised under a Shared Contract, the benefits and burdens with respect to such Shared Contract (as modified by such Force Majeure Event or similar event) shall, if reasonably practicable, be shared proportionally or, if not reasonably practicable, in such other manner as would be most equitable, among the Groups related to such Contract (or in any other manner as may be agreed in good faith by the relevant Parties whose Group is related to such contract), in each case, to the extent so related to the Agriculture Business, the Materials Science Business or the Specialty Products Business) and (B) to the extent that the Parties cannot effect a Partial Assignment in accordance with this Section 2.2(d), or cannot implement the arrangements set forth in clause (A), within 180 days of the MatCo Distribution Date, the Parties shall use commercially reasonable efforts to, if requested by any Party, seek mutually acceptable alternative arrangements for the purpose of allocating rights and obligations to each Group under such Shared Contract reflecting the principles set forth in clause (A) of this provision (an "Acceptable Alternative Arrangement").

(ii) Each Party shall, and shall cause the other members of its Group to, use its commercially reasonable efforts to obtain the required Consents to complete a Partial Assignment of any Shared Contract as contemplated by this Agreement. Notwithstanding anything herein to the contrary, no Partial Assignment of any Shared Contract or Acceptable Alternative Arrangement shall be completed if it would violate any applicable Law or the rights of any third party to such Shared Contract.

(iii) To the extent permitted by applicable Law, each of SpecCo, MatCo and AgCo shall, and shall cause the members of its respective Group to, (A) treat for all Tax purposes the portion of each Shared Contract inuring to its respective Businesses as Assets owned by, and/or Liabilities of, as applicable, such Party not later than the applicable Relevant Time and (B) neither report nor take any Tax position (on a Tax Return or otherwise) inconsistent with such treatment (unless required by a change in applicable Tax Law or good faith resolution of a Tax Contest relating to income Taxes).

77

(iv) With respect to Liabilities pursuant to, under or relating to a Shared Contract to the extent relating to occurrences from and after the Relevant Time, such Liabilities shall, unless otherwise allocated pursuant to this Agreement or any Ancillary Agreement, be allocated among SpecCo, MatCo and AgCo as follows:

(1) If such Liability is incurred (x) exclusively in respect of the Agriculture Business, such Liability shall be allocated to AgCo or its applicable Subsidiary, (y) exclusively in respect of the Materials Science Business, such Liability shall be allocated to MatCo or the applicable member of its Group or (z) exclusively in respect of the Specialty Products Business, such Liability shall be allocated to SpecCo or the applicable member of its Group;

(2) If such Liability cannot be so allocated under clause (1) above, such Liability shall be allocated to SpecCo, MatCo or AgCo, as the case may be, based on the relative proportions of total benefit received (over the term of the Shared Contract remaining as of the date of the MatCo Distribution (for apportioning between MatCo, on the one hand, and AgCo and SpecCo on the other hand) or the AgCo Distribution (for apportioning between AgCo and SpecCo)) by the Agriculture Business, the Materials Science Business or the Specialty Products Business, respectively, under the relevant Shared Contract after the Relevant Time; and

(3) Notwithstanding the foregoing in this clause (3), each of AgCo, MatCo or SpecCo shall be responsible for any and all such Liabilities to the extent arising from its (or its Subsidiary's) breach after the Relevant Time of the relevant Shared Contract.

(v) None of SpecCo, MatCo, AgCo or any of the members of their respective Group or their Affiliates shall be required to commence any litigation or offer or pay any money or otherwise grant any accommodation (financial or otherwise) to any third party to (x) obtain any new Contract or Partial Assignment with respect to any Shared Contract, as the case may be or (y) obtain any Consent necessary to enter into an Acceptable Alternative Arrangement; provided, however, any Party to which the benefit of a new Contract, Partial Assignment or Acceptable Alternative Arrangement would inure pursuant to this Section 2.2(d) may request that the Party that is allocated such Shared Contract as an Agriculture Asset, Materials Science Asset or Specialty Products Asset commence litigation, which request shall be considered in good faith by such Party; provided, further, that such Party's good faith determination not to commence litigation shall not in and of itself constitute a breach of this Section 2.2(d)(v), but the foregoing shall not preclude consideration of a Party's good faith for purposes of determining compliance with Section 2.2(d)(v).

78

(vi) From and after the Relevant Time, the Party to whose Group a Shared Contract has been allocated shall not (and shall cause the other members of its Group not to), without the consent of the other applicable Party or Parties (such consent not to be unreasonably withheld, conditioned or delayed) (x) waive any rights under such Shared Contract to the extent related to the Business, Assets or Liabilities of such other Party, (y) terminate (or consent to be terminated by the counterparty) such Shared Contract except in connection with (1) the expiration of such Shared Contract in accordance with its terms (it being understood, for the avoidance of doubt, that sending a notice of non-renewal to the counterparty to such Shared Contract in accordance with the terms of such Shared Contract is expressly permitted) or (2) a partial termination of such Shared Contract that would not reasonably be expected to impact any rights under such Shared Contract related to the Business, Assets or Liabilities of such other Party or Parties or any of its or their respective Subsidiaries, or (z) amend, modify or supplement such Shared Contract in a manner material (relative to the existing rights and obligations related to such other Party's Business, Assets or Liabilities under such Shared Contract) and adverse to the Business, Assets or Liabilities of such other Party or Parties or any of its or their respective Subsidiaries. From and after the MatCo Distribution or AgCo Distribution, as applicable, if a member of a Group (the "Notice Recipient") receives from a counterparty to a Shared Contract a formal notice of breach of such Shared Contract that would reasonably be expected to impact another Group, the Notice Recipient shall provide written notice to the other Party as soon as reasonably practicable (and in no event later than five (5) Business Days following receipt of such notice) and the Parties shall consult with respect to the actions proposed to be taken regarding the alleged breach. If a Group (the "Notifying Party") sends to a counterparty to a Shared Contract a formal notice of breach of such Shared Contract that would reasonably be expected to impact another Group, the Notifying Party shall provide written notice to the other Party as soon as reasonably practicable (and in any event no less than five (5) Business Days prior to sending such notice of breach to the counterparty), and the Parties shall consult with each other regarding such alleged breach. From and after the MatCo Distribution or the AgCo Distribution, as applicable, no Party shall (and shall cause the other members of its Group not to) breach any Shared Contract to the extent such breach would reasonably be expected to result in a loss of rights, or acceleration of obligations, of any member of another Party's Group (or related to its Business, Assets or Liabilities under such Shared Contract) pursuant to (X) such Shared Contract, (Y) any Partial Assignment related to such Shared Contract or (Z) any other Contract with the counterparty to such Shared Contract (or any of its Affiliates) in existence at the time of the applicable MatCo Distribution or AgCo Distribution that contains cross-default or similar provisions related to such Shared Contract.

(e) If any Party believes in good faith that it (or a member of its Group) was intended to have access to all or certain rights or benefits under a Non-Shared Contract pursuant to the efforts by each Group prior to the Relevant Time to separate, replace, replicate, mirror and/or bifurcate Non-Shared Contracts but such Non-Shared Contract is deemed not to inure in part to the benefit or burden of that Party (or a member of its Group) pursuant to Schedule 1.1(212), then such Party may request that the Party whose Group is a party to such Non-Shared Contract enter into a Partial Assignment or Acceptable Alternative Arrangement in accordance with Section 2.2(d)(i) and such other Party shall consider such request in good faith. With respect to any Contract that is (x) a Dow Corporate Contract, (y) a Specified Agriculture DuPont Corporate Contract or (z) a Specified Specialty Products DuPont Corporate Contract, then, (1) in the case of a Dow Corporate Contract, which inures in part to the benefit or burden of

79

any member of the SpecCo Group or the AgCo Group, as the case may be, each of SpecCo or AgCo, as the case may be, may request, in good faith, that MatCo arrange a Partial Assignment or an Acceptable Alternative Arrangement of such Contract pursuant to Section 2.2(d)(i) which request shall be considered in good faith by MatCo and, if MatCo agrees to arrange a Partial Assignment or an Acceptable Alternative Arrangement of such Contract, MatCo shall provide AgCo or SpecCo, as the case may be, reasonable support in arranging such Partial Assignment or Acceptable Alternative Arrangement, (2) in the case of a Specified Agriculture DuPont Corporate Contract which inures in part to the benefit or burden of any member of the SpecCo Group or the MatCo Group, as the case may be, each of SpecCo or MatCo, as the case may be, may request, in good faith, that AgCo arrange a Partial Assignment or an Acceptable Alternative Arrangement of such Contract pursuant to Section 2.2(d)(i) which request shall be considered in good faith by AgCo and, if AgCo agrees to arrange a Partial Assignment or an Acceptable Alternative Arrangement of such Contract, AgCo shall provide MatCo or SpecCo, as the case may be, reasonable support in arranging such Partial Assignment or Acceptable Alternative Arrangement and (3) in the case of a Specified Specialty Products DuPont Corporate Contract which inures in part to the benefit or burden of any member of the AgCo Group or the MatCo Group, as the case may be, each of AgCo or MatCo, as the case may be, may request, in good faith, that SpecCo arrange a Partial Assignment or an Acceptable Alternative Arrangement of such Contract pursuant to Section 2.2(d)(i) which request shall be considered in good faith by SpecCo and, if SpecCo agrees to arrange a Partial Assignment or an Acceptable Alternative Arrangement of such Contract, SpecCo shall provide AgCo or MatCo, as the case may be, reasonable support in arranging such Partial Assignment or Acceptable Alternative Arrangement. The failure to enter into, or arrange, a Partial Assignment or an Acceptable Alternative Arrangement shall not in and of itself constitute a breach of this Section 2.2(e); provided, that the foregoing shall not preclude consideration of a party's efforts in pursuing such consent or approval for purposes of determining compliance with this Section 2.2(e).

(f) Consents. Each Party shall, and shall cause each member of its respective Group to, use its commercially reasonable efforts to obtain the required Consents for the Transfer of any Assets, Contracts, licenses, permits and authorizations issued by any Governmental Entity or parts thereof as contemplated by this Agreement, including those Consents set forth on Schedule 2.2(f). Notwithstanding anything herein to the contrary, no Contract or other Asset shall be transferred if it would violate applicable Law or, in the case of any Contract, the rights of any third party to such Contract; provided that Sections 2.2(d) and 2.5, to the extent provided therein, shall apply thereto.

(g) Each party understands and agrees on behalf of itself and each member of its Group that certain of the Transfers referenced in Section 2.2(b) or Assumptions referenced in Section 2.2(c) have heretofore occurred and, as a result, no additional Transfers or Assumptions by any member of the SpecCo Group, MatCo Group or AgCo Group, as applicable, shall be deemed to occur upon the execution of this Agreement with respect thereto. To the extent that a member of the SpecCo Group, the MatCo Group or the AgCo Group, as applicable, owns a Specialty Products Asset, Materials Science Asset or Agriculture Asset, respectively, as of the Effective Time, there shall be no need for such member to Transfer such Asset in connection with the operation of Section 2.2(b). Moreover, to the extent that a member of the SpecCo Group, the MatCo Group or the AgCo Group, as applicable, is liable for any Specialty Products Liability, Materials Science Liability or Agriculture Liability, respectively, at the Effective Time, there shall be no need for such member to Assume such Liability in connection with the operation of Section 2.2(c).

80

Section 2.3 <u>Intergroup Accounts; Intercompany Accounts</u>.

(a) Except as set forth in <u>Section 8.1(b)</u>, any and all intercompany receivables, payables, loans and balances (other than (x) as specifically provided for under this Agreement, under any Ancillary Agreement, under any Continuing Arrangements as set forth on <u>Schedule 1.1(68)</u> or (y) as otherwise set forth on <u>Schedule 2.3(a)</u> (the matters set forth on <u>Schedule 2.3(a)</u>, the "<u>Other Surviving Intergroup Accounts</u>")) (i) between any member of (A) the SpecCo Group or (B) the AgCo Group, in each case (clauses (A) and (B)), that was a member of Historical DuPont, on the one hand, and any member of the MatCo Group that was a member of Historical DuPont, on the other hand, which exist as of immediately prior to the Tower Realignment Time, (ii) between any member of the AgCo Group that was a member of Historical DuPont, on the one hand, and any member of the SpecCo Group that was a member of Historical DuPont, on the other hand, as of immediately prior to the AgCo Distribution Date (clauses (i) and (ii), the "<u>Historical DuPont Intergroup Accounts</u>") or (iii) between any member of the MatCo Group that was a member of Historical Dow, on the one hand, and any member of (x) the AgCo Group that was a member of Historical Dow or (y) the SpecCo Group that was a member of Historical Dow, on the other hand, or between any member of the AgCo Group that was a member of Historical Dow or any member of the SpecCo Group that was a member of Historical Dow, in each case, which exist as of immediately prior to the Tower Realignment Time (the "<u>Historical Dow Intergroup Accounts</u>" and together with the Historical DuPont Intergroup Accounts, the "<u>Intergroup Accounts</u>") shall, prior to the Tower Realignment Time (or, in the case of clause (ii) prior to the AgCo Distribution Date), be caused by Historical Dow (in the case of clause (iii)) and Historical DuPont (in the case of clauses (i) and (ii)) to be settled immediately prior to the Tower Realignment Time, by means of cash payments, a dividend, capital contribution, a combination of the foregoing or otherwise. For the avoidance of doubt, the Other Surviving Intergroup Accounts (i) shall be an obligation of the relevant Party (or the relevant member of such Party's Group), each responsible for fulfilling its (or a member of such Party's Group's) obligations in accordance with the terms and conditions applicable to such obligation or if such terms and conditions are not set forth in writing, such obligation shall be satisfied within the payment terms set forth therefor on <u>Schedule 2.3(a)</u> or thirty (30) days of a written request by the beneficiary of such obligation given to the corresponding obligor thereunder, and (ii) shall be for each relevant Party (or the relevant member of such Party's Group) an obligation to a third party and shall no longer be an intercompany account. The covenants and agreements of Historical Dow under clause (iii) of the first sentence of this <u>Section 2.3(a)</u> shall constitute Materials Science Liabilities and the covenants and agreements of Historical DuPont under clause (i)(A) of the first sentence of this <u>Section 2.3(a)</u> shall constitute Specialty Products Liabilities and those under clause (i)(B) of the first sentence of this <u>Section 2.3(a)</u> shall constitute Agriculture Liabilities and those under clause (ii) of the first sentence of this <u>Section 2.3(a)</u> shall constitute Shared Historical DuPont Liabilities.

(b) Except as set forth in <u>Section 8.1(b)</u>, all intercompany receivables, payables, loans and balances (other than (x) as specifically provided for under this Agreement or (y) as otherwise set forth on <u>Schedule 2.3(b)(1)</u> (the matters set forth on <u>Schedule 2.3(b)(1)</u>, the "<u>Other Surviving Selected Intercompany Accounts</u>")) (i) between two or more members of the

81

SpecCo Group that were members of Historical Dow, (ii) between any two or more members of the AgCo Group that were members of Historical Dow (together with those described in clause (i), the "Historical Dow Selected Intercompany Accounts") or (iii) between two or more members of the MatCo Group that were members of Historical Dow (the "Historical DuPont Selected Intercompany Accounts"), in each case, which exist as of the Tower Realignment Time (collectively, clauses (i)-(iii), the "Selected Intercompany Accounts") shall, prior to the Tower Realignment Time, be caused by Historical Dow (in the case of Historical Dow Selected Intercompany Accounts) and Historical DuPont (in the case of clause Historical DuPont Selected Intercompany Accounts) to be settled, by means of cash payments, a dividend, capital contribution, a combination of the foregoing or otherwise; provided, however, that the Other Surviving Selected Intercompany Accounts shall remain an obligation of the relevant Party (or the relevant member of such Party's Group), each responsible for fulfilling its (or a member of such Party's Group's) obligations in accordance with the terms and conditions applicable to such obligation or if such terms and conditions are not set forth in writing, such obligation shall be satisfied within the payment terms set forth therefor on Schedule 2.3(b)(1) or thirty (30) days of a written request by the beneficiary of such obligation given to the corresponding obligor thereunder. The covenants and agreements of Historical Dow under clauses (i) and (ii) shall constitute Materials Science Liabilities and the covenants and agreements of Historical DuPont under clause (iii) shall constitute Shared Historical DuPont Liabilities; provided, however, that each Party's (and each Indemnitee's) rights to indemnification for Taxes as set forth in the Tax Matters Agreement with respect to any failure to settle, prior to the Tower Realignment Time, any of the Selected Intercompany Accounts set forth on Schedule 2.3(b)(2) (the matters set forth on Schedule 2.3(b)(2), the "Scheduled Selected Intercompany Accounts") shall be governed exclusively by the Tax Matters Agreement; provided, further, that the Indemnitee shall use its commercially reasonable efforts, to the extent practicable, to mitigate any Indemnifiable Losses (other than Taxes) due to a breach of this covenant by a Party (but this shall not require the Indemnitee to pay any money to a third party or settle any Selected Intercompany Accounts).

(c) All receivables, payables, loans and balances (other than as specifically provided for under this Agreement) between a member of Historical Dow and a member of Historical DuPont (the "Intertower Accounts") that are due prior to April 1, 2019, and would, after the MatCo Distribution, be receivables, payables, loans and balances (w) between members of the MatCo Group, (x) between members of the AgCo Group, (y) between members of the SpecCo Group or (z) between a member of Historical Dow that is a member of the AgCo Group (on the one hand) and a member of Historical Dow that is a member of the SpecCo Group (on the other hand), in each case (clauses (w)-(z)), which exist as of the Tower Realignment Time shall, prior to the Tower Realignment Time, be caused by Historical Dow (in the case of Intertower Accounts for which a member of Historical Dow is the obligor) and Historical DuPont (in the case of Intertower Accounts for which a member of Historical DuPont is the obligor) to be settled, by means of cash payments. The covenants and agreements of Historical Dow under the preceding sentence shall constitute Materials Science Liabilities and the covenants and agreements of Historical DuPont under the preceding sentence shall constitute Shared Historical DuPont Liabilities.

82

Section 2.4 <u>Limitation of Liability; Intergroup Contracts</u>.

(a) No Party shall have any Liability to any other Party in the event that any information exchanged or provided pursuant to this Agreement (but excluding any such information included in a Distribution Disclosure Document or Financing Disclosure Document) which is an estimate or forecast, or which is based on an estimate or forecast, is found to be inaccurate.

(b) Except as set forth in <u>Section 2.4(c)</u>, no Party or any other member of its Group shall be liable to any other Party or any other member of such other Party's Group based upon, arising out of or resulting from any Contract, arrangement, course of dealing or understanding existing on or prior to the Relevant Time (other than this Agreement, the Ancillary Agreements, the Continuing Arrangements, the Other Surviving Intergroup Accounts, and the Other Surviving Selected Intercompany Accounts) and each Party (on behalf of itself and each other member of its Group) hereby terminates any and all Contracts, arrangements, course of dealings or understandings between or among it or any of its other Group members, on the one hand, and any other Party or any of its respective Group members, on the other hand, effective as of the Relevant Time (other than this Agreement, the Ancillary Agreements, the Continuing Arrangements, the Other Surviving Intergroup Accounts, the Other Surviving Selected Intercompany Accounts and the Conveyancing and Assumption Instruments). No such terminated Contract, arrangement, course of dealing or understanding (including any provision thereof which purports to survive termination) shall be of any further force or effect after the applicable Relevant Time. The Parties shall, and shall cause the other members of their respective Groups to, execute and deliver such agreements, instruments and other papers as may be required to terminate any such Contract, arrangement, course of dealing or understanding pursuant to this <u>Section 2.4(b)</u> if so requested by a Party.

(c) The provisions of <u>Section 2.4(b)</u> shall not apply to any of the following Contracts, arrangements, course of dealings or understandings (or to any of the provisions thereof): any agreements, arrangements, commitments or understandings to which any Person other than the Parties and their respective Affiliates is a Party (it being understood that (x) to the extent that the rights and obligations of the Parties and the members of their respective Groups under any such Contracts constitute Agriculture Assets or Agriculture Liabilities, Materials Science Assets or Materials Science Liabilities, or Specialty Products Assets or Specialty Products Liabilities, such Contracts shall be assigned or retained pursuant to <u>Article II</u> and (y) the obligations of any member of a Group to any other Group shall be deemed terminated as of the Relevant Time with no further liability to any Group as a result thereof).

(d) If any Contract, arrangement, course of dealing or understanding is terminated pursuant to <u>Section 2.4(b)</u>, and, but for the mistake or oversight of any Party, would have been listed as continuing and is reasonably necessary for such affected Party to be able to continue to operate its Business in substantially the same manner in which such Businesses were operated prior to the applicable Relevant Time, then, at the request of such affected Party made within fifteen (15) months following the applicable Relevant Time, the Parties shall negotiate in good faith to determine whether and to what extent (including the terms and conditions relating thereto), if any, notwithstanding such termination, such Contract, arrangement, course of dealing or understanding should continue, or as appropriate, be re-instated, following the applicable Relevant Time; <u>provided</u>, however, that any Party may determine, in its sole discretion, not to re-instate or otherwise continue any such Contract, arrangement, course of dealing or understanding.

83

Section 2.5 <u>Transfers Not Effected On or Prior to the Effective Time; Transfers Deemed Effective as of the Effective Time</u>.

      (a) To the extent that any Transfers or Assumptions contemplated by this <u>Article II</u>, including the Transfers of certain Assets and Assumptions of certain Liabilities set forth on <u>Schedule 2.5</u>, shall not have been consummated at or prior to the Effective Time, the Parties shall use commercially reasonable efforts to effect such Transfers or Assumptions as promptly following the Effective Time as shall be practicable. Nothing herein shall be deemed to require or constitute the Transfer of any Assets or the Assumption of any Liabilities which by their terms or operation of Law cannot be Transferred; <u>provided</u>, <u>however</u>, that the Parties and their respective Subsidiaries shall cooperate and use commercially reasonable efforts to seek to obtain, in accordance with applicable Law, any necessary Consents for the Transfer of all Assets and Assumption of all Liabilities contemplated to be Transferred and Assumed pursuant to this <u>Article II</u> to the fullest extent permitted by applicable Law, including the Consents set forth on <u>Schedule 2.2(f)</u>. In the event that any such Transfer of Assets or Assumption of Liabilities has not been consummated, from and after the Effective Time (i) the Party (or relevant member in its Group) retaining such Asset shall thereafter hold (or shall cause such member in its Group to hold) such Asset in trust for the use and benefit of the Party entitled thereto (at the expense of the Party entitled thereto) and (ii) the Party intended to Assume such Liability shall, or shall cause the applicable member of its Group to, pay or reimburse the Party retaining such Liability for all amounts paid or incurred in connection with the retention of such Liability. To the extent the foregoing applies to any Contracts (other than Shared Contracts, which shall be governed solely by <u>Section 2.2(d)</u>) to be assigned for which any necessary Consents are not received prior to the Effective Time, the treatment of such Contracts shall, for the avoidance of doubt, also be subject to <u>Section 2.9</u> and <u>Section 2.10</u>, to the extent applicable. In addition, the Party retaining such Asset or Liability (or relevant member of its Group) shall (or shall cause such member in its Group to) treat, insofar as reasonably possible and to the extent permitted by applicable Law, such Asset or Liability in the ordinary course of business and take such other actions as may be reasonably requested by the Party to which such Asset is to be Transferred or by the Party responsible for Assuming such Liability in order to place such Party, insofar as reasonably possible and to the extent permitted by applicable Law, in the same position as if such Asset or Liability had been Transferred or Assumed as contemplated hereby and so that all the benefits and burdens relating to such Asset or Liability, including possession, use, risk of loss, potential for income and gain, and dominion, control and command over such Asset or Liability, are to inure from and after the Effective Time to the relevant member or members of the SpecCo Group, MatCo Group or AgCo Group entitled to the receipt of such Asset or required to Assume such Liability. In furtherance of the foregoing, each Party agrees (on behalf of itself and each other member of its Group) that, as of the Effective Time, subject to <u>Section 2.2(c)</u> and <u>Section 2.9(b)</u>, each Party and/or each member of its Group shall (i) be deemed to have acquired complete and sole beneficial ownership over all of the Assets, together with all rights, powers and privileges incident thereto, and shall be deemed to have Assumed in accordance with the terms of this Agreement all of the Liabilities, and all duties, obligations and responsibilities incident thereto, which such Party is entitled to acquire or required to Assume pursuant to the

84

terms of this Agreement and (ii) (A) enforce at another Party's (or relevant member of its Group's) request, or allow another Party's Group to enforce in a commercially reasonable manner, any rights of the Party or its Group under such Assets and Liabilities against any other Persons, (B) not waive any rights related to such Assets or Liabilities to the extent related to the Business, Assets or Liabilities of another Party's Group (C) not terminate (or consent to be terminated by the counterparty) any Contract that constitutes such Asset except in connection with the expiration of such Contract in accordance with its terms, (D) not amend, modify or supplement any Contract that constitutes such Asset and (E) provide written notice to the applicable other Party as soon as reasonably practicable (and in no event later than five (5) Business Days following receipt) after receipt of any formal notice of breach received from a counterparty to any Contract that constitutes such Asset; provided, that the costs and expenses incurred by the responding Party or its Group in respect of any request by another Party in respect of such Assets or Liabilities shall be borne solely by the requesting Party or its Group.

(b) If and when the Consents and/or conditions, the absence or non-satisfaction of which caused the deferral of Transfer of any Asset or deferral of the Assumption of any Liability pursuant to Section 2.5(a), are obtained or satisfied, the Transfer, assignment, Assumption or novation of the applicable Asset or Liability shall be effected without further consideration in accordance with and subject to the terms of this Agreement (including Sections 2.2 and 2.5) and/or the applicable Ancillary Agreement, and shall, to the extent possible without the imposition of any undue cost on any Party, be deemed to have become effective as of the Effective Time.

(c) The Party (or relevant member of its Group) retaining any Asset or Liability due to the deferral of the Transfer of such Asset or the deferral of the Assumption of such Liability pursuant to Section 2.5(a) or otherwise shall (i) not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced, assumed, or agreed in advance to be reimbursed by the Party (or relevant member of its Group) entitled to such Asset or the Person intended to be subject to such Liability, other than reasonable attorneys' fees and recording or similar or other incidental fees, all of which shall be promptly reimbursed by the Party (or relevant member of its Group) entitled to such Asset or the Person intended to be subject to such Liability and (ii) be indemnified for all Indemnifiable Losses or other Liabilities arising out of any actions (or omissions to act) of such retaining Party taken at the direction of the other Party (or relevant member of its Group) in connection with and relating to such retained Asset or Liability, as the case may be. Except as otherwise expressly provided herein, none of SpecCo, MatCo or AgCo or any of their respective Affiliates shall be required to commence any litigation or offer or pay any money or otherwise grant any accommodation (financial or otherwise) to any third party with respect to any Assets or Liabilities not Transferred as of the Effective Time; provided, however, that any Party to which such Asset or Liability has not been Transferred or Assumed, respectively, due to the deferral of the Transfer of such Asset or the deferral of the Assumption of such Liability may request that the Party retaining such Asset or Liability commence litigation, which request shall be considered in good faith by the Party retaining such Asset or Liability; provided, further, that a Party's good faith determination not to commence litigation shall not in and of itself constitute a breach of this Section 2.5(c), but the foregoing shall not preclude consideration of a Party's good faith for purposes of determining compliance with this Section 2.5(c).

85

(d) Notwithstanding anything else set forth in this Section 2.5 to the contrary, (A) neither SpecCo nor any of its Subsidiaries shall be required by this Section 2.5 to take any action that may, in the good faith judgment of SpecCo, (x) result in a violation of any obligation which SpecCo or any such Subsidiary has to any third party or (y) violate applicable Law, (B) neither MatCo nor any of its Subsidiaries shall be required by this Section 2.5 to take any action that may, in the good faith judgment of MatCo, (x) result in a violation of any obligation which MatCo or any such Subsidiary has to any third party or (y) violate applicable Law and (C) neither AgCo nor any of its Subsidiaries shall be required by this Section 2.5 to take any action that may, in the good faith judgment of AgCo, (x) result in a violation of any obligation which AgCo or any such Subsidiary has to any third party or (y) violate applicable Law.

(e) The failure to obtain a Consent shall not in and of itself constitute a breach of this Agreement; provided, that the foregoing shall not preclude consideration of a Party's efforts in pursuing such Consent for purposes of determining compliance with this Section 2.5.

(f) To the extent permitted by applicable Law, with respect to Assets and Liabilities described in Section 2.5(a), each of SpecCo, MatCo and AgCo shall, and shall cause the members of its respective Group to, (i) treat for all Tax purposes (A) the deferred Assets as assets having been Transferred to and owned by the Party entitled to such Assets not later than the applicable Relevant Time and (B) the deferred Liabilities as liabilities having been Assumed and owned by the Person intended to be subject to such Liabilities not later than the applicable Relevant Time and (ii) neither report nor take any Tax position (on a Tax Return or otherwise) inconsistent with such treatment (unless required by a change in applicable Tax Law or good faith resolution of a Tax Contest).

Section 2.6 Wrong Pockets; Mail & Other Communications; Payments.

(a) Subject to Section 2.5 (Transfers Not Effected On or Prior to the Effective Time; Transfers Deemed Effective as of the Effective Time) and Section 2.2(d) (Treatment of Shared Contracts), (i) if at any time within twenty-four (24) months after the applicable Relevant Time any Party discovers that any Agriculture Asset is held by any member of the SpecCo Group, the MatCo Group or any of their respective then-Affiliates, SpecCo and MatCo shall, and shall cause the other members of their respective Group and its and their respective then-Affiliates to, use their respective reasonable best efforts to promptly procure the transfer of the relevant Agriculture Asset to AgCo or an Affiliate of AgCo designated by AgCo for no additional consideration, (ii) if at any time within twenty-four (24) months after the MatCo Distribution, any Party discovers that any Materials Science Asset is held by SpecCo, AgCo or any of their respective Affiliates, SpecCo and AgCo shall use their respective reasonable best efforts to promptly procure the transfer of the relevant Materials Science Asset to MatCo or an Affiliate of MatCo designated by MatCo for no additional consideration; or (iii) if at any time within twenty-four (24) months after the applicable Relevant Time, any Party discovers that any Specialty Products Asset is held by MatCo, AgCo or any of their respective Affiliates, MatCo and AgCo shall use their respective reasonable best efforts to promptly procure the transfer of the relevant Specialty Products Asset to SpecCo or an Affiliate of SpecCo designated by SpecCo for no additional consideration; provided that in the case of clause (i),

86

neither SpecCo or MatCo nor any of their respective Affiliates, in the case of clause (ii), neither SpecCo or AgCo nor any of their respective Affiliates, or in the case of clause (iii), neither MatCo or AgCo nor any of their respective Affiliates, shall be required to commence any litigation or offer or pay any money or otherwise grant any accommodation (financial or otherwise) to any third party. If reasonably practicable and permitted under applicable Law, such Transfer may be effected by rescission of the applicable portion of a Conveyancing and Assumption Instrument as may be agreed by the relevant Parties.

(b) On and prior to the twenty-four (24) month anniversary following the applicable Relevant Time, if any Party or any member of its Group or (or any of its or their respective then-Affiliates) owns any Asset, that, although not Transferred pursuant to this Agreement, is agreed by such Party and the other applicable Party in their good faith judgment to be an Asset that more properly belongs to such other Party or a member of its Group, or is an Asset that such other Party or a member of its Group was intended to have the right to continue to use (other than (for the avoidance of doubt), as between any two Parties, or any Asset acquired from an unaffiliated third party by a Party or member of such Party's Group following the applicable Relevant Time), then the Party or a member of its Group (or applicable then-Affiliate) owning such Asset shall, as applicable (i) Transfer any such Asset to the Party or a member of its Group identified as the appropriate transferee and following such Transfer, such Asset shall be an Agriculture Asset, Materials Science Asset or Specialty Products Asset, as the case may be, or (ii) grant such mutually agreeable rights with respect to such Asset to permit such continued use, subject to, and consistent with this Agreement, including with respect to Assumption of associated Liabilities. If reasonably practicable and permitted under applicable law, such Transfer may be effected by rescission of the applicable portion of a Conveyancing and Assumption Instrument as may be agreed by the relevant Parties.

(c) After the Effective Time, each Party (or any member of its Group and any of its or their respective then-Affiliates) may receive mail, packages and other communications properly belonging to another Party (or any member of its Group). Accordingly, at all times after the Effective Time, each Party (or any member of its Group and any of its or their respective then-Affiliates) is hereby authorized to receive and, to the extent reasonably necessary to identify the proper recipient in accordance with this Section 2.6(c), open all mail, packages and other communications received by such Party (or member of its Group or its or their then-Affiliate) that belongs to such other Party (or member of such other Party's Group), and to the extent that they do not relate to the business of the receiving Party, the receiving Party shall as promptly as reasonably practicable deliver or cause to be delivered such mail, packages or other communications (or, in case the same also relates to the business of the receiving Party or another Party, copies thereof) to such other Party as provided for in Section 12.6; provided that, if a Party (or any member of its Group and any of its or their respective then-Affiliates) receives any claim or demand against any other Party (or any member of such other Party's Group), or any notice or other communication regarding any Action involving any other Party (or any member of such other Party's Group), such Party shall and shall cause the other members of its Group to, as promptly as practicable (and, in any event, use commercially reasonable efforts to do so within fifteen (15) days after receipt thereof) notify such other Party (including such other Party's legal department) of the receipt of such claim, demand, notice or other communication, and shall promptly deliver such claim, demand, notice or other communication (or, in case the same also relates to the business of the receiving Party or another Party, copies

87

thereof) to such other Party provided, however, that the failure to provide such notice shall not constitute a breach of this Section 2.6(c) except to the extent that any such Party shall have been actually prejudiced as a result of such failure. The provisions of this Section 2.6(c) are not intended to, and shall not, be deemed to constitute an authorization by any Party or any other member of any Group (or any of their Affiliates from time to time) to permit the other to accept service of process on its behalf and no Party is or shall be deemed to be the agent of any other Party or any other member of any Group or any of their respective then-Affiliates for service of process purposes.

(d) After the MatCo Distribution, each of SpecCo and AgCo shall, and shall cause the other members of its Group and its and any of their respective then-Affiliates to, promptly pay or deliver to MatCo (or its designee) any monies or checks that have been received by SpecCo or AgCo (or another member of its Group or its or their respective then-Affiliates) after the MatCo Distribution to the extent they are (or represent the proceeds of) a Materials Science Asset (it being understood and agreed that any such amounts shall be paid and delivered on a monthly basis, in each case to the applicable members of the applicable Group; provided, that if the aggregate amount not yet paid or delivered by the SpecCo Group or the AgCo Group, as applicable, exceeds $100,000 before such monthly payment and delivery, such amount shall be paid and delivered to the applicable members of the MatCo Group within seven (7) days).

(e) After the MatCo Distribution, MatCo shall, or shall cause the other members of its Group and its and any of its respective then-Affiliates to, promptly pay or deliver to SpecCo (or its designee) any monies or checks that have been received by MatCo (or another member of its Group or its or its respective then-Affiliates) after the MatCo Distribution to the extent they are (or represent the proceeds of) a Specialty Products Asset (it being understood and agreed that any such amounts shall be paid and delivered on a monthly basis, in each case to the applicable members of the SpecCo Group; provided, that if the aggregate amount not yet paid or delivered exceeds $100,000 before such monthly payment and delivery, such amount shall be paid and delivered to the applicable members of the SpecCo Group within seven (7) days).

(f) After the MatCo Distribution, MatCo shall, or shall cause the other members of its Group and its and any of its respective then-Affiliates to, promptly pay or deliver to AgCo (or its designee) any monies or checks that have been received by MatCo (or another member of its Group or its or its respective then-Affiliates) after the MatCo Distribution to the extent they are (or represent the proceeds of) an Agriculture Asset (it being understood and agreed that any such amounts shall be paid and delivered on a monthly basis, in each case to the applicable members of the AgCo Group; provided, that if the aggregate amount not yet paid or delivered exceeds $100,000 before such monthly payment and delivery, such amount shall be paid and delivered to the applicable members of the AgCo Group within seven (7) days).

(g) After the AgCo Distribution, SpecCo shall, or shall cause the other members of its Group and its and any of its respective then-Affiliates to, promptly pay or deliver to AgCo (or its designee) any monies or checks that have been received by SpecCo (or another member of its Group or its or its respective then-Affiliates) after the AgCo Distribution to the extent they are (or represent the proceeds of) an Agriculture Asset (it being understood and agreed that any such amounts shall be paid and delivered on a monthly basis, in each case to the applicable members of the AgCo Group; provided, that if the aggregate amount not yet paid or delivered exceeds $100,000 before such monthly payment and delivery, such amount shall be paid and delivered to the applicable members of the AgCo Group within seven (7) days).

88

(h) After the AgCo Distribution, AgCo shall, or shall cause the other members of its Group and its any of its respective then-Affiliates to, promptly pay or deliver to SpecCo (or its designee) any monies or checks that have been received by AgCo (or another member of its Group or its or its respective then-Affiliates) after the AgCo Distribution to the extent they are (or represent the proceeds of) a Specialty Products Asset (it being understood and agreed that any such amounts shall be paid and delivered on a monthly basis, in each case to the applicable members of the SpecCo Group; provided, that if the aggregate amount not yet paid or delivered exceeds $100,000 before such monthly payment and delivery, such amount shall be paid and delivered to the applicable members of the SpecCo Group within seven (7) days).

(i) Notwithstanding Sections 2.5 and 5.2 of this Agreement, MatCo acknowledges on behalf of itself and the other members of its Group that (i) the Transfer or delivery of the Agriculture Assets owned or possessed by members of the MatCo Group, (ii) the provision of access to Information that AgCo has, pursuant to this Agreement or any Designated Ancillary Agreement, the right to access and (iii) the provision of access to Information that AgCo has, pursuant to this Agreement or any Ancillary Agreement, the right to use, in each case (clauses (i)-(iii)), as set forth on Schedule 2.6(i), has not been consummated at or prior to the Effective Time and MatCo shall effect such Transfers, delivery and provision of access to AgCo (or its designee) as promptly following the Effective Time as shall be practicable (and in any event, prior to the time set forth therefor on Schedule 2.6(i)) and otherwise in accordance with Section 2.6(a) (in respect of the Transfer of the Agriculture Assets) and the other applicable provisions of this Agreement and the applicable Ancillary Agreements (including the Service Addendum regarding Access to Information and Records set forth in each of the General Services Agreements).

(j) Notwithstanding Sections 2.5 and 5.2 of this Agreement, MatCo acknowledges on behalf of itself and the other members of its Group that (i) the Transfer or delivery of the Specialty Products Assets owned or possessed by members of the MatCo Group, (ii) the provision of access to Information that SpecCo has, pursuant to this Agreement or any Designated Ancillary Agreement, the right to access, and (iii) the provision of access to Information that SpecCo has, pursuant to this Agreement or any Ancillary Agreement, the right to use, in each case (clauses (i)-(iii)), as set forth on Schedule 2.6(j), has not been consummated at or prior to the Effective Time and MatCo shall effect such Transfers, delivery and provision of access to SpecCo (or its designee) as promptly following the Effective Time as shall be practicable (and in any event, prior to the time set forth therefor on Schedule 2.6(j)) and otherwise in accordance with Section 2.6(a) (in respect of the Transfer of the Specialty Products Assets) and the other applicable provisions of this Agreement and the applicable Ancillary Agreements (including the Service Addendum regarding Access to Information and Records set forth in each of the General Services Agreements).

(k) Notwithstanding Sections 2.5 and 5.2 of this Agreement, each of AgCo and SpecCo acknowledges on behalf of itself and the other members of its Group that (i) the Transfer or delivery of the Materials Science Assets owned or possessed by either members of the AgCo Group or members of the SpecCo Group, respectively, (ii) the provision of access to

89

Information that MatCo has, pursuant to this Agreement or any Designated Ancillary Agreement, the right to access, and (iii) the provision of access to Information that MatCo has, pursuant to this Agreement or any Ancillary Agreement, the right to use, in each case (clauses (i)-(iii)), as set forth on Schedule 2.6(k) has not been consummated at or prior to the Effective Time and each of AgCo and SpecCo, respectively, shall effect such Transfers, delivery and provision of access to MatCo (or its designee) as promptly following the Effective Time as shall be practicable (and in any event, prior to the time set forth therefor on Schedule 2.6(k)) and otherwise in accordance with Section 2.6(a) (in respect of the Transfer of the Materials Science Assets) and the other applicable provisions of this Agreement and the applicable Ancillary Agreements (including the Service Addendum regarding Access to Information and Records set forth in each of the General Services Agreements).

Section 2.7 Conveyancing and Assumption Instruments.

(a) In connection with, and in furtherance of, the Transfers of Assets and the acceptance and Assumptions of Liabilities contemplated by this Agreement, the Parties shall execute or cause to be executed, on or prior to the Relevant Time, by the appropriate entities, the Conveyancing and Assumption Instruments necessary to evidence the valid and effective Assumption by the applicable Party of its Assumed Liabilities and the valid Transfer to the applicable Party or member of such Party's Group of all right, title and interest in and to its accepted Assets, in substantially the form contemplated hereby for Transfers and Assumptions to be effected pursuant to Delaware Law or the Laws of one of the other states of the United States or, if not appropriate for a given Transfer or Assumption, and for Transfers and Assumptions to be effected pursuant to non-U.S. Laws, in such other form as the Parties shall reasonably agree; provided that Section 8.5(f) shall apply to each Transfer and Assumption contemplated by this Agreement.

(b) With respect to the transfer, directly or indirectly, in connection with the transactions contemplated hereby, of real property (or any portion thereof) that is, or at any time has been, used for any Industrial Purpose, whether or not of record (the portion of such real property that is or has been used for an Industrial Purpose, the "Transferred Industrial Real Property"), the restrictions set forth on Exhibit C attached hereto (the "Industrial Real Property Restrictions") shall apply unless (A) the transferee of such Transferred Industrial Real Property reasonably determines that compliance with one or more of the Industrial Real Property Restrictions is not necessary based on the facts and circumstances existing at the time and notifies the applicable transferor thereof, and (B) such transferor consents in writing thereto (such consent not to be unreasonably withheld, conditioned or delayed). In furtherance of the foregoing, prior to the Tower Realignment Time, the transferor of any Transferred Industrial Real Property shall be entitled to, in its reasonable discretion, taking into account applicable Law and practicality, exclude or modify to be less stringent any or all of the Industrial Real Property Restrictions. With respect to any Transferred Industrial Real Property that constitutes an Agriculture Asset, Materials Science Asset or Specialty Products Asset, AgCo (or the applicable member of its Group), MatCo (or the applicable member of its Group) or SpecCo (or the applicable member of its Group), respectively may, in its discretion, request that the transferor of such Transferred Industrial Real Property remove one or more Industrial Real Property Restrictions in the event that facts and circumstances reasonably warrant such removal, and, provided that the transferor of such

90

Transferred Industrial Real Property consents in writing to such removal (such consent not to be unreasonably withheld, conditioned or delayed), the transferor shall (or if the transferor is a member of a Party's Group, that Party shall cause such transferor to), at the expense of the requesting Party (or applicable member of its Group), reasonably cooperate to remove such Industrial Real Property Restrictions. Unless and until the Industrial Real Property Restrictions have been removed, each Party shall, and shall cause the other members of its Group and its and their respective transferees to, comply with the Industrial Real Property Restrictions, unless in the reasonable discretion of the Parties, enforcement of the applicable Industrial Real Property Restrictions is not necessary based on the facts and circumstances existing at the time.

Section 2.8 Further Assurances.

(a) In addition to and without limiting the actions specifically provided for elsewhere in this Agreement and subject to the limitations expressly set forth in this Agreement, including Section 2.5, each of the Parties shall, and shall cause the other members of its Group to, cooperate with each other and use commercially reasonable efforts, on and after the Effective Time, to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary on its part under applicable Law or contractual obligations to consummate and make effective the transactions contemplated by this Agreement.

(b) Without limiting the foregoing, on and after the Effective Time, each Party shall, and shall cause the other members of its Group to, cooperate with the other Parties (or the relevant member of its Group), and without any further consideration, but at the expense (unless allocated to the Group of the requested Party pursuant to the other terms of this Agreement) of the requesting Party (or the relevant member of its Group) (except as provided in Sections 2.2(d)(v) and 2.5(c)) from and after the Effective Time, to execute and deliver, or use commercially reasonable efforts to cause to be executed and delivered, all instruments, including instruments of Transfer, and to make all filings with, and to obtain all Consents, any permit, license, Contract, indenture or other instrument (including any Consents), and to take all such other actions as such Party (or the relevant member of its Group) may reasonably be requested to take by any other Party (or the relevant member of its Group) from time to time, consistent with the terms of this Agreement, in order to effectuate the provisions and purposes of this Agreement and the Transfers of the applicable Assets and the assignment and Assumption of the applicable Liabilities and the other transactions contemplated hereby. Without limiting the foregoing, each Party shall, and shall cause the other members of its Group to, at the reasonable request, cost and expense (unless allocated to the Group of the requested Party (or other member of its Group) pursuant to the other terms of this Agreement) of any other Party, take such other actions as may be reasonably necessary to vest in such other Party (or other member of its Group) such title and such rights as possessed by the transferring Party (or its Group) to the Assets allocated to such Party (or member of its Group) under this Agreement, free and clear of any Security Interest.

Section 2.9 Novation of Liabilities.

(a) Each Party, at the request of another Party (such other Party, the "Other Party"), shall use commercially reasonable efforts to obtain, or to cause to be obtained, any Consent, release, substitution or amendment required to novate or assign to the fullest extent permitted by Law all obligations under Contracts (other than Shared Contracts, which shall be

91

governed by Section 2.2(d)), and other obligations or Liabilities (other than with regard to guarantees or Credit Support Instruments, which shall be governed by Section 2.10) for which a member of such Party's Group and a member of the Other Party's Group are jointly or severally liable and that do not constitute Liabilities of such Other Party as provided in this Agreement, or to obtain in writing the unconditional release of the applicable Other Party to such arrangements (other than any member of the Group who Assumed or retained such Liability as set forth in this Agreement), so that, in any such case, the members of the applicable Group will be solely responsible for such Liabilities; provided, however, that no Party shall be obligated to pay any consideration therefor to any third party from whom any such Consent, substitution or amendment is requested (unless such Party is fully reimbursed by the requesting Party). For the purposes of complying with the terms set forth in this Section 2.9, not more than thirty (30) Business Days after the end of each of the first six (6) fiscal quarters after the applicable Relevant Time, each of AgCo, MatCo and SpecCo shall deliver to the other Parties a list of the Consents, releases, substitutions or amendments required to novate or assign to the fullest extent permitted by Law all obligations under Contracts (other than Shared Contracts, which shall be governed by Section 2.2(d)), and other obligations or Liabilities (other than with regard to guarantees or Credit Support Instruments, which shall be governed by Section 2.10) for which a member of such Party's Group and a member of the Other Party's Group are jointly or severally liable and that do not constitute Liabilities of such Other Party as provided in this Agreement, along with the status and anticipated timing for obtaining such Consents, releases, substitutions or amendments required.

(b) If the Parties are unable to obtain, or to cause to be obtained, any such required Consent, release, substitution or amendment, the Other Party or a member of such Other Party's Group shall continue to be bound by such Contract or other obligation that does not constitute a Liability of such Other Party and, unless not permitted by Law or the terms thereof, as agent or subcontractor for such Party, the Party or member of such Party's Group who Assumed or retained such Liability as set forth in this Agreement (the "Liable Party") shall, or shall cause a member of its Group to, directly pay, perform and discharge fully all the obligations or other Liabilities of such Other Party or member of such Other Party's Group thereunder from and after the Effective Time. The Other Party shall, without further consideration, promptly pay and remit, or cause to be promptly paid or remitted, to the Liable Party or to another member of the Liable Party's Group, all money, rights and other consideration received by it or any member of its Group in respect of such performance by the Liable Party (unless any such consideration is an Asset of such Other Party pursuant to this Agreement). If and when any such Consent, release, substitution or amendment shall be obtained or such agreement, lease or other rights or obligations shall otherwise become assignable or able to be novated, the Other Party shall promptly Transfer all rights, obligations and other Liabilities thereunder of any member of such Other Party's Group to the Liable Party or to another member of the Liable Party's Group without payment of any further consideration and the Liable Party, or another member of such Liable Party's Group, without the payment of any further consideration, shall Assume such rights and Liabilities. Each of the applicable Parties shall, and shall cause their respective Subsidiaries to, take all actions and do all things reasonably necessary on its part, or such Subsidiaries' part, under applicable Law or contractual obligations to consummate and make effective the transactions contemplated by this Section 2.9(b).

92

Section 2.10 Guarantees.

(a) (i) SpecCo shall, and shall cause the other members of its Group to, (with the reasonable cooperation of the applicable other Party) use commercially reasonable efforts to have all members of the MatCo Group and all members of the AgCo Group removed as guarantor of or obligor for any Specialty Products Liability to the fullest extent permitted by applicable Law, including in respect of the guarantees set forth on Schedule 2.10(a)(i), (ii) MatCo shall, and shall cause the other members of its Group to, (with the reasonable cooperation of the applicable Party) use commercially reasonable efforts to have all members of the SpecCo Group and all members of the AgCo Group removed as guarantor of or obligor for any Materials Science Liability to the fullest extent permitted by applicable Law, including in respect of those guarantees set forth on Schedule 2.10(a)(ii) and (iii) AgCo shall, and shall cause the other members of its Group to, (with the reasonable cooperation of the applicable Party) use commercially reasonable efforts to have all members of the SpecCo Group and all members of the MatCo Group removed as guarantor of or obligor for any Agriculture Liability to the fullest extent permitted by applicable Law, including in respect of those guarantees set forth on Schedule 2.10(a)(iii), in each case (clauses (i)-(iii)), on or prior to the Relevant Time or as soon as reasonably practicably thereafter. Except as otherwise provided in Section 2.10(b), no member of the AgCo Group, SpecCo Group or MatCo Group or any of their respective Affiliates from time to time shall be required to commence any litigation or offer or pay any money or otherwise grant any accommodation (financial or otherwise) to any third party with respect to any such guarantees.

(b) On or prior to the Relevant Time or as soon as reasonably practicable thereafter, to the extent required to obtain a release from a guaranty (a "Guaranty Release") (i) of any member of the SpecCo Group, MatCo and/or AgCo shall, and shall cause the other members of their respective Groups to, as applicable, execute a guaranty agreement in the form of the existing guaranty, except to the extent that such existing guaranty contains representations, covenants or other terms or provisions either (A) with which any member of the MatCo Group or AgCo Group, as the case may be, would be reasonably unable to comply or (B) which would be reasonably expected to be breached, (ii) of any member of the MatCo Group, SpecCo and/or AgCo shall, and shall cause the other members of their respective Groups to, as applicable, execute a guaranty agreement in the form of the existing guaranty, except to the extent that such existing guaranty contains representations, covenants or other terms or provisions either (A) with which any member of the SpecCo Group or the AgCo Group, as the case may be, would be reasonably unable to comply or (B) which would be reasonably expected to be breached and (iii) of any member of the AgCo Group, SpecCo and/or MatCo shall, and shall cause the other members of their respective Groups to, as applicable, execute a guaranty agreement in the form of the existing guaranty, except to the extent that such existing guaranty contains representations, covenants or other terms or provisions either (A) with which SpecCo or MatCo, as the case may be, would be reasonably unable to comply or (B) which would be reasonably expected to be breached.

93

(c) If any of SpecCo, MatCo or AgCo is unable to obtain, or to cause to be obtained, any such required removal as set forth in clauses (a) and (b) of this Section 2.10, (i) the Party whose Group is relevant beneficiary shall indemnify and hold harmless the guarantor or obligor for any Indemnifiable Loss arising from or relating thereto (in accordance with the provisions of Article VIII) and shall or shall cause one of the other members of its Group, as agent or subcontractor for such guarantor or obligor to pay, perform and discharge fully all the obligations or other Liabilities of such guarantor or obligor thereunder, (ii) each of SpecCo, MatCo and AgCo agrees not to renew or extend the term of, increase its obligations under, or Transfer to a third party, any guarantees or Credit Support Instruments, for which another Party is or may be liable unless all obligations of such other Party and the other members of such Party's Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to such Party; provided, however, with respect to guarantees included in leases for real property, in the event a Guaranty Release is not obtained and such Party wishes to extend the term of such guaranteed lease, then such Party shall have the option of extending the term until the fourth (4th) anniversary of the Relevant Time if it provides such security as is reasonably satisfactory to the guarantor under such guaranteed lease and (iii) the relevant beneficiary shall pay to the guarantor or obligor a fee payable at the end of each calendar quarter based on a rate of 0.65% per annum on the average outstanding amount of the obligation underlying such guarantee or obligation during such quarter.

(d) Each Party shall, and shall cause the other members of their respective Groups to cooperate and (i) MatCo shall, and shall cause the other members of its Group to, use reasonable best efforts to replace all Credit Support Instruments issued by SpecCo or other members of the SpecCo Group or by AgCo or other members of the AgCo Group on behalf of or in favor of any member of the MatCo Group or the Materials Science Business, including in respect of those Credit Support Instruments set forth on Schedule 2.10(d)(i) (the "MatCo CSIs") as promptly as practicable with Credit Support Instruments from MatCo or a member of the MatCo Group as of the Effective Time, (ii) AgCo shall, and shall cause the other members of its Group to, use reasonable best efforts to replace all Credit Support Instruments issued by SpecCo or other members of the SpecCo Group or by MatCo or other members of the MatCo Group on behalf of or in favor of any member of the AgCo Group or the Agriculture Business, including in respect of those Credit Support Instruments set forth on Schedule 2.10(d)(ii) (the "AgCo CSIs") as promptly as practicable with Credit Support Instruments from AgCo or a member of the AgCo Group as of the Effective Time and (iii) SpecCo shall, and shall cause the other members of its Group to, use reasonable best efforts to replace all Credit Support Instruments issued by AgCo or other members of the AgCo Group or by MatCo or other members of the MatCo Group on behalf of or in favor of any member of the SpecCo Group or the Specialty Products Business, including in respect of those Credit Support Instruments set forth on Schedule 2.10(d)(iii) (the "SpecCo CSIs") as promptly as practicable with Credit Support Instruments from SpecCo or a member of the SpecCo Group as of the Effective Time:

(i) With respect to any MatCo CSIs that remain outstanding after the Effective Time (x) MatCo shall, and shall cause the members of the MatCo Group to, jointly and severally indemnify and hold harmless the AgCo Indemnitees and SpecCo Indemnitees for any Liabilities arising from or relating to the such MatCo CSIs, including, any fees in connection with the issuance and maintenance thereof and any funds drawn by (or for the benefit of), or disbursements made to, the beneficiaries of such MatCo CSIs in accordance with the terms thereof, (y) MatCo shall pay to SpecCo and AgCo, as applicable, a fee payable at the end of each calendar quarter based on a rate of 0.65% per annum on the average outstanding balance during such quarter of any outstanding MatCo CSIs issued by SpecCo or any member of the SpecCo Group or by

94

AgCo or any member of the AgCo Group, respectively, and (z) without the prior written consent of SpecCo or AgCo, as applicable, MatCo shall not, and shall not permit any member of the MatCo Group to, enter into, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, Contract or other obligation in connection with which SpecCo or any member of the SpecCo Group or AgCo or any member of the AgCo Group, respectively, has issued any Credit Support Instruments which remain outstanding. None of SpecCo, the members of the SpecCo Group, AgCo and the members of the AgCo Group will have any obligation to renew any Credit Support Instruments issued on behalf of or in favor of any member of the MatCo Group or the Materials Science Business after the expiration of such MatCo CSI.

(ii) With respect to any AgCo CSIs that remain outstanding after the Effective Time (x) AgCo shall, and shall cause the members of the AgCo Group to, jointly and severally indemnify and hold harmless the MatCo Indemnitees and SpecCo Indemnitees for any Liabilities arising from or relating to the such AgCo CSIs, including any fees in connection with the issuance and maintenance thereof and any funds drawn by (or for the benefit of), or disbursements made to, the beneficiaries of such AgCo CSIs in accordance with the terms thereof, (y) AgCo shall pay to SpecCo and MatCo, as applicable, a fee payable at the end of each calendar quarter based on a rate of 0.65% per annum on the average outstanding balance during such quarter of any outstanding AgCo CSIs issued by SpecCo or any member of the SpecCo Group or by MatCo or any member of the MatCo Group, respectively, and (z) without the prior written consent of SpecCo or MatCo, as applicable, AgCo shall not, and shall not permit any member of the AgCo Group to, enter into, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, Contract or other obligation in connection with which SpecCo or any member of the SpecCo Group or MatCo or any member of the MatCo Group, respectively, has issued any Credit Support Instruments which remain outstanding. None of SpecCo, the members of the SpecCo Group, MatCo and the members of the MatCo Group will have any obligation to renew any Credit Support Instruments issued on behalf of or in favor of any member of the AgCo Group or the Agriculture Business after the expiration of such AgCo CSI.

(iii) With respect to any SpecCo CSIs that remain outstanding after the Effective Time (x) SpecCo shall, and shall cause the members of the SpecCo Group to, jointly and severally indemnify and hold harmless the AgCo Indemnitees and MatCo Indemnitees for any Liabilities arising from or relating to the such SpecCo CSIs, including any fees in connection with the issuance and maintenance thereof and any funds drawn by (or for the benefit of), or disbursements made to, the beneficiaries of such SpecCo CSIs in accordance with the terms thereof, (y) SpecCo shall pay to MatCo and AgCo, as applicable, a fee payable at the end of each calendar quarter based on a rate of 0.65% per annum on the average outstanding balance during such quarter of any outstanding SpecCo CSIs issued by MatCo or any member of the MatCo Group or by AgCo or any member of the AgCo Group, respectively, and (z) without the prior written consent of MatCo or AgCo, as applicable, SpecCo shall not, and shall not permit any member of the SpecCo Group to, enter into, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, Contract or other obligation in connection with which MatCo or any member of the MatCo Group or AgCo or any

95

member of the AgCo Group, respectively, has issued any Credit Support Instruments which remain outstanding. None of MatCo, the members of the MatCo Group, AgCo and the members of the AgCo Group will have any obligation to renew any Credit Support Instruments issued on behalf of or in favor of any member of the SpecCo Group or the Specialty Products Business after the expiration of such SpecCo CSI.

Section 2.11 <u>Disclaimer of Representations and Warranties</u>. EACH OF SPECCO (ON BEHALF OF ITSELF AND EACH MEMBER OF THE SPECCO GROUP), MATCO (ON BEHALF OF ITSELF AND EACH MEMBER OF THE MATCO GROUP) AND AGCO (ON BEHALF OF ITSELF AND EACH MEMBER OF THE AGCO GROUP) UNDERSTANDS AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN OR IN ANY ANCILLARY AGREEMENT, NO PARTY TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY OTHER AGREEMENT OR DOCUMENT CONTEMPLATED BY THIS AGREEMENT, ANY ANCILLARY AGREEMENTS OR OTHERWISE, IS REPRESENTING OR WARRANTING IN ANY WAY AS TO THE ASSETS, BUSINESSES, INFORMATION OR LIABILITIES CONTRIBUTED, TRANSFERRED OR ASSUMED AS CONTEMPLATED HEREBY OR THEREBY, AS TO ANY CONSENTS REQUIRED IN CONNECTION HEREWITH OR THEREWITH, AS TO THE VALUE OR FREEDOM FROM ANY SECURITY INTERESTS OF, AS TO NONINFRINGEMENT, VALIDITY OR ENFORCEABILITY OR ANY OTHER MATTER CONCERNING, ANY ASSETS OF SUCH PARTY, OR AS TO THE ABSENCE OF ANY DEFENSES OR RIGHT OF SETOFF OR FREEDOM FROM COUNTERCLAIM WITH RESPECT TO ANY ACTION OR OTHER ASSET, INCLUDING ACCOUNTS RECEIVABLE, OF ANY PARTY, OR AS TO THE LEGAL SUFFICIENCY OF ANY CONTRIBUTION, ASSIGNMENT, DOCUMENT, CERTIFICATE OR INSTRUMENT DELIVERED HEREUNDER TO CONVEY TITLE TO ANY ASSET OR THING OF VALUE UPON THE EXECUTION, DELIVERY AND FILING HEREOF OR THEREOF. EXCEPT AS MAY EXPRESSLY BE SET FORTH HEREIN OR THEREIN, ALL SUCH ASSETS ARE BEING TRANSFERRED ON AN "AS IS," "WHERE IS," AND "WITH ALL FAULTS" BASIS (AND, IN THE CASE OF ANY REAL PROPERTY, WITHOUT LIABILITIES OR WARRANTIES EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT) AND THE RESPECTIVE TRANSFEREES SHALL BEAR THE ECONOMIC AND LEGAL RISKS THAT (I) ANY CONVEYANCE SHALL PROVE TO BE INSUFFICIENT TO VEST IN THE TRANSFEREE GOOD TITLE, FREE AND CLEAR OF ANY SECURITY INTEREST OR OTHER MATTER WHETHER OR NOT OF RECORD AND (II) ANY NECESSARY CONSENTS ARE NOT OBTAINED OR THAT ANY REQUIREMENTS OF LAWS OR JUDGMENTS ARE NOT COMPLIED WITH.

## ARTICLE III

## <u>CERTAIN ACTIONS AT OR PRIOR TO THE DISTRIBUTIONS</u>

Section 3.1 <u>Certificate of Incorporation; Bylaws</u>.

(a) At or prior to the MatCo Distribution, all necessary actions shall be taken to adopt the form of Certificate of Incorporation and Bylaws filed by MatCo with the Commission as exhibits to the Materials Science Form 10.

96

Section 6.6 <u>Cooperation with Governmental Entity</u>. If, in connection with any Specified DowDuPont Shared Asset or Specified DowDuPont Shared Liability, a Party (or any member of its Group or its or their respective then-Affiliates) is required by Law to respond to and/or cooperate with a Governmental Entity, such Party (and/or any applicable member of its Group and any of its or their respective and applicable then-Affiliates) shall be entitled to cooperate and respond to such Governmental Entity after, to the extent practicable under the specific circumstances, consultation with the Managing Party of such Specified DowDuPont Shared Asset or Specified DowDuPont Shared Liability; <u>provided</u>, that to the extent such consultation was not practicable such Party shall promptly inform the Managing Party and Contingent Claim Committee of such cooperation and/or response to the Governmental Entity and the subject matter thereof.

Section 6.7 <u>Default</u>. In the event that one or more of the Parties defaults in any full or partial payment in respect of any Specified DowDuPont Shared Liability (as provided in this <u>Article VI</u> and in <u>Article VIII</u>), including the payment of the costs and expenses of the Managing Party, then each non-defaulting Party shall be required to pay an equal portion of the amount in default; <u>provided</u>, <u>however</u>, that any such payment by a non-defaulting Party shall in no way release the defaulting Party from its obligations to pay its obligations in respect of such Specified DowDuPont Shared Liability (both for past and future obligations) and any non-defaulting Party may exercise any available legal remedies available against such defaulting Party; <u>provided</u>, <u>further</u>, that interest shall accrue on any such defaulted amounts at a rate per annum equal to the then applicable LIBOR plus 3% (or the maximum legal rate, whichever is lower). In connection with the foregoing, it is expressly understood that any defaulting Party's share of the proceeds from any Specified DowDuPont Shared Asset may be used via a right of offset to satisfy, in whole or in part, the obligations of such defaulting Party; such rights of offset shall be applied in favor of the non-defaulting Party or Parties in proportion to the additional amounts paid by any such non-defaulting Party.

## ARTICLE VII

### SHARED HISTORICAL DUPONT ASSETS AND SHARED HISTORICAL DUPONT LIABILITIES

Section 7.1 <u>Management of Shared Historical DuPont Assets and Shared Historical DuPont Liabilities</u>.

(a) For purposes of this <u>Article VII</u>, subject to <u>Section 7.1(c)</u>, "<u>Managing Party</u>" shall mean with respect to the Shared Historical DuPont Assets and Shared Historical DuPont Liabilities known by AgCo, SpecCo or any other member of its Group as of the date hereof, (i) AgCo, with respect to the matters designated as such on <u>Schedule 7.1(a)(i)</u> and (ii) SpecCo, with respect to the matters designated as such on <u>Schedule 7.1(a)(ii)</u>; <u>provided</u>, <u>however</u>, that subject to <u>Section 7.1(c)</u>, the Managing Party with respect to any particular Shared Historical DuPont Asset or Shared Historical DuPont Liability not set forth in any of <u>Schedule 7.1(a)(i)</u> or <u>Schedule 7.1(a)(ii)</u>, shall be determined in accordance with <u>Section 7.2(c)</u> and <u>Section 7.1(c)</u>.

134

(b) Subject to (x) the matters expressly allocated to the Shared Historical DuPont Claim Committee pursuant to Section 7.2(c) and (y) Section 7.1(c), the applicable Managing Party shall, on behalf of the other Party, have sole and exclusive authority to commence, prosecute, manage, control, conduct or defend (or assume the defense of) or otherwise determine all matters whatsoever (including, as applicable, litigation strategy and choice of legal counsel or other professionals) on behalf of the other Party, with respect to any Shared Historical DuPont Asset and, on behalf of itself and the other Party, any Action or Third Party Claim with respect to a Shared Historical DuPont Liability.

(c) Notwithstanding Section 7.1(b), each of AgCo and SpecCo shall have the right to assume and manage the defense of any Action with respect to a Shared Historical DuPont Liability that is brought against any member of the AgCo Group or any member of the SpecCo Group, respectively, by any Governmental Entity (a "Historical DuPont Specified Governmental Action"); provided, that without limiting the terms of this Section 7.1(c), such Party's defense and management of any Historical DuPont Specified Governmental Action shall be with the full consultation of the Shared Historical DuPont Claim Committee, and such Party, in its capacity as Managing Party, shall, in good faith, take into account any recommendation made by or actions proposed by the Shared Historical DuPont Claim Committee.

(d) The applicable Managing Party shall be responsible for proposing settlements, resolutions or dispositions of Shared Historical DuPont Assets and Shared Historical DuPont Liabilities to the Shared Historical DuPont Claim Committee (for purposes of this Article VII, a "Proposal") which shall be resolved by the Shared Historical DuPont Claim Committee as set forth in Section 7.2. In addition, the Managing Party shall as soon as reasonably practicable (and, in any event, no later than five (5) Business Days after receipt thereof) inform the Shared Historical DuPont Claim Committee as soon as reasonably practicable of (i) any offer of settlement or disposition of a Shared Historical DuPont Liability made by a third party and (ii) in the event that AgCo or SpecCo or any member of such Party's Group, becomes aware of (1) any Asset that may be a Shared Historical DuPont Asset, (2) any Liability that may be a Shared Historical DuPont Liability, (3) any matter or occurrence that has given or would reasonably be expected to give rise to a Shared Historical DuPont Asset or Shared Historical DuPont Liability or (4) any matter reasonably relevant to the Managing Party's ongoing or future management, prosecution, defense and/or administration of any Shared Historical DuPont Asset or Shared Historical DuPont Liability.

(e) The applicable Managing Party shall on a monthly basis, or if a material development occurs (including if a settlement proposal has been made) as soon as reasonably practicable (and, in any event, no later than five (5) Business Days) thereafter, fully inform the members of the Shared Historical DuPont Claim Committee of the status of and developments relating to any matter involving Shared Historical DuPont Asset or Shared Historical DuPont Liability, provide copies of any material document, notices or other materials related to such matters and shall, and shall cause the other members of its Group (and its and their respective then-Affiliates) to, cooperate with each other Party and consider in good faith

135

any request of such Party with respect to the management of procedural and administrative matters impacting such other Party. Each Party shall, and shall cause the other members of its Group (and its and their respective then-Affiliates) to, cooperate fully with the applicable Managing Party in its management of any of such Shared Historical DuPont Asset or Shared Historical DuPont Liability and shall take such actions in connection therewith that the Managing Party reasonably requests (including providing access to such Party's Records and employees (and those of the other members of its Group and its and their respective then-Affiliates) as set forth in <u>Section 7.3</u>).

(f) Not more than thirty (30) Business Days after the end of a fiscal quarter, the AgCo Representative shall deliver to the SpecCo Representative, and the SpecCo representative shall deliver to the AgCo Representative, a statement of out-of-pocket expenses incurred in respect of any and all AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities (in the case of AgCo) (the "<u>AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement</u>") or any and all SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities (in the case of SpecCo) (the "<u>SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement</u>"), but in each case, without giving effect to the AgCo Hurdle or the SpecCo Hurdle, including a calculation of the amount (if any) for which the other party is then liable pursuant to <u>Section 8.13</u> and copies of all statements, invoices, bills and other documents related to each such expense. SpecCo, in the case of each AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement, and AgCo, in the case of each AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement, shall have fifteen (15) days following delivery of each to object to any amount set forth therein by delivering a written statement of its objections to AgCo or SpecCo, respectively (the "<u>AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement Objection Notice</u>"). If SpecCo does not object to any amount set forth in the AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement within such fifteen (15) day period, the AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement will be final, conclusive and binding on the parties. If AgCo does not object to any amount set forth in the SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement within such fifteen (15) day period, the SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement will be final, conclusive and binding on the parties. If SpecCo, in the case of each AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement, and AgCo, in the case of each AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement, objects to any amount set forth in such statement within such fifteen (15) day period, the AgCo Representative and SpecCo Representative shall negotiate in good faith to resolve such objections at the next scheduled meeting of the Shared Historical DuPont Claim Committee (the "<u>First Shared Historical DuPont Escalation Negotiation Period</u>"). In the event that the Shared Historical DuPont Claim Committee cannot reach a unanimous resolution regarding the objections, the issue shall be submitted to the general counsels of AgCo and SpecCo and/or such other executive officer designated by AgCo and SpecCo in writing (the "<u>Shared Historical DuPont Escalation Committee</u>"). The Shared Historical DuPont Escalation Committee shall thereupon negotiate for a reasonable period of time to settle such issue; <u>provided</u>, <u>however</u>, that such reasonable period shall not, unless otherwise agreed by AgCo and

136

SpecCo in writing, exceed thirty (30) days from the date on which the matter was submitted to the Shared Historical DuPont Escalation Committee (the "Second Shared Historical DuPont Escalation Negotiation Period"). If the issue has not been resolved for any reason as of the expiration of the Second Shared Historical DuPont Escalation Negotiation Period, such disagreement shall be submitted to final and binding arbitration pursuant to the procedures set forth in Article X of this Agreement. The outcome of the arbitration pursuant to Article X shall be final and binding on all parties and their respective successors and assigns.

(g) Each of SpecCo or AgCo shall, and shall cause the other members of its respective Group (and its and their respective then-Affiliates), to, reasonably cooperate with the applicable managing party, including with respect to any action (including the commencement of any Action) by such Party or any member of its Group and its and their respective then-Affiliates and omitting from taking any action that would be reasonably likely to interfere with or adversely affect the rights and powers of such Managing Party pursuant to this Article VII.

Section 7.2 Shared Historical DuPont Claim Committee.

(a) Without limiting the rights given to the Managing Party in Section 7.1, the Parties shall form a committee consisting of the AgCo Representative and the SpecCo Representative with the powers enumerated below (the "Shared Historical DuPont Claim Committee"). Each member of the Shared Historical DuPont Claim Committee shall have one vote with respect to all matters submitted to the Shared Historical DuPont Claim Committee for resolution.

(b) Each Party has the exclusive right to appoint and remove its respective Representative to the Shared Historical DuPont Claim Committee and in the event of such removal and/or replacement the applicable Party shall provide written notice to the other Parties of such replacement.

(c) Authority of Shared Historical DuPont Claim Committee.

(i) Subject to Section 7.1(c), the Shared Historical DuPont Claim Committee shall have the sole authority to designate the Managing Party for Shared Historical DuPont Assets or Shared Historical DuPont Liabilities not set forth in Schedule 7.1(a)(i) or Schedule 7.1(a)(ii). If any Party or any member of such Party's Group shall receive notice or otherwise learn of an Asset that may reasonably be determined to be a Shared Historical DuPont Asset or a Liability or Third Party Claim that may reasonably be determined to be a Shared Historical DuPont Liability (including any Third Party Claim brought against AgCo and/or SpecCo for any AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities or any SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities that would reasonably be expected to cause the AgCo Hurdle and SpecCo Hurdle to be met), not identified in the schedules to this Agreement, such Party shall give the other Party and the Shared Historical DuPont Claim Committee written notice (the "Managing Party Determination Notice") thereof promptly (and in any event within fifteen (15) days) after such Person becomes aware of such Asset, Liability or Third Party Claim.

137

Thereafter, the Party shall deliver to the Shared Historical DuPont Claim Committee, promptly (and in any event within five (5) Business Days) after the Party's (or its Group's or its or their respective then-Affiliates) receipt thereof, copies of all notices and documents (including court papers) received by the Party or the member of such Party's Group (or its or their respective then-Affiliates) relating to the matter. The Shared Historical DuPont Claim Committee's determination as to the appropriate Managing Party (which shall be made within thirty (30) days of such referral, unless a shorter time period is necessary due to the nature of the Asset, Liability or Third Party Claim, in which case, within a shorter time period reasonably appropriate for such Asset, Liability or Third Party Claim), if unanimous, shall be binding on all of the Parties and their respective successors and assigns. In the event that the Shared Historical DuPont Claim Committee cannot reach a unanimous determination as to the appropriate Managing Party, the issue shall be submitted to the Shared Historical DuPont Escalation Committee. The Shared Historical DuPont Escalation Committee shall thereupon negotiate for a reasonable period of time to settle such issue; provided, however, that such reasonable period shall not, unless otherwise agreed by AgCo and SpecCo in writing, exceed thirty (30) days from the date on which the matter was submitted to the Shared Historical DuPont Escalation Committee (the "Managing Party Negotiation Period"). If the issue has not been resolved for any reason as of the expiration of the Managing Party Negotiation Period, such disagreement shall be submitted to final and binding arbitration pursuant to the procedures set forth in Article X of this Agreement. The outcome of the arbitration pursuant to Article X shall be final and binding on all Parties and their respective successors and assigns. In resolving which Party shall act as the Managing Party with respect to any such Shared Historical DuPont Asset or Shared Historical DuPont Liability, the Shared Historical DuPont Claim Committee shall consider (i) the allocation of Shared Historical DuPont Assets or Shared Historical DuPont Liabilities reflected in Schedule 7.1(a)(i) and Schedule 7.1(a)(ii), whereby the Parties have assigned control of matters known as of the date of this Agreement, which may have precedential value for allocation of similar matters that were not known as of the date of this Agreement, (ii) whether the designation of a Party as the Managing Party, would reasonably be expected to materially and adversely prejudice the position of another Party or a member of such Party's Group in any other Action or matter arising out of substantially similar facts or circumstances and (iii) in the case of a Third Party Claim, whether the Third Party Claim names both AgCo and SpecCo (or any member of such Parties' respective Groups) as defendants, in which case, the Shared Historical DuPont Claim Committee shall consider whether both AgCo and SpecCo may jointly act as the Managing Party.

(ii) Prior to the time at which a Party is finally designated as the Managing Party pursuant to this Section 7.2(c), AgCo shall serve as the temporary Managing Party; provided, that, in the event that the matter is an Action or Third Party Claim in connection with a Shared Historical DuPont Asset or a Shared Historical DuPont Liability for which AgCo is not named, SpecCo will serve as the temporary Managing Party (such Party acting pursuant to this Section 7.2(c)(ii), the "Temporary Managing Party"). The applicable Temporary Managing Party shall, on behalf of itself and the other Party, have sole and exclusive authority to defend (or assume the defense of) and determine all matters whatsoever (including, as applicable, litigation strategy and

138

choice of legal counsel or other professionals) with respect to any Action or Third Party Claim with respect to a Shared Historical DuPont Asset or a Shared Historical DuPont Liability until a Party is finally designated as the Managing Party pursuant to Section 7.2(c)(i); provided, however, that (i) the Temporary Managing Party shall deliver to each other Party a reasonably complete draft of any submission (formal or informal) at least seven (7) Business Days prior to filing such submission with a court or grand jury, any Governmental Entity or any arbitration or mediation tribunal or authority (unless a shorter time period is necessary due to the nature of the Action or Third Party Claim, in which case, the Temporary Managing Party shall use its reasonable best efforts to provide the submission to the other Party within a time period reasonably appropriate for such Action or Third Party Claim) and (ii) the Temporary Managing Party shall not admit any liability with respect to, consent to entry of any judgment of, or settle, compromise or discharge, the Action or Third Party Claim without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed); provided, further, that in the case of clause (i), that the Temporary Managing Party's Representative will use its reasonable best efforts to actively consult with each other Party's Representative regarding any changes, which it shall consider in good faith making to the submission, with particular focus on any changes the omission of which would reasonably be expected to (x) materially prejudice the other Party's obligations, rights or remedies with respect to the subject matter underlying such Action or Third Party Claim or (y) have a significant adverse impact (financial or non-financial) on the other Party, including a significant adverse impact on the other Party's rights, obligations, operations, standing or reputation (unless such consultation is not possible due to the nature of the Action or Third Party Claim or the other Party's failure to respond to the submission within three (3) Business Days after receipt of the submission, in which case, the Temporary Managing Party may file the submission if the Temporary Managing Party determines in good faith that the filing will not materially prejudice the other Party's rights or remedies); provided, still, further, that the Temporary Managing Party shall not be obligated to provide the other Party with the opportunity to review the submission if such submission contains solely disclosure with respect to the applicable Shared Historical DuPont Asset or Shared Historical DuPont Liability that is substantially similar in all respects to disclosure previously made in accordance with the terms hereof.

(iii) Either AgCo or SpecCo may refer by written notice to the other Party and the Shared Historical DuPont Claim Committee (the "Shared Historical DuPont Assets and Liabilities Notice") any potential claim, right, Asset or Liability to the Shared Historical DuPont Claim Committee for the purpose of resolving whether any claim, right, Asset or Liability is a Shared Historical DuPont Asset or a Shared Historical DuPont Liability and the Shared Historical DuPont Claim Committee's determination (which shall be made within thirty (30) days of such referral, unless a shorter time period is necessary due to the nature of the claim, right, Asset or Liability, within a shorter time period reasonably appropriate for such claim, right, Asset or Liability (the "Shared Historical DuPont Assets and Liabilities Determination Period")), if unanimous, shall be binding on AgCo, SpecCo and their respective successors and assigns.

139

(1) In the event that the Shared Historical DuPont Claim Committee cannot reach a unanimous determination as to the nature or status of any such claim, right, Asset or Liability within thirty (30) days after such referral, the issue will be submitted for arbitration pursuant to the procedures set forth in Article X of this Agreement. The outcome of the arbitration pursuant to Article X shall be final and binding on both Parties and their respective successors and assigns.

(2) In the event that either AgCo or SpecCo commences arbitration, upon resolution of the dispute (pursuant to Article X or otherwise), if it is determined that such Asset or Liability is not a Shared Historical DuPont Asset or a Shared Historical DuPont Liability and that such Asset or Liability belongs to the SpecCo Group or the AgCo Group, as applicable, pursuant to the provisions of this Agreement, then AgCo and SpecCo shall cooperate to transfer the control thereof to SpecCo or AgCo, as applicable (unless otherwise agreed in writing by the Party to whose Group such Asset or Liability belongs and the applicable Managing Party). In such event, SpecCo or AgCo, as applicable, shall promptly reimburse the Party which commenced the arbitration for all out-of-pocket costs and expenses incurred to such date in connection with the assertion of such claim or right.

(iv) The Shared Historical DuPont Claim Committee shall have the sole authority to approve or consent to any settlement, resolution or other disposition in connection with and in respect of any Shared Historical DuPont Asset or Shared Historical DuPont Liability. The approval and adoption of any matter submitted to the Shared Historical DuPont Claim Committee for resolution shall require the Requisite Approval of the members of the Shared Historical DuPont Claim Committee. In the event that any settlement, resolution or other disposition is approved by the Shared Historical DuPont Claim Committee and involves a release (or any agreement with similar import) of the Managing Party and/or any other Party or members of their respective Groups, then, in such event, such settlement, resolution or disposition shall also provide for a substantially similar release (or agreement with similar import) of each other applicable Party and members of its respective Group. Any such settlement, resolution or other disposition approved by the Requisite Approval of the members of the Shared Historical DuPont Claim Committee (which shall be made within thirty (30) days of such referral) shall be binding on all of the Parties and the other members of each Group (and each of their respective Affiliates at the time of such settlement, resolution or other disposition) and their respective successors and assigns.

140

(v) For the purposes of this Section 7.2, "Requisite Approval" means the approval of all Representatives entitled to vote on such matter; provided, that in the case of any Historical DuPont Specified Governmental Action described in Section 7.1(c), if the effect of any proposed settlement, resolution or other disposition thereof provides solely for non-monetary relief against the Managing Party (or solely non-monetary relief against the Managing Party and monetary relief that the Managing Party has agreed to directly bear and waive any claim to indemnification related thereto pursuant to this Agreement (and the non-Managing Party would not reasonably be expected to be significantly adversely impacted thereby)), then only the approval of the Representative of the Managing Party shall be required. Notwithstanding the foregoing, if the effect of a settlement of any matter is (i) to permit any injunction, declaratory judgment, other order or other non-monetary relief to be entered, directly or indirectly, that would reasonably be expected to materially impair the business or Assets of a Party or a member of its Group (other than procedural requirements and releases that are reasonable and customary for the settlement of the type of Shared Historical DuPont Asset or Shared Historical DuPont Liability addressed) or (ii) would reasonably be expected to materially and adversely prejudice the position of a Party or a member of such Party's Group in any other Action or matter arising out of substantially similar facts or circumstances (e.g., a civil action arising out of the same situation that is the subject of an Action by a Governmental Entity), then in any such matter submitted for approval by the Shared Historical DuPont Claim Committee, the approval of the Representative of such affected Party shall also be required.

(d) Meetings of the Shared Historical DuPont Claim Committee. (i) Each Representative shall be entitled to notice of all meetings of the Shared Historical DuPont Claim Committee, (ii) unless otherwise agreed by the Parties, the Shared Historical DuPont Claim Committee shall meet at least once every calendar quarter (either in person, telephonically or by other electronic means) and (iii) any Party entitled to vote on a particular Shared Historical DuPont Liability may call a special meeting of the Shared Historical DuPont Claim Committee, from time to time, for the purpose of discussing any such Shared Historical DuPont Liability by written notice to the other members setting forth in reasonable detail the matter(s) to be discussed and the time of such meeting.

(e) All Proposals must be submitted to the Shared Historical DuPont Claim Committee for approval (unless such Proposal is solely for monetary damages and is in respect of either an AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability or a SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability, in which case, whether the Proposal is formally submitted to the Shared Historical DuPont Claim Committee for approval shall be in the sole discretion of AgCo or SpecCo, as applicable, provided that the Proposal would not result in the aggregate amount of AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities or SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities, exceeding the AgCo Group DuPont Divested Business Liability Basket or SpecCo Group DuPont Divested Business Liability Basket, as applicable, in which case such Proposal must be submitted to the Shared Historical DuPont Claim Committee for approval).

141

(f) In the event that a third party makes a Proposal in respect of a Shared Historical DuPont Asset or Shared Historical DuPont Liability that solely involves monetary damages and such Proposal is put to a vote of the Shared Historical DuPont Claim Committee and Requisite Approval is not obtained, if AgCo (if SpecCo is the applicable Managing Party) or SpecCo (if AgCo is the applicable Managing Party) (for purposes of this Section 7.2(f), each a "Settling Party") affirmatively states in writing, within ten (10) Business Days following such meeting of the Shared Historical DuPont Claim Committee that such Settling Party's Representative voted to approve such Proposal, then the maximum amount of Liability (including the costs of defense thereof) that such Settling Party shall have with respect to such Shared Historical DuPont Liability shall be capped at its respective Shared Historical DuPont Percentage of such Proposal and the costs and expenses incurred in respect of such Shared Historical DuPont Liability to the date of such Proposal (the "Shared Historical DuPont Liability Settlement Cap") (with the applicable Managing Party and, if applicable, the other Party that did not accept the Proposal being responsible for any amounts in excess of the applicable Shared Historical DuPont Liability Settlement Cap(s) established pursuant to the foregoing (to the extent applicable, in proportion to their respective Shared Historical DuPont Percentage)); provided, that if, following a failure to accept the Proposal, the Settling Party's Shared Historical DuPont Percentage of the final settlement, resolution or disposition (including the total costs of the defense thereof) of the applicable Action is less than the Shared Historical DuPont Liability Settlement Cap, the Settling Party shall be required to bear 100% of the Incremental Costs of the defense from the date of the Proposal through the date of final settlement, resolution or disposition; provided, however, that the amount of Incremental Costs so borne by the Settling Party shall be capped so that aggregate of the amount of Incremental Costs borne by the Settling Party plus such Settling Party's Shared Historical DuPont Percentage of the final settlement, resolution or disposition (including the total costs of the defense thereof) shall not exceed the Shared Historical DuPont Liability Settlement Cap, and such Incremental Costs, as borne by the Settling Party, shall be deducted from the total amount subject to allocation pursuant to the Shared Historical DuPont Percentage of the applicable non-settling Party. In addition, following such time as a Settling Party chooses to cap its potential Liability with respect to any such matter, such Settling Party's Representative on the Shared Historical DuPont Claim Committee shall not have any voting right with respect to such matter unless any resolution thereof would reasonably be expected to impose a non-monetary impairment on such Settling Party.

Section 7.3 Access; Reimbursement; Limitation on Liability.

(a) Access to Information and Employees by the Managing Party. In connection with the management and disposition of any Shared Historical DuPont Asset and/or any Shared Historical DuPont Liability, each of AgCo and SpecCo shall make readily available to and afford to the Managing Party and its authorized accountants, counsel and other designated representatives reasonable access, subject to appropriate restrictions for classified, privileged or confidential information, to the employees, properties, and Information of such Party and the members of such Party's Group insofar as such access relates to the relevant Shared Historical DuPont Asset or Shared Historical DuPont Liability; it being understood by the Parties that such access as well as any services provided pursuant to Section 7.3(b) may require a significant time commitment on the part of such Party's employees and that any such commitment shall not otherwise limit any of the rights or obligations set forth in this Article VII. Nothing in this Section 7.3(a) shall require any Party to violate any Law or any Contract with any third party regarding the confidentiality of confidential and proprietary information relating to that third party or its business; provided, however, that in the event that access to, or the provision of, any such Information would violate a Contract with a third party, such Party shall use commercially reasonable efforts to seek to obtain such third party's Consent to the disclosure of such information.

142

(b) <u>Certain Services</u>. Each of SpecCo and AgCo shall make available to the others, upon reasonable written request, its and its Subsidiaries' officers, directors, employees and agents to assist in the management (including, if applicable, as witnesses in any Action) of any Shared Historical DuPont Asset or Shared Historical DuPont Liability to the extent that such Persons may reasonably be required in connection with the prosecution, defense or day-to-day management of any Shared Historical DuPont Asset or Shared Historical DuPont Liability.

(c) <u>Costs and Expenses Relating to Access by the Managing Party</u>. Except as otherwise provided in any Ancillary Agreement, the provision of access and other services pursuant to <u>Section 7.3(a)</u>-<u>(c)</u> shall be at no additional cost or expense of the Managing Party or any other Party (other than for (i) actual out-of-pocket costs and expenses which shall be allocated as set forth in <u>Section 7.3(d)</u> and (ii) costs incurred directly or indirectly by such Party affording such access and other services which shall be the responsibility of such Party).

(d) Any amounts owed in respect of any Shared Historical DuPont Liability (including reimbursement for the out-of-pocket costs and expenses of defending, managing or providing assistance to the Managing Party with respect to any Third Party Claim that is a Shared Historical DuPont Liability, which shall include any amounts with respect to a bond, prepayment or similar security or obligation required (or determined to be advisable by the Managing Party) to be posted by the Managing Party in respect of any claim) shall be remitted promptly pursuant to <u>Section 12.12</u> (for the avoidance of doubt, such amount and such costs and expenses shall be included in the calculation of the amount of the applicable Shared Historical DuPont Liability in determining the reimbursement obligations of the other Party with respect thereto).

(e) It shall not be a defense to any obligation by AgCo or SpecCo to pay any amounts, whether pursuant to this <u>Section 7.3(e)</u> or in respect of Indemnifiable Losses pursuant to <u>Article VIII</u>, in respect of any Shared Historical DuPont Liability that (i) that such Party does not approve of the quality or manner of the defense thereof or (ii) that such Shared Historical DuPont Liability was incurred by reason of a settlement rather than by a judgment or other determination of Liability (even if, subject in each case to <u>Sections 7.2</u> and <u>8.5(e)</u>, such settlement was effected without the consent or over the objection of such Party); it being understood that if such obligations arose in connection with any settlement of a Shared Historical DuPont Liability, and such settlement is of a type that required Requisite Approval of the Shared Historical DuPont Claim Committee and such Requisite Approval has not been obtained, then (to the extent such right exists) a Party may assert as a defense that the provisions of this <u>Article VII</u> have not been complied with.

Section 7.4 <u>Cooperation with Governmental Entities</u>. If, in connection with any Shared Historical DuPont Asset or Shared Historical DuPont Liability, any Party (or any member of its Group or its or their respective then-Affiliates) is required by Law to respond to and/or cooperate with any Governmental Entity, such Party (and/or any applicable member of its

143

Group and any of its or their respective and applicable then-Affiliates) shall, prior to cooperating and responding to such Governmental Entity, consult with the Managing Party of such Shared Historical DuPont Asset or Shared Historical DuPont Liability, to the extent practicable under the specific circumstances; provided, that to the extent such consultation was not practicable such Party shall promptly inform the Managing Party and Shared Historical DuPont Claim Committee of such cooperation and/or response to the Governmental Entity and the subject matter thereof.

Section 7.5 Default. In the event that one or more of the Parties defaults in any full or partial payment in respect of any Shared Historical DuPont Asset or Shared Historical DuPont Liability (as provided in this Article VII and in Article VIII), including the payment of the costs and expenses of the Managing Party, then each non-defaulting Party shall be required to pay an equal portion of the amount in default; provided, however, that any such payment by a non-defaulting Party shall in no way release the defaulting Party from its obligations to pay its obligations in respect of such Shared Historical DuPont Asset or Shared Historical DuPont Liability (both for past and future obligations) and any non-defaulting Party may exercise any available legal remedies available against such defaulting Party; provided, further, that interest shall accrue on any such defaulted amounts at a rate per annum equal to the then applicable LIBOR plus 3% (or the maximum legal rate, whichever is lower).

Section 7.6 No Effect on MatCo. For the avoidance of doubt, (a) the provisions set forth in this Article VII are effective only as between AgCo and SpecCo (and the other members of their respective Groups), (b) this Article VII does not apply with respect to any Materials Science Asset or Materials Science Liability and (c) nothing in this Article VII shall (i) affect any provisions of, or any obligations under, this Agreement that are for the benefit of MatCo or any member of the MatCo Group, or prejudice any rights of MatCo or any member of the MatCo Group pursuant to the other Articles of this Agreement or (ii) create any independent Liability of, or impose any independent Liability on, MatCo or any member of its Group.

**ARTICLE VIII**

**INDEMNIFICATION**

Section 8.1 Release of Pre-Distribution Claims.

(a) Except (i) as provided in Section 8.1(b), (ii) as may be otherwise expressly provided in this Agreement and (iii) for any matter for which any Indemnitee is entitled to indemnification pursuant to this Article VIII, each Party, on behalf of itself and each member of its Group, and to the extent permitted by Law, all Persons who at any time prior to the Relevant Time were directors, officers, agents or employees of any member of its respective Group (in their respective capacities as such), in each case, together with their respective heirs, executors, administrators, successors and assigns, do hereby remise, release and forever discharge the other Parties and the other members of such other Parties' Group and their respective successors and all Persons who at any time prior to the Relevant Time were shareholders, directors, officers or employees of any member of such other Parties' Group (in their capacity as such), in each case, together with their respective heirs, executors, administrators, successors and assigns from any and all Liabilities whatsoever, whether at Law

144

or in equity, whether arising under any Contract, by operation of Law or otherwise, in each case, existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the Relevant Time, including in connection with the Internal Reorganization, MatCo Distribution and AgCo Distribution and any of the other transactions contemplated hereunder and under the Ancillary Agreements; provided, however, that no employee shall be remised, released and discharged to the extent that such Liability relates to, arises out of or results from intentional misconduct by such employee.

(b) Nothing contained in this Agreement, including Section 8.1(a) or Section 2.4 shall impair or otherwise affect any right of any Party, any member of any Group, or any Party's or member of a Group's respective heirs, executors, administrators, successors and assigns to enforce this Agreement, any Ancillary Agreement, any Continuing Arrangements or any agreements, arrangements, commitments or understandings that continue in effect after the Relevant Time pursuant to the terms of this Agreement or any Ancillary Agreement. In addition, nothing contained in Section 8.1(a) shall release any Person from:

(i) any Liability Assumed, Transferred or allocated to a Party or a member of such Party's Group pursuant to or as contemplated by, or any other Liability of any member of such Group under, this Agreement or any Ancillary Agreement including (A) with respect to AgCo, any Agriculture Liability, (B) with respect to MatCo, any Materials Science Liability and (C) with respect to SpecCo, any Specialty Products Liability;

(ii) any Specified DowDuPont Shared Liability;

(iii) any Shared Historical DuPont Liability;

(iv) any Liability under any Continuing Arrangements, any Other Surviving Intergroup Account, and Other Surviving Selected Intercompany Accounts;

(v) any Liability that the Parties may have with respect to indemnification pursuant to this Agreement or any Ancillary Agreement or otherwise for claims or Actions brought against any Indemnitee by third Persons, which Liability shall be governed by the provisions of this Agreement and, in particular, this Article VIII or, in the case of any Liability arising out of an Ancillary Agreement, the applicable provisions of the Ancillary Agreement; or

(vi) any Liability the release of which would result in a release of any Person other than the Persons released in Section 8.1(a); provided that the Parties agree not to bring any Action or permit any other member of their respective Group to bring any Action against a Person released in Section 8.1(a) with respect to such Liability.

In addition, nothing contained in Section 8.1(a) shall release (x) SpecCo from indemnifying any director, officer or employee of MatCo and AgCo who was a director, officer or employee of SpecCo or any of its Subsidiaries on or prior to the MatCo Distribution or AgCo Distribution, as

145

applicable, to the extent such director, officer or employee is or becomes a named defendant in any Action with respect to which he or she was entitled to such indemnification pursuant to then-existing obligations; it being understood that if the underlying obligation giving rise to such Action is a Materials Science Liability or Agriculture Liability, MatCo or AgCo, as applicable, shall indemnify SpecCo for such Liability (including SpecCo's costs to indemnify the director, officer or employee) in accordance with the provisions set forth in this Article VIII, (y) MatCo from indemnifying any director, officer or employee of SpecCo and AgCo who was a director, officer or employee of MatCo or any of its Subsidiaries on or prior to the MatCo Distribution, to the extent such director, officer or employee is or becomes a named defendant in any Action with respect to which he or she was entitled to such indemnification pursuant to then-existing obligations; it being understood that if the underlying obligation giving rise to such Action is a Specialty Products Liability or Agriculture Liability, SpecCo or AgCo, as applicable, shall indemnify MatCo for such Liability (including MatCo's costs to indemnify the director, officer or employee) in accordance with the provisions set forth in this Article VIII and (z) AgCo from indemnifying any director, officer or employee of MatCo and SpecCo who was a director, officer or employee of AgCo or any of its Subsidiaries on or prior to the MatCo Distribution or the AgCo Distribution, as the case may be, to the extent such director, officer or employee is or becomes a named defendant in any Action with respect to which he or she was entitled to such indemnification pursuant to then-existing obligations; it being understood that if the underlying obligation giving rise to such Action is a Materials Science Liability or Specialty Products Liability, MatCo or SpecCo, as applicable, shall indemnify AgCo for such Liability (including AgCo's costs to indemnify the director, officer or employee) in accordance with the provisions set forth in this Article VIII.

(c) Each Party shall not, and shall not permit any member of its Group to make, any claim, demand or offset, or commence any Action asserting any claim, demand or offset, including any claim for indemnification, against any other Party or any member of any other Party's Group, or any other Person released pursuant to Section 8.1(a) or their respective successors with respect to any Liabilities released pursuant to Section 8.1(a).

(d) It is the intent of each Party, by virtue of the provisions of this Section 8.1, to provide for a full and complete release and discharge of all Liabilities existing or arising from all acts and events occurring or failing to occur or alleged to have occurred or to have failed to occur and all conditions existing or alleged to have existed on or before the Relevant Time, whether known or unknown, between or among any Party (and/or a member of such Party's Group), on the one hand, and any other Party or Parties (and/or a member of such Party's or parties' Group), on the other hand (including any contractual agreements or arrangements existing or alleged to exist between or among any such members on or before the Relevant Time), except as specifically set forth in Sections 8.1(a) and 8.1(b). At any time, at the reasonable request of any other Party, each Party shall cause each member of its respective Group and, to the extent practicable each other Person on whose behalf it released Liabilities pursuant to this Section 8.1 to execute and deliver releases reflecting the provisions hereof.

(e) Each of AgCo and SpecCo, on behalf of itself and the members of Historical DuPont, and MatCo, on behalf of itself and the members of Historical Dow, hereby waives any claims, rights of termination and any other rights under any Continuing Arrangement related to or arising out of the Internal Reorganization, the MatCo Distribution and the AgCo

146

Distribution (including with respect to any of "change of control" or similar provision or any failure of (x) in the case of MatCo, any member of Historical Dow that is a member of the AgCo Group or the SpecCo Group no longer being an Affiliate of any member of Historical Dow that is a member of the MatCo Group and (y) in case of SpecCo and AgCo , any member of Historical DuPont that is (i) a member of the AgCo Group no longer being an Affiliate of any member of Historical DuPont that is a member of the SpecCo Group or the MatCo Group or (ii) a member of the SpecCo Group no longer being an Affiliate of any member of Historical DuPont that is a member of the AgCo Group or the MatCo Group, and agrees that any change in rights or obligations that would automatically be effective as a result thereof be deemed amended to no longer apply (and that Section 2.8 shall apply in respect of such amendments).

Section 8.2 Indemnification by SpecCo. In addition to any other provisions of this Agreement requiring indemnification and except as otherwise specifically set forth in any provision of this Agreement, following (a) the MatCo Distribution Date (with respect to the MatCo Indemnitees) and (b) the AgCo Distribution Date (with respect to the AgCo Indemnitees), SpecCo shall and shall cause the other members of the SpecCo Group to indemnify, defend and hold harmless the MatCo Indemnitees and the AgCo Indemnitees from and against any and all Indemnifiable Losses of the MatCo Indemnitees and the AgCo Indemnitees, respectively, to the extent relating to, arising out of or resulting from (i) the Specialty Products Liabilities or any Third Party Claim that would, if resolved in favor of the claimant, constitute a Specialty Products Liability or (ii) any breach by SpecCo of any provision of this Agreement.

Section 8.3 Indemnification by MatCo. In addition to any other provisions of this Agreement requiring indemnification and except as otherwise specifically set forth in any provision of this Agreement, MatCo shall and shall cause the other members of the MatCo Group to indemnify, defend and hold harmless the SpecCo Indemnitees and the AgCo Indemnitees from and against any and all Indemnifiable Losses of the SpecCo Indemnitees and the AgCo Indemnitees, respectively, to the extent relating to, arising out of or resulting from (i) the Materials Science Liabilities or any Third Party Claim that would, if resolved in favor of the claimant, constitute a Materials Science Liability or (ii) any breach by MatCo of any provision of this Agreement.

Section 8.4 Indemnification by AgCo. In addition to any other provisions of this Agreement requiring indemnification and except as otherwise specifically set forth in any provision of this Agreement, AgCo shall and shall cause the other members of the AgCo Group to indemnify, defend and hold harmless the SpecCo Indemnitees and the MatCo Indemnitees from and against any and all Indemnifiable Losses of the SpecCo Indemnitees and the MatCo Indemnitees, respectively, to the extent relating to, arising out of or resulting from (i) the Agriculture Liabilities or any Third Party Claim that would, if resolved in favor of the claimant, constitute an Agriculture Liability or (ii) any breach by AgCo of any provision of this Agreement.

147

Section 8.5 Procedures for Third Party Claims.

(a) If a claim or demand is made against a SpecCo Indemnitee, a MatCo Indemnitee or an AgCo Indemnitee (each, an "Indemnitee") by any Person who is not a member of the AgCo Group, SpecCo Group or MatCo Group (a "Third Party Claim") as to which such Indemnitee is or may be entitled to indemnification pursuant to this Agreement, such Indemnitee shall notify the Party (and, if applicable, the Contingent Claim Committee and/or the Shared Historical DuPont Claim Committee) which is or may be required pursuant to this Article VIII to make such indemnification (the "Indemnifying Party") in writing, and in reasonable detail, of the Third Party Claim as promptly as practicable (and in any event within fifteen (15) days) after receipt by such Indemnitee of written notice of the Third Party Claim. If any Party shall receive notice or otherwise learn of the assertion of a Third Party Claim which may reasonably be determined to be a Specified DowDuPont Shared Liability or a Shared Historical DuPont Liability, such Party, as appropriate, shall give the Contingent Claim Committee and/or the Shared Historical DuPont Claim Committee (as determined pursuant to Article VI or Article VII, as applicable) written notice thereof within fifteen (15) days after such Person becomes aware of such Third Party Claim; provided, however, that the failure to provide notice of any such Third Party Claim pursuant to this or the preceding sentence shall not release the Indemnifying Party from any of its obligations under this Article VIII except and solely to the extent the Indemnifying Party shall have been actually materially prejudiced as a result of such failure. Thereafter, the Indemnitee shall deliver to the Indemnifying Party (and, as applicable, to the Managing Party, the Contingent Claim Committee and the Shared Historical DuPont Claim Committee), as promptly as practicable (and in any event within five (5) Business Days) after the Indemnitee's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnitee relating to the Third Party Claim.

(b) Other than in the case of (i) Taxes addressed in the Tax Matters Agreement, which shall be addressed as set forth therein, (ii) indemnification by a beneficiary Party of a guarantor Party pursuant to Section 2.10(c) (the defense of which shall be controlled by the beneficiary Party), (iii) a Specified DowDuPont Shared Liability (the defense of which shall be controlled by the Managing Party as provided for in Article VI) or (iv) a Shared Historical DuPont Liability (the defense of which shall be controlled by the Managing Party as provided for in Article VII), (A) an Indemnifying Party shall be entitled (but shall not be required) to assume and control the defense of any Third Party Claim, and (B) if it does not assume the defense of such Third Party Claim, to participate in the defense of such Third Party Claim, in each case, at such Indemnifying Party's own cost and expense and by such Indemnifying Party's own counsel that is reasonably acceptable to the applicable Indemnitees (after consultation in good faith with the applicable Indemnitees), if it gives notice of its intention to do so to the applicable Indemnitees within thirty (30) days of the receipt of such notice from such Indemnitees; provided, however, that the Indemnifying Party shall not be entitled to assume the defense of any Third Party Claim to the extent such Third Party Claim (x) is an allegation of a criminal violation, (y) seeks injunctive, equitable or other relief other than monetary damages against the Indemnitee (provided that such Indemnitee shall reasonably cooperate with the Indemnifying Party, at the request of the Indemnifying Party, in seeking to separate any such claims from any related claim for monetary damages if this clause (y) is the sole reason that such Third Party Claim is a Non-Assumable Third Party Claim) or (z) is made by a Governmental Entity (clauses (x), (y) and (z), the "Non-Assumable Third Party Claims"). After notice from an Indemnifying Party to an Indemnitee of the Indemnifying Party's election to assume the defense of a Third Party Claim, such Indemnitee shall have the right to employ separate counsel and to participate in (but not control) the defense, compromise, or settlement thereof, at its own expense and, in any event, shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all

148

witnesses, pertinent Information, materials and other information in such Indemnitee's possession or under such Indemnitee's control relating thereto as are reasonably required by the Indemnifying Party; provided, however, that in the event a conflict of interest exists, or is reasonably likely to exist, that would make it inappropriate in the reasonable judgment of the applicable Indemnitee(s) for the same counsel to represent both the Indemnifying Party and the applicable Indemnitee(s), such Indemnitee(s) shall be entitled to retain, at the Indemnifying Party's expense, separate counsel as required by the applicable rules of professional conduct with respect to such matter. In the event that the Indemnifying Party exercises the right to assume and control the defense of a Third Party Claim as provided above, (1) the Indemnifying Party shall keep the Indemnitee(s) apprised of all material developments in such defense, (2) the Indemnifying Party shall not withdraw from the defense of such Third Party Claim without providing advance notice to the Indemnitee(s) reasonably sufficient to allow the Indemnitee(s) to prepare to assume the defense of such Third Party Claim, and (3) the Indemnifying Party shall conduct the defense of the Third Party Claim actively and diligently, including the posting of bonds or other security required in connection with the defense of such Third Party Claim.

(c) Other than in the case of a Specified DowDuPont Shared Liability, a Shared Historical DuPont Liability or a Non-Assumable Third Party Claim, if an Indemnifying Party elects not to assume responsibility for defending a Third Party Claim or fails to notify an Indemnitee of its election as provided in Section 8.5(b), or if the Indemnifying Party fails to actively and diligently defend the Third Party Claim (including by withdrawing or threatening to withdraw from the defense thereof), the applicable Indemnitee(s) may defend such Third Party Claim at the cost and expense of the Indemnifying Party. If the Indemnitee is conducting the defense of any Third Party Claim, the Indemnifying Party shall cooperate with the Indemnitee in such defense and make available to the Indemnitee, at the Indemnifying Party's expense, all witnesses, pertinent Information, material and information in such Indemnifying Party's possession or under such Indemnifying Party's control relating thereto as are reasonably required by the Indemnitee.

(d) Other than any Third Party Claim that is in respect of (x) a Specified DowDuPont Shared Liability, which shall be governed by Article VI or (y) a Shared Historical DuPont Liability, which shall be governed by Article VII, no Indemnitee may admit any liability with respect to, consent to entry of any judgment of, or settle, compromise or discharge any Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(e) In the case of a Third Party Claim (except for any Third Party Claim that is in respect of (x) a Specified DowDuPont Shared Liability which, with respect to the subject matter of this Section 8.5(e), shall be governed by Article VI or (y) a Shared Historical DuPont Liability which, with respect to the subject matter of this Section 8.5(e), shall be governed by Article VII), the Indemnifying Party shall not admit any liability with respect to, consent to entry of any judgment of, or settle, compromise or discharge, the Third Party Claim without the prior written consent of the Indemnitee (which consent shall not be unreasonably withheld, conditioned or delayed) unless such settlement or judgment (A) completely and unconditionally releases the Indemnitee in connection with such matter, (B) provides relief consisting solely of money damages borne by the Indemnifying Party and (C) does not involve any admission by the Indemnitee of any wrongdoing or violation of Law.

149

(f) Notwithstanding anything herein or in any Ancillary Agreement or any Conveyancing and Assumption Instrument to the contrary, other than (x) as set forth in the Dow Captive Policies and (y) as provided in Section 12.19 with respect to this Agreement, (i) the indemnification provisions of this Article VIII shall be the sole and exclusive remedy of the Parties, the parties to the Conveyancing and Assumption Instruments and any Indemnitee for any breach of this Agreement or any Conveyancing and Assumption Instrument and for any failure to perform and comply with any covenant or agreement in this Agreement or in any Conveyancing and Assumption Instrument; (ii) each party hereto and each Indemnitee expressly waives and relinquishes any and all rights, claims or remedies it may have with respect to the foregoing other than under this Article VIII and the Dow Captive Policies against any Indemnifying Party; (iii) none of the Parties, the members of their respective Groups or any other Person may bring a claim under any Conveyancing and Assumption Instrument; (iv) any and all claims arising out of, resulting from, or in connection with the Internal Reorganization or the other transactions contemplated in this Agreement must be brought under and in accordance with the terms of this Agreement (or under an applicable Dow Captive Policy); and (v) no breach of this Agreement or any Conveyancing and Assumption Instrument shall give rise to any right on the part of any party hereto or thereto, after the consummation of the MatCo Distribution, to rescind this Agreement, any Conveyancing and Assumption Instrument or any of the transactions contemplated hereby or thereby, except as expressly provided in Section 2.6(a) and Section 2.6(b); provided, however, that with respect to the transactions contemplated by this Agreement (including the Internal Reorganization and Distributions), the Parties may also bring claims arising under the Tax Matters Agreement under and in accordance with the Tax Matters Agreement and claims arising under the Employee Matters Agreement under and in accordance with the Employee Matters Agreement. Each Party shall cause the members of its Group to comply with this Section 8.5(f).

(g) The provisions of this Article VIII shall apply to Third Party Claims that are already pending or asserted as well as Third Party Claims brought or asserted after the date of this Agreement. There shall be no requirement under this Section 8.5 to give a notice with respect to any Third Party Claim that exists as of the Effective Time. Each Party on behalf of itself and each other member of its Group acknowledges that Liabilities for Actions (regardless of the parties to the Actions) may be partly Specialty Products Liabilities, partly Materials Science Liabilities and partly Agriculture Liabilities. If the Parties cannot agree on the allocation of any such Liabilities for Actions, they shall resolve the matter pursuant to the procedures set forth in Article X. No Party shall, nor shall any Party permit the other members of its Group (or their respective then-Affiliates) to, file Third Party Claims or cross-claims against any other Party or any members of another Group in an Action in which a Third Party Claim is being resolved.

(h) For purposes of this Section 8.5, any claim or demand that is made against any member of the SpecCo Group or AgCo Group or any of their respective then-Affiliates as to which any member of the SpecCo Group or AgCo Group or such then-Affiliate, as applicable, is or may be entitled to insurance coverage for more than 50% of the total related costs and liabilities by the Dow Insurer pursuant to Section 11.5, shall be considered a "Third Party Claim" and MatCo shall be considered the "Indemnifying Party" and the applicable member of the AgCo Group or SpecCo Group, or such applicable then-Affiliate, as applicable, shall be considered the "Indemnitee" with respect thereto, each with the rights and

150

responsibilities set forth in this Section 8.5. With respect to those claims or demands for which any member of the SpecCo Group or AgCo Group, or any of their respective then-Affiliates, is or may be entitled to coverage for 50% or less of the total related costs and liabilities, their relationship with the Dow Insurer shall be governed by the terms and conditions of the relevant insurance policy(ies), in accordance with historical claim-handling practices of said insurer, without regard to the terms of this Section 8.5.

Section 8.6 Procedures for Direct Claims. An Indemnitee shall give the Indemnifying Party written notice of any matter that an Indemnitee has determined has given or would reasonably be expected to give rise to a right of indemnification under this Agreement (other than a Third Party Claim which shall be governed by Section 8.5(a)), within thirty (30) days of such determination, stating the amount of the Indemnifiable Loss claimed, if known, and method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed by such Indemnitee or arises; provided, however, that the failure to provide such written notice shall not release the Indemnifying Party from any of its obligations except and solely to the extent the Indemnifying Party shall have been actually materially prejudiced as a result of such failure.

Section 8.7 Cooperation In Defense and Settlement.

(a) With respect to any Third Party Claim (other than in respect of (x) a Specified DowDuPont Shared Liability or (y) a Shared Historical DuPont Liability that does not implicate any MatCo Indemnitees) that implicates two or more Parties in a material respect, including due to the allocation of Liabilities, the reasonably foreseeable impact on the Businesses of the relief sought or the responsibilities for management of defense and related indemnities pursuant to this Agreement, the applicable Parties agree to use reasonable best efforts to cooperate fully and maintain a joint defense (in a manner that will preserve for all Parties any Privilege). The Party that is not responsible for managing the defense of any such Third Party Claim shall be consulted with respect to significant matters relating thereto and may, if necessary or helpful, retain counsel to assist in the defense of such claims. Notwithstanding the foregoing, nothing in this Section 8.7 shall derogate from any Party's rights to control the defense of any Action in accordance with Section 8.5.

(b) (i) Notwithstanding anything to the contrary in this Agreement, with respect to any Third Party Claim where the resolution of such Third Party Claim by order, judgment, settlement or otherwise, would reasonably be expected to include any condition, limitation or other stipulation that would, in the reasonable judgment of SpecCo, significantly and adversely impact the conduct of the Specialty Products Business or result in a significant adverse change to any member of the SpecCo Group at shared locations where any member of the MatCo Group and any member of the SpecCo Group or any member of the AgCo Group and any member of the SpecCo Group, as applicable, have operating agreements, governmental permits or joint obligations to a Governmental Entity with interdependencies, SpecCo shall have, at SpecCo's expense, the reasonable opportunity to consult, advise and comment in all preparation, planning and strategy regarding any such Third Party Claim, including with regard to any drafts of notices and other conferences and communications to be provided or submitted by any member of the MatCo Group or any member of the AgCo Group to any third party involved in such Third Party Claim (including any Governmental Entity), to the extent that

151

SpecCo's participation does not affect any Privilege in a material and adverse manner; provided that to the extent that any such Third Party Claim requires the submission by any member of the MatCo Group or any member of the AgCo Group of any Information relating to any current or former officer or director of any member of the SpecCo Group, such Information will only be submitted in a form approved by SpecCo in its reasonable discretion, (ii) notwithstanding anything to the contrary in this Agreement, with respect to any Third Party Claim where the resolution of such Third Party Claim by order, judgment, settlement or otherwise, would reasonably be expected to include any condition, limitation or other stipulation that would, in the reasonable judgment of MatCo, significantly and adversely impact the conduct of the Materials Science Business or result in a significant adverse change to any member of the MatCo Group at shared locations where any member of the MatCo Group and any member of the SpecCo Group or any member of the MatCo Group and any member of the AgCo Group, as applicable, have operating agreements, governmental permits or joint obligations to a Governmental Entity with interdependencies, MatCo shall have, at MatCo's expense, the reasonable opportunity to consult, advise and comment in all preparation, planning and strategy regarding any such Third Party Claim, including with regard to any drafts of notices and other conferences and communications to be provided or submitted by any member of the SpecCo Group or any member of the AgCo Group to any third party involved in such Third Party Claim (including any Governmental Entity), to the extent that MatCo's participation does not affect any Privilege in a material and adverse manner; provided that to the extent that any such Third Party Claim requires the submission by any member of the SpecCo Group or any member of the AgCo Group of any Information relating to any current or former officer or director of any member of the MatCo Group, such Information will only be submitted in a form approved by MatCo in its reasonable discretion and (iii) notwithstanding anything to the contrary in this Agreement, with respect to any Third Party Claim where the resolution of such Third Party Claim by order, judgment, settlement or otherwise, would reasonably be expected to include any condition, limitation or other stipulation that would, in the reasonable judgment of AgCo, significantly and adversely impact the conduct of the Agriculture Business or result in a significant adverse change to any member of the AgCo Group at shared locations where any member of the AgCo Group and any member of the SpecCo Group or any member of the AgCo Group and any member of the MatCo Group, as applicable, have operating agreements, governmental permits or joint obligations to a Governmental Entity with interdependencies, AgCo shall have, at AgCo's expense, the reasonable opportunity to consult, advise and comment in all preparation, planning and strategy regarding any such Third Party Claim, including with regard to any drafts of notices and other conferences and communications to be provided or submitted by any member of the MatCo Group or any member of the SpecCo Group to any third party involved in such Third Party Claim (including any Governmental Entity), to the extent that AgCo's participation does not affect any Privilege in a material and adverse manner; provided that to the extent that any such Third Party Claim requires the submission by any member of the MatCo Group or any member of the SpecCo Group of any Information relating to any current or former officer or director of any member of the AgCo Group, such Information will only be submitted in a form approved by AgCo in its reasonable discretion. (l) With regard to the matters specified in the preceding clause (i), SpecCo shall have a right to consent to any compromise or settlement related thereto by any member of the AgCo Group or any member of the MatCo Group to the extent that the effect on any member of the SpecCo Group would reasonably be expected to result in a significant adverse effect on the financial condition or results of operations of SpecCo and its Subsidiaries at

152

such time or the Specialty Products Business conducted thereby at such time, taken as a whole, and such significant adverse effect would reasonably be expected to be greater with respect to the SpecCo Group, taken as a whole, than the effect on either the MatCo Group, taken as a whole, or the AgCo Group, taken as a whole, (II) with regard to the matters specified in the preceding clause (ii), MatCo shall have a right to consent to any compromise or settlement related thereto by any member of the AgCo Group or any member of the SpecCo Group to the extent that the effect on any member of the MatCo Group would reasonably be expected to result in a significant adverse effect on the financial condition or results of operations of MatCo and its Subsidiaries at such time or the Materials Science Business conducted thereby at such time, taken as a whole, and such significant adverse effect would reasonably be expected to be greater with respect to the MatCo Group, taken as a whole, than the effect on either the AgCo Group, taken as a whole, or the SpecCo Group, taken as a whole, and (III) with regard to the matters specified in the preceding clause (iii), AgCo shall have a right to consent to any compromise or settlement related thereto by any member of the MatCo Group or any member of the SpecCo Group to the extent that the effect on any member of the AgCo Group would reasonably be expected to result in a significant adverse effect on the financial condition or results of operations of AgCo and its Subsidiaries at such time or the Agriculture Business conducted thereby at such time, taken as a whole, and such significant adverse effect would reasonably be expected to be greater with respect to the AgCo Group, taken as a whole, than the effect on either the MatCo Group, taken as a whole, or the SpecCo Group, taken as a whole.

(c) Each of SpecCo, MatCo and AgCo agrees on behalf of itself and the other members of its Group that at all times from and after the Effective Time, if an Action is commenced by a third party naming two (2) or more Parties (or any member of such Parties' respective Groups or their respective then-Affiliates) as defendants and with respect to which one or more named Parties (or any member of such Party's respective Group or their respective then-Affiliates) is a nominal defendant and/or such Action is otherwise not a Liability allocated to such named Party under this Agreement, then the other Party or Parties shall use, and shall cause the other members of its respective Group to use, commercially reasonable efforts to cause such nominal defendant to be removed from such Action, as soon as reasonably practicable (including using commercially reasonable efforts to petition the applicable court to remove such Party (or member of its Group or their respective then-Affiliates) as a defendant to the extent such Action relates solely to Assets or Liabilities that another Party (or Group) has been allocated pursuant to this Agreement). In the event of an Action in which the Indemnifying Party is not a named defendant, if either the Indemnitee or Indemnifying Party shall so request, each Party shall, and shall cause the other members of its Group to, endeavor to substitute the Indemnifying Party for the named defendant, if at all practicable and advisable under the circumstances. If such substitution or addition cannot be achieved for any reason or is not requested, management of the Action shall be determined as set forth in this Article VIII.

Section 8.8 Indemnification Payments. Indemnification required by this Article VIII shall be made by periodic payments of the amount of Indemnifiable Loss in a timely fashion during the course of the investigation or defense, as and when bills are received or an Indemnifiable Loss or Liability incurred. The applicable Indemnitee shall deliver to the Indemnifying Party, upon request, reasonably satisfactory documentation setting forth the basis for the amount of such payments, including documentation with respect to calculations made and consideration of any Insurance Proceeds or Third Party Proceeds that actually reduce the amount

of such Indemnifiable Losses; provided, that the delivery of such documentation shall not be a condition to the payments described in the first sentence of this Section 8.8, but the failure to deliver such documentation may be the basis for the Indemnifying Party to contest whether the applicable Indemnifiable Loss or Liability was incurred by the applicable Indemnitee.

Section 8.9 Indemnification Obligations Net of Insurance Proceeds and Other Amounts.

(a) Any Indemnifiable Loss subject to indemnification pursuant to this Article VIII including, for the avoidance of doubt, in respect of any Specified DowDuPont Shared Liability and any Shared Historical DuPont Liability, shall be calculated (i) net of Insurance Proceeds that actually reduce the amount of the Indemnifiable Loss and (ii) net of any proceeds received by the Indemnitee from any third party for such Liability that actually reduce the amount of the Indemnifiable Loss ("Third Party Proceeds"). Accordingly, the amount which any Indemnifying Party is required to pay pursuant to this Article VIII to any Indemnitee pursuant to this Article VIII shall be reduced by any Insurance Proceeds or Third Party Proceeds theretofore actually recovered by or on behalf of the Indemnitee in respect of the related Indemnifiable Loss. If an Indemnitee receives a payment required by this Agreement from an Indemnifying Party in respect of any Indemnifiable Loss (an "Indemnity Payment") and subsequently receives Insurance Proceeds or Third Party Proceeds, then the Indemnitee shall pay to the Indemnifying Party an amount equal to the excess of the Indemnity Payment received over the amount of the Indemnity Payment that would have been due if the Insurance Proceeds or Third Party Proceeds had been received, realized or recovered before the Indemnity Payment was made.

(b) The Parties hereby agree that an insurer who would otherwise be obligated to pay any claim shall not be relieved of the responsibility with respect thereto and, solely by virtue of the indemnification provisions hereof, shall not have any subrogation rights with respect thereto, and that no insurer or any other third party shall be entitled to a "windfall" (e.g., a benefit it would not otherwise be entitled to receive, or the reduction or elimination of an insurance coverage obligation that it would otherwise have, in the absence of the indemnification or release provisions) by virtue of any provision contained in this Agreement. The Indemnitee shall use commercially reasonable efforts to seek to collect or recover any Insurance Proceeds and any Third Party Proceeds to which the Indemnitee is entitled in connection with any Indemnifiable Loss for which the Indemnitee seeks indemnification pursuant to this Article VIII; provided, that the Indemnitee's inability, following such efforts, to collect or recover any such Insurance Proceeds or Third Party Proceeds shall not limit the Indemnifying Party's obligations hereunder.

(c) No Indemnitee shall be entitled to any payment or indemnification more than once with respect to the same Indemnifiable Loss.

(d) In addition to the provisions of Section 8.9(a), any Indemnifiable Loss subject to indemnification pursuant to this Article VIII (including, for the avoidance of doubt, in respect of any Specified DowDuPont Shared Liability or any Shared Historical DuPont Liability), shall (i) be reduced by the amount of any reduction in Taxes for which the Indemnitee is responsible under the Tax Matters Agreement actually realized as a result of the event giving

154

rise to the payment by the end of the taxable year in which the payment is made, and (ii) be increased if and to the extent necessary to ensure that, after all required Taxes on the payment are paid (including Taxes attributable to any increases in the payment under this Section 8.9(d)), the Indemnitee receives the amount it would have received if the payment was not taxable or did not result in an increase in Taxes.

Section 8.10 Additional Matters; Survival of Indemnities.

(a) The indemnity agreements contained in this Article VIII shall remain operative and in full force and effect, regardless of (i) any investigation made by or on behalf of any Indemnitee; (ii) the knowledge by the Indemnitee of Indemnifiable Losses for which it might be entitled to indemnification hereunder; and (iii) any termination of this Agreement. The indemnity agreements contained in this Article VIII shall survive the Distribution.

(b) The rights and obligations of any member of the SpecCo Group, any member of the MatCo Group, or any member of the AgCo Group in each case, under this Article VIII shall survive the sale or other Transfer by any Party or its respective Subsidiaries of any Assets or businesses or the assignment by it of any Liabilities, with respect to any Indemnifiable Loss of any Indemnitee related to such Assets, businesses or Liabilities.

Section 8.11 Environmental Matters.

(a) Substitution. AgCo, MatCo and SpecCo, as the case may be, shall use their reasonable best efforts to obtain any Consents, transfers, assignments, assumptions, waivers or other legal instruments necessary to cause such party or a member of its Group to be fully substituted for any member of the Group of any other Party with respect to any order, decree, judgment, agreement or Action that is in effect as of the Relevant Time in connection with any Agriculture Environmental Liability, any Materials Science Environmental Liability or any Specialty Products Environmental Liability, respectively. AgCo, MatCo or SpecCo, as the case may be, shall inform third parties associated with such matter, including Governmental Entities, about the assumption of such liability by the Party to which it has been allocated and request that such Persons direct all communications, requirements, notifications and/or official letters related to such matters to the Party to which it has been allocated. The members of such other Groups (and their successors) shall use commercially reasonable efforts to provide necessary assistance or signatures to AgCo, MatCo or SpecCo, as the case may be, to achieve the purposes of this Section 8.11(a). Until such time as the substitutions outlined above have been completed, AgCo, MatCo or SpecCo, as the case may be, shall comply with the terms and conditions of all such orders, decrees, judgments, agreements and Actions in respect of which it has been allocated Environmental Liabilities pursuant to this Agreement.

(b) Remediation Procedures. Except as provided below, the Parties shall follow the general procedures for indemnification set forth in this Article VIII with respect to any claim for indemnification pursuant to Sections 8.2, 8.3 or 8.4, relating to remediation of contaminated environmental media, where the owner or primary tenant of the impacted property is not a member of the Group of the Party to which such liability for remediation has been allocated. For such matters, if the Indemnifying Party acknowledges in writing that it is obligated

155

to provide indemnification pursuant to this Section 8.11(b) with respect to such remediation Liability, such Party (and members of its Group) shall be entitled (but shall not be required) to undertake the response action or actions (including investigation, remediation and monitoring) relating to such contamination ("Response Action"). The Party (and members of its Group) performing the Response Action shall be referred to as the "Performing Party."

(c) If the Performing Party is not both (x) the owner of the real property and (y) the only Party whose Group is using such real property, the following conditions shall apply to the performance of any Response Action:

(i) The Performing Party shall take reasonable precautions to minimize any interference with or disruption of the operations of the property owners and/or any other parties that have operations at the site (including third-parties) (each such party that is a member of any Group, a "Non-Performing Impacted Party"), including obtaining the owner's and/or the other operating parties', as applicable, prior written Consent to any Response Action that would reasonably be expected to substantially interfere with or disrupt the operations of such Person at the affected real property, which Consent shall not be unreasonably withheld, conditioned or delayed;

(ii) If a member of a Group other than that of the Performing Party is the owner of the real property or otherwise has operational control of the impacted property (a "Non-Performing Site Controller"), such Non-Performing Site Controller shall, and shall cause the other members of the Group to, provide reasonable access to, and reasonably cooperate with, the Performing Party in its performance of such Response Action, it being understood that such cooperation shall in no event in and of itself require any Non-Performing Impacted Party or Non-Performing Site Controller to incur any out-of-pocket expenses.

(iii) The Performing Party shall use reasonable efforts to avoid and minimize any harm to any persons or damage to real or personal property, and shall be responsible for any harm or damages resulting from the performance of any such Response Action, except to the extent such harm or damage results from the negligence or willful misconduct of such other Party or any member of its Group or any of their respective representatives; and

(iv) All required Response Actions shall be diligently and expeditiously performed in compliance with all applicable Laws, including Environmental Laws and worker health and safety Laws.

(d) The Performing Party shall (i) notify each Non-Performing Impacted Party and Non-Performing Site Controller prior to commencing or performing any Response Actions, (ii) keep each Non-Performing Impacted Party and Non-Performing Site Controller reasonably informed of the progress of any Response Actions and provide copies of any final, proposed response, remediation, investigation or sampling plans and the results of sampling and analysis (including any final status reports of work in progress or other final reports), in each case required to be submitted to any Governmental Entity or third party, (iii) provide each Non-Performing Impacted Party and Non-Performing Site Controller, at such

156

Non-Performing Impacted Party and Non-Performing Site Controller's sole cost and expense, with a reasonable opportunity to review and comment on any material proposed response, remediation, investigation or sampling plans prior to submission to a Governmental Entity, (iv) provide each Non-Performing Impacted Party and Non-Performing Site Controller with the opportunity to attend, at such Non-Performing Impacted Party and Non-Performing Site Controller's sole cost and expense, any planned meeting with any Governmental Entity regarding a Response Action (provided, that the Governmental Entity does not object) and (v) provide each Non-Performing Impacted Party and Non-Performing Site Controller an opportunity to observe, at such Non-Performing Impacted Party and Non-Performing Site Controller's sole cost and expense, any Response Action (other than Response Actions consisting of routine sampling, monitoring, maintenance or similar activities performed in the ordinary course) and to obtain, at such Non-Performing Impacted Party and Non-Performing Site Controller's sole cost and expense, splits of any samples obtained in the course of conducting any Response Action.

(e) Subject to Section 8.11(f), all Response Actions subject to this Section 8.11 shall meet the least stringent applicable standards, regulations, or requirements of applicable Law, including applicable Environmental Law or, where an applicable Governmental Entity with or asserting jurisdiction is supervising such Response Action, required by such Governmental Entity, and be consistent with the use of the property as of the Effective Time and any applicable terms of the relevant lease or similar site-specific agreement as such terms are in effect as of the Effective Time (the "Appropriate Remediation Standard"). In furtherance of and to the extent consistent with the foregoing, the parties agree to utilize institutional controls and engineering controls (including capping, signs, fences and deed restrictions on the use of real property, soils or groundwater) to satisfy the Appropriate Remediation Standard and to cooperate in obtaining all necessary approvals of the use of such controls; provided, that such controls do not prevent or materially interfere with the continued operation or reasonable future expansion of the operations on such real property. Once a notice of no further action or equivalent determination with respect to such matter has been issued by a Governmental Entity (or, if the Governmental Entity has delegated authority to conduct and certify the completion of a Response Action to a licensed professional, upon notice of the applicable Governmental Entity's receipt and acceptance of such licensed professional's certification), the Indemnifying Party shall have no further obligations with respect to such matter, other than with respect to any Indemnifiable Losses arising out of (1) any Third Party Claims relating to such matter and (2) the performance of and any costs associated with any ongoing operations and maintenance, if any, required with respect to the Response Action, including inspections and repair of any engineering controls, ongoing pumping and treating of impacted groundwater (including any material equipment or system repairs, replacements or required upgrades), ongoing groundwater monitoring and related reporting, and the provision of any required financial assurance, provided, that the Indemnitee shall be responsible for the performance of and any costs associated with any and all ongoing operations and maintenance relating to the following obligations: (i) any institutional controls, including any deed restrictions or land use controls and reporting obligations related to the same; (ii) monitoring, maintenance, repair and reporting associated with a cap used as part of the remedy, but only to the extent that the cap consists of (x) the buildings at the site, (y) asphalt or similar materials already present at the site or that are used at the site for purposes in addition to the Response Action (i.e., parking), or (z) landscaping; and (iii) groundwater monitoring associated with a natural monitored attenuation remedy. The

157

Indemnifying Party shall have the right to transfer to the Indemnitee (upon payment of the amount set forth in this sentence as mutually agreed in writing by the Indemnifying Party and Indemnitee or determined pursuant to the procedures set forth in Article X) its obligations for its ongoing operations and maintenance costs, if any, with respect to engineering controls approved as part of a no further action, equivalent determination or certification if the Indemnifying Party agrees to pay to the Indemnitee a sum equal to the present value of the reasonably estimated future costs of said engineering controls (where the period of time used for such present value calculation shall be the entire period for which it is reasonably anticipated that such continuing obligations will be performed, but no more than thirty (30) years, and the discount rate shall be reasonable). For the avoidance of doubt, if the Indemnifying Party and the Indemnitee cannot mutually agree in writing on the amount set forth in the preceding sentence, such disagreement shall be resolved in accordance with the procedures set forth in Article X of this Agreement. In the event that any Governmental Entity reopens or otherwise modifies any determination related to the notice of no further action or equivalent determination, or notice of receipt and acceptance of the licensed professional's certification, such that additional Response Actions are required, the Indemnifying Party shall indemnify the Indemnitee for any Liabilities associated with the reopening or modification of such determination that would have otherwise constituted Indemnifiable Losses of such Indemnitee.

(f) The Indemnifying Party shall not be responsible or liable to the Indemnitee for any Indemnifiable Losses associated with any Response Action to the extent:

(i) incurred by or on behalf of the Indemnitee to achieve compliance with standards in excess of the Appropriate Remediation Standards;

(ii) incurred for Response Actions not required under or to achieve compliance with applicable Laws or required by a Governmental Entity with or asserting jurisdiction, unless undertaken as a result of a reasonable belief that there exists a condition that, if unabated, poses a risk of reasonable possibility of harm to human health and safety, or to property of any third party; or

(iii) resulting from the exacerbation after the Relevant Time of any Release or threat of Release of or exposure to Hazardous Substances which first occurred prior to the Relevant Time; provided, that this clause (iii) shall in no way relieve the Indemnifying Party of any Liability for Indemnifiable Losses associated with a Response Action if the exacerbation of a Release that occurred on or prior to the Relevant Time arises as a result of any action or inaction on the part of the Indemnitee that does not rise to the level of negligence.

(g) Corrective Actions for Compliance-Related Liabilities Subject to Indemnity. If a Party is providing indemnification pursuant to this Agreement in connection with an ongoing business operation of another Party, which (x) involves a violation of applicable Environmental Law which occurred prior to the Relevant Time, (y) requires a capital project (or series of capital projects) to bring the facility into compliance with applicable Environmental Law in effect as of the Relevant Time, and (z) does not involve a Response Action, the following shall apply:

158

(i) The Party that owns and operates the business operation after the Relevant Time will conduct and control the capital project (or series of capital projects), including the implementation thereof (the "Corrective Action Performing Party");

(ii) All expenditures shall be commercially reasonable taking into account the obligation to bring the business operation into compliance with applicable Environmental Law in effect as of the Relevant Time ("Commercially Reasonable Expenditures"), and the Indemnifying Party shall not be liable for additional expenditures, if any, in excess of Commercially Reasonable Expenditures, including any such additional expenditures that are made for the purpose of providing an economic benefit to the Corrective Action Performing Party, including, expanding the business operation;

(iii) The Indemnifying Party shall have no further obligation with respect to the matter subject to indemnification hereunder once the capital project (or series of capital projects) has been implemented and compliance has been achieved to the satisfaction of the relevant Governmental Entity; and

(iv) The Corrective Action Performing Party shall promptly provide the Indemnifying Party with: (A) copies of any proposed corrective action plan to be submitted to the relevant Governmental Entity, including the proposed cost of the corrective action; (B) a reasonable opportunity to review and suggest comments to the corrective action plan prior to submission to the relevant Governmental Entities; (C) the opportunity to attend, at the Indemnifying Party's sole cost and expense, any planned meeting with any Governmental Entity regarding the corrective action (provided, that the Governmental Entity does not object); (D) material correspondence between the relevant Governmental Entities and the Corrective Action Performing Party relating to the corrective action; and (E) the final corrective action plan approved by or agreed to with the relevant Governmental Entities and the budget for implementation of said plan.

Section 8.12 Closure of Discontinued Operations.

(a) Notwithstanding anything in this Agreement to the contrary and except with respect to indemnification for (x) Environmental Liabilities, (y) Third Party Claims or (z) Indemnifiable Losses to the extent related to, resulting from or arising out of the Demolition Party's failure to perform its obligations pursuant to this Section 8.12 or its negligent or willful misconduct in performing such obligations, the following obligations set forth in this Section 8.12 shall be the exclusive obligations pursuant to this Agreement of the Parties for any Liabilities to the extent arising from required actions to execute demolition and removal of any buildings, improvements, facilities, equipment or other fixtures that: (i)(x) are Discontinued and/or Divested Operations and Businesses of Historical Dow which give rise to Dow Discontinued and/or Divested Operations and Business Liabilities (other than those for which, pursuant to Section 8.13(b), a claim for indemnification could not be brought) and (y) are located at a property owned by or within the leasehold interest of AgCo or a member of the AgCo Group or SpecCo or a member of the SpecCo Group as of the MatCo Distribution Date (the "Historical Dow Discontinued Buildings and Related Improvements"), (ii)(x) are Discontinued and/or

159

Divested Operations and Businesses of Historical DuPont which give rise to Agriculture DuPont Discontinued and/or Divested Operations and Business Liabilities (other than those for which, pursuant to Section 8.13(b), a claim for indemnification could not be brought) and (y) are located at a property owned by or within the leasehold interest of MatCo or a member of the MatCo Group or SpecCo or a member of the SpecCo Group as of the MatCo Distribution Date and (iii)(x) are Discontinued and/or Divested Operations and Businesses of Historical DuPont which give rise to Specialty Products Discontinued and/or Divested Operations and Business Liabilities (other than those for which, pursuant to Section 8.13(b), a claim for indemnification could not be brought) and (y) are located at a property owned by or within the leasehold interest of MatCo or a member of the MatCo Group or AgCo or a member of the AgCo Group as of the MatCo Distribution Date (the buildings, improvements, facilities, equipment or other fixtures covered by clauses (ii) and (iii) are the "Historical DuPont Discontinued Buildings and Related Improvements" and together with the Historical Dow Discontinued Buildings and Related Improvements, the "Discontinued Buildings and Related Improvements"). For purposes of this section, the term "Demolition Party" shall mean: (x) MatCo, in the case of Historical Dow Discontinued Buildings and Related Improvements, (y) AgCo, in the case of Historical DuPont Discontinued Buildings and Related Improvements which constitute Agriculture DuPont Discontinued and/or Divested Operations and Business Liabilities and (z) SpecCo, in the case of Historical DuPont Discontinued Buildings and Related Improvements which constitute Specialty Products DuPont Discontinued and/or Divested Operations and Business Liabilities, in each case including, where relevant, the other members of their respective Groups, and the term "Owner or Lessee Party" shall mean the Party on whose property or leasehold the Discontinued Buildings and Related Improvements are located.

(b) The Demolition Party shall undertake the demolition and removal of the Discontinued Buildings and Related Improvements if: (i) required by applicable Law, including an applicable permit issued by a Governmental Entity; (ii) demolition or removal is ordered by a Governmental Entity, provided that the Demolition Party retains all rights that it may have to challenge or defend against such order or demand; (iii) the Discontinued Buildings and Related Improvements constitute a nuisance that unreasonably and significantly harms or threatens to unreasonably and significantly harm the health and safety of other persons at the Owner or Lessee Party's properties or members of the public; or (iv) the Discontinued Buildings and Related Improvements unreasonably interfere with the current, or would unreasonably interfere with the planned, operations (such operations being determined as of the MatCo Distribution, after giving effect to the Ancillary Agreements, and such plans being those documented in writing as of February 14, 2019 and in the Ancillary Agreements) by the Owner or Lessee Party or any other lessee at the property; provided that, with respect to any such planned operations, in the event that (x) the Demolition Party is required pursuant to this Section 8.12(b)(iv) to undertake the demolition and removal of the applicable Discontinued Buildings and Related Improvements and completes such demolition and removal, and (y) the Owner or Lessee Party has not, by the later of (A) three (3) years after the completion of such demolition and removal and (B) two (2) years after all necessary permits have been obtained to allow for the start of the implementation of the applicable planned operation (provided that the Owner or Lessee Party has used commercially reasonable efforts to obtain such permits as promptly as practicable), started to implement the applicable planned operation, then the Owner or Lessee Party shall reimburse the Demolition Party for all reasonable and documented out of pocket costs and expenses incurred by the Demolition Party in connection with such demolition and removal. The Owner or Lessee Party shall provide written notice to the Demolition Party that demolition and removal of the Discontinued Buildings and Related Improvements are required as a result of the satisfaction of any of the conditions set forth in this Section 8.12(b).

160

(c) If demolition and removal is required pursuant to <u>Section 8.12(b)</u>, the Demolition Party shall undertake the demolition and removal of the Discontinued Buildings and Related Improvements in accordance with all applicable Laws, applicable site-specific safety requirements, and the Demolition Party's decommissioning plan, subject to the Owner or Lessee Party's written approval of such plan, such approval not to be unreasonably withheld, conditioned, or delayed.

(d) The Demolition Party shall take reasonable precautions to minimize any interference with or disruption of the operations of the property owners and/or any other parties that have operations at the site (including third parties). The Demolition Party shall restore the Owner or Lessee Party's premises to a level grade; <u>provided</u>, <u>however</u>, that the Demolition Party shall only be required to decommission, remove or demolish the Discontinued Buildings and Related Improvements down to, but not through, the subsurface.

(e) The Owner or Lessee Party shall provide reasonable access to, and reasonably cooperate with, the Demolition Party in its demolition and removal of the subject Discontinued Buildings and Related Improvements. The Demolition Party may access, occupy and use the Discontinued Buildings and Related Improvements for a period of up to twelve (12) months, solely for the purposes of performing and completing the demolition and removal work, after being provided such access and after the receipt of written approval of its demolition plan as provided in <u>Section 8.12(c)</u>; provided, however, if the demolition and removal work cannot reasonably be completed within such period, the Demolition Party may, prior to the expiration of such twelve (12) month period, send a written request to the Owner or Lessee Party seeking an extension of the period of access, and subject to the Owner or Lessee Party's approval of such request (such approval not to be unreasonably withheld, conditioned or delayed), the Owner or Lessee Party shall continue to provide reasonable access to, and shall continue to reasonably cooperate with, the Demolition Party through the period specified in the request.

(f) If the Demolition Party and the Owner or Lessee Party cannot mutually agree in writing whether the Demolition Party has completed its demolition and removal obligations pursuant to <u>Section 8.12</u>, such disagreement shall be resolved in accordance with the procedures set forth in <u>Article X</u> of this Agreement. If the disagreement is so resolved in favor of the Owner or Lessee Party, and the Demolition Party fails to complete such required work, the Owner or Lessee Party may undertake any such work, at the sole cost and expense of the Demolition Party to be paid by the Demolition Party upon demand, excluding any costs and expenses that relate to liabilities that have been otherwise allocated to the Owner or Lessee Party pursuant to the terms of this Agreement.

Section 8.13 <u>Certain Other Limits on Indemnification</u>.

(a) <u>Historical DuPont Discontinued and/or Divested Operations and Business Liability Limitations</u>.

161

(i) In the event that Indemnifiable Losses relating to, arising out of or resulting from AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities exceed $200,000,000 (the "AgCo Group DuPont Divested Business Liability Basket"), SpecCo shall and shall cause the other members of the SpecCo Group to indemnify, defend and hold harmless the AgCo Indemnitees from and against any and all Indemnifiable Losses of the AgCo Indemnitees relating to, arising out of, by reason of or otherwise in connection with any AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities in excess of the AgCo Group DuPont Divested Business Liability Basket until the sum of (x) Indemnifiable Losses of the SpecCo Indemnitees relating to, arising out of, by reason of or otherwise in connection with any SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities and (y) any and all amounts paid pursuant to this Section 8.13(a)(i) is equal to the SpecCo Group DuPont Divested Business Liability Basket (such equality, the "SpecCo Hurdle").

(ii) In the event that Indemnifiable Losses relating to, arising out of or resulting from SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities exceed $200,000,000 (the "SpecCo Group DuPont Divested Business Liability Basket"), AgCo shall and shall cause the other members of the AgCo Group to indemnify, defend and hold harmless the SpecCo Indemnitees from and against any and all Indemnifiable Losses of the SpecCo Indemnitees relating to, arising out of, by reason of or otherwise in connection with any SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities in excess of the SpecCo Group DuPont Divested Business Liability Basket until the sum of (x) Indemnifiable Losses of the AgCo Indemnitees relating to, arising out of, by reason of or otherwise in connection with any AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities and (y) any and all amounts paid pursuant to this Section 8.13(a)(ii) is equal to the AgCo Group DuPont Divested Business Liability Basket (such equality, the "AgCo Hurdle").

(iii) From and after the time that both the SpecCo Hurdle and the AgCo Hurdle have been met, (i) SpecCo shall not be required to indemnify, defend and hold harmless the AgCo Indemnitees from and against any individual or series of related Indemnifiable Losses of the AgCo Indemnitees relating to, arising out of, by reason of or otherwise in connection with any AgCo Group Excess DuPont Discontinued and/or Divested Operations and Businesses Liabilities until the aggregate amount of the AgCo Indemnitees' Indemnifiable Losses with respect thereto exceeds $1,000,000 (the "De Minimis Threshold"), after which SpecCo shall be obligated for the Specialty Products Shared Historical DuPont Percentage of all the AgCo Indemnitee's Indemnifiable Losses with respect to such individual or series of related Indemnifiable Losses from the first dollar regardless of the De Minimis Threshold and (ii) AgCo shall not be required to indemnify, defend and hold harmless the SpecCo Indemnitees from and against any individual or series of related Indemnifiable Losses of the SpecCo Indemnitees relating to, arising out of, by reason of or otherwise in connection with any SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities until the aggregate amount of the SpecCo Indemnitees' out-of-pocket Indemnifiable Losses with respect thereto exceeds the De Minimis Threshold, after which AgCo shall be obligated for the Agriculture Shared Historical DuPont Percentage of all the AgCo Indemnitee's Indemnifiable Losses with respect to such individual or series of related Indemnifiable Losses from the first dollar regardless of the De Minimis Threshold.

162

(b) <u>Designated DuPont DDOB Liabilities and Designated Dow DDOB Liabilities</u>.

(i) MatCo shall not be required pursuant to this Agreement to indemnify, defend or hold harmless (x) the AgCo Indemnitees from or against Indemnifiable Losses to the extent relating to, arising out of or resulting from any Designated Dow DDOB Liability (1) unless the claim or series of related claims or other claims arising out of substantially similar facts, circumstances or occurrences involves Indemnifiable Losses in excess of $1,000,000 (the "<u>Designated DDOB De Minimis Threshold</u>") and (2) until the aggregate amount of the AgCo Indemnitees' Indemnifiable Losses with respect to all Designated Dow DDOB Liabilities exceeds $75,000,000 (the "<u>AgCo Designated Dow DDOB Deductible Amount</u>"), after which MatCo shall be obligated to indemnify the AgCo Indemnitees for any and all such Indemnifiable Losses in excess of the AgCo Designated Dow DDOB Deductible Amount; provided that, for purposes of this clause (2) only, Indemnifiable Losses shall include all reasonable costs and expenses (A) actually incurred by the AgCo Indemnitees, (B) with respect to the demolition and removal of the applicable Historical Dow Discontinued Buildings and Related Improvements, and (C) for which MatCo would have been responsible pursuant to <u>Section 8.12</u> if, at the time such costs and expenses were incurred by the AgCo Indemnitees, the aggregate amount of the AgCo Indemnitees' Indemnifiable Losses with respect to all Designated Dow DDOB Liabilities had exceeded the AgCo Designated Dow DDOB Deductible Amount; or (y) the SpecCo Indemnitees from or against Indemnifiable Losses to the extent relating to, arising out of or resulting from a Designated Dow DDOB Liability (1) unless the claim or series of related claims or other claims arising out of substantially similar facts, circumstances or occurrences involves Indemnifiable Losses in excess of the Designated DDOB De Minimis Threshold and (2) until the aggregate amount of the SpecCo Indemnitees' Indemnifiable Losses with respect to all Designated Dow DDOB Liabilities exceeds $75,000,000 (the "<u>SpecCo Designated Dow DDOB Deductible Amount</u>"), after which MatCo shall be obligated to indemnify the SpecCo Indemnitees for any and all such Indemnifiable Losses in excess of the SpecCo Designated Dow DDOB Deductible Amount; provided that, for purposes of this clause (2) only, Indemnifiable Losses shall include all reasonable costs and expenses (A) actually incurred by the SpecCo Indemnitees, (B) with respect to the demolition and removal of the applicable Historical Dow Discontinued Buildings and Related Improvements, and (C) for which MatCo would have been responsible pursuant to <u>Section 8.12</u> if, at the time such costs and expenses were incurred by the SpecCo Indemnitees, the aggregate amount of the SpecCo Indemnitees' Indemnifiable Losses with respect to all Designated Dow DDOB Liabilities had exceeded the SpecCo Designated Dow DDOB Deductible Amount.

163

(ii) Neither (A) AgCo nor (B) SpecCo shall be required pursuant to this Agreement to indemnify, defend or hold harmless the MatCo Indemnitees from or against Indemnifiable Losses to the extent relating to, arising out of or resulting from any Designated DuPont DDOB Liability (1) unless the claim or series of related claims or other claims arising out of substantially similar facts, circumstances or occurrences involves Indemnifiable Losses in excess of the Designated DDOB De Minimis Threshold and (2) until (x) in the case of AgCo, the aggregate amount of the MatCo Indemnitees' Indemnifiable Losses with respect to all Designated DuPont DDOB Liabilities constituting Agriculture Liabilities exceeds $37,500,000 (the "MatCo AgCo Designated DuPont DDOB Deductible Amount"), after which AgCo shall be obligated to indemnify the MatCo Indemnitees for any and all such Indemnifiable Losses in excess of the MatCo AgCo Designated DuPont DDOB Deductible Amount; provided that, for purposes of this clause (2)(x) only, Indemnifiable Losses shall include all reasonable costs and expenses (I) actually incurred by the MatCo Indemnitees, (II) with respect to the demolition and removal of the applicable Historical DuPont Discontinued Buildings and Related Improvements, and (III) for which AgCo would have been responsible pursuant to Section 8.12 if, at the time such costs and expenses were incurred by the MatCo Indemnitees, the aggregate amount of the MatCo Indemnitees' Indemnifiable Losses with respect to all Designated DuPont DDOB Liabilities constituting Agriculture Liabilities had exceeded the MatCo AgCo Designated DuPont DDOB Deductible Amount; or (y) in the case of SpecCo, the aggregate amount of the MatCo Indemnitees' Indemnifiable Losses with respect to all Designated DuPont DDOB Liabilities constituting Specialty Products Liabilities exceeds $37,500,000 (the "MatCo SpecCo Designated DuPont DDOB Deductible Amount"), after which SpecCo shall be obligated to indemnify the MatCo Indemnitees for any and all such Indemnifiable Losses in excess of the MatCo SpecCo Designated DuPont DDOB Deductible Amount; provided that, for purposes of this clause (2)(y) only, Indemnifiable Losses shall include all reasonable costs and expenses (I) actually incurred by the MatCo Indemnitees, (II) with respect to the demolition and removal of the applicable Historical DuPont Discontinued Buildings and Related Improvements, and (III) for which SpecCo would have been responsible pursuant to Section 8.12 if, at the time such costs and expenses were incurred by the MatCo Indemnitees, the aggregate amount of the MatCo Indemnitees' Indemnifiable Losses with respect to all Designated DuPont DDOB Liabilities constituting Specialty Products Liabilities had exceeded the MatCo SpecCo Designated DuPont DDOB Deductible Amount.

(iii) Notwithstanding anything to the contrary in this Agreement, after April 1, 2034 (the "Specified Tier 1 DDOB Liability Termination Date"), (i) (A) the MatCo Indemnitees shall not be entitled to indemnification pursuant to this Agreement for any Indemnifiable Loss to the extent relating to, arising out of or resulting from any Specified Tier 1 DuPont DDOB Liability and (B) neither AgCo nor SpecCo (nor any member of their respective Groups nor any of their respective Affiliates) shall have, or shall be subject to, any indemnification obligation pursuant to this Agreement to any MatCo Indemnitee to the extent relating to, arising out of, or resulting from any Specified Tier 1 DuPont DDOB Liability, (ii) (A) the AgCo Indemnitees shall not be entitled to indemnification pursuant to this Agreement for any Indemnifiable Loss to the extent relating to, arising out of or resulting from any Specified Tier 1 Dow DDOB Liability and (B) none of MatCo or any member of its Group or any of their respective Affiliates shall have, and shall not be subject to, any indemnification

164

APP. 090

obligation pursuant to this Agreement to any AgCo Indemnitee to the extent relating to, arising out of, or resulting from, any Specified Tier 1 Dow DDOB Liability and (iii) (A) the SpecCo Indemnitees shall not be entitled to indemnification pursuant to this Agreement for any Indemnifiable Loss to the extent relating to, arising out of or resulting from any Specified Tier 1 Dow DDOB Liability and (B) none of MatCo or any member of its Group or any of their respective Affiliates shall have, and shall not be subject to, any indemnification obligation pursuant to this Agreement to any SpecCo Indemnitee to the extent relating to, arising out of, or resulting from any Specified Tier 1 Dow DDOB Liability, unless, in each case (clauses (i)-(iii)), an Indemnification Notice was provided in respect thereof (or in respect of a Liability arising from the same or substantially similar facts) on or prior to the Specified Tier 1 DDOB Liability Termination Date.

(iv) Notwithstanding anything to the contrary in this Agreement, after April 1, 2024 (the "Specified Tier 2 DDOB Liability Termination Date"), (i) (A) the MatCo Indemnitees shall not be entitled to indemnification pursuant to this Agreement for any Indemnifiable Loss to the extent relating to, arising out of or resulting from any Specified Tier 2 DuPont DDOB Liability and (B) neither AgCo nor SpecCo (nor any member of their respective Groups nor any of their respective Affiliates) shall have, or shall be subject to, any indemnification obligation pursuant to this Agreement to any MatCo Indemnitee to the extent relating to, arising out of, or resulting from any Specified Tier 2 DuPont DDOB Liability, (ii) (A) the AgCo Indemnitees shall not be entitled to indemnification pursuant to this Agreement for any Indemnifiable Loss to the extent relating to, arising out of or resulting from any Specified Tier 2 Dow DDOB Liability and (B) none of MatCo or any member of its Group or any of their respective Affiliates shall have, and shall not be subject to, any indemnification obligation pursuant to this Agreement to any AgCo Indemnitee to the extent relating to, arising out of, or resulting from, any Specified Tier 2 Dow DDOB Liability and (iii) (A) the SpecCo Indemnitees shall not be entitled to indemnification pursuant to this Agreement for any Indemnifiable Loss to the extent relating to, arising out of or resulting from any Specified Tier 2 Dow DDOB Liability and (B) none of MatCo or any member of its Group or any of their respective Affiliates shall have, and shall not be subject to, any indemnification obligation pursuant to this Agreement to any SpecCo Indemnitee to the extent relating to, arising out of, or resulting from any Specified Tier 2 Dow DDOB Liability, unless, in each case (clauses (i)-(iii)), an Indemnification Notice was provided in respect thereof (or in respect of a Liability arising from the same or substantially similar facts) on or prior to the Specified Tier 2 DDOB Liability Termination Date.

(v) Notwithstanding anything to the contrary in this Agreement no Indemnitees shall be entitled to indemnification pursuant to this Agreement for any Indemnifiable Loss to the extent relating to, arising out of or resulting from any Liability arising in connection with the breach of any of the covenants and agreements set forth in Section 2.3(b), unless an Indemnification Notice was provided in respect thereof (or in respect of a Liability arising from the same or substantially similar facts) on or prior to the expiration of the statute of limitations under applicable Law applicable to the Third Party Claim(s) underlying such Indemnifiable Loss.

(c) De Minimis Amount.

165

(i) SpecCo shall not be required to indemnify, defend and hold harmless the MatCo Indemnitees and the AgCo Indemnitees from and against any Indemnifiable Losses pursuant to Section 8.2 unless the aggregate amount of all such Indemnifiable Losses arising from a single claim or a series of related claims arising out of substantially similar facts, circumstances or occurrences exceeds $25,000 (the "De Minimis Amount") (other than those subject to the Designated DDOB De Minimis Threshold, which shall be subject thereto but not the De Minimis Amount); provided, that in the event that the aggregate amount of Indemnifiable Losses which were not in excess of the De Minimis Amount exceed $10,000,000 (the "Section 8.13(c) Basket") (other than those subject to the Designated DDOB De Minimis Threshold, which shall be subject thereto but not subject to, or included in any calculation with respect to, the Section 8.13(c) Basket), the De Minimis Amount shall no longer apply, after which SpecCo shall be obligated for all Indemnifiable Losses under Section 8.2 from the first dollar regardless of the Section 8.13(c) Basket.

(ii) MatCo shall not be required to indemnify, defend and hold harmless the SpecCo Indemnitees and the AgCo Indemnitees from and against any Indemnifiable Losses pursuant to Section 8.3 unless the aggregate amount of all such Indemnifiable Losses arising from a single claim or a series of related claims arising out of substantially similar facts, circumstances or occurrences exceeds the De Minimis Amount (other than those subject to the Designated DDOB De Minimis Threshold, which shall be subject thereto but not the De Minimis Amount); provided, that in the event that the aggregate amount of Indemnifiable Losses which were not in excess of the De Minimis Amount exceed the Section 8.13(c) Basket (other than those subject to the Designated DDOB De Minimis Threshold, which shall be subject thereto but not subject to, or included in any calculation with respect to, the Section 8.13(c) Basket), the De Minimis Amount shall no longer apply, after which MatCo shall be obligated for all Indemnifiable Losses under Section 8.3 from the first dollar regardless of the Section 8.13(c) Basket.

(iii) AgCo shall not be required to indemnify, defend and hold harmless the SpecCo Indemnitees and the MatCo Indemnitees from and against any Indemnifiable Losses pursuant to Section 8.4 unless the aggregate amount of all such Indemnifiable Losses arising from a single claim or a series of related claims arising out of substantially similar facts, circumstances or occurrences exceeds the De Minimis Amount (other than those subject to the Designated DDOB De Minimis Threshold, which shall be subject thereto but not the De Minimis Amount); provided, that in the event that the aggregate amount of Indemnifiable Losses which were not in excess of the De Minimis Amount exceed the Section 8.13(c) Basket (other than those subject to the Designated DDOB De Minimis Threshold, which shall be subject thereto but not subject to, or included in any calculation with respect to, the Section 8.13(c) Basket), the De Minimis Amount shall no longer apply, after which AgCo shall be obligated for all Indemnifiable Losses under Section 8.4 from the first dollar regardless of the Section 8.13(c) Basket.

166

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

DOWDUPONT INC.

By /s/ Jeanmarie F. Desmond
    Name:  Jeanmarie F. Desmond
    Title:    Co-Controller

DOW INC.

By /s/ Amy E. Wilson
    Name:  Amy E. Wilson
    Title:    Secretary

CORTEVA, INC.

By /s/ James C. Collins, Jr.
    Name:  James C. Collins, Jr.
    Title:    Chief Executive Officer

[Signature Page to the Separation and Distribution Agreement]

# EXHIBIT B

IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-110

No. 436A21

Filed 4 November 2022

STATE OF NORTH CAROLINA *ex rel.* JOSHUA H. STEIN, ATTORNEY GENERAL

v.

E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and BUSINESS ENTITIES 1-10

Appeal as of right directly to the Supreme Court pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion, entered on 9 September 2021 by Judge Michael L. Robinson, Special Superior Court Judge for Complex Business Cases, in Superior Court, Cumberland County, after being designated a mandatory complex business case pursuant to N.C.G.S. § 7A-45(b). Heard in the Supreme Court on 19 September 2022.

> *Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, Daniel S. Hirschman, Senior Deputy Attorney General, and Marc Bernstein, Special Deputy Attorney General; and Kelley Drye & Warren LLP, by David Zalman, pro hac vice, Levi Downing, pro hac vice, Elizabeth N. Krasnow, pro hac vice, Julia Schuurman, pro hac vice, and Lauren H. Shah, pro hac vice, for plaintiff-appellee.*

> *Bradley Arant Boult Cummings LLP, by Robert R. Marcus, C. Bailey King, Jr., and Brian M. Rowlson; and Bartlit Beck LLP, by Katherine L.I. Hacker, pro hac vice, and Joshua P. Ackerman, pro hac vice, for defendant-appellants.*

EARLS, Justice.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

¶ 1      Individuals and corporate entities have a "liberty interest in not being subject to the binding judgments of a forum with which [they] ha[ve] no meaningful contacts, ties, or relations" *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). That liberty interest is protected by requiring courts—both state and federal—to have personal jurisdiction over a party before subjecting it to legal proceedings. Where personal jurisdiction exists, it follows that individuals or entities had a "fair warning" they might be subject to legal proceedings in that forum. *Id.* In this sense, personal jurisdiction is a shield—not a sword. Though it protects against the threat of litigation in arbitrary jurisdictions, it is not a tool to be weaponized against claimants by enabling defendants to evade accountability for potentially tortious conduct. But according to the State, that is precisely what E.I. DuPont de Nemours and Company ("Old DuPont") sought to do when, facing liability for releasing harmful chemicals into the environment in North Carolina over a period of decades, it underwent a significant corporate reorganization and transferred millions of dollars in assets to out-of-state companies, creating substantial losses for itself. This appeal concerns whether the Due Process Clause allows North Carolina courts to exercise personal jurisdiction over the companies that received those assets, even though they do not have any contacts of their own in this state. We hold that due process indeed allows as much.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

# I.    Factual Background

## A. Old DuPont's Use of Per- and Polyfluoroalkyl Substances ("PFAS")

¶ 2        Old DuPont is a chemical company that produces agricultural and other specialty products. In 2020, North Carolina (the State) brought an action against Old DuPont and its corporate successors, including Chemours, New DuPont, and Corteva,[1] alleging that Old DuPont knowingly operated a plant in North Carolina that released harmful chemicals called per- and polyfluoroalkyl substances ("PFAS") into the environment for over forty years.

¶ 3        PFAS are a class of manmade chemicals nicknamed "forever chemicals" because they are resistant to degradation and thus persist in the environment. In the 1950s, Old DuPont began using various kinds of PFAS, such as perfluorooctanoic acid ("PFOA"), at chemical plants around the country.[2] In 1969, Old DuPont purchased the Fayetteville Works plant, located in Fayetteville, North Carolina, and began producing PFAS at that location in the early 1970s.

¶ 4        PFOA, one of the most widely studied PFAS, is highly soluble, meaning it can be freely transported through water and soil. Thus, because it does not degrade, it can cause environmental damage over long distances. PFOA accumulates and

---

[1] The legal names of these entities are The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.

[2] Unless otherwise indicated, throughout this opinion, we rely on the facts as stated in the State's complaint and take them as true for purposes of this motion to dismiss under Rule 12(b)(2).

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

persists in people and other organisms, and it has been shown to be carcinogenic at very low concentrations.

¶ 5        The State alleges that, as early as 1961, company scientists warned Old DuPont of the risks associated with PFOA. The warnings were based on internal studies concluding that PFOA caused liver damage in rats and dogs. These early studies led company scientists to caution that PFOA should be handled with extreme care and should not come into direct contact with skin. Old DuPont continued to conduct studies about the health effects of PFOA on plant workers throughout the late 1970s and early 1980s, which similarly concluded that the chemical is toxic and causes adverse health effects. The State also alleges that by 1984, Old DuPont was aware of PFOA's lasting environmental effects. The State alleges that, despite knowing of the consequences associated with PFOA, Old DuPont both concealed such knowledge and refused to adopt technologies that would reduce its PFOA output and thus its human and environmental impact. In 2002, Old DuPont's supplier ceased production of PFOA, leading the company to begin producing its own, including at Fayetteville Works. According to the State's brief, by 2006, Fayetteville Works was the only facility in the United States still producing PFOA. Publicly, the company maintained that PFOA did not cause adverse health or environmental consequences.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

**B. Old DuPont's Restructuring**

¶ 6    Since approximately 2000, Old DuPont's liabilities arising from its PFOA use have been mounting around the country, including a $10.25 million fine paid to the EPA stemming from its failure to report the risks associated with PFOA exposure, a class action settlement for over $300 million arising out of its PFOA discharges at a facility in West Virginia, and a settlement in federal multidistrict litigation for approximately $670 million. The State alleges that, recognizing the scope of its liability for contamination caused by its PFAS and PFOA use, Old DuPont chose to restructure its business to limit future liability and protect its remaining assets. The restructuring took form over three stages.

¶ 7    First, Old DuPont transferred its Performance Chemicals Business, which included its PFOA and other PFAS-related assets, such as Fayetteville Works, to a wholly-owned subsidiary called Chemours.[3] Old DuPont then spun off Chemours as a separate public company, but the State claims that Chemours was intentionally undercapitalized and unable to satisfy Old DuPont's PFAS liabilities. For instance, aside from assuming Old DuPont's PFAS liabilities, Chemours transferred approximately $3.4 billion to Old DuPont as a cash dividend and issued promissory notes with a principal amount totaling $507 million. Following the spinoff, Chemours reported that its assets totaled $6.298 billion, while its liabilities totaled $6.168

_____

[3] Chemours is a defendant in this litigation, but it is not an appellant here.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

billion. The State alleges that this figure was an underestimate, and had the estimate been accurate, Chemours would have been deemed insolvent at the time of the spinoff. In fact, in an unrelated lawsuit brought by Chemours against Old DuPont, Chemours made a similar argument and contended that Old DuPont intentionally downplayed the extent of its PFAS liability. *See Chemours Co. v. DowDuPont Inc.*, No. 2019-0351-SG, 2020 WL 1527783, at *7 (Del. Ch. Mar. 30, 2020) (unpublished), *aff'd*, 243 A.3d 441 (Del. 2020) (unpublished order). Because Old DuPont knew that Chemours would be unable to satisfy all of Old DuPont's PFAS-related liabilities, the State argues that Old DuPont also knew that it remained responsible for them.

¶ 8        After the Chemours spinoff, the next step in Old DuPont's reorganization plan was a merger with a company called The Dow Chemical Company ("Old Dow"). But, according to the State's brief, instead of completing the merger as originally announced, Old DuPont and Old Dow formed a new holding company called DowDuPont. Old DuPont and Old Dow became subsidiaries of DowDuPont. During this step of the reorganization, DowDuPont executed numerous business segment and product line realignments and divestitures, which reallocated a substantial portion of Old DuPont's assets to DowDuPont.

¶ 9        Finally, during the third stage in the reorganization, the State argues DowDuPont took additional steps to shield its remaining good assets. As part of this reorganization, DowDuPont formed three separate business lines: (1) the Materials

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

Science Business; (2) the Agriculture Business; and (3) the Specialty Products Business. It then formed two new companies called Dow, Inc. ("New Dow"), which holds Old Dow as a subsidiary, and Corteva, which holds Old DuPont. DowDuPont also renamed itself DuPont de Nemours, Inc ("New DuPont"). The Materials Science Business was transferred to New Dow, the Agriculture Business was transferred to Corteva, and New DuPont retained ownership of the Specialty Products Business. The Business Court found that Old DuPont transferred these business lines for less than their assets' value. The court further found that, since these transfers took place, Old DuPont's value has dropped continuously, at one point falling at least as low as negative $1.125 billion. In 2019, New DuPont spun off Corteva and New Dow as separate public companies. Corteva and New DuPont are the corporate successors that bring this appeal. New Dow is not a party in this litigation.

¶ 10    A Separation and Distribution Agreement ("the Separation Agreement"), dated 1 April 2019, governs the separation of Corteva and New Dow from New DuPont. In June 2019, the parties entered into a Letter Agreement ("the Letter Agreement"), which amended certain provisions in the Separation Agreement.[4] Based on the Separation Agreement, in conjunction with the Letter Agreement, the Business Court

---

[4] Certain terms of these agreements have been filed under seal, and we therefore do not disclose them here.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

found that New DuPont agreed to assume all the Specialty Products liabilities and Corteva agreed to assume all the Agriculture Business liabilities.

## C. Defendant's Motion to Dismiss and the Business Court's Order

¶ 11        In 2020, North Carolina brought an action against Old DuPont, Corteva, New DuPont, and Chemours asserting claims of negligence, trespass, public nuisance, fraud, and fraudulent transfer related to Old DuPont's use of PFAS at Fayetteville Works and its subsequent reorganization to avoid liability. New DuPont and Corteva moved to dismiss the State's action, arguing that the trial court could not exercise personal jurisdiction over them because they are Delaware holding companies that do not conduct business in North Carolina. They assert that they never owned or operated the Fayetteville Works plant, nor have they ever made, sold, distributed, or discharged PFAS. Rather, Corteva and New DuPont assert that they are "just holding companies" that exist only in Delaware. At this stage, Corteva and New DuPont did not, however, contest the State's allegations regarding Old DuPont's fraudulent restructuring.

¶ 12        Relying on a significant body of case law from both state and federal courts, the Business Court held that the Due Process Clause permits jurisdiction to be exercised over a corporate successor when (1) the predecessor is subject to jurisdiction in the forum; and (2) state law subjects the successor to liability. Recognizing that the first requirement was easily established given Old DuPont's history in North

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

Carolina, the Business Court focused on the second factor and identified the extent to which North Carolina law imputes the liabilities of a predecessor to its successors. Citing a previous Court of Appeals decision, the Business Court first explained that "[a] corporation which purchases all, or substantially all, of the assets of another corporation is generally not liable for the old corporation's debts or liabilities." *State ex rel. Stein v. E.I. du Pont de Nemours & Co.*, No. 20 CVS 5612, 2021 WL 4127106, at *6, 2021 NCBC 54, ¶ 44 (N.C. Super. Ct. Cumberland County (Bus. Ct.) Sept. 9, 2021) (unpublished) (alteration in original) (quoting *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 687 (1988)). But in *Budd Tire*, the Court of Appeals recognized four exceptions to this principle—two of which the Business Court found to be relevant here. The first exception the Business Court applied imputes the liabilities of a predecessor to its successor when "there is an express or implied agreement by the purchasing corporation to assume the debt or liability." *Budd Tire*, 90 N.C. App. at 687. The second exception imputes liability to the successor when "the transfer of assets was done for the purpose of defrauding the corporation's creditors." *Id.*

¶ 13        In its opposition to the motion to dismiss, the State argued that, as an alternative ground for jurisdiction, defendants' allegedly fraudulent conduct was aimed at North Carolina and justified exercising direct jurisdiction over Corteva and New DuPont under the Supreme Court's decision in *Calder v. Jones*. 465 U.S. 783 (1984). In *Calder*, the Court held that courts may exercise jurisdiction over

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

defendants who commit "intentional, and allegedly tortious, actions" outside the forum that "were expressly aimed at" the forum. *Id.* at 789. Exercising *Calder* jurisdiction would obviate the need to conduct the imputation analysis to determine whether personal jurisdiction is proper under North Carolina law. The Business Court declined to address this argument, however, finding it an unnecessary step because jurisdiction was established by imputing Old DuPont's liabilities to Corteva and New DuPont.

## II.    Analysis

¶ 14        There are two questions on appeal. The first is whether the Due Process Clause permits personal jurisdiction over out-of-state corporate successors to be based on the contacts of their in-state predecessor company by imputing the conduct and liabilities of the predecessor to its successors. Second, the State asks this Court to determine whether Old DuPont's allegedly fraudulent conduct was expressly aimed at North Carolina, justifying the exercise of direct jurisdiction pursuant to the United States Supreme Court's decision in *Calder v. Jones.*

### A. Personal Jurisdiction

¶ 15        When the parties have submitted affidavits and other documentary evidence, a trial court reviewing a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) must determine whether the plaintiff has established that jurisdiction exists by a preponderance of the evidence. *See Bauer v. Douglas Aquatics, Inc.*, 207 N.C.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

App. 65, 68 (2010). The documentary evidence may include "any allegations in the complaint that are not controverted by the defendant's affidavit." *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.,* 169 N.C. App. 690, 693-94 (2005) (quoting *Bruggeman v. Meditrust Acquisition Co.,* 138 N.C. App. 612, 615-16 (2000) (citations omitted)). As an appellate court, we consider whether the trial court's determination regarding personal jurisdiction is supported by competent evidence in the record. *Toshiba Glob. Com. Sols., Inc. v. Smart & Final Stores LLC*, 2381 N.C. 692, 2022-NCSC-81, ¶ 8 (2022) ("[W]hether personal jurisdiction exists is a question of fact and . . . appellate courts . . . assess whether the determination is supported by competent evidence in the record"). "However, when the pertinent inquiry on appeal is based on a question of law[,] we conduct de novo review." *Id.* (citing *Da Silva v. WakeMed*, 375 N.C. 1, 5 (2020)).

¶ 16    Determining whether a nonresident defendant is subject to personal jurisdiction in this State's courts involves a two-step analysis. *Beem USA Ltd.-Liab. Ltd. P'shp v. Grax Consulting LLC*, 373 N.C. 297, 302 (2020). "First, jurisdiction over the defendant must be authorized by N.C.G.S. § 1-75.4—North Carolina's long-arm statute." *Id.* Relevant here, § 1-75.4 states that personal jurisdiction exists where a party "[i]s engaged in substantial activity within this State, whether such activity is wholly interstate, intrastate, or otherwise." N.C.G.S. § 1-75.4(1)(d) (2021). This statute is "intended to make available to the North Carolina courts the full

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

jurisdictional powers permissible under federal due process." *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676 (1977). Therefore, in this case, the statutory analysis merges with the due process analysis.

¶ 17       Second, "if the long-arm statute permits consideration of the action, exercise of jurisdiction must not violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Beem USA*, 373 N.C. at 302 (quoting *Skinner v. Preferred Credit*, 361 N.C. 114, 119 (2006)). Exercising jurisdiction over an out-of-state defendant comports with the Due Process Clause when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (alteration in original) (quoting *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted)). Minimum contacts, in turn, result from 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 303 (quoting *Skinner*, 361 N.C. at 133).

¶ 18       There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014). General jurisdiction exists when the defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*,

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

326 U.S. at 317). Specific jurisdiction, however, exists only when "the suit 'arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Daimler*, 571 U.S. at 127 (alterations in original) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). The parties here agree that Corteva and New DuPont are not subject to general jurisdiction. The question then is whether these out-of-state successors of Old DuPont can be subject to specific jurisdiction in North Carolina courts based on Old DuPont's conduct and liabilities in the State.

¶ 19        "'The great weight of persuasive authority permits imputation of a predecessor's actions upon its successor *whenever* forum law would hold the successor liable for its predecessor's actions.'"[5] *City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454 (4th Cir. 1990) (quoting *Simmers v. Am. Cyanamid Corp.*, 576 A.2d

---

[5] *See, e.g., Hawkins v. i-TV Digitális Távközlési zrt.*, 935 F.3d 211, 227 (4th Cir. 2019) ("[W]here one corporation has succeeded to another's liabilities, the predecessor corporation's forum contacts can be imputed to the successor corporation."); *Perry Drug Stores v. CSK Auto Corp.*, 93 F. App'x 677, 681 (6th Cir. 2003) (opining that "[a] court may impute the jurisdictional contacts of a corporate predecessor to its successor where the successor expressly assumed the liability of the predecessor" and explaining that "a contrary result would allow corporations to 'immunize themselves by formalistically changing their titles'") (quoting *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982), *aff'd sub nom, Pallas Shipping Agency, Ltd. V. Duris*, 461 U.S. 529 (1983)); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) ("A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor."); *Jeffrey v. Rapid Am. Corp.*, 529 N.W.2d 644, 654-55 (Mich. 1995) ("We hold that the actions of a constituent corporation may be attributed to a surviving corporation following a merger for purposes of determining the surviving corporation's amenability to personal jurisdiction for liabilities allegedly incurred by the constituent corporation . . . [W]e find the rule equally applicable when a corporation expressly assumes the liabilities of its predecessors.").

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

376, 385 (Pa. Super. Ct. 1990) (emphasis in original); *see also Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (explaining that "federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor" of an entity that is subject to jurisdiction there).

¶ 20    "The theory underlying these cases is that, because the two corporations . . . are the *same entity,* the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis." *Patin*, 294 F.3d at 653. Further, as the Business Court acknowledged, declining to impute contacts for jurisdictional purposes in all cases would enable corporations to "avoid all consequences . . . by just reforming in some other jurisdiction[.]" *Madison Mgmt. Grp.*, 918 F.2d at 455; *see also E.I. du Pont de Nemours*, 2021 WL 4127106, at *6, 2021 NCBC 54, ¶ 43.

¶ 21    Cases from other jurisdictions reaching the same conclusion are instructive. In *Simmers v. American Cyanamid Corp.*, for example, a Pennsylvania court held that a company not otherwise operating in the state that purchased a product line from a second in-state company and expressly assumed the second company's related liabilities could be subject to personal jurisdiction in Pennsylvania. *See Simmers*, 576

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

A.2d at 387. In so holding, the court "recognize[d] the realities of modern corporate law and the ever increasing frequency of corporate reorganizations." *Id.* at 389. It reasoned that refusing to impute a predecessor's liabilities to its successor would allow the successor to "avoid the jurisdiction of the very forum where the liability accrued simply because it never did business within that forum." *Id.* at 390. The court explained that this would be an "absurd" result, particularly when "the assets purchased by the successor, at least in part, were derived from the forum and the successor no doubt had knowledge of its predecessor's presence within the forum." *Id.* We find this reasoning persuasive and hold that due process permits courts to exercise successor jurisdiction whenever (1) the predecessor is subject to personal jurisdiction in a particular forum; and (2) that forum's law permits courts to impute the liabilities of the predecessor to its successors.[6] Because neither party disputes that Old DuPont is subject to jurisdiction in North Carolina, this appeal focuses on the second factor.

¶ 22     It is true that, in North Carolina, "[a] corporation which purchases all, or substantially all, of the assets of another corporation is generally not liable for the old corporation's debts or liabilities." *Budd Tire*, 90 N.C. App. at 687; *see also McAlister v. Am. Ry. Express Co.* 179 N.C. 556, 561 (1920) ("As a general rule [ ] the

---

[6] As explained below, forum law dictates the extent to which imputation to establish both liability and jurisdiction is permissible. The predecessor company's liability alone is not enough to establish successor jurisdiction.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

mere purchase of the assets and franchise[s] of one corporation by another will not imply a promise on the part of the new to pay or satisfy the debts and obligations of the old.") (quoting 5 Seymour D. Thompson, *Commentaries on the Law of Corporations* § 6090 (2d Ed.)). But there are several exceptions to this principle, which the Court of Appeals encapsulated in *Budd Tire*, where:

> (1) there is an express or implied agreement by the purchasing corporation to assume the debt or liability; (2) the transfer amounts to a de facto merger of the two corporations; (3) the transfer of assets was done for the purpose of defrauding the corporation's creditors, or; (4) the purchasing corporation is a "mere continuation" of the selling corporation in that the purchasing corporation has some of the same shareholders, directors, and officers.

*Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. at 687 (citations omitted); *see also McAlister*, 179 N.C. at 560. If any one of these circumstances is present, North Carolina law permits a predecessor company's liabilities to be imputed to its corporate successors, making jurisdiction over out-of-state successors proper under the Due Process Clause.[7]

¶ 23    Importantly, exercising jurisdiction over out-of-state successors in these circumstances does not offend "our traditional conception of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 324. Where any of these conditions exist, it cannot be

---

[7] We clarify, however, that this list is not exhaustive. Additional circumstances may arise that warrant expanding these limitations. Such circumstances are not before us now, and we need not decide what they might be.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

said that a successor's contacts are "random, fortuitous, or attenuated." *See Burger King*, 471 U.S. at 475 (cleaned up). Rather, in these situations, a successor likely has or should have notice of the liabilities of its predecessor in a given jurisdiction.

¶ 24     The court in *Simmers* put it well. In holding that due process permits jurisdiction to be established by imputing a predecessor company's contacts to its out-of-state successors, the court explained, "[n]o doubt in today's sophisticated world of corporate takeovers, a corporation, which assumes another's liabilities . . . seriously considers the possible extent of any liabilities and where those liabilities may exist." *Simmers*, 576 A.2d at 3. Here, for instance, the Business Court found that both Corteva and New DuPont expressly assumed Old DuPont's PFAS-related liabilities via the April 2019 Separation Agreement and the June 2019 Letter Agreement. And "[w]hen a successor corporation assumes the liabilities of its corporate predecessors, the successor in effect consents to be held liable in the same locations where its predecessor would have been exposed." *Id.* By assuming the liabilities of Old DuPont, Corteva and New DuPont's "conduct and connection with the forum State are such that [they] should reasonably anticipate being haled into court" in North Carolina. *See Burger King*, 471 U.S. at 474 (quoting *Worldwide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

¶ 25     Corteva and New DuPont argue that imputing Old DuPont's contacts to establish personal jurisdiction is inappropriate because they are not the corporate

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

continuations or embodiments of Old DuPont, which continues to exist as its own entity. They argue that the cases that allow personal jurisdiction to be established for out-of-state successors through imputation have involved actual or de facto mergers. *See, e.g., Synergy Ins. Co. v. Unique Pers. Consultants, Inc.*, No. 3:16CV611, 2017 WL 5474058, at *2 (W.D.N.C. Nov. 14, 2017) (unpublished order) (finding that an entity was a corporate successor when, among other things, it purchased all assets and took over the headquarters, satellite branches, phone numbers, and website content of its predecessor); *Simmers*, 576 A.2d at 386–88 (imputing predecessors' contacts to establish jurisdiction over corporate successors after de facto mergers).[8]

¶ 26    We decline to recognize mergers as the sole circumstance in which successor jurisdiction is appropriate. Such a holding would result in the very consequence described above: Companies could avoid liability for tortious conduct simply by forming a new, out-of-state company instead of effectuating a merger. Moreover, where, as here, a company has explicitly assumed certain liabilities or reorganized to

---

[8] Instead, Corteva and New DuPont argue they should be treated as assignees and point out that "[t]he expectations of a corporate successor and an assignee are different." *See Ostrem v. Prideco Secure Loan Fund, LP,* 841 N.W.2d 882, 895 (Iowa 2014). Citing the Iowa Supreme Court's opinion in *Ostrem*, they argue that unlike a successor, "an assignee . . . assumes a limited bundle of rights, obligations, and expectations." *Id.* Corteva and New DuPont contend that they assumed only limited assets and corresponding liabilities from Old DuPont and should thus be treated as assignees. This argument fails, however, because it ignores the other circumstances in which successor jurisdiction is appropriate— circumstances that we hold exist here. But even if we were to treat Corteva and New DuPont as assignees, the "limited bundle of . . . obligations," *id.*, they assumed include the liabilities that are the subject of this litigation.

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

avoid the very liability for which it is brought to court, requiring a merger or a corporate continuation to establish successor jurisdiction would serve no additional purpose.

¶ 27    Recognizing successor liability and jurisdiction in these narrow circumstances ensures that a company that merely receives assets from another entity does not, without more, become saddled with all of the transferor's debts and liabilities. *See Madison Mgmt. Grp.*, 918 F.2d at 450. But a company may take certain affirmative steps that justify both the imputation of those liabilities and the exercise of jurisdiction. Actual and de facto mergers are one such example, in part because the merging companies know in advance that they will become responsible for each other's liabilities, and they thus weigh the associated risks.[9] Assuming certain liabilities or intentionally reorganizing to avoid them similarly requires a party to weigh the risks at hand and affirmatively decide whether to become legally responsible for them or, as alleged here, attempt to fraudulently evade them. When a party has engaged in such conduct, successor jurisdiction is equally appropriate.

---

[9] *See, e.g., McAlister v. Am. Ry. Express Co.*, 179 N.C. at 564 ("Where two corporations effect a consolidation (or merger), and one of them goes entirely out of existence, and no arrangements are made respecting its liabilities, the resulting consolidated (or merged) corporation will, as a general rule, be entitled to all the property and answerable for all the liabilities of the corporation thus absorbed." (quoting *Atlanta, B. & A.R. Co. v. Atl. Coast Line R.R. Co.*, 75 S.E. 468, 470 (1912) (parentheticals added))).

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

Thus, like many other courts that have decided this question, we are satisfied that due process permits jurisdiction to be exercised over out-of-state corporate successors where there is jurisdiction over the predecessor and North Carolina law would impute the predecessor's liability to its successors.

¶ 28    Here, the Business Court found that North Carolina law permits liability to be imputed to Corteva and New DuPont, thereby creating personal jurisdiction over the companies, because: (1) the parties expressly agreed to assume Old DuPont's liabilities in the April 2019 Separation Agreement and the June 2019 Letter Agreement; and (2) the State alleged sufficient facts at the motion to dismiss stage to support the claim that Old DuPont transferred its assets to Corteva and New DuPont in an attempt to defraud the State in its position as a creditor.

¶ 29    As to the first exception, the Business Court made detailed findings of fact regarding the meaning of the April 2019 Separation Agreement and the June 2019 Letter Agreement. Key to this analysis, the court pointed to plain contractual language stating that Corteva and New DuPont expressly assumed Old DuPont's PFAS-related liabilities. *E.I. du Pont de Nemours*, 2021 WL 4127106, at *7, 2021 NCBC 54, ¶ 48. The Business Court found that "[i]t is clear that by execution of the DowDuPont Separation Agreement and the Letter Agreement, Corteva and New DuPont assumed certain liabilities related to Old DuPont's manufacturing of PFAS." *Id.* at *8, 2021 NCBC 54, ¶ 51. The court rejected Corteva and New DuPont's

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

argument that Chemours exclusively assumed all of the PFAS liabilities when it was spun off as a separate company because "Chemours' assumption of PFAS liabilities as a legal matter does not preclude Corteva and New DuPont from assuming those same PFAS liabilities and [Corteva and New DuPont] do not cite any authority supporting this position." *Id.* at *8, 2021 NCBC 54, ¶ 53. The court also rejected the argument that Corteva and New DuPont agreed to indemnify each other for PFAS-related losses but did not assume such liabilities. *Id.* at *8, 2021 NCBC 54, ¶ 53. The court found that the relevant term within the Separation Agreement was sufficiently broad to permit "the interpretation that Corteva and New DuPont not only agreed to indemnify against certain liabilities but additionally assume the same liabilities."[10] *Id.* at *8, 2021 NCBC 54, ¶ 53.

¶ 30          On appeal, Corteva and New DuPont argue that the language of these Agreements is merely "the starting point of the analysis," and the Business Court

---

[10] Section 1.1(144) of the April 2019 Separation Agreement defines "Indemnifiable Loss" and "Indemnifiable Losses" as:

> any and all Damages, losses, deficiencies, Liabilities, obligations, penalties, judgments, settlements, claims, payments, fines, interest, costs, and expenses (including the costs and expenses of any and all Actions and demands, assessments, judgments, settlements, and compromises relating thereto and the reasonable costs and expenses of attorneys', accountants', consultants' and other professionals' fees and expenses incurred in the investigation or defense thereof or the enforcement of rights hereunder).

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

should have gone on to "evaluate whether those assumptions of liability were such that Corteva and New DuPont reasonably could have expected to be subject to jurisdiction in North Carolina." They contend that the answer to this question is no, in part because, through those Agreements, "Corteva, New DuPont, and Dow were allocating liabilities amongst themselves against the backdrop of Historic DuPont's previous divestiture of its PFAS business to Chemours." Corteva and New DuPont do not, however, respond to the Business Court's decision that Chemours' assumption of the PFAS liabilities did not preclude them from assuming these liabilities as well. Furthermore, nothing in the record suggests that Chemours validly assumed all PFAS-related liabilities to the exclusion of all parties that would otherwise be liable. Corteva and New DuPont's assertion on this point is therefore unconvincing.

¶ 31        Corteva and New DuPont also argue that assuming liability through the Agreements was insufficient to put them on notice that they may be subject to jurisdiction in North Carolina because those liability provisions pertain to Old DuPont's operations broadly, without specifying *where* they would be liable. This argument, too, is unavailing. A company cannot expressly assume liabilities from its predecessor, fail to limit those liabilities geographically, and then disclaim liability based on the notion that it did not expect to be brought to court in a particular forum. Such a holding would nullify the relevant provisions entirely because the lack of geographic specificity would mean that there is *no* jurisdiction in which Corteva and

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

New DuPont expected to be held liable. Moreover, to reiterate what we have already explained, when companies undergo complicated transactions like that between Old DuPont, Corteva, and New DuPont, they conduct extensive due diligence, and the new parties either are aware of, or should be aware of, the liabilities they might acquire. Old DuPont's PFAS liabilities were no secret—before the corporate reorganization, it had already paid millions in well-publicized fines and settlements. Corteva and New DuPont had ample notice then that they might become liable in any venue where Old DuPont acquired PFAS liability.

¶ 32    In sum, the Business Court's interpretation of the plain language of the Agreements is well supported, and we uphold its finding that Corteva and New DuPont expressly assumed Old DuPont's PFAS liabilities, including those liabilities arising in North Carolina.

¶ 33    The Business Court also found that Old DuPont's PFAS liabilities could be imputed to its successors because the State sufficiently alleged that Old DuPont fraudulently engaged in the reorganization transactions that created Corteva and New DuPont to prevent the State and other creditors from holding the company liable to the full extent. The State alleged that "these transactions have resulted in (1) Old DuPont having a negative net worth; (2) Chemours being undercapitalized and unable to satisfy Old DuPont's PFAS liabilities; and (3) the transfer of valuable assets from Old DuPont to Corteva and New DuPont for far less consideration than those

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

assets were worth." *Id.* at *9, 2021 NCBC 54, ¶ 57. Relying on the same evidence that was before the Business Court, this Court finds that the complaint alleged sufficient facts from which to conclude that Old DuPont engaged in a corporate reorganization to defraud its creditors. For example, the State alleges that, as part of its plan to insulate its assets, Old DuPont spun off Chemours, its wholly owned subsidiary. As part of the spinoff, Chemours agreed to accept all of Old DuPont's PFAS liabilities, transferred to Old DuPont approximately $3.4 billion as a cash dividend, and issued promissory notes with a principal amount of $507 million. The State then alleges that, knowing Chemours would be unable to satisfy the full extent of its PFAS liabilities, Old DuPont proceeded with the series of transactions that eventually created New DuPont, Corteva and New Dow. After the corporate reorganization was complete, the value of Old DuPont's tangible assets had decreased by $20.85 billion. As the State points out, this loss came at a time when Old DuPont knew it faced potentially billions of dollars in liability.

¶ 34        These examples support the State's theory that Old DuPont engaged in the corporate reorganization to fraudulently deprive its creditors of judicial recourse. The State's allegations are extensive, and we hold that they are sufficient to support the Business Court's conclusion that, at this stage of the proceedings, the State has adequately pleaded that Corteva and New DuPont acted fraudulently. Thus, there is a second, independent ground upon which to hold the successors liable for Old

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

DuPont's debts and liabilities and therefore, to find jurisdiction over Corteva and New DuPont in this state.[11]

## B. *Calder* Jurisdiction

¶ 35     The State asserts an alternative ground for jurisdiction under the U.S. Supreme Court's decision in *Calder v. Jones*. In *Calder*, the Court held that it may be appropriate for a court to exercise jurisdiction over a defendant who commits "intentional, and allegedly tortious, actions" outside the forum that "were expressly aimed at" the forum. 465 U.S. at 789. *Calder* involved an allegedly libelous story that was written and edited in Florida about events that occurred in California and concerned a California resident. *Id.* at 784–86. The story's sources were from California and the alleged harm was suffered in California. *Id.* In holding that the authors of the story could be sued in California, the Supreme Court opined that it was foreseeable that the effects of the story would be felt in California, and that "[a]n

_____

[11] Courts in other jurisdictions presiding over litigation related to Old DuPont's use of PFAS have reached similar conclusions. *See, e.g., State of New Hampshire v. 3M Company*, No. 216-2019-CV-0045 (Sup. Ct., Merrimack Co. July 8, 2021) (unpublished) (holding that New Hampshire law permits imputation of a predecessor corporation's contacts to establish successor jurisdiction and finding that the State made a prima facie showing that jurisdiction existed over Corteva and New DuPont based on (1) their express assumption of Old DuPont's PFAS liabilities; and (2) their fraudulent efforts to help Old DuPont evade liability); *State of Ohio ex rel. DeWine v. E.I. du Pont de Nemours and Co.*, No. 18OT32 (Ct. Common Pleas, Wash. Co. Aug. 4, 2021) (unpublished) (denying Corteva and New DuPont's motion to dismiss for lack of jurisdiction and granting the State's cross-motion regarding their assumption of Old DuPont's liabilities); *Suez Water New Jersey, Inc. v. E.I. DuPont de Nemours, et al.*, No. 2:20-CV-19906 (D.N.J. Oct. 14, 2021) ("If Corteva and New DuPont expressly assumed some PFAS-related liability from Old DuPont's activities in New Jersey, this would provide minimum contacts with the forum state sufficient to support personal jurisdiction.").

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California. *Id.* at 790.

¶ 36    The Business Court declined to decide whether jurisdiction here was proper under *Calder* because it found that personal jurisdiction could be established through the imputation analysis alone. Still, the State argues that this Court should determine whether *Calder* applies because, if so, the Business Court could exercise direct jurisdiction over the defendants for all fraud claims without needing to revisit the imputation analysis to determine whether personal jurisdiction exists after the pleadings stage. We conclude that determining whether *Calder* jurisdiction exists is unnecessary under these circumstances. Our rulings here establish that North Carolina courts have personal jurisdiction over Corteva and New DuPont. Even if, after the motion to dismiss stage, the Business Court determines that Corteva and New DuPont did not attempt to defraud creditors for purposes of the third *Budd Tire* exception for imputing liability, jurisdiction is conclusively established under *Budd Tire's* other relevant exception—that Corteva and New DuPont expressly assumed Old Dupont's PFAS-related liabilities. The parties do not dispute that Old DuPont is subject to specific jurisdiction in North Carolina based on its PFAS-related liabilities. Thus, the Business Court has jurisdiction over Corteva and New DuPont for all of the

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

State's claims arising out of and related to Old DuPont's PFAS-related activities in North Carolina.

### III.    Conclusion

¶ 37        We follow the "great weight of persuasive authority," *Madison Mgmt. Grp.*, 918 F.2d at 454, and hold that the Due Process Clause permits a predecessor's liabilities to be imputed to its corporate successors to establish personal jurisdiction even where the successor itself has no direct contact with the forum state. Successor liability comports with both due process and North Carolina law at least where (1) a party assumes another entity's debts or liabilities through an express or implied agreement; (2) the transfer constitutes an actual or de facto merger of corporations; (3) a transfer of assets occurred for the purpose of defrauding the corporation's creditors; or (4) the purchasing corporation is a continuation of the selling corporation because it has the same shareholders, directors, and officers.

¶ 38        Because personal jurisdiction can be established through the imputation analysis for all of the State's claims arising out of or related to Old DuPont's PFAS-related activities in North Carolina, we need not determine whether *Calder* would permit the Business Court to exercise direct jurisdiction.

¶ 39        Accordingly, we affirm the decision of the Business Court denying Corteva and New DuPont's motion to dismiss under Rule 12(b)(2) of the North Carolina Rules of Civil Procedure and remand this case to that court for additional proceedings not

STATE, EX REL STEIN V. E.I. DUPONT DE NEMOURS AND COMPANY

2022-NCSC-110

*Opinion of the Court*

inconsistent with this opinion.

AFFIRMED.

# EXHIBIT C

# The State of New Hampshire

**MERRIMACK COUNTY**                                **SUPERIOR COURT**

THE STATE OF NEW HAMPSHIRE

v.

3M COMPANY, E.I. DU PONT DE NEMOURS AND COMPANY,
THE CHEMOURS COMPANY
f/k/a THE CHEMOURS COMPANY, LLC, CORTEVA, INC.,
and DUPONT DE NEMOURS, INC.

Docket No.: 216-2019-CV-00445

## ORDER (REDACTED) [1]

The State of New Hampshire,[2] as trustee of the State's surface and groundwater,
as steward of the State's fish, wildlife, and marine resources, and in its <u>parens patriae</u>
capacity (the "State"), has brought an action for negligence (Count I), defective design
(Count II), failure to warn (Count III), trespass (Count IV), invasion of public trust
property (Count V), recovery of drinking water and groundwater protection trust funds,
RSA 485-F:3 (Count VI), violations of the Uniform Fraudulent Transfer Act, RSA 545-A
(Count VII–X), and enhanced compensatory damages (Count XI). Counts IV, and XI
have since been dismissed, and Count VI has been voluntarily non-suited without
prejudice. Corteva, Inc. ("Corteva") and DuPont de Nemours, Inc. ("New DuPont")
move to dismiss for lack of personal jurisdiction. The remaining defendants, 3M
Company ("3M"), E.I. Du Pont de Nemours and Company ("Historic DuPont"), and the

---

[1] This is a redacted version of the Order which shall be kept in the public file.
[2] The State initially brought suit along with the Drinking Water and Groundwater Advisory Commission
(the "Commission"). The defendants moved to dismiss a number of counts only with respect to the
Commission's participation in this action. On February 4, 2021, the Court granted the parties' joint-
stipulation to "voluntarily non-suit, without prejudice, the Commission as a party plaintiff." (Court's
February 4, 2021 Order.)

## II.    Background

3M, Historic DuPont, and Chemours are major chemical companies that have previously manufactured per- and polyfluoroalkyl substances ("PFAS"), a family of chemical compounds that have been used for decades in industrial and commercial settings.  (Am. Compl. ¶¶ 13, 49–50.)[3]  In particular, they have been involved in the manufacture of perfluorooctanesulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluorononanoic acid ("PFNA"), and perfluorohexane sulfonate ("PFHxS").  (Id. ¶ 13.)[4]

3M started to manufacture PFAS by electrochemical fluorination in the 1940s. (Id. ¶ 111.)  Beginning in 1951, Historic DuPont purchased PFOA from 3M for use in the manufacture of Historic DuPont's name-brand product, Teflon®, which is commonly known for its use as a coating for non-stick cookware.  (Id. ¶ 114.)  For most of the past seven decades and through the early 2000s, 3M became the primary manufacturer of PFAS chemistry in the United States.  (Id. ¶ 108.)

In the 1950s, however, 3M discovered, based on its own internal studies, that PFAS are "toxic" and bioaccumulate in humans and animals.  (Id. ¶ 119.)  Rather than reveal the results of these studies, 3M continued to market PFAS products.  (Id. ¶ 143.) In 1960, 3M recognized in internal memoranda that chemical wastes from its PFAS manufacturing facilities could "eventually reach the water table and pollute domestic wells."  (Id. ¶ 121.)  Then, in 1961, Historic DuPont scientists also issued internal

---

[3] The Court takes judicial notice that "PFAS," "PFOS," "PFOA," and "PFHxS" are abbreviations for the listed chemicals by reference to findings of the Federal National Institutes of Health ("NIH"), available at https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm; Super. Ct. Civ. R. 12 ("A court may take judicial notice, whether requested or not," of any fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.")
[4] Id.; The Court similarly takes judicial notice that "PFNA" stands for "perfluorononanoic acid" by reference to a publication of the New Jersey Department of Environmental Protection, available at https://www.state.nj.us/dep/wms/bears/docs/pfna_fact_sheet.pdf.

3

warnings about the toxicity associated with their PFOA products. (Id. ¶ 146.) In fact, Historic DuPont's "Toxicology Section Chief" concluded that PFOA products should be "handled with extreme care" and that contact with the skin should be "strictly avoided." (Id. ¶ 147.)

Further internal studies conducted by 3M confirmed, as early as 1963, that PFAS are stable and do not degrade, but persist in the environment. (Id. ¶¶ 120, 122.) By 1970, 3M also became aware that PFAS products were hazardous to marine life. (Id. ¶ 125.) To avoid causing severe local pollution in nearby surface waters, one of 3M's studies around this time had to be abandoned. (Id. ¶ 126.)

In the 1970s and 80s, 3M conducted a series of additional studies to understand the effects of PFAS on human health. In 1975, 3M detected a "universal presence" of PFOA in human blood serum samples from across the United States and, out of concern for the health effects PFAS may pose, began monitoring the blood of its employees for PFAS levels the following year. (Id. ¶¶ 123, 127.) When the results were obtained in 1977, 3M discovered, yet again, that PFAS bioaccumulate in humans. (Id. ¶ 124.) Then, in 1978, 3M conducted studies exposing monkeys to PFAS, which also confirmed that PFOA and PFOS are toxic. (Id. ¶ 130.)

That same year, 3M shared with Historic DuPont that workers exposed to PFOA showed elevated and persistent blood fluorine levels. (Id. ¶ 148.) Historic DuPont began tracking the level of fluorine in employee blood samples and, in 1979, discovered that workers exposed to PFOA had a higher incidence of health issues than did unexposed workers. (Id. ¶¶ 148–50.) By 1980, Historic DuPont scientists had, like 3M scientists, concluded that PFOA "is toxic," that it accumulates in human tissue, and that

4

"continued exposure is not tolerable." (Id. ¶ 152.) They also discovered that PFOA could be emitted into the air from its facilities, and even that it could cross the placenta from an exposed mother to her gestational child. (Id. ¶¶ 153, 156.) Historic DuPont concealed the results of its findings from the public and from its plant workers at risk of exposure. (Id. ¶¶ 151, 154.)

For its part, 3M ignored repeated warnings from its own scientists that PFAS caused harm to individuals and the environment from 1979 until, at least, 1999. (Id. ¶ 134.) An internal 1979 report drew a direct causal line between effluent from 3M's Decatur, Alabama plant and PFAS accumulating in fish tissue taken from the Tennessee River. (Id. ¶ 132.) In response, 3M's toxicologists began calling for 3M to perform an ecological risk assessment on PFOS and other chemicals. (Id. ¶ 133.) In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment." (Id. ¶ 135.) Then, in 1984, 3M's analyses demonstrated PFAS was bioccumulating in its fluorochemical employees. (Id. ¶ 136.)

That same year, Historic DuPont learned that PFOA is biopersistent. (Id. ¶ 157.) After obtaining data on leachate from its facilities into groundwater used for public drinking water, and from consequent contamination near its plant in West Virginia, Historic DuPont held a meeting in its corporate headquarters in Wilmington, Delaware to discuss the health and environmental issues posed by PFOA. (Id. ¶¶ 158–59.) During the meeting, Historic DuPont employees recognized the company faced "incremental liability from this point on if we do nothing," because Historic DuPont was "already liable for the past 32 years of operation." (Id. ¶ 163.) The employees raised the PFOA issue

APP. 127

as "one of corporate image, and corporate liability."  (Id. ¶ 162.)  They stated the "legal

and medical [departments within Historic DuPont] w[ould] likely take the position of total

elimination" of PFOA, as these departments had "no incentive to take any other

position."  (Id. ¶¶ 161, 164.)

In response to pressure from the Federal Environmental Protection Agency (the

"EPA"), 3M finally began to phase out PFOS and PFOA products in 2000.  (Id. ¶ 138.)

A year earlier, a former 3M employee suggested 3M was concealing known dangers

relating to PFAS:

> I can no longer participate in the process that 3M has established for the
> management of [PFAS.]  For me, it's unethical to be concerned with markets, legal
> defensibility and image over environmental safety.

(Id. ¶ 137.)  Despite concerns raised by the EPA and by 3M's own internal studies,

however, 3M issued a news release on May 16, 2000 asserting that, although it was

ceasing production of PFOS and PFOA, its PFAS "products are safe" for use.  (Id. ¶

139.)  In response, the EPA issued its own press releases, asserting:

> 3M data supplied to EPA indicated that these chemicals are very persistent in the
> environment, have a strong tendency to accumulate in human and animal tissues
> and could potentially pose a risk to human health and the environment over the
> long term . . . [PFOS] appears to combine Persistence, Bioaccumulation, and
> Toxicity . . . to an extraordinary degree.

(Id. ¶ 140–41.)  That year, Historic DuPont began to grow particularly concerned about

the threat of punitive damages resulting from the company's release of PFOA at its

facility in West Virginia.  (Id. ¶ 165.)

In 2004, the EPA filed an action against Historic DuPont based on its failure to

disclose toxicity and exposure information for PFOA, in violation of federal

environmental laws.  (Id. ¶ 168.)  Historic DuPont settled the action in 2005, agreeing to

6

pay $10.5 million in a civil administrative penalty and to commit to $6.25 million in supplemental environmental projects. (Id. ¶ 169.)  Historic DuPont also agreed to phase out production and use of PFOA by 2015. (Id. ¶ 171.)

In 2005, Historic DuPont settled a class action lawsuit brought on behalf of 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million. (Id. ¶ 174.)  Under the terms of the settlement, Historic DuPont agreed to fund a panel of independent scientists (the "C8[5] Science Panel") to conduct whatever studies necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. (Id. ¶ 175.)

Nevertheless, Historic DuPont continued telling the public that there were no adverse health effects associated with human exposure to PFOA. (Id. ¶ 166.)  In 2006, Historic DuPont's own Epidemiology Review Board ("ERB") "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Historic DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health." (Id. ¶ 167.)

After seven years of studies and analyses, the C8 Science Panel found that PFOA exposures among class members were linked to several serious human diseases, including two types of cancer. (Id. ¶ 176.)  More than 3,500 personal injury

---

[5] "C-8" was a term used internally by Historic DuPont employees to refer to PFOA. (Id. ¶ 175.)

APP. 129

claims were filed against Historic DuPont in Ohio and West Virginia following the 2005 settlement and the findings of the C8 Science Panel.  (Id. ¶ 177.)  These claims were consolidated into a federal multidistrict action filed in Federal District Court, In re: E.I. Du Pont de Nemours and Co. C-8 Personal Injury Lit., MDL No. 2433 (S.D. Ohio) (the "MDL").  (Id. ¶ 178.)

By 2013, Historic DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA in West Virginia, as well as liability related to PFAS contamination in other areas of the country, including New Hampshire.  (Id. ¶ 182.)  Expecting its liability to number in the billions of dollars, Historic DuPont's management considered restructuring the company.  (Id. ¶¶ 182, 184.)  In 2013, Historic DuPont began discussions about a possible "merger of equals" with the Dow Chemical Company ("Dow").  (Id. ¶ 185.)  It recognized, however, that neither Dow nor any other rational potential merger partner would agree to a transaction that would expose it to the substantial PFAS liabilities Historic DuPont faced.  (Id. ¶ 186.)

Accordingly, Historic DuPont attempted to entice Dow to pursue the merger by restructuring in such a way as to isolate its liabilities from its tangible assets.  (Id. ¶ 187.)  In February 2014, Historic DuPont formed a wholly-owned subsidiary, "Performance Operations, LLC," now Chemours, that would broadly agree to assume liability for Historic DuPont's past use, manufacture, and discharge of PFAS ("Assumption of Liability").  (Id. ¶¶ 199, 210.)  In June 2015, Historic DuPont and Chemours entered into a separation agreement (the "Chemours Separation Agreement"), pursuant to which Chemours agreed to the Assumption of Liability in exchange for all of Historic DuPont's performance chemicals business and assets, including 37 active chemical plants

8

responsible for producing Teflon® and other products containing PFAS. (Id. ¶¶ 188–89, 208.) Historic DuPont went on to publicly claim that PFAS liabilities associated with its performance chemicals business rested solely with Chemours, and no longer with Historic DuPont. (Id. ¶ 232.)

In addition, Chemours transferred to Historic DuPont approximately $3.4 billion as a cash dividend, along with a distribution of promissory notes with an aggregate principal amount of $507 million. (Id. ¶ 211.) Chemours funded these distributions, totaling $3.4 billion, by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes. (Id. ¶ 212.) Shortly thereafter, Chemours distributed approximately $3 billion in common stock to Historic DuPont shareholders. (Id.) In total, Chemours transferred almost $7 billion in stock, cash, and notes to Historic Dupont and its shareholders, while Historic DuPont only transferred $4.1 billion in net assets and saddled Chemours with its PFAS liability. (Id. ¶ 213.) Shortly after Chemours separated from Historic DuPont, market analysts described it as a company "purposely designed for bankruptcy" and as a "bankruptcy waiting to happen." (Id. ¶ 226.) Historic DuPont hoped it might, as a result of these transactions, limit its exposure while ensuring most of the valuable assets that Chemours may have had at the time would be unavailable to creditors with current or future PFAS claims. (Id. ¶ 213.)

With the Chemours Separation Agreement complete, Historic DuPont attempted to further distance itself from exposure to PFAS liability by pursuing the merger with Dow. Within six months, Historic DuPont and Dow announced their boards had approved "an all-stock merger of equals" into a new combined entity, Diamond-Orion

9

HoldCo, Inc., later renamed DowDuPont. (Id. ¶¶ 235–36.) The parties' agreement and plan of merger (the "DowDuPont Merger Agreement") envisioned the merged entity would function as a holding company for two new merger subsidiaries, into which Dow and Historic DuPont would merge, respectively. (Id. ¶ 236.) As a result, Dow and Historic DuPont became wholly-owned subsidiaries of DowDuPont. (Id. ¶ 237.) Following the merger, Historic DuPont transferred its assets, including its remaining business segments and product lines, to DowDuPont for far less than the assets were worth. (Id. ¶¶ 240–43.) DowDuPont then combined these assets with certain assets of Dow and reorganized both entities' businesses into three distinct divisions: (1) the "Agriculture Business," (2) the "Specialty Products Business," and (3) the "Material Sciences Business." (Id. ¶ 242.) Once the assets of Old DuPont and Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: Corteva, which became the parent holding company of Historic DuPont, and Dow, Inc. ("New Dow"), which became the parent holding company of Dow. (Id. ¶¶ 195, 244.) Historic DuPont now held the agriculture business, Dow held the materials science business, and DowDuPont retained the specialty products business. (Id.) The below graph depicts the resulting structure of DowDuPont after the initial internal reorganization and realignment:



(Id. ¶ 245.)

The mechanics of these separations were governed by an April 1, 2019 agreement between Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement"). (Id. ¶ 246.) As part of that agreement, Corteva and DowDuPont assumed all direct financial liabilities of Historic DuPont that were not related to the agriculture, material science, or specialty products businesses, including its PFAS liabilities. (Id. ¶ 249.) These assumed PFAS liabilities were allocated on a pro rata basis between Corteva and DowDuPont, such that, after both companies had satisfied certain conditions, future liabilities were to be allocated at 71% to DowDuPont and 29% to Corteva. (Id.)

Finally, in May 2019, DowDuPont consolidated its agricultural business line into Historic DuPont and, then, contributed Historic DuPont to Corteva. (Id. ¶ 253.) On June 1, 2019, Corteva separated from DowDuPont to form its own, independent company. (Id.) Corteva now holds 100% of the outstanding common stock of Historic DuPont. (Id. ¶ 254.) Following the separations, DowDuPont rebranded as New DuPont. (Id. ¶ 257.) The resulting corporate structures of Corteva and Historic DuPont and New Dow and Dow, are depicted below:



(Id. ¶ 256.)

After the five-year period over which the restructuring occurred, Historic DuPont

11

divested approximately half of its tangible assets, which dropped from $41 billion in 2014 to $21 billion in 2019. (Id. ¶¶ 263–24.) The vast majority of Historic DuPont's divested assets are now held by New DuPont and New Dow. (Id. ¶ 197.) At the same time, Historic DuPont has reported liabilities totalling $22.06 billion, such that, when Corteva separated from DowDuPont, Historic DuPont's tangible net worth was negative $644 million. (Id. ¶ 266.) Part of those liabilities includes $4 billion in debts owed to Corteva, which Historic DuPont lacks the funds to satisfy. (Id. ¶¶ 260, 276.) Corteva, which is responsible for 29% of PFAS liabilities under the DowDuPont Separation Agreement, holds Historic DuPont's unsatisfiable debt obligations as its primary tangible asset. (Id. ¶ 276.) In 2019, Chemours sued Historic DuPont in Delaware state court, alleging, in part, that Chemours was insolvent at the time of the Chemours Separation Agreement because the full value of Historic DuPont's PFAS liabilities was improperly estimated. (Id. ¶ 219.)

Although Historic DuPont and 3M no longer manufacture or sell PFAS, 3M continues to claim it "do[es] not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment," nor that "there is a[ny] public health issue related to PFOA and PFOS." (Id. ¶ 143.)

### III. Analysis

#### A. Motion to Unseal

The Court first turns to the State's motion to unseal exhibits. The motion concerns exhibits disclosed to the State when it first propounded discovery bearing on New DuPont and Corteva's motion to dismiss. (Mot. Remove "Highly Confidential" Designation and Remove Seal ("Mot. Unseal") ¶ 1; Obj. Mot. Unseal at 2.) On March

12

12, 2021, the parties jointly submitted to the Court a Proposed Protective Order (the "Protective Order"), pursuant to which the parties may designate materials "Highly Confidential" only "if they have a good-faith basis to believe" such materials would be confidential "under statute, rule, or other applicable law." (Protective Order ¶ 8.) The Court granted the proposed order on March 17, 2021. The Protective Order provided that, where "any party believes that any [m]aterial" was designated Highly Confidential in error:

> that Challenging Party may challenge that designation by notifying the Designating Party in writing, identifying the Material contested, and articulating the reason(s) for challenging the designation. The parties shall promptly confer in good faith and use their best efforts to resolve any challenge to a designation. If the parties are unable to resolve the dispute within fourteen (14) days of the notice to the Designating Party of such challenge, or the Designating Party does not respond within such time, then the Challenging Party may request resolution of the dispute by the Court. The Designating Party shall have the burden of showing that the Materials are . . . Highly Confidential.

(Id. ¶ 10.)

On April 9, 2021, Corteva and New DuPont produced a series of documents to the State, in advance of this Court's April 23, 2021 hearing on the motions to dismiss. (Mot. Unseal ¶ 3.) Corteva and New DuPont designated at least some of the documents as Highly Confidential. (Obj. Mot. Unseal at 5.) The State alleges it requested to meet and confer with Corteva and New DuPont to challenge that designation. (Mot. Unseal ¶ 6.) These documents include complete versions of evidence relevant to the Court's determination of Corteva and New DuPont's motion to dismiss, including the DowDuPont Separation Agreement (NHAG-CTVA 1–301), and a document the parties refer to as the "June 1, 2019 Letter Agreement" (NHAG-CTVA 1346–67) (collectively, the "Agreements"). (Id.; Obj. Mot. Unseal at 2–3.)

13

Following the meet and confer on May 6, 2021, Corteva and New DuPont allegedly agreed to remove the Highly Confidential designation from the Agreements, but not from their attached schedules and exhibits. (Mot. Unseal ¶ 7.) The State now requests that the Court strike the Highly Confidential designation of the remaining sealed documents and rescind its April 22, 2021 orders to seal. (Id. at 1.) The attachments subject to this motion may be found at: NHAG-CTVA 302, 326–27, 433, 1373–75 (the "Sealed Attachments"). (Id.)

Corteva and New DuPont object that, because the Sealed Attachments were sealed pursuant to this Court's orders, the State's request amounts to a motion for reconsideration. They ask the Court to deny the motion because it was filed well in excess of the ten days afforded by Rule 12(e). (Obj. Mot. Unseal at 1, 5–6); see Super. Ct. Civ. R. 12(e). They also argue the State waived its right to challenge the designation by failing to bring the challenge during this Court's April 23, 2021 hearing on the motions to dismiss. In the alternative, they argue the documents do not relate to the adjudication of an important substantive right, because they were attached to the briefing on their motion to dismiss for lack of personal jurisdiction. (Obj. Mot. Unseal at 1, 6–8.) Corteva and New DuPont add that they have business interests in maintaining the confidentiality of the Sealed Attachments, that so does Dow, a third party, and that the Sealed Attachments contain sensitive commercial information. (Id. at 2, 8–10.)

"[A]bsent special circumstances, those things which are filed in court in connection with a pending case are open to public inspection." Assoc. Press v. State, 153 N.H. 120, 125 (2005). A "[C]ourt record may not be kept sealed[,] unless 'no reasonable alternative to nondisclosure exists' and the 'least restrictive means available'

14

is utilized to serve the interest that compels nondisclosure." Id. at 30.  Whether sealing

a Court record is reasonable "must be examined in light of the ability of the public to

hold [the] government accountable absent such access." Sumner v. N.H. Secy. of

State, 168 N.H. 667, 669–70 (2016); see N.H. CONST. pt. I, art. 8 (". . . the public's right

of access to governmental proceedings and records shall not be unreasonably

restricted.").  The New Hampshire Supreme Court has repeatedly held that:

> . . . under the constitutional and decisional law of this State, there is a presumption
> that court records are public and the burden of proof rests with the party seeking
> closure or nondisclosure of court records to demonstrate with specificity that there
> is some overriding consideration or special circumstance, that is, a sufficiently
> compelling interest, which outweighs the public's right of access to those records.

Id. at 129; In re Keene Sentinel, 136 N.H. 121, 128 (1992).

The "State constitutional right of access attaches only to those documents,"

however, "that are important and relevant to a determination made by the [C]ourt in its

adjudicatory function in connection with a proceeding to which the State constitutional

right of access has attached." Assoc. Press, 153 N.H. at 134.  In determining whether

the common law right of access applies, the New Hampshire Supreme Court has

"adopt[ed] the United States Supreme Court's experience and logic test," which

inquires: "(1) 'whether the place and process have historically been open to the press

and general public,' and (2) 'whether public access plays a significant positive role in the

functioning of the particular process in question.'" Id. at 133; State v. DeCato, 156 N.H.

570, 575 (2007) (citing Press-Enter. Co. v. Sup. Ct., 478 U.S. 1, 8 (1986)).  The "cases

turn," in part, "on whether the documents that are sought constitute . . . materials on

which a court relies in determining the litigants' substantive rights." See United States v.

Kravetz, 706 F.3d 47, 54 (1st Cir. 2013) (emphasis added).  Questions of jurisdiction do

15

not involve a party's substantive rights.  Property Owners Ass'n v. Sholley, 111 N.H.

363, 365 (1971) (Holding a jurisdictional statute produced "no change in [a defendant's]

substantive rights" because, whether a defendant "must answer for his [or her] acts here

rather than another forum," the defendant's "rights remain the same.")

As a preliminary matter, the Court does not construe the State's motion as an

untimely motion for reconsideration.  Pursuant to the Court's Protective Order, if the

parties have a dispute concerning the confidentiality of documents following a bona fide

conference to resolve the issues between them, the challenging party, here, the State,

"may request resolution of the dispute by the Court."  (Protective Order ¶ 10.)   The

Court finds the State's relative delay in challenging the Highly Confidential designations

stems from the Protective Order's textual requirement that the State attempt to meet

and confer with Corteva and New DuPont prior to resorting to this forum.  The Sealed

Attachments were allegedly submitted on April 9, approximately 2 weeks prior to the

April 23, 2021 hearing.  The parties were unable to meet and confer regarding the

Highly Confidential designations until May 6, 2021.  Corteva and New DuPont, who

"have the burden of showing" why the materials should not be unsealed pursuant to the

Protective Order, do not challenge this timeline.  (Id.; see Obj. Mot. Unseal.)  The State

filed its Motion to Unseal on May 21, 2021, approximately 2 weeks after the conference,

an amount of time the Court finds reasonable under the circumstances.  Because the

Protective Order makes no mention of deadlines by which to challenge a designation,

and because the Court finds whatever delay on the part of the State is the result of its

attempts to comply in good faith with the procedural requirements of this Court's

Protective Order, the Court concludes the State has not waived its right to challenge the

16

Highly Confidential designation of the Sealed Attachments at this juncture. N. Country Envtl. Servs. v. Town of Bethlehem, 146 N.H. 348, 355 (2001) ("A finding of waiver must be based upon an intention expressed in explicit language to forego a right, or upon conduct . . . [indicating] a relinquishment of it.")

Nevertheless, the Court concludes that there is "no reasonable alternative" to or "less restrictive means" than "nondisclosure" of the Sealed Attachments. Assoc. Press, 153 N.H. at 130. The Sealed Attachments were submitted in connection with Corteva and New DuPont's jurisdictional challenge and, as such, do not—at this time— constitute "materials on which a court relies in determining the litigants' substantive rights." Kravetz, 706 F.3d at 54; Sholley, 111 N.H. at 365. Moreover, the information sought to be disclosed is allegedly confidential pursuant to the rules of this Court, as Corteva and New DuPont allege it would "substantially impair" their "business, financial, or commercial interests." Super. Ct. Civ. R. 13B(c). Given the amount of information concerning this and similar cases already in the public domain, the Court concludes that, by declining to make the Sealed Attachments publicly available, the Court does not unreasonably impinge upon the public's right to a "judicial process [that] is [both] open and accountable." Assoc. Press, 153 N.H. at 134. The Court, accordingly, DENIES the State's motion to unseal exhibits, without prejudice.

B. Corteva and New DuPont's Motion to Dismiss

The Court next turns to Corteva and New DuPont's motion to dismiss for lack of personal jurisdiction. Corteva and New DuPont contend neither company has a constant and pervasive presence in New Hampshire and that, because neither company existed at the time of the alleged acts giving rise to this claim, there is no

17

relation between the State's claims and any contacts Corteva or New DuPont might have to this forum. (Corteva and New DuPont's Mem. L. in Supp. Mot. Dismiss ("Mot. Dismiss Pers. Juris.") at 1.) The State replies that specific personal jurisdiction exists because "(a) Corteva and New DuPont contractually assumed the liability of" Historic DuPont, and (b) Corteva and New DuPont participated "in a scheme to fraudulently transfer assets out of the reach of a known creditor (New Hampshire)[.]" (Mem. Supp. State's Obj. Mot. Dismiss Pers. Juris. ("State's Obj. Pers. Juris.") at 1.)

On a "motion to dismiss for lack of personal jurisdiction" that is adjudicated prior to "an evidentiary hearing," "the Court employs a prima facie standard" of review. State v. N. Atl. Ref., Ltd., 160 N.H. 275, 280 (2010) "To make a prima facie showing, the plaintiff 'ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts.'" Id. (citations omitted). That is, the Court "must look beyond the plaintiff's unsubstantiated allegations and determine, based on the facts, whether the plaintiff has sufficiently demonstrated his [or her] right to claim relief.'" In re Trust of Eddy, 172 N.H. 266, 272–73 (2019) (citing Ossipee Auto Parts v. Ossipee Planning Bd., 134 N.H. 401, 403–04 (1991)). The Court's role "is not as a factfinder," however, "but as a data collector," who "must construe the plaintiff's evidentiary proffers in the light most congenial to the plaintiff's jurisdictional claim," and who must accept such proffers as "true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Red Oak Apt. Homes v. Strategis Floor & Décor, 173 N.H. 529, 533 (2020).

With that standard in mind, the Court determines whether it possesses personal jurisdiction by engaging in "a two-part analysis." Petition of Reddam, 170 N.H. 590, 595 (2018). "First, the State's long-arm statute must authorize such jurisdiction," and

18

"[s]econd, the requirements of the [F]ederal Due Process Clause must be satisfied." Id.

"[B]ecause New Hampshire's long-arm statute authorizes the exercise of personal

jurisdiction over a non-resident to the extent permissible under the Federal Due Process

Clause, the due process analysis is normally dispositive of the matter." Id.

Personal jurisdiction can either be "general, i.e., the defendant's contacts with

New Hampshire are 'continuous or systematic,' or specific, i.e., 'the cause of action

arises out of or relates to the defendant's forum-based contacts.'" Red Oak, 173 N.H. at

533. Because the State does not assert general jurisdiction, the Court need only inquire

whether specific jurisdiction exists. For the Court "[t]o decide whether the exercise of

specific personal jurisdiction comports with due process," the plaintiff must show: "(1)

the contacts relate to the cause of action; (2) [each] defendant has purposefully availed

itself of the protection of New Hampshire's laws; and (3) it would be fair and reasonable

to require [each defendant] to defend the suit in New Hampshire." Id. at 533–34.

However, "[a] corporation's contacts with a forum may [also] be imputed to its

successor if forum law would hold the successor liable for the actions of its

predecessor." See McClary v. Erie Engine & Mfg. Co., 856 F. Supp. 52, 57 (D.N.H.

1994) (citations omitted). In this forum, "[t]he standard for successor liability . . . begins

with the general rule of commercial law that a corporation purchasing the assets of

another corporation is not liable for the seller's debts." Bielagus v. EMRE of N.H. Corp.,

149 N.H. 635, 640 (2003). Nevertheless, the Court recognizes four judicial exceptions,

each of which is "intended to prevent corporations from evading their business

obligations to creditors by selling their assets[:]"

> (1) when the purchasing corporation expressly or impliedly agrees to assume the
> obligations of the selling corporation; (2) when the asset transfer amounts to a de

19

facto merger of the two corporations; (3) when the purchasing corporation becomes a "mere continuation" of the selling corporation; and (4) when the transaction is fraudulent because its only purpose is to evade corporate liability.

Id.

Here, the State has sufficiently made a prima facie showing that this Court has specific personal jurisdiction over Corteva and New DuPont. As Corteva and New DuPont recognize, the State's primary basis for naming them parties to this action is that both companies assumed Historic DuPont's liabilities related to the underlying PFAS claims. (Mot. Dismiss Pers. Juris at 3.) Corteva and New DuPont do not contest that this Court possesses personal jurisdiction over Historic DuPont. The State, therefore, points to language in ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████ When viewed "in the light most congenial to the [State]'s jurisdictional claim," the "adduce[d] evidence" is sufficient to make "a prima facie jurisdictional showing" that Corteva and New DuPont "expressly . . . agree[d] to assume" Historic DuPont's PFAS-related liabilities and have, thereby, submitted to the jurisdiction of this Court. Bielagus, 149 N.H. at 640; N. Atl, 160 N.H. at 280; Red Oak, 173 N.H. at 533. The evidence is also consistent with the

20

State's allegation that Corteva and New DuPont assumed these liabilities with the fraudulent intent to help Historic DuPont "evade corporate liability" to potential future creditors, including this State.  Bielagus, 149 N.H. at 640.  Corteva and New DuPont's motion to dismiss is, accordingly, DENIED.

C. 3M, Historic DuPont, and Chemours' Motions to Dismiss the State's Public Trust Claim

The State contends the public trust doctrine enables it to recover for the defendants' "unreasonable interference with the public trust resulting from their manufacture, distribution, and sale of [PFAS] and products containing PFAS in New Hampshire without appropriate warnings or other precautions."  (Pl.'s Mem. Supp. Obj. Historic DuPont and Chemours' Mot. Dismiss ("State Mem.") at 2.)  3M, Historic DuPont, and Chemours argue that the public trust doctrine is a property right, not a tort, that the New Hampshire Supreme Court has never "squarely addressed" whether the public trust doctrine is a separate cause of action, and that no state recognizes the public trust as a standalone claim.  (Historic DuPont and Chemours' Reply Mem. in Supp. Mots. Dismiss ("Public Trust Reply Mem.") at 2–21.)  3M adds that Count V is, in effect, a request for this Court to "creat[e] [] a new common law cause of action out of whole cloth," and that it would consequently be "highly unjust and inequitable to allow the State to pursue recovery of damages based upon the unknown and untested criteria of an unestablished claim."  (3M's Reply State's Obj. Mot. Dismiss.)

"The public trust has its origins in the concept of the jus publicum, an English common law doctrine under which the tidelands and navigable waters were held by the king in trust for the general public."  Opinion of the Justices, 139 N.H. 82, 87 (1994).  "Following the American Revolution, 'the people of each state became themselves

21

sovereign; and in that character h[e]ld the absolute right to all their navigable waters and the soils under them for their own common use.'" Id. at 82-83 (citing Martin v. Lessee of Waddell, 41 U.S. 367, 410 (1842)). Over time, the common law began to recognize additional natural resources as constituting public trust property. In 1896, the United States Supreme Court recognized the reach of a state's public trust at common law extends, beyond water resources, to include wild game. Geer v. Connecticut, 161 U.S. 519, 534 (1896) ("[T]he power of the State in regard to the property in game" is "derived from . . . the trust for the benefit of its people which the State exercises in relation thereto[.]"), overruled on other grounds by Hughes v. Oklahoma, 441 U.S. 322 (1979). In 1948, Justice Frankfurter, joined in a concurring opinion by Justice Jackson, described an even more expansive view of the common law public trust doctrine:

> [The] State may care for its own in utilizing the bounties of nature within her borders because . . . the State may for the common good exercise all the authority that technical ownership ordinarily confers.

Toomer v. Witsell, 334 U.S. 385, 408 (1948) (Frankfurter, concurring) (emphasis added).

Subsequently, courts around the country have progressively expanded the scope of the public trust doctrine. In In re Complaint of Steuart Transp. Co., 495 F. Supp. 38, 40 (E.D. Va. 1980), a Virginia Federal court held that the state's public trust extends not only over wild game or wildlife on the embankments of navigable waters, but over all "natural wildlife resources." More recently, the Hawai'i Supreme Court "confirm[ed] that the public trust doctrine applies to all water resources, unlimited by any surface-ground distinction." In re Water Use Permit Applications, 9 P.3d 409, 447 (2000) (emphasis added). In Maryland, a Federal Court expressly adopted Justice Frankfurter's view of

22

the public trust doctrine's reach, holding that a state's public trust extends over all

"valuable natural resource[s]." Md. Dep't of Nat. Res. v. Amerada Hess Corp., 350 F.

Supp. 1060, 1066–67 (D. Md. 1972) (citing Witsell, 334 U.S. at 408). The Vermont

Supreme Court summarized the evolving scope of the doctrine as follows:

> Despite its antediluvian nature, [] the public trust doctrine retains an undiminished vitality. The doctrine is not fixed or static, but one to be molded and extended to meet changing conditions and [the] needs of the public it was created to benefit. The very purposes of the public trust have evolved in tandem with the changing public perception of the values and uses of waterways. Nor is the doctrine fixed in its form among jurisdictions, as there is no universal and uniform law upon the subject.

State v. Central Vermont Ry., Inc., 571 A.2d 1128, 1130 (1989) (internal quotations and

citations omitted).

In New Hampshire, the traditional conception of the public trust doctrine has also

expanded. The State Legislature has made clear that "[t]he [S]tate [is] trustee . . . for

the public benefit" of "all" "the water of New Hampshire[,] whether located above or

below ground," not merely over its navigable waters. RSA 481:1 (emphasis added).

Though in dicta, the New Hampshire Supreme Court has also cited Amerada's

expansive view of the public trust doctrine approvingly. The Amerada court held that,

"[a]s trustee, the State [is] empowered to bring suit" at common law "to protect the

corpus of the [public] trust," and that "this right of recourse is available against any

polluter" of public trust resources. Amerada, 350 F. Supp. at 1066–67. In Hess, the

New Hampshire Supreme Court similarly declared that the public trust doctrine is

"available to states seeking to remedy environmental harm," and that "the State can

bring suit to protect the waters over which it is trustee from contamination." 161 N.H. at

432. The New Hampshire Supreme Court defined the public trust doctrine as providing

23

that "the government holds public <u>lands, waters and other natural resources</u> in trust for
the benefit of its citizens. <u>State v. Hess Corp.</u>, 161 N.H. 426, 431 (2010) (emphasis
added).

The Court went further than <u>Amerada</u>, however, asserting that, in addition to
empowering the State to bring common law claims, "the public trust doctrine is its own
cause of action." <u>Id</u>. at 431–32. The Court explained that, "[t]o bring a successful
[public trust] claim, the State must prove an unreasonable interference with the use and
enjoyment of trust rights." <u>Id</u>. at 431. The New Hampshire Supreme Court reaffirmed
this view, though also in <u>dicta</u>, in <u>State v. Exxon Mobil Corp.</u>, 168 N.H. 211 (2015)
(citing <u>Hess</u>, 161 N.H. at 431).

In <u>Vermont v. 3M Co.</u>, No. 547-6-19 (Vt. Sup. Ct. 2020), the Vermont Superior
Court was presented with a case similar to the one now before this Court. (Mem. Supp.
Historic DuPont and Chemours' Mot. Dismiss ("Count V Mot. Dismiss"), Ex. A.) In that
case, the State of Vermont brought an action against a number of PFAS manufacturers
alleging, like the State does here, that 3M, Chemours, and Historic DuPont, among
others, were "responsible for [the] contamination of drinking water, groundwater[,] and
other natural resources" in Vermont. (<u>Id</u>. at 1.) The court dismissed the state's claim for
a standalone public trust cause of action, observing that:

> Our sister state of New Hampshire has stated that while "<u>parens patriae</u> is a
> concept of standing," the public trust doctrine "is its own cause of action . . . ."
> <u>Hess</u>, 20 A.3d at 216 (quotation omitted). However, as Defendants point out, that
> was merely <u>dictum</u> and relied solely upon one journal article—by one of the State's
> lawyers here—which itself contained contradictory statements and cited no cases
> for this proposition. A. Kanner, <u>The Public Trust Doctrine, Parens Patriae, and the
> Attorney General As the Guardian of the State's Natural Resources</u>, 16 Duke Envtl.
> L. & Pol'y F. 57, 62 n. 29 [(2005)] [("<u>Kanner Article</u>")] . . . [I]f the State were correct,
> what would the elements of its claim be? What would it have to prove to win? To
> what source would the court look for these answers?

24

Id. at 14.

Here, the Court concludes Count V of the State's Amended Complaint does not state a claim upon which relief can be granted. Our State Supreme Court's statements in Hess and Exxon that "the public trust doctrine is its own cause of action" were made in the context of adjudicating claims involving parens patriae standing, and both ultimately rely on a journal article from 2005 that, in turn, does not cite relevant precedential authority. Kanner Article at 88. The Court is mindful that, while not precedential, the statements of the New Hampshire Supreme Court in Hess and Exxon may yet prove to constitute more than mere "dictum," and rise to a "judicial act of the court which it will thereafter [rely upon in] a binding decision." (See State Mem. at 10 (citing Gillen v. City of Neenah, 580 N.W.2d 628, 635 (Wis. 1998)).) However, at this point in time, the Court is unable to find binding legal precedent, whether in this State or elsewhere, for the notion that the common law public trust doctrine constitutes a standalone claim. While it is the State's burden to plead "a basis for legal relief" on the basis of "the applicable law," the State has not cited any precedential authority that independently supports the conclusions reached in the article.

None of the cases cited by the State are dispositive here. Amerada did not reach whether the public trust doctrine supported a standalone cause of action. Paschen v. Vill. of Winnetka concerns the use of public property pursuant to a provision of the Illinois Constitution, not a common law public trust claim. 392 N.E.2d 306, 309–10 (Ill. App. Ct. 1979). The underlying claim in the remaining cases, including both State v. City of Bowling Green and State v. Jersey Central Power & Light Co., was an action for negligence, not for an independent invasion of the public trust. 313 N.E.2d 409, 411

(Ohio 1974); 336 A.2d 750 (App. Div. 1975).  The Court accordingly GRANTS 3M, Historic DuPont, and Chemours' Motions to Dismiss Count V of the State's Amended Complaint for failure to state a claim for relief.

## IV.    Conclusion

For the foregoing reasons, the State's motion to unseal is DENIED, Corteva and New DuPont's motion to dismiss is, likewise, DENIED, and 3M, Historic DuPont, and Chemours' motions to dismiss Count V are GRANTED.

**SO ORDERED.**

_____7/7/21_____
**Date**

John C. Kissinger, Jr.
Presiding Justice

Clerk's Notice of Decision
Document Sent to Parties
on  07/08/2021

26

# EXHIBIT D

COURT OF COMMON PLEAS, WASHINGTON COUNTY, OHIO

CASE NO. 18 OT 32                    ASSIGNED JUDGE R. McMONAGLE

STATE OF OHIO / YOST        VS E.I. DUPONT DE NEMOURS AND CO., ET AL

| | | |
|---|---|---|
| ☐ 02 REASSIGNED | ☐ 81 JURY TRIAL | ☐ 89 DIS.W/PREJ. |
| ☐ 03 REINSTATED (C/A) | ☐ 82 ADR DECREE | ☐ 91 COGNOVITS |
| ☐ 04 REINSTATED | ☐ 83 COURT TRIAL | ☐ 92 DEFAULT |
| ☐ 20 MAGISTRATE | ☐ 85 PRETRIAL | ☐ 93 TRANS TO COURT |
| ☐ 40 ADR | ☐ 86 FOREIGN JUDGMENT | ☐ 95 TRANS TO JUDGE |
| ☐ 65 STAY | ☐ 87 DIS.W/O PREJ | ☐ 96 OTHER |
| ☐ 69 SUBMITTED | ☐ 88 BANKRUPTCY/APPEAL STAY | |

DISPOSITION  CIVIL CASE STATUS FORM

NO. JURORS ___    COURT REPORTER ___    ☐ PARTIAL
START DATE _/_/_    START DATE _/_/_.    ☐ FINAL
END DATE _/_/_    END DATE _/_/_    ☐ POST CARD

DATE 8/2/2021 (NUNC PRO TUNC ENTRY AS OF & FOR _/_/_)    CLERK OF COURTS

THE MOTION TO DISMISS OF CORTEVA, INC AND
DUPONT DE NEMOURS, INC. IS DENIED,
    THE PLAINTIFF'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THE ASSUMPTION OF LIABILITY
IS GRANTED
        SO ORDERED

JUDGE        AUG - 4 2021

FILED CLERK OF COURTS 2021 AUG -4 PM 2:02 WASHINGTON CO. OHIO

CPC 43-2 / 4345

JM 1084

# EXHIBIT E

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

CHAMBERS OF
MADELINE COX ARLEO
UNITED STATES DISTRICT JUDGE

MARTIN LUTHER KING COURTHOUSE
50 WALNUT ST. ROOM 4066
NEWARK, NJ 07101
973-297-4903

October 14, 2021

<u>VIA ECF</u>

## <u>LETTER ORDER</u>

Re:   **SUEZ Water New Jersey, Inc. v. E.I. DuPont De Nemours, <u>et. al</u>,**
**Civil Action No. 20-19906**

Dear Litigants:

Before the Court is (1) Defendants Corteva, Inc.'s ("Corteva") and DuPont de Nemours, Inc.'s ("New DuPont") Motion to Dismiss the First Amended Complaint, ECF No. 35, for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), ECF No. 38; and (2) Defendants E.I. DuPont De Nemours and Company, Inc.'s ("Old DuPont"), New DuPont's, DuPont Specialty Products USA, LLC's ("DuPont LLC"), Corteva's, the Chemours Company's ("Chemours"), and the Chemours Company FC, LLC's ("Chemours FC") (collectively with the other defendants, "Defendants") Motion to Dismiss the First Amended Complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF No. 39. Plaintiff SUEZ Water New Jersey, Inc. ("Plaintiff") opposes each motion. ECF Nos. 41, 42. For the reasons explained below, both Motions are **DENIED**, and the Parties are **ORDERED** to proceed with jurisdictional discovery.

## I.   BACKGROUND[1]

This action arises from Defendants' use and release of per- and polyfluoroalkyl substances ("PFAS") into New Jersey's environment. Am. Compl. ¶ 1. Beginning in the 1950s, Old DuPont, Chemours, Chemours FC, and DuPont LLC produced PFAS at several manufacturing facilities in New Jersey. <u>Id.</u> ¶¶ 1, 17, 42. PFAS are a group of manufactured chemicals that are incorporated into a wide variety of industrial and commercial products. <u>Id.</u> ¶ 14. The United States Environmental Protection Agency has identified widespread PFAS contamination in the environment, and drinking water is a primary source of exposure to PFAS. <u>Id.</u> ¶¶ 17-18.

Old DuPont is a Delaware corporation with its principal place of business in Delaware. <u>Id.</u> ¶ 6. It is undisputed that Old DuPont has sold, licensed, and distributed PFAS and PFAS-containing products in New Jersey. <u>Id.</u> ¶ 6. Old DuPont later underwent complex corporate restructuring, resulting in the spin-off of Chemours, which assumed some of Old DuPont's

---

[1] These facts are principally drawn from the First Amended Complaint, ECF No. 35, and the exhibits attached thereto.

environmental liabilities resulting from its involvement with PFAS, and Corteva, which Plaintiff alleges also assumed some of Old DuPont's liabilities.[2]  Id. ¶¶ 97-102.  Specifically, Plaintiff alleges, "upon information and belief," that Corteva and New DuPont agreed during the restructuring to assume liabilities of Old DuPont relating to PFAS that were not previously assumed by Chemours during its spin off.  Id. ¶ 103.

On June 1, 2020, the New Jersey Department of Environmental Protection (the "NJDEP") announced the adoption of Maximum Containment Levels ("MCLs") for public water systems. Id. ¶ 2.  In recognition of the health risks presented by high concentrations of PFAS in water, the NJDEP established MCLs between 13 and 14 parts per trillion ("ppt") for PFAS.  Id. ¶¶ 25-30.  As the owner and operator of multiple public water systems in New Jersey, Plaintiff must comply with the MCLs and alleges that it will be required to incur significant costs to remove the PFAS from its water supplies to comply with the new requirements.  Id. ¶¶ 82-91.  Plaintiff alleges that the presence of the PFAS in its water supplies is the direct and proximate result of Defendants' long-running releases of PFAS into New Jersey's environment. Id. ¶ 1.

On December 18, 2020, Plaintiff filed its initial Complaint, ECF No. 1, which it then amended on February 25, 2021, see Am. Compl.  The Amended Complaint asserts seven causes of action against Defendants: (1) public nuisance; (2) private nuisance; (3) negligence; (4) trespass; (5) strict liability—abnormally dangerous activity; (6) strict liability—defective design; and (7) strict liability—failure to warn.  Am. Compl. ¶¶ 106-73.  The instant Motions followed.

## II.   LEGAL STANDARD

### A.   Motion to Dismiss Under Rule 12(b)(2)

To survive a Rule 12(b)(2) motion to dismiss, Plaintiff bears "the burden of demonstrating facts that establish[] personal jurisdiction" over Defendant.  Fatouros v. Lambrakis, 627 F. App'x 84, 86-87 (3d Cir. 2015) (citation omitted).  Plaintiff must make "a prima facie case of personal jurisdiction and . . . is entitled to have its allegations taken as true and all factual disputes drawn in its favor."  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).  Plaintiff may not rely on "the bare pleadings alone," but instead must establish its "jurisdictional facts through sworn affidavits or other competent evidence."  Id. at 101 n.6 (internal quotation marks and citation omitted).  If Plaintiff meets its burden, then Defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992) (citation and quotation marks omitted).

---

[2] In 2015, Old DuPont created Chemours as a wholly-owned and operated subsidiary.  Id. ¶ 98.  Shortly thereafter, Old DuPont transferred some of its business lines, which included those that used PFAS in manufacturing, to Chemours.  Id.  Old DuPont then spun-off Chemours as a separate public entity according to a separation agreement dated June 26, 2015 (the "Chemours Separation Agreement").  Id. ¶ 99.  As part of that agreement, Chemours assumed Old DuPont's environmental liabilities relating to PFAS and agreed to indemnify Old DuPont for those liabilities.  Id.

In 2015, Old DuPont and the Dow Chemical Company merged and became subsidiaries of DowDuPont, Inc.  Id. at 100.  DowDuPont, Inc. incorporated Corteva in 2019, transferred some of its business lines to Corteva, and made Corteva the parent company of Old DuPont.  Id. ¶ 101.  Shortly thereafter, DowDuPont, Inc. spun Corteva off into an independent company.  Id.  Corteva holds 100% of Old DuPont's common stock.  DowDuPont, which retained some of Old DuPont's business lines, changed its name in 2019 to DuPont de Nemours, Inc. ("New DuPont").  Id.

**B.      Motion to Dismiss Under Rule 12(b)(6)**

In resolving a Rule 12(b)(6) motion to dismiss, the Court accepts all pleaded facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citation omitted). To survive a motion to dismiss, the claims must be facially plausible, meaning that the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

**III.    ANALYSIS**

**A.      Personal Jurisdiction**

Corteva and New DuPont argue that the Court should dismiss the Complaint for lack of general or specific personal jurisdiction. See Def. Br. at 1, ECF No. 38. Plaintiff counters that Corteva and New DuPont expressly assumed Old DuPont's jurisdictional contacts in this forum. See Pl. Rep. at 15, ECF No. 42. The Court holds that such a finding cannot be made on the record before the Court and jurisdictional discovery is therefore warranted.

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law," which "provides for jurisdiction coextensive with the due process requirements of the United States Constitution." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004) (citations omitted). To comport with due process, a plaintiff must separately demonstrate personal jurisdiction over each defendant. Bristol Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty., 137 S. Ct. 1773, 1783 (2017). This typically requires a plaintiff to demonstrate that each defendant has constitutionally sufficient contacts with New Jersey, either generally or specifically with regards to this action. O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007). In some cases, however, an entity may inherit the jurisdictional contacts of a predecessor organization and be subject to suit even if personal jurisdiction would otherwise not independently exist.[3]

"Successor jurisdiction 'can be present in the following situations: (1) merger or de facto merger; (2) express or implied assumption of liabilities, including by a ratification of the predecessor's activities; or (3) acquisition of assets or reorganization undertaken to fraudulently avoid jurisdiction." American Estates Wines, Inc. v. Kreglinger Wine Estates Pty., Ltd., No. 07-2474, 2008 WL 819993, at *5 (D.N.J. Mar. 25, 2008) (quoting In re Nazi Era Cases Against German Defendants Litig., 153 F. App'x 819, 823 (3d Cir. 2005)); see also Flagship Interval Owner's Ass'n, Inc. v. Philadelphia Furniture Manuf. Co., No. 09-1173, 2010 WL 1135736, at *6-7 (D.N.J. Mar. 22, 2010) (finding successor jurisdiction based on de facto merger and alter ego theories).

---

[3] Plaintiff does not argue that Corteva and New DuPont are subject to the Court's general jurisdiction and does not contend that specific jurisdiction exists in the absence of successor liability.

3

Here, Corteva and New DuPont argue that the Court lacks personal jurisdiction over them because Chemours assumed all of Old DuPont's PFAS-related liabilities, leaving no remaining liability for Corteva or New DuPont to assume.  See Def. Rep. at 3, ECF No. 45.  However, Corteva and New DuPont do not support such a contention with any legal authority.  Nor do they cite any language from the Chemours Separation Agreement to show that Chemours would assume PFAS-related liability to the exclusion of any other successors.[4]  If Corteva and New DuPont expressly assumed some PFAS-related liability from Old DuPont's activities in New Jersey, this would provide minimum contacts with the forum state sufficient to support personal jurisdiction.  See Am. Estates Wines, Inc. v. Kreglinger Wine Estates Pty, Ltd., No. 07-2474, 2008 WL 819993 (D.N.J. Mar. 25, 2008).

Plaintiff argues that it has sufficiently pled facts to show a prima facie case of successor jurisdiction, but in the alternative, requests jurisdictional discovery to support its allegations.  See Def. Rep. at 15, 27.  The documentation Plaintiff submitted is insufficient for the Court to determine whether Corteva and New DuPont actually assumed PFAS-related liabilities from Old DuPont.  Plaintiff points to the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont, Inc. (the "DowDuPont Separation Agreement") to allege that Corteva and New DuPont each assumed liabilities of Old DuPont, including PFAS liabilities not previously assumed by Chemours.  Am. Compl. ¶ 103.[5]  While the DowDuPont Separation Agreement does specify that New DuPont assumed all "Specialty Products Liabilities" and Corteva assumed all "Agriculture Liabilities," the specific definitions of these terms are set forth in non-public schedules to the DowDuPont Separation Agreement.  Certification of Richard P. O'Leary, Ex. B. §§ 1.1(38)(vii), 1.1(309)(vi), ECF No. 41.3.  These schedules are not attached to the Complaint and neither party has submitted them for the Court's review.  Because inferences could be drawn either way, depending on the definitions of "Agricultural Liabilities" and "Special Products Liabilities," the Court is unable to determine from the present record whether Corteva or New DuPont assumed any PFAS-related liability of Old DuPont.

Plaintiff has therefore not yet carried its burden to demonstrate personal jurisdiction; however, the Court can assist the plaintiff in proving jurisdiction "by allowing jurisdictional discovery" where appropriate.  Kirkwood v. Brenntag N. Am., Inc., No. 19-14947, 2020 WL 1516974 (D.N.J. Mar. 30, 2020) (quoting Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003)).  At the pleading stage, a plaintiff need only present "factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between the party and the forum state,' such that [its] claim is not clearly frivolous."  Id. (quoting Toys "R" Us, 318 F.3d at 456).  A grant of jurisdictional discovery lies within a district court's discretion, guided as always by the relevant legal standards.  SoftwareArt Corp. v. Satyajit Gopalakrishnan, No. 07-4755, 2008 WL 2876395 (D.N.J. July 22, 2008).

---

[4] Although the Chemours Separation Agreement was not included in the Amended Complaint, it was specifically referenced in the Amended Complaint, see Am. Compl. ¶ 99, and it is a matter of public record.

[5] In considering a Rule 12(b)(2) motion to dismiss, a court may evaluate jurisdictional allegations by considering sworn affidavits and certifications.  See Cruickshank-Wallace v. CAN Fin. Corp., 768 F. App'x 77, 80 (3d Cir. 2019).

4

The Court is satisfied that Plaintiff has particularly pled enough to set forth a nonfrivolous claim of personal jurisdiction over Corteva and New DuPont. The Court denies Corteva's and New DuPont's Motion without prejudice but permits them to renew their objections following jurisdictional discovery.

## B.   Proximate Cause

Defendants next contend that the entire complaint must be dismissed[6] because Plaintiff fails to set forth sufficient allegations to establish that Defendants were the proximate cause of PFAS in Plaintiff's water sources, particularly because their manufacturing sites are fifty and 135 miles away from Plaintiff's public water sources. The Court disagrees.

"The proximate cause inquiry asks 'whether the [injury] was reasonably foreseeable or was, on the contrary, a remote or abnormal incident . . . that was not otherwise reasonably foreseeable by defendant []." Sabree v. Williams, No. 06-2164, 2008 WL 11509881, at *47 (D.N.J. June 30, 2008) (alteration in original) (quoting Jakelsky v. Friehling, 33 F.Supp.2d 359, 365 (D.N.J. 1999)). Put differently, proximate cause is "a cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." Severa v. Solvay Specialty Polymers USA, LLC, No. 20-6909, 2021 WL 912850, at *13 (D.N.J. Mar. 10, 2021). "'Ordinarily, issues of proximate cause are considered to be jury questions,' but a court may decide the issue as a matter of law where 'no reasonable jury could find that the plaintiff's injuries were proximately caused'" by the defendant. Id. (quoting Broach-Butts v. Therapeutic Alternatives, Inc., 456 N.J. Super. 25, 191 (App. Div. 2018)).

Plaintiff alleges that Defendants used, manufactured, and disposed of PFAS at several sites in New Jersey, which resulted in long-running PFAS releases to the environment. Am. Compl. ¶¶ 39-58. Plaintiff further alleges that PFAS are highly resistant to natural and chemically-aided degradation, are water-soluble, can migrate from soil to groundwater, and are highly mobile in water, which can allow them to spread beyond their initial sources of introduction into the environment. Id. at ¶¶ 23-24. Moreover, Plaintiff's Amended Complaint asserts that PFAS are in their water supply as a result of Defendants' PFAS use, manufacturing, and distribution. Accepting these pleaded facts as true, the Plaintiff adequately alleges that Defendants were the proximate cause of Plaintiff's injuries, as a reasonable jury could find that Defendants' actions caused the PFAS to contaminate Plaintiff's water supply.[7]

## C.   Public Nuisance Claim (Count One)

Defendants next argue that Plaintiff has failed to allege a special injury to maintain its public nuisance claim, as Plaintiff has suffered from the same alleged water supply contamination

---

[6] Proximate cause is an essential element of each of Plaintiff's claims.

[7] Defendants additionally argue that Plaintiff needed to specifically allege "when, where, and to whom" Defendants allegedly sold, licensed, manufactured, discharged, or disposed of any PFAS in New Jersey to constitute sufficiently particularized allegations of causation. Mot. to Dismiss, ECF No. 39. However, such a level of evidentiary proof is not required at the motion to dismiss stage. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

as the general public.  Specifically, they contend that while Plaintiff alleges only greater damages in connection with its need to remediate the PFAS contamination, it did not suffer a different kind of injury from the public's injury.  This argument is unavailing.

A public nuisance is "an unreasonable interference with a right common to the general public," such as the right to clean public water.  Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 315 (3d Cir. 1985) (citation omitted).  "[T]o sustain a private claim on a public nuisance theory, 'a plaintiff must have suffered a harm of greater magnitude and of a different kind than that which the general public suffered.'"  Baptiste v. Bethlehem Landfill Co., 965 F.3d 214, 221 (3d Cir. 2020) (quoting Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 446 (3d Cir. 2000)).

Plaintiff alleges that its special injury is that PFAS have entered its public drinking water systems, requiring Plaintiff to design, install, and operate new systems to eradicate the contaminants.  Pl. Rep. at 19.  While Plaintiff has not alleged any direct injury to its property, the Third Circuit has recognized that injury to a business operation as a result of pollution may constitute a special injury.  Hercules, 762 F.2d at 316 (finding special injury "where an established business made commercial use of the public right with which the defendant interfered") (quoting William L. Prosser, Private Action for Public Nuisance, 52 Va. L. Rev. 997, 999 (1966)); see also Mayor & Council of Borough of Rockaway v. Klockner & Klockner, 811 F. Supp. 1039, 1056-57 (D.N.J. 1993) (finding special injury where a plaintiff's business suffered substantial business losses as a result of defendant's alleged pollution of public water).  Because Plaintiff has alleged significant injuries to its business operations as a result of Defendants' alleged environmental contamination—the need to expend financial resources to rid the public water supply of PFAS— the Court finds that Plaintiff has adequately alleged a special injury to maintain its public nuisance claim.

### D.    Private Nuisance and Trespass Claims (Counts Two & Four)

Defendants moved to dismiss Plaintiff's private nuisance and trespass claims for its alleged failure to plead the prima facie element of exclusive possession.  Specifically, Defendants argue that Plaintiff does not have an adequate possessory interest in the public water supply to the exclusion of others, even though the water enters Plaintiff's wells, intakes and treatment plants.  The Court disagrees.

Under New Jersey law, a plaintiff must allege exclusive possession of property to succeed in trespass and private nuisance claims.  See Dep't of Env't Prot. v. Ventron Corp., 94 N.J. 473, 488 (1983).  Our Courts have held that the presence of contaminants on exclusively possessed real property is sufficient to maintain such claims.  See, e.g., Sines v. Darling Ingredients Inc., No. 19-19121, 2020 WL 5015488, at *6 (D.N.J. Aug. 25, 2020) ("[C]ourts have allowed for trespass claims to go forward based solely on the alleged invasion of microscopic deposits onto the property of another without consent." (citations omitted)); In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., No. 1:00-1898, 378 F. Supp. 2d 348, 423 (S.D.N.Y. 2005) (applying New Jersey law and permitting private nuisance claims to continue where the plaintiff alleged that the defendant's pollution of groundwater contaminated the plaintiff's wells).  Here, Plaintiff has alleged that

6

Defendants' actions caused PFAS to enter its water treatment facilities, which has interfered with its use and enjoyment of those facilities. As such, Plaintiff has adequately pled exclusive possession and is entitled to proceed on its private nuisance and trespass claims.

### E.      Cognizable Injury (Counts Three, Six, & Seven)

Defendants next move to dismiss Plaintiff's negligence, design-defect, and failure-to-warn claims on the basis that: (1) contamination alone does not constitute an "injury" sufficient to substantiate a negligence claim; and (2) economic losses are not compensable for negligence and strict liability claims. The Court disagrees.

First, while Defendants are correct in that "contamination alone does not constitute an 'injury' sufficient to substantiate a negligence claim," Rowe v. E.I. Dupont de Nemours & Co., 262 F.R.D. 452, 465 (D.N.J. Oct. 9, 2009), contamination can be a basis for an injury where a plaintiff can show that they suffered harm as a result of such contamination. See id. (observing that a plaintiff's contamination did not constitute "injury" for purposes of a negligence claim, but that "the contamination caused plaintiff's well to be 'unfit for use' and, thus, plaintiff was forced to dig a new well," which was a cognizable injury). Because Plaintiff has alleged that it will suffer harm as a result of removing the PFAS from its water supply, see Compl. ¶ 67, it has sufficiently alleged a cognizable injury for its negligence claim.

Second, under the New Jersey Products Liability Act ("PLA"), a manufacturer of goods can only be strictly liable for "harm" stemming from "(a) physical damage to property . . . ; (b) personal physical illness, injury or death; [and] (c) pain and suffering, mental anguish, or emotional harm." N.J.S.A. § 2A:58C-1(b)(2). Defendants rely upon the PLA to contend that Plaintiff cannot seek only economic losses for its strict liability claims. However, this argument overlooks the plainly applicable environmental tort exception to the PLA. The environmental tort exception applies to "civil action[s] seeking damages for harm where the cause of the harm is exposure to toxic chemicals or substances." N.J.S.A. §§ 2A:58C-1, -6. As Plaintiff has brought suit for the alleged presence of toxic chemicals in its water supplies as a result of the Defendants' actions, the PLA does not bar Plaintiff from seeking only damages stemming from its economic losses.[8]

As for Plaintiff's negligence claims, Defendants cite to People Express Airlines, Inc. v. Consol. Rail Corp., 100 N.J. 246, 263 (N.J. 1985), to assert that Plaintiff, as a public water system operator, is not part of a "particularly foreseeable" class of plaintiffs and cannot recover for purely economic loss under a negligence theory. Although plaintiffs generally cannot recover for purely economic losses, such recovery is possible in New Jersey under limited exceptions, including where the plaintiff is part of a "particularly foreseeable" class of plaintiffs. Id. Under the People Express standard, "a defendant owes a duty of care to take reasonable measures to avoid the risk

---

[8] Defendants additionally assert that the economic loss doctrine applies to common law products liability claims, barring recovery for economic loss for Plaintiff's strict liability claims. However, the economic loss doctrine only "bars negligence claim when the party asserting the action has a contractual remedy." Schenker, Inc. v. Expeditors Int'l of Wash., Inc., No. A-3555-15T1, 2016 WL 3563187, at *4 (App. Div. July 1, 2016) (emphasis added) (quoting Dean v. Barrett Homes, Inc., 204 N.J. 286, 295 (2010)). As Plaintiff and Defendants have no contractual relationship, the economic loss doctrine is clearly inapplicable here.

of causing economic damages, aside from physical injury, to particular plaintiffs or plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct." Id.  To determine whether a plaintiff fits within an identifiable class of plaintiffs, courts look to whether the plaintiffs are particularly foreseeable in terms of the type of persons or entities comprising the class, the certainty or predictability of their presence, the number of those in the class, and the type of economic harm anticipated. Coleman v. Martinez, 247 N.J. 319, 350 (2021) (citing People Express, 100 N.J. at 263-64).  In People Express, the Court specifically looked at cases involving plaintiffs recovering economic damages for environmental pollution, observing the common theory that public utilities, who "depend on the exercise of the public . . . right to clean water as a natural resource," were "particularly foreseeable because they are so closely linked, through the resource, to the defendants' behavior." 100 N.J. at 260.

The Court finds that Plaintiff, as a public water utility, is a member of a particularly foreseeable class of plaintiffs affected by Defendants' alleged environmental contamination. Plaintiff has alleged that Defendants knew that PFAS could harm the environment since at least the early 1960s, and that they were aware that PFAS could spread throughout the environment. Am. Compl. ¶¶ 35-36.  It was therefore reasonably foreseeable that public water utilities, including Plaintiff, would be harmed by such environmental pollution.  Thus, Plaintiff has set forth sufficient allegations to maintain its negligence claims for purely economic losses.[9]

### F.  Products Liability Claims (Counts Six & Seven)

Defendants lastly challenge Plaintiff's design defect and failure to warn claims, contending that Plaintiff has not adequately pleaded that it was a reasonably foreseeable user of the PFAS-containing products.  Again, the Court finds Defendants' argument unavailing.

Strict products liability exists where a "seller distributes a product, it is not reasonably fit, suitable and safe for its intended or reasonable foreseeable purposes so that users or others who may be expected to come into contact with the product are injured as a result thereof . . . ." Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 169 (1979) (emphasis added).  As discussed supra, it was reasonably foreseeable that Plaintiff would come in contact with the PFAS that

---

[9] Defendants alternatively assert that People Express "no longer has any continuing validity in New Jersey" because of its disfavored treatment by the California Supreme Court and other states.  Mot. to Dismiss at 14.  However, Defendants have not argued that the New Jersey Supreme Court has overruled People Express, and so it remains god law.  As a federal court sitting in diversity jurisdiction, this Court will apply valid substantive state law, including People Express.  Thabault v. Chait, 541 F.3d 512, 521 (3d Cir. 2008) (citing Erie R. Co v. Tompkins, 304 U.S. 64, 78 (1938)).  Defendants additionally argue that Plaintiff cannot recover purely economic damages because it lacks privity of contract with Defendants.  However, Defendants offer no support for such a requirement that a plaintiff be in privity of contract with a defendant to be part of a reasonably foreseeable class of plaintiffs.  C.f. People Express, 100 N.J. at 267 (finding that the plaintiff could recover for economic losses from the defendant's negligence, despite the parties lacking contractual privity).

Defendants allegedly put into the stream of commerce.  Thus, Plaintiff need not be a user of the PFAS-containing products to bring suit for design defects or a failure to warn claim.[10][11]

## IV.   CONCLUSION

For the reasons stated above, Corteva and New DuPont's Motion to Dismiss, ECF No. 38, and Defendants' Motion to Dismiss, ECF No. 39 are **DENIED** without prejudice to the arguments raised therein.  The Parties are **ORDERED** to confer with Judge Hammer to prepare a schedule for jurisdictional discovery.  After the completion of jurisdictional discovery, Defendants may renew their Motion to Dismiss for lack of personal jurisdiction.

**SO ORDERED.**

*/s Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

---

[10] Defendants ask this Court to adopt the decision in <u>Menkes v. 3M Co.</u>, No. 17-0573, 2018 WL 2298620, at *9 (E.D. Pa. May 21, 2018), which dismissed the plaintiffs' strict liability claims stemming from water contamination because they were not consumers of the allegedly defective product.  However, that decision was based in part on Pennsylvania law, and New Jersey law clearly allows for bystanders to succeed in products liability claims.

[11] Defendants lastly argue that dismissal of all of Plaintiff's common law claims is appropriate because common law claims are disfavored in environmental tort actions.  Mot. to Dismiss at 16-17.  However, Defendants cite only to cases in which plaintiffs sought to proceed on both statutory and common law claims.  <u>See, e.g.</u>, <u>Heller Urban Renewal, LLC v. FER Blvd. Realty Corp.</u>, No. 13-431, 2014 WL 252106, at *7 (D.N.J. Jan. 6, 2014) (dismissing common law claims where plaintiff additionally alleged Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and New Jersey Spill Act claims); <u>Pub. Serv. Elec. & Gas Co. v. Newport Assocs. Dev. Co.</u>, 365 F. Supp. 3d 506, 522 (D.N.J. 2019) (dismissing trespass and private nuisance claims as "superfluous" of claims under the Oil Pollution Act, CERCLA, and the New Jersey Sill Compensation 86 Control Act).  Because Plaintiff is only seeking relief on common law claims, Plaintiff is entitled to proceed on its adequately pled claims.  <u>See</u> <u>Sines</u>, 2020 WL 5015488, at *6 ("[W]hen Courts in this District have dismissed common law trespass claims in pollution cases, they have generally only done so where the plaintiff has also pled an alternative claim under a strict liability statute regulating pollution, which Plaintiffs have not done.").

# EXHIBIT F

**Exhibit 10.2**

**LETTER AGREEMENT**

This letter agreement (this "Agreement"), effective June 1, 2019, is made by and between DowDuPont Inc, a Delaware corporation ("SpecCo") and Corteva, Inc., a Delaware corporation ("AgCo"). Reference is made to that certain Separation and Distribution Agreement, dated as of April 1, 2019, (the "SDA"), by and among SpecCo, AgCo and Dow Inc., a Delaware Corporation ("MatCo") and that certain Employee Matters Agreement, dated as of April 1, 2019 (the "EMA"), by and among SpecCo, AgCo and MatCo. Capitalized terms used herein without definition have the meaning given to them in the SDA. SpecCo and AgCo are referred to herein as the "Letter Parties".

WHEREAS, the MatCo Distribution Date has passed;

WHEREAS, given the passage of time, the Letter Parties desire to treat certain schedules to the SDA as if they had been updated in connection with the AgCo Distribution in a manner effective among the Letter Parties and the other members of their respective Groups (but not the MatCo Group or MatCo Indemnitees (together the "MatCo Parties"), or any third-party beneficiaries (as set forth in Section 12.15 of the SDA) (the "Third-Party Beneficiaries") (except as expressly set forth in Section 6.03(b) of this Agreement));

WHEREAS, the Letter Parties wish to modify certain of their respective obligations under the SDA in a manner effective as between the Letter Parties and the other members of their respective Groups, but not the MatCo Parties or the Third-Party Beneficiaries (except as expressly set forth in Section 6.03(b) of this Agreement);

WHEREAS, the Letter Parties wish to modify certain of their respective obligations under the EMA in a manner effective as between the Letter Parties and the other members of their respective Groups, but not the MatCo Parties or the Third-Party Beneficiaries (except as expressly set forth in Section 6.03(b) of this Agreement); and

WHEREAS, the Letter Parties wish to enter into certain additional agreements in a manner effective as between the Letter Parties and the other members of their respective Groups but not the MatCo Parties or the Third-Party Beneficiaries;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, provisions and covenants contained in this Agreement, the Parties hereby agree as follows:

**ARTICLE I**
**SCHEDULES UPDATES.**

Section 1.01    Each of the Letter Parties hereby agrees on behalf of itself and each other member of its Group that the following schedules to the SDA are to be treated for all purposes as if they have been amended to reflect the changes set forth on Schedule I hereto.

1

## ARTICLE II
## SDA AMENDMENTS, MODIFICATIONS AND SUPPLEMENTS.

Each of the Letter Parties hereby agrees on behalf of itself and each other member of its Group that the SDA is amended, modified and/or supplemented to reflect the changes set forth below:

Section 2.01    Intergroup Accounts. Section 2.3(a)(ii) of the SDA and any references to Section 2.3(a)(ii) of the SDA are deleted in their entirety, and a new Section 2.3(d) is added to the SDA as follows:

Each of AgCo and SpecCo shall cause (i) all intercompany receivables, payables and balances (other than loans) that are due on or prior to the AgCo Distribution Date and (ii) all intercompany loans as of immediately prior to the AgCo Distribution Date (regardless of when due and payable), in each case, between any member of the AgCo Group on the one hand and any member of the SpecCo Group on the other hand (other than those in place as of the Tower Realignment Time between (x) a member of Historical Dow that is a member of the AgCo Group on the one hand and (y) a member of Historical Dow that is a member of the SpecCo Group on the other hand) to be settled immediately prior to the AgCo Distribution Date, by means of cash payment, a dividend, capital contribution, a combination of the foregoing or otherwise (with the obligation to settle each such amount constituting an Agriculture Liability in case the obligor is a member of the AgCo Group and a Specialty Products Liability in case the obligor is a member of the SpecCo Group).

Section 2.02    Shared Historical DuPont Assets and Shared Historical DuPont Liabilities.

(a)    Section 7.1(f) of the SDA is amended and restated in its entirety as follows:

Not more than thirty (30) Business Days after the end of a fiscal quarter, the AgCo Representative shall deliver to the SpecCo Representative, and the SpecCo representative shall deliver to the AgCo Representative, a statement of out-of-pocket expenses incurred in respect of any and all AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities and AgCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities (in the case of AgCo) (the "AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement") or any and all SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities and SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liabilities (in the case of SpecCo) (the "SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement"), but in each case, without giving effect to the AgCo Hurdle or the SpecCo Hurdle, including

2

APP. 163

a calculation of the amount (if any) for which the other party is then liable pursuant to Section 8.13 and copies of all statements, invoices, bills and other documents related to each such expense. SpecCo, in the case of each AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement, and AgCo, in the case of each AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement, shall have sixty (60) days following delivery of each to object to any amount set forth therein by delivering a written statement of its objections to AgCo or SpecCo, respectively (the "AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement Objection Notice" and the "SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement Objection Notice", respectively). If SpecCo does not object to any amount set forth in the AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement within such sixty (60) day period, the AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement will be final, conclusive and binding on the parties. If AgCo does not object to any amount set forth in the SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement within such sixty (60) day period, the SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement will be final, conclusive and binding on the parties. If SpecCo, in the case of each AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement, and AgCo, in the case of each SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement, objects to any amount set forth in such statement within such sixty (60) day period, the AgCo Representative and SpecCo Representative shall negotiate in good faith to resolve such objections at the next scheduled meeting of the Shared Historical DuPont Claim Committee (the "First Shared Historical DuPont Escalation Negotiation Period"). In the event that the Shared Historical DuPont Claim Committee cannot reach a unanimous resolution regarding the objections, the issue shall be submitted to the general counsels of AgCo and SpecCo and/or such other executive officer designated by AgCo and SpecCo in writing (the "Shared Historical DuPont Escalation Committee"). The Shared Historical DuPont Escalation Committee shall thereupon negotiate for a reasonable period of time to settle such issue; provided, however, that such reasonable period shall not, unless otherwise agreed by AgCo and SpecCo in writing, exceed thirty (30) days from the date on which the matter was submitted to the Shared Historical DuPont Escalation Committee (the "Second Shared Historical DuPont Escalation Negotiation Period"). If the issue has not been resolved for any reason as of the expiration of the Second Shared Historical DuPont Escalation Negotiation Period, such disagreement shall be submitted to final and binding arbitration pursuant to the procedures set forth in Article X of this Agreement. The outcome of the arbitration pursuant to Article X shall be final and binding on all parties and their respective successors and assigns.

3

(b)     The statement of out-of-pocket expenses referred to in Section 7.1(f) of the SDA shall be in the form attached hereto as Exhibit A.

(c)     The definition of "Dispute Notice" in Section 1.1(90) shall be amended to correct a scrivener's error by adding the following underlined text:

"Dispute Notice" shall mean (i) the General Dispute Notice, (ii) Non-Compete Dispute Notice (iii) the New Shared Matter Notice, (iv) <u>(A)</u> the AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement Objection Notice <u>and (B) the SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability Statement Objection Notice</u>, (v) the Managing Party Determination Notice, (vi) the Shared Historical DuPont Assets and Liabilities Notice, (vii) the Privilege Waiver Objection Notice or (viii) Indemnification Notice, as applicable.

(d)     Section 7.2(c)(i) and (ii) of the SDA is amended and restated in their entirety as follows:

(i)     If any Party or any member of such Party's Group shall receive notice or otherwise learn of an Asset that may reasonably be determined to be a Shared Historical DuPont Asset or a Liability or Third Party Claim that may reasonably be determined to be a Shared Historical DuPont Liability (including any Third Party Claim brought against AgCo and/or SpecCo for any AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities or any SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities that, in each case, would reasonably be expected to cause the AgCo Hurdle and SpecCo Hurdle to be met), such Party shall give the other Party and the Shared Historical DuPont Claim Committee written notice (the "Managing Party Determination Notice") thereof promptly (and in any event within fifteen (15) days) after such Person becomes aware of such Asset, Liability or Third Party Claim. Thereafter, the Party shall deliver to the Shared Historical DuPont Claim Committee, promptly (and in any event within five (5) Business Days) after the Party's (or its Group's or its or their respective then-Affiliates) receipt thereof, copies of all notices and documents (including court papers) received by the Party or the member of such Party's Group (or its or their respective then-Affiliates) relating to the matter; <u>provided</u>, <u>however</u>, that the failure to provide such notice shall not release any Party from any of its obligations under this <u>Article VII</u> or under <u>Article VIII</u> except and solely to the extent that such Party (or a member of its Group) shall have been actually prejudiced as a result of such failure.

4

APP. 165

(ii)    Subject to Section 7.1(c), SpecCo shall serve as the Managing Party with respect to Shared Historical DuPont Assets and Shared Historical DuPont Liabilities not set forth in <u>Schedule 7.1(a)(i)</u> or <u>Schedule 7.1(a)(ii)</u>. Within fifteen (15) days of a Managing Party Determination Notice, AgCo may give SpecCo notice, that AgCo believes in good faith that it should serve as the Managing Party (a "Shared Historical DuPont Managing Party Notice"). The Shared Historical DuPont Claim Committee shall meet to discuss the appropriate Managing Party promptly (and in any event within five (5) days of such Shared Historical DuPont Managing Party Notice) (such discussions, the "Shared Historical DuPont Managing Party First Discussion"). In the event that the Shared Historical DuPont Claim Committee agrees, AgCo shall then serve as the Managing Party. In the event that the Shared Historical DuPont Claim Committee cannot reach a unanimous determination as to the appropriate Managing Party, the issue shall be submitted to the Shared Historical DuPont Escalation Committee. The Shared Historical DuPont Escalation Committee shall thereupon discuss for a reasonable period of time to settle such issue; provided, however, that such reasonable period shall not, unless otherwise agreed by each of AgCo and SpecCo in writing, exceed five (5) Business Days from the date on which the matter was submitted to the Shared Liability Escalation Committee (the "Shared Historical DuPont Escalation Discussion Period" and such discussions, the "Shared Historical DuPont Escalation Discussions"). In resolving which Party shall act as the Managing Party with respect to any such Shared Historical DuPont Asset or Shared Historical DuPont Liability, the Shared Historical DuPont Claim Committee shall consider (i) the allocation of Shared Historical DuPont Assets or Shared Historical DuPont Liabilities reflected in <u>Schedule 7.1(a)(i)</u> and <u>Schedule 7.1(a)(ii)</u>, whereby the Parties have assigned control of matters known as of the date of this Agreement, which may have precedential value for allocation of similar matters that were not known as of the date of this Agreement, (ii) whether the designation of a Party as the Managing Party, would reasonably be expected to materially and adversely prejudice the position of another Party or a member of such Party's Group in any other Action or matter arising out of substantially similar facts or circumstances and (iii) in the case of a Third Party Claim, whether the Third Party Claim names both AgCo and SpecCo (or any member of such Parties' respective Groups) as defendants, in which case, the Shared Historical DuPont Claim Committee shall consider whether both AgCo and SpecCo may jointly act as the

5

Managing Party. If the issue has not been resolved for any reason as of the expiration of the Shared Historical DuPont Escalation Discussion Period, then such matter shall be resolved pursuant to and in accordance with the dispute resolution provisions set forth in Article X.

Section 2.03    Schedule 1.1(31)(xii)(a)(1) Matters. Any and all rights, title and interest in, and to, including any proceeds of any kind arising out of, the matters set forth on Schedule 1.1(31)(xii)(a)(1) of the SDA shall be allocated between members of the AgCo Group and SpecCo Group as set forth thereon.

Section 2.04    Additional Obligations With Respect to Management of AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities and SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities.

(a)    Notwithstanding anything to the contrary in Section 8.5(b)(A) of the SDA and subject to Section 2.04(b) of this Agreement, in the event that (i) AgCo is managing any Third Party Claim for any AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities and thereafter such claim causes the AgCo Hurdle to be met ("AgCo Hurdle Excess Claims") or (ii) SpecCo is managing any Third Party Claim for any SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities and thereafter such claim causes the SpecCo Hurdle to be met ("SpecCo Hurdle Excess Claims"), each of AgCo and SpecCo and the members of their respective Groups agree that AgCo (in the case of such AgCo Hurdle Excess Claims) or SpecCo (in the case of SpecCo Hurdle Excess Claims), as applicable, shall continue to manage such claims (the "Continuing Managing Party") if the Shared Historical DuPont Claim Committee determines that is appropriate and otherwise management of such Third Party Claim shall transition to the other Party over a reasonable time period (as determined by the Shared Historical DuPont Claim Committee) until both Hurdles have been met; provided, however, (I) in the cause of clause (i), if prior to the time such Third Party Claim causes the AgCo Hurdle to be met, such Third Party Claim would reasonably be expected to (taking into account other existing Third Party Claims) cause the AgCo Hurdle to be met, SpecCo shall be entitled (but shall not be required) to assume and control the defense of any such Third Party Claim subject to Section 8.5(b) of the SDA if the SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities with respect to such Third Party Claim (or series of related Third Party Claims) would reasonably be expected to exceed the AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities with respect to such Third Party Claim (or series of related Third Party Claims) and (II) in the cause of clause (ii), if prior to the time such Third Party Claim causes the SpecCo Hurdle to be met, such Third Party Claim would reasonably be expected to (taking into account other existing Third Party Claims) cause the SpecCo Hurdle to be met, AgCo shall be entitled (but shall not be required) to assume and control the defense of any such Third Party Claim subject to Section 8.5(b) of the SDA if the AgCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities with respect to such Third Party Claim (or series of related Third Party Claims) would reasonably be expected to exceed the SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liabilities with respect to such Third Party Claim (or series of related Third Party Claims).

6

(b)  The applicable Continuing Managing Party shall, on behalf of itself and the other Party, have sole and exclusive authority to defend and determine all matters whatsoever (including, as applicable, litigation strategy and choice of legal counsel or other professionals) with respect to any AgCo Hurdle Excess Claims or SpecCo Hurdle Excess Claims, as applicable; provided, however, that (i) the Continuing Managing Party shall deliver to each other Party a reasonably complete draft of any submission (formal or informal) at least seven (7) Business Days prior to filing such submission with a court or grand jury, any Governmental Entity or any arbitration or mediation tribunal or authority (unless a shorter time period is necessary due to the nature of the Action or Third Party Claim, in which case, the Continuing Managing Party shall use its reasonable best efforts to provide the submission to the other Party within a time period reasonably appropriate for such Action or Third Party Claim) and (ii) the Continuing Managing Party shall not admit any liability with respect to, consent to entry of any judgment of, or settle, compromise or discharge, the Action or Third Party Claim without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed); provided, further, that in the case of clause (i), that the Continuing Managing Party's Representative will use its reasonable best efforts to actively consult with each other Party's Representative regarding any changes, which it shall consider in good faith making to the submission, with particular focus on any changes the omission of which would reasonably be expected to (x) materially prejudice the other Party's obligations, rights or remedies with respect to the subject matter underlying such Action or Third Party Claim or (y) have a significant adverse impact (financial or non-financial) on the other Party, including a significant adverse impact on the other Party's rights, obligations, operations, standing or reputation (unless such consultation is not possible due to the nature of the Action or Third Party Claim or the other Party's failure to respond to the submission within three (3) Business Days after receipt of the submission, in which case, the Continuing Managing Party may file the submission if the Continuing Managing Party determines in good faith that the filing will not materially prejudice the other Party's rights or remedies); provided, still further, that the Continuing Managing Party shall not be obligated to provide the other Party with the opportunity to review the submission if such submission contains solely disclosure with respect to the applicable Shared Historical DuPont Asset or Shared Historical DuPont Liability that is substantially similar in all respects to disclosure previously made in accordance with the terms hereof. applicable Shared Historical DuPont Asset or Shared Historical DuPont Liability that is substantially similar in all respects to disclosure previously made in accordance with the terms hereof.

Section 2.05   Shared Contracts. The Contracts described in Item 7 of Schedule I of this Agreement constitute Shared Contracts as between the SpecCo Group and the AgCo Group.

Section 2.06   Certain Costs. The costs described in Item 9 of Schedule I shall be treated as set forth therein.

7

## ARTICLE III
## EMA AMENDMENTS, MODIFICATIONS AND SUPPLEMENTS.

Each of the Letter Parties hereby agrees on behalf of itself and each other member of its Group that the EMA is amended, modified and/or supplemented to reflect the changes set forth below:

Section 3.01    Certain Employee Related Liabilities.

(a)    Notwithstanding anything to the contrary in the EMA or the SDA, for purposes of Section 1.16(a) of the EMA, the Agriculture Shared Historical DuPont Percentage of the HR Liabilities (as defined in the EMA) related to any Heritage DuPont Employee (as defined in the EMA) who (a) (i) is employed as of the AgCo Distribution Date by a member of the AgCo Group or SpecCo Group in a leveraged, corporate functional role, (ii) is identified on Schedule 1.02(a) to the EMA as a Deselected Employee (as defined in the EMA) and (iii) terminates employment on or before August 31, 2019, or (b) terminated employment with Heritage DuPont in a leveraged corporate functional role prior to October 2017, shall be deemed to constitute AgCo HR Liabilities (as defined in the EMA).

(b)    Notwithstanding anything to the contrary in the EMA or the SDA, for purposes of Section 1.16(a) of the EMA, the Specialty Products Shared Historical DuPont Percentage of the HR Liabilities (as defined in the EMA) related to any Heritage DuPont Employee (as defined in the EMA) who (a) (i) is employed as of the AgCo Distribution Date by a member of the AgCo Group or SpecCo Group in a leveraged, corporate functional role, (ii) is identified on Schedule 1.02(a) to the EMA as a Deselected Employee (as defined in the EMA) and (iii) terminates employment on or before August 31, 2019, or (b) terminated employment with Heritage DuPont in a leveraged corporate functional role prior to October 2017, shall be deemed to constitute SpecCo HR Liabilities (as defined in the EMA).

Section 3.02    Certain Plans.

(a)    Section 2.07(b) of the EMA is amended by adding the following clauses (iii) and (iv):

(iii)    SpecCo (or its applicable Affiliate) shall assign to E. I. du Pont de Nemours and Company and E. I. du Pont de Nemours and Company shall (and AgCo shall cause it to) assume from the applicable members of the SpecCo Group all of the rights and obligations of the sponsor of the Pension Restoration Plan for Title V of the DuPont Pension and Retirement Plan, the Retirement Restoration Plan for Title V of the DuPont Pension and Retirement Plan and the Solae Supplemental Retirement Plan (the "Transferred S-A Plans");

(iv)    SpecCo shall direct the trustee of the Existing Rabbi Trust to Transfer to the trustee of the New Rabbi Trust, in kind, such portion of the "Plan Accounts" under the Existing Rabbi Trust attributable to the Transferred S-A Plans.

8

APP. 169

Section 3.03    Certain Swiss Pension Matters. Without limiting Section 1.10(b) of the EMA and to clarify the treatment of the Fondation de Prévoyance en Faveur du Personnel de DuPont De Nemours International Sàrl (the "Swiss DB Plan") provided therein:

(a)    The Transfer in respect of the Swiss DB Plan contemplated by Section 1.10(b) of the EMA shall not occur as of the AgCo Distribution Date. The Letter Parties shall cooperate so that, effective December 31, 2019, SpecCo shall cause the assignment to AgCo (or such member of the AgCo Group or a defined contribution retirement plan as AgCo may designate) and AgCo shall assume (or cause such member of the AgCo Group or such plan to assume), as of the date of such assignment/assumption (the "Swiss DB Plan Transfer Date"), the Assets and Liabilities of the Swiss DB Plan attributable to such participants in the Swiss DB Plan who as of the Swiss DB Plan Transfer Date are employees of any member of the AgCo Group (the "Swiss DB Transfer Participants") together with any transition pension benefits and (if applicable) Transferee Pension Guide ("TPG") benefits attributable to Swiss DB Transfer Participants as of the AgCo Distribution Date (such transition and TPG benefits, the "Transition Benefits"). SpecCo shall ensure that, as of the Swiss DB Plan Transfer Date, such Assets attributable to any Swiss DB Transfer Participant shall not be less than the respective Liabilities.

(b)    For the period in 2019 on and after the AgCo Distribution Date through the Swiss DB Plan Transfer Date, AgCo shall contribute (or cause to be contributed) to the Swiss DB Plan in respect of those participants therein who are employees of any member of the AgCo Group such amount as is required pursuant to the local funding agreement in respect of such employment (*i.e.*, the amount set forth on Schedule 3.03(b) hereto).

(c)    Except as provided in and subject to the foregoing provisions of this Section 3.03, on and after the AgCo Distribution Date, SpecCo shall discharge (or cause to be discharged) all obligations of any member of the AgCo Group in respect of the Swiss DB Plan and all Transition Benefits in respect of Swiss DB Transfer Participants.

Section 3.04    Rabbi Trust. SpecCo acknowledges that AgCo may not cause the establishment of the New Rabbi Trust referenced in Section 2.07(b)(ii) of the EMA on or before AgCo Distribution Date and agrees that the obligations imposed upon SpecCo under Section 2.07(b)(ii) of the EMA shall apply from such time as AgCo causes the establishment of the New Rabbi Trust (and regardless whether the New Rabbi Trust is established by AgCo or a Subsidiary thereof).

Section 3.05    Certain Informational Requirements No Longer Necessary.

(a)    Notwithstanding Section 1.01(c) of the EMA, neither AgCo nor SpecCo shall be required to update Schedule 1.01(a) or Appendix 1 thereto, other than to reflect the return of any LTD Employee (as defined in the EMA) in accordance with clause (y) of the final sentence of Section 1.01(c) of the EMA.

(b)    Notwithstanding Section 1.06(b) of the EMA, (i) AgCo shall not be required to provide SpecCo with a statement of SpecCo Assumed Vacation Liabilities (as defined in the EMA), and (ii) SpecCo shall not be required to provide AgCo with a Statement of AgCo Assumed Vacation Liabilities (as defined in the EMA).

9

APP. 170

# ARTICLE IV
## ADDITIONAL AGREEMENTS.

Each of the Letter Parties hereby agrees on behalf of itself and each other member of its Group:

Section 4.01    Certain Requirements Related to Transfers.

(a)    After the Distribution Date, until the End Date or such earlier time as SpecCo's obligations pursuant to this Section 4.01 shall be terminated in accordance with Section 4.02, without the prior written consent of the Other Party, SpecCo shall not, and shall cause its Subsidiaries not to, directly or indirectly, sell, transfer or otherwise dispose of any business or asset of SpecCo and its consolidated Subsidiaries to any Person that is not a Subsidiary of SpecCo at such time, including by way of a Spin-Off (a "SpecCo Transfer"), unless (i) the Transfer is an Exempted Transfer, (ii) the Transfer would meet both the Minimum EBITDA Condition and the Credit Rating Condition or (iii) the Transfer would meet the Indemnification Condition.

(b)    After the Distribution Date, until the End Date or such earlier time as AgCo's obligations pursuant to this Section 4.01 shall be terminated in accordance with Section 4.02, without the prior written consent of the Other Party, AgCo shall not, and shall cause its Subsidiaries not to, directly or indirectly, sell, transfer or otherwise dispose of any business or asset of AgCo and its consolidated Subsidiaries to any Person that is not a Subsidiary of AgCo at such time, including by way of a Spin-Off (an "AgCo Transfer"), unless (i) the Transfer is an Exempted Transfer, (ii) the Transfer would meet both the Minimum EBITDA Condition and the Credit Rating Condition or (iii) the Transfer would meet the Indemnification Condition.

(c)    The "Minimum EBITDA Condition" in respect of any Transfer is satisfied if the amount equal to AgCo's or SpecCo's, as applicable, Pro Forma Operating EBITDA (measured at the time of the Transfer, including the effects of such Transfer and any Qualifying Deposit in connection with such Transfer, and any previous Transfer or Qualifying Deposit by or on behalf of AgCo or any of its Subsidiaries or SpecCo or any of its Subsidiaries, as applicable, after the beginning of the Relevant Period) is greater than or equal to SpecCo's or AgCo's, as applicable, Minimum EBITDA (measured at the time of such Transfer, including the effects of such Transfer and any Qualifying Deposit in connection with such Transfer).

(d)    The "Credit Rating Condition" in respect of any Transfer is satisfied if there is not related to such Transfer a Below Required Credit Rating Event with respect to AgCo or SpecCo, as applicable.

(e)    The "Indemnification Condition" in respect of any Transfer is satisfied if:

(i)    the Transfer meets the Assumption Condition and the aggregate fair value of SpecCo's or AgCo's, as applicable, Legacy Liabilities assumed (including pursuant to a contractual indemnity made in favor of the Other Party or a guarantee made in favor of the Other Party's Indemnitees) by the

10

transferee in such Transfer (or by the Ultimate Parent Entity if such Transfer is by way of a Spin-off), is greater than or equal to the product of (x) the quotient of (i) the Pro Forma Operating EBITDA attributable to the business and assets subject to such Transfer (measured at the time of such Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) divided by (ii) the Pro Forma Operating EBITDA (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) of SpecCo or AgCo, as applicable, multiplied by (y) the Remaining Aggregate Fair Indemnification Value (measured at the time of such Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) of SpecCo or AgCo, as applicable; or

(ii)    SpecCo or any of its Subsidiaries or AgCo or any of its Subsidiaries, as applicable, effects or makes (or causes to be effected or made) substantially concurrently with the Transfer, a Qualifying Deposit in an amount greater than or equal to (x) the quotient of (i) the Pro Forma Operating EBITDA attributable to the business and assets subject to such Transfer (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) divided by (ii) the Pro Forma Operating EBITDA of SpecCo or AgCo, as applicable, (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) multiplied by (y) the Remaining Aggregate Fair Indemnification Value (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer).

(f)    For purposes of this Section 4.01 and Section 4.02, the following terms shall have the following meanings:

(i)    "Aggregate Fair Indemnification Value", at any time, means the aggregate fair value of the Legacy Liabilities of SpecCo or AgCo, as applicable, as (i) agreed in writing by AgCo or SpecCo, as applicable, and the Other Party or (ii) as determined by the Valuation Expert, absent manifest error or fraud by a Party or its Representatives in delivering Information to the Valuation Expert, provided that, in case of any determination by the Valuation Expert, the Valuation Expert shall take into consideration, among such other factors as it may deem reasonably relevant based on its expertise any pending Notices of Indemnifiable Losses, other Third Party Claims and the value of indemnification rights against other Persons under Contract or applicable law but, for the avoidance of doubt, excluding the value of indemnification rights the relevant Indemnitees may have from any assignment or guaranty of Legacy Liabilities by an Assuming Transferee.

(ii)    "Aggregate Indemnification Reduction Quotient" means, at any time, the product of all Tracked Reduction Quotients for AgCo or SpecCo, as applicable, prior to such time.

11

(iii)    "<u>Assuming Transferee</u>" means, with respect to any Transfer, the transferee (or the Ultimate Parent Entity if such Transfer is by way of a Spin-Off) in such Transfer.

(iv)    "<u>Assumption Condition</u>" means the condition that is met if (x) in respect of a Transfer that meets both the Minimum EBITDA Condition and the Credit Rating Condition, both of the following conditions are met or (y) in respect of a Transfer that does not meet both the Minimum EBITDA Condition and the Credit Rating Condition, the first condition listed below is met:

(1)    the Assuming Transferee in such Transfer agrees in favor of the members of the Other Party's Group (pursuant to a Contract with the Other Party or to which the members of the Other Party's Group are third party beneficiaries of transferee's covenants and obligations described in this Section 4.01) to comply with the provisions of this Section 4.01 from and after the time of such Transfer as if it were AgCo, in case of an AgCo Transfer, or SpecCo, in case of a SpecCo Transfer, (A) other than the references to AgCo and SpecCo in the definitions of "Other Party", "Valuation Expert" and sections (i) and (ii) of "Aggregate Fair Indemnification Value" and (B) substituting (x) the amount equal to (i) the Indemnification Reduction Quotient for such Transfer multiplied by (ii) SpecCo's or AgCo's, as applicable, Minimum EBITDA (measured at the time of such Transfer, prior to giving effect to such Transfer) for the value of Minimum EBITDA and (y) the Legacy Liabilities assumed (including pursuant to a contractual indemnity made in favor of the Other Party or a guarantee made in favor of the Other Party's Indemnitees) by the Assuming Transferee in such Transfer for the definition of Legacy Liabilities.

(2)    there is not related to such Transfer a Below Required Rating Event with respect to the Assuming Transferee.

(v)    "<u>Below Required Credit Rating Event</u>" means, with respect to any Transfer and AgCo, SpecCo or an Assuming Transferee, as applicable:

(1)    if such Person has Rated Indebtedness: that (i) if the Pro Forma Operating EBITDA attributable to the business and assets subject to such Transfer (other than Transfers of all or part of the SpecCo Non-Core Business and excluding any Pro Forma Operating EBITDA attributable thereto) (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) exceeds, in the case of AgCo, the amount set forth for AgCo on Schedule 4.01(f)(v) or in the case of SpecCo, the amount set forth for SpecCo on Schedule 4.01(f)(v), it fails for any of its Rated Indebtedness to obtain a Positive Advisory Rating Opinion in respect of such Transfer prior to the occurrence of such Transfer or (ii) with respect to any other Transfer, any of its Rated Indebtedness is rated below a Required Credit Rating by each of the applicable Rating Agencies that provide a rating of such Rated Indebtedness on any date following public notice of an arrangement that

12

could result in such Transfer until the end of the sixty (60) day period following public notice of the occurrence of such Transfer (which sixty (60) day period shall be extended so long as the rating of such Rated Indebtedness is under publicly announced consideration for possible downgrade by any of the Rating Agencies to a rating that is below a Required Credit Rating); provided that if it obtains a Positive Advisory Rating Opinion in respect of such Transfer with respect to any of its Rated Indebtedness prior to the occurrence of such Transfer, such Transfer shall be deemed to not result in a Below Required Credit Rating Event with respect to such Rated Indebtedness (although such Transfer may still result in a Below Required Credit Rating Event as a result of any Rated Indebtedness for which it does not so obtain a Positive Advisory Rating Opinion);

(2)    if such Person does not have any Rated Indebtedness: that the ratio of such Person's consolidated net liabilities to Pro Forma Operating EBITDA is below (measured at the time of the Transfer, including the effects of such Transfer and any Qualifying Deposit in connection with such Transfer) the applicable ratio that generally would be required by at least two of the Rating Agencies to rate indebtedness of such Person (taking into account the industries in which it operates) with a Required Credit Rating.

(vi)    "End Date" means June 1, 2044; provided, that if the Indemnifiable Losses from Actions in respect of Legacy Liabilities to the extent arising out of, related to or resulting from the matters set forth on Schedule 4.01(f)(vi) (the "Tested Liabilities") paid or payable in compliance with the terms of the SDA and this Agreement exceed $10,000,000 in any one of the three (3) immediately preceding consecutive twelve (12) month periods prior to such date, the End Date shall be extended to the date (June 1) that is the first quinquennial anniversary of June 1, 2044, on which the Tested Liabilities paid or payable in compliance with the terms of the SDA and this Agreement do not exceed $10,000,000 in each of the three (3) immediately preceding consecutive twelve (12) month periods prior to such date.

(vii)    "Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right (other than Indebtedness that is convertible into, or exchangeable for, any such equity interest) entitling the holder thereof to purchase or otherwise acquire any such equity interest.

(viii)    "Exempted Transfer" means, with respect to any Person, any of the following by such Person or any of its Subsidiaries (i) any direct or indirect sale, transfer or other disposition of assets in the ordinary course of business, (ii) any direct or indirect sale, transfer or other disposition of obsolete inventory and equipment, (iii) any distributions of cash or cash equivalents to its stockholders or its Ultimate Parent Entity and/or (iv) any pro rata distributions and contractually required distributions to other holders of its Equity Interests.

13

      (ix)   "<u>Indemnification Account</u>" means, with respect to SpecCo or AgCo, as applicable, (i) any "qualified settlement fund" (as defined in the Internal Revenue Code) established by SpecCo in respect of any potential or actual SpecCo Legacy Liability or established by AgCo in respect of any potential or actual AgCo Legacy Liability and (ii) any account with a trustee or escrow agent, in each case established in accordance with the terms set forth on Schedule 4.01(f)(ix) hereto.

      (x)   "<u>Indemnification Reduction Quotient</u>" means, with respect to SpecCo or AgCo, as applicable:

      (1)   for any Transfer meeting the Assumption Condition, an amount equal to the lower of (A) the quotient of (x) the aggregate fair value of the Legacy Liabilities of SpecCo or AgCo, as applicable, assumed (including pursuant to a contractual indemnity made in favor of the Other Party or a guarantee made in favor of the Other Party's Indemnitees) by the transferee in such Transfer (or by the Ultimate Parent Entity if such Transfer is by way of a Spin-Off) (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) divided by (y) the Remaining Aggregate Fair Indemnification Value for SpecCo or AgCo, as applicable (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) and (B) the quotient of (x) the Pro Forma Operating EBITDA attributable to the business and/or assets subject to such Transfer (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer) divided by (y) SpecCo's or AgCo's, as applicable, Pro Forma Operating EBITDA (measured at the time of the Transfer, but prior to giving effect to such Transfer and any Qualifying Deposit in connection with such Transfer);

      (2)   for any Qualifying Deposit by or on behalf of SpecCo or any of its Subsidiaries or AgCo or any of its Subsidiaries, as applicable, an amount equal to the quotient of (x) the amount of such Qualifying Deposit divided by (y) the Remaining Aggregate Fair Indemnification Value of SpecCo or AgCo, as applicable (measured at the time of the SpecCo Qualifying Deposit, but prior to giving effect to such Qualifying Deposit).

      (xi)   "<u>Legacy Liabilities</u>" means, at any time, with respect to SpecCo or AgCo, as applicable, its indemnification obligations to the Other Party's Indemnitees pursuant to the Separation Agreement, Employee Matters Agreement and/or Tax Matters Agreement, in each case to the extent such obligations relate to a Liability that is (i) in case of SpecCo, a SpecCo Group Excess DuPont Discontinued and/or Divested Operations and Business Liability, SpecCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liability, Specialty Products Related DuPont Discontinued and/or Divested Operations and Business Liability or a Shared Historical DuPont Liability or (ii) in case of AgCo, an AgCo Group Excess DuPont Discontinued

14

APP. 175

and/or Divested Operations and Business Liability, AgCo Group Specified DuPont Discontinued and/or Divested Operations and Business Liability, Agriculture Products Related DuPont Discontinued and/or Divested Operations and Business Liability or a Shared Historical DuPont Liability.

    (xii)    "Minimum EBITDA" means:

    (1)    in respect to SpecCo, (x) $2,500,000,000 multiplied by (y) the larger of (i) SpecCo Aggregate Indemnification Reduction Quotient (for all Transfers and Qualifying Deposits prior to such Transfer and any Qualifying Deposit in connection with such transfer), and (ii) zero (0).

    (2)    in respect to AgCo, (x) $833,000,000 multiplied by (y) the larger of (i) the AgCo Aggregate Indemnification Reduction Quotient (for all Transfers and Qualifying Deposits prior to such Transfer and any Qualifying Deposit in connection with such transfer), and (ii) zero (0).

    (xiii)    "Other Party" means with respect to (i) an AgCo Transfer, SpecCo and (ii) a SpecCo Transfer, AgCo; and "Other Party's Group" and "Other Party's Indemnitees" have correlative meanings.

    (xiv)    "Positive Advisory Rating Opinion" means, with respect to any Transfer and any Rated Indebtedness of AgCo, SpecCo or an Assuming Transferee, as applicable, that (i) it provides each of the applicable Rating Agencies that provides a rating of such Rated Indebtedness with all relevant material information with respect to such Transfer, including the use of the proceeds to be received by it in such Transfer, which information is accurate in all material respects, and (ii) having provided each such Rating Agency with all such information, it obtains a written advisory opinion (following a RAS, RES or similar review by the Rating Agency) from at least two (2) Rating Agencies that such Rated Indebtedness will continue to have a Required Credit Rating following such Transfer and provides the Other Party with a copy of such opinion.

    (xv)    "Pro Forma Operating EBITDA" means pro forma earnings (i.e. pro forma Income (loss) from continuing operations before income taxes) before interest, depreciation, amortization, non-operating pension / other postemployment benefits ("OPEB") / charges, and foreign exchange gains / losses, excluding the impact of (x) adjusted significant items publicly disclosed as adjustments in reconciliations to GAAP figures and (y) costs historically allocated to the Materials Science Business and/or Agriculture Business (in the case of SpecCo) or the Materials Science Business and/or Specialty Products Business (in the case of AgCo).

    (xvi)    "Qualifying Deposit" means any deposit of Cash and Cash Equivalents or Marketable Securities by (or on behalf of) any member of the AgCo Group or SpecCo Group, as applicable, into an Indemnification Account.

15

(xvii)    "Rated Indebtedness" means, with respect to AgCo, SpecCo or an Assuming Transferee, as applicable, any of its indebtedness, or of any of its material Subsidiaries, that is rated by one or more of the Rating Agencies.

(xviii)    "Rating Agencies" means, with respect to AgCo, SpecCo or an Assuming Transferee, as applicable, (i) any of Fitch, Moody's and S&P or (ii) a credit rating agency registered as a "nationally recognized statistical rating organization" with the SEC and selected by AgCo, SpecCo or the Assuming Transferee, as applicable.

(xix)    "Relevant Period" means, at any specific time, the four (4) consecutive fiscal quarter period ending with the end of the most recently completed fiscal quarter for which the financial statements have not ceased to comply with the rules for age of financial statements (regardless of whether such rules are otherwise applicable to such financial statements) pursuant to Section 1200 of the Division of Corporation Finance Financial Reporting Manual or, in the case of a foreign private issuer as determined in accordance with Rule 405 of the Securities Act or Rule 3b-4 of the Exchange Act, Section 6220 of the Division of Corporation Finance Financial Reporting Manual.

(xx)    "Remaining Aggregate Fair Indemnification Value", at any time, with respect to AgCo or SpecCo, as applicable, means the product of (x) SpecCo's or AgCo's, as applicable, Aggregate Fair Indemnification Value (measured at such time) multiplied by (y) the larger of (i) AgCo's or SpecCo's, as applicable, Aggregate Indemnification Reduction Quotient (for all Transfers and any Qualifying Deposit by or on behalf of AgCo or any of its Subsidiaries or SpecCo or any of its Subsidiaries, as applicable, prior to such time), and (ii) zero (0).

(xxi)    "Required Credit Rating" means a rating equal to or higher than BB+ (or the equivalent) by Fitch, Ba1 (or the equivalent) by Moody's, BB+ (or the equivalent) by S&P, or in each such case, an equivalent rating of any replacement agency for Fitch, Moody's or S&P, as applicable, if such agency is no longer registered as a "nationally recognized statistical rating organization" with the SEC.

(xxii)    "SpecCo Non-Core Business" means the assets and business in SpecCo's Non-Core reporting segment as of June 1, 2019 (and natural evolutions thereof that are not, as of June 1, 2019, in one of SpecCo's other reporting segments).

(xxiii)    "Spin-Off" with respect to AgCo or SpecCo, as applicable, a distribution of the outstanding common stock of one or more Persons holding any of its business or assets, and/or any of its Subsidiaries, to its common stockholders, or to those of its Ultimate Parent Entity at such time.

16

(xxiv) "<u>Tracked Reduction Quotient</u>" means, with respect to each Indemnification Reduction Quotient, the value equal to (i) one (1) minus (ii) such Indemnification Reduction Quotient.

(xxv) "<u>Transfer</u>" means AgCo Transfer or SpecCo Transfer, as applicable.

(xxvi) "<u>Ultimate Parent Entity</u>" means, in respect of a Transfer by way of a Spin-off, the ultimate parent entity of the relevant Persons ceasing to be Subsidiaries of AgCo or SpecCo, as applicable.

(xxvii) "<u>Valuation Expert</u>" means an independent valuation expert of national repute reasonably acceptable to AgCo and SpecCo or as determined pursuant to Article X of the SDA.

(xxviii) "<u>Wholly-Owned Subsidiary</u>" means, for any Person, a Subsidiary of such Person of which securities (except for directors' and foreign national qualifying shares) or other ownership interests representing one hundred per cent (100%) of the outstanding Equity Interests are, at the time any determination is being made, owned, controlled (as such term is defined in the SDA) or held by such Person or one or more wholly owned Subsidiaries of such Person or by such Person and one or more wholly owned Subsidiaries of such Person.

Section 4.02    <u>Certain Matters with Respect to Captive Insurance</u>.

(a) From and after the Distribution Date, the Letter Parties shall cooperate in good faith to explore the possibility of, and consider in good faith, one or both of the Letter Parties forming and funding a captive insurance company to provide insurance coverage with respect to Legacy Liabilities (and/or such other liabilities as may be determined by the Letter Parties to be reasonably necessary or prudent at such time). Each of Letter Parties shall, and shall cause their respective Affiliates to, provide reasonable access and Information to the other Letter Party and its Representatives (and any Governmental Agency reasonably required in connection with the formation and funding of such captive insurer) in connection with the foregoing in accordance with Article X of the SDA.

(b) If a Letter Party (the "<u>Forming Party</u>") forms (and funds in compliance with applicable Law) a captive insurance company that has issued an insurance policy to the Forming Party in respect of Liabilities including at least all of the Forming Party's Legacy Liabilities (or such tranches of Legacy Liabilities as the Letter Parties mutually determine in good faith to be reasonably appropriate (with such mutual determination to be evidenced in a written agreement between the Letter Parties)) (the "<u>Qualifying Captive Policy</u>"), then (1) all of the Forming Party's obligations under Section 4.01 shall be deemed terminated from and after such time and (2) any funds held in any Indemnification Account of the Forming Party shall be permitted to be withdrawn. Prior to forming and funding such captive insurance company, obtaining the Qualifying Captive Policy and the selection of an actuary (which actuary shall be mutually agreed by the Forming Party and the Other Applicable Party or, in the event of

17

a Dispute regarding the selection of such actuary, an actuary of national repute with relevant expertise selected in accordance with Article X of the SDA (without giving effect to the General Negotiation Period with respect to such Dispute) (the "<u>Selected Actuary</u>")), (x) the Forming Party shall consult in good faith with the other Letter Party (the "<u>Other Applicable Party</u>") regarding the formation and funding of such captive insurance company and the terms of the Qualifying Captive Policy, (y) the Forming Party shall provide the Other Applicable Party with a draft of any proposed Qualifying Captive Policy, business plan and other material documentation (including any proposed third party reinsurance policy to be obtained by the captive insurance company) reasonably in advance of any submission to any insurance regulator of competent jurisdiction over such captive insurance company (the "<u>Insurance Regulator</u>") and shall consider in good faith any comments received from the Other Applicable Party, and (z) the Other Applicable Party shall have the right to make presentations and submissions to the Selected Actuary involved in designing the terms of any proposed Qualifying Captive Policy and/or obtaining any required approval from the Insurance Regulator; in addition, the Forming Party and the Other Applicable Party shall implement and agree to measures to maintain and cause to be maintained the confidentiality of Privileged Information and assert and maintain, and cause to be asserted and maintained, all applicable Privileges in any discussions with and submission(s) to any actuary and/or Insurance Regulator(s) and in any communications with each other regarding such matters.

## ARTICLE V
## ADDITIONAL INDEMNITIES

Section 5.01    SpecCo shall and shall cause the other members of the SpecCo Group to indemnify, defend and hold harmless AgCo (and any of its successors or permitted assigns) from and against any and all Indemnifiable Losses of the AgCo Indemnitees arising out of or resulting from the making of any claim, demand or offset, or commencement of any Action asserting any claim, demand or offset, including any claim for indemnification by any SpecCo Indemnitee against AgCo (or its applicable successor or permitted assigns) for any "Indemnifiable Losses" (as defined in the SDA prior to giving effect to this Agreement) that would not constitute "Indemnifiable Losses" under the SDA (and, in the case of Article III of this Agreement, the EMA) had the SDA (and, in the case of Article III of this Agreement, the EMA) been initially entered into as of the Effective Time in form and substance reflecting the terms of this Agreement (including, without limitation, any such claims premised on any argument that any SpecCo Indemnitee is not bound by this Agreement).

Section 5.02    AgCo shall and shall cause the other members of the AgCo Group to indemnify, defend and hold harmless SpecCo (and any of its successors or permitted assigns) from and against any and all Indemnifiable Losses of the SpecCo Indemnitees arising out of or resulting from the making of any claim, demand or offset, or commencement of any Action asserting any claim, demand or offset, including any claim for indemnification by any AgCo Indemnitee against SpecCo (or its applicable successor or permitted assigns) for any "Indemnifiable Losses" (as defined in the SDA prior to giving effect to this Agreement) that would not constitute "Indemnifiable Losses" under the SDA (and, in the case of Article III of this Agreement, the EMA) had the SDA (and, in the case of Article III of this Agreement, the EMA) been initially entered into as of the Effective Time in form and substance reflecting the terms of this Agreement (including, without limitation, any such claims premised on any argument that any AgCo Indemnitee is not bound by this Agreement).

18

## ARTICLE VI
## <u>MISCELLANEOUS.</u>

Each of the Letter Parties agrees on behalf of itself and the other members of its Group:

Section 6.01    <u>Entire Agreement</u>. This Agreement, including the Appendices hereto, and the SDA, including the Exhibits and Schedules thereto, shall constitute the entire agreement between the Letter Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments, course of dealings and writings with respect to such subject matter.

Section 6.02    Each of the Letter Parties agrees on behalf of itself and the other members of its Group:

(a)    not to bring any Action against, or send any Dispute Notice to, any member of the SpecCo Group or AgCo Group, respectively, that would be inconsistent with the agreements and covenants set forth herein;

(b)    in any matter between (or on behalf of, or in respect of) a member of the AgCo Group, on the one hand, and the SpecCo Group, on the other hand, (i) to treat the SDA and the schedules thereto as having been formally amended, modified and/or supplemented as set forth herein and (ii) not to assert that the SDA or schedules thereto have not been so amended, modified and/or supplemented (including due to the absence of MatCo as a party to this Agreement);

(c)    that they have waived any provision of the SDA that otherwise would or could operate to restrict or limit the effectiveness of this Agreement including, without limitation, any provision that would require MatCo to be a party to this Agreement; and

(d)    that, in the event of any conflict between this Agreement and the SDA, this Agreement shall control.

Section 6.03    <u>MatCo Parties; Third Party Beneficiaries</u>.

(a)    Nothing contained herein shall be construed as modifying or limiting any right, remedy or obligation any MatCo Party or Third-Party Beneficiary has under the SDA (provided, however, such claims may be subject to indemnification as between the Letter Parties pursuant to Article V, above), and provided further that the rights of certain Third Party Beneficiaries are expanded to the extent expressly set forth in Section 6.03(b) of this Agreement).

(b)    Except (i) any provisions of this Agreement that modify or supplement Article VIII of the SDA, Section 11.2 of the SDA and/or Section 11.8 of the SDA (including by modifying or supplementing the definitions of "Agriculture Liabilities" and/or "Specialty Products Liabilities"), to each of which the AgCo Group Indemnitees and SpecCo

19

Group Indemnitees are third party beneficiaries (subject to any termination of Section 4.01 in accordance with Section 4.02), and (ii) any provisions of this Agreement that modify Section 9.8 of the SDA to which Historical DuPont Counsel is a third party beneficiary, this Agreement is solely for the benefit of, and is only enforceable by, the Letter Parties and their permitted successors and assigns and should not be deemed to confer upon third parties any remedy, benefit, claim, liability, reimbursement, claim of Action or other right of any nature whatsoever, including any rights of employment for any specified period, in excess of those existing without reference to this Agreement.

Section 6.04    Schedules and Appendices. The Schedules and Appendices shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein. Nothing in the Schedules or Appendices constitutes an admission of any Liability or obligation of any member of the SpecCo Group or the AgCo Group or any of their respective Affiliates to any third party (including any member of the MatCo Group), nor, with respect to any third party (including any member of the MatCo Group), an admission against the interests of any member of the SpecCo Group or the AgCo Group or any of their respective Affiliates. The inclusion of any item or Liability or category of item or Liability on any Schedule or Appendix is made solely for purposes of allocating potential Liabilities among the Letter Parties and shall not be deemed as or construed to be an admission that any such Liability exists.

Section 6.05    Incorporation of Certain Provisions of the SDA by Reference. The provisions of Sections 10 (Dispute Resolution), 12.3 (Counterparts), 12.7 (Waivers), 12.8 (Amendments), 12.9 (Assignment) (as modified by Section 4.01 of this Agreement), 12.10 (Successors and Assigns), 12.13 (No Circumvention), 12.14 (Subsidiaries), 12.16 (Title and Headings), 12.18 (Governing Law), 12.19 (Specific Performance), 12.20 (Severability), 12.21 (No Duplication, No Double Recovery) of the SDA shall apply *mutatis mutandis* as if such provisions were set forth in full herein, provided, however, that any reference to "Parties" in such provisions, shall mean, when applied to this Agreement, the Letter Parties.

*[Remainder of this page intentionally left blank.]*

20

IN WITNESS WHEREOF, the Letter Parties have executed this agreement as of the date first above written.

DOWDUPONT INC.

By:     /s/ Jeanmarie F. Desmond
Name:   Jeanmarie F. Desmond
Title:    Chief Financial Officer

CORTEVA, INC.

By:     /s/ Gregory R. Friedman
Name:   Gregory R. Friedman
Title:    Executive Vice President, Chief Financial Officer