# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | **Civil Action No. 3:25-cv-00122-K** |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| 3M COMPANY; CORTEVA, INC., DUPONT | § | |
| DE NEMOURS, INC., and EIDP, INC. F/K/A | § | |
| E. I. DU PONT DE NEMOURS AND | § | |
| COMPANY, | § | |
| | § | |
| *Defendants.* | § | |

---

## BRIEF IN OPPOSITION TO DEFENDANT 3M COMPANY'S MOTION TO DISMISS

Plaintiff the State of Texas ("Plaintiff" or "the State") submits this memorandum of law in

opposition to the motion filed by Defendant 3M Company ("3M" or "Defendant") to dismiss the

claims asserted against them in the State's Original Petition for lack of personal jurisdiction

(ECF No. 29, the "Motion").[1]

---

[1] The State's Motion to Remand should be decided prior to Defendant's Motions to Dismiss because the Court must satisfy itself that federal jurisdiction is proper. For the reasons set forth in the State's Motion to Remand, it is not.

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................2

II.   FACTUAL BACKGROUND ...............................................................................3

      A.    3M Has Been Aware of the Toxicity of PFAS For Over 60 years ..........................3

III.  PROCEDURAL BACKGROUND.......................................................................4

IV.   LEGAL STANDARD...........................................................................................6

V.    ARGUMENT ........................................................................................................7

      A.    The State Has Established That 3M Has Minimum Contacts with Texas ..............7

      B.    The State's DTPA Claim Arises Out of 3M's Contact with the Forum ................12

      C.    Exercising Jurisdiction Over 3M is in Line with Due Process .............................16

      D.    In the Alternative, the State Should be Permitted Jurisdictional Discovery ..........18

VI.   CONCLUSION...................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ainsworth v. Moffett Eng'g, Ltd.*,
   716 F.3d 174 (5th Cir. 2013) .................................................8

*Andra Grp., LP v. BareWeb, Inc.*,
   No. 4:17-cv-00815, 2018 WL 2848985 (E.D. Tex. June 11, 2018) .......................12

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
   480 U.S. 102 (1987).................................................9, 10

*AT&T Mobility LLC v. T-Mobile USA Inc.*
   No. 4:22-cv-760, 2023 WL 186809 (E.D. Tex. Jan. 13, 2023) ..............................13

*Best Glide Aviation Survival Equipment, Inc. v. Tag-Z, LLC*,
   No. 1:23-cv-1080, 2024 WL 3488129 (W.D. Tex. July 19, 2024)..........................13

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985).................................................7, 16, 17

*In re Christianson Air Conditioning & Plumbing, LLC*,
   639 S.W.3d 671 (Tex. 2022).................................................12

*In re Depuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
   888 F.3d 753 (5th Cir. 2018) .................................................10

*E. Concrete Materials, Inc. v. ACE Am. Ins. Co.*,
   948 F.3d 289 (5th Cir. 2020) .................................................7

*Ethridge v. Samsung SDI Co., Ltd.*,
   617 F. Supp. 3d 638 (S.D. Tex. 2022) .................................................11

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
   592 U.S. 351 (2021).................................................*passim*

*Google LLC v. State*,
   2025 WL 52611 (Tex. App.–Corpus Christi-Edinburg Jan. 9, 2025, pet.
   pending) .................................................14, 15

*Heller v. Marriott Vacations Worldwide Corp.*,
   2023 WL 12027439 (W.D. Tex. Apr. 26, 2023).................................................18

*Innova Hosp. San Antonio, L.P. v. Blue Cross and Blue Shield of Georgia, Inc.*,
   995 F. Supp. 2d 587 (N.D. Tex. 2014) .................................................6, 18

*Int'l Energy Ventures Mgmt, LLC v. United Energy Grp., Ltd.*,
    818 F.3d 193 (5th Cir. 2016) ........................................................13

*J. McIntyre Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011)...................................................................8

*Johnston v. Multidata Sys. Int'l Corp.*,
    523 F.3d 602 (5th Cir. 2008) ........................................................6

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984).........................................................8, 12, 13

*Lapin v. EverQuote, Inc.*,
    No 4:22-cv-4058, 2023 WL 2072059 (D.S.D. Feb. 17, 2023) ................10

*Lewis v. BT Inv. Managers, Inc.*
    447 U.S. 27 (1980)..................................................................17

*Luciano v. SprayFoamPolymers.com, LLC*,
    625 S.W.3d 1 (Tex. 2021).......................................................11, 12

*Luv N'care, Ltd. v. Insta-Mix, Inc.*,
    438 F.3d 465 (5th Cir. 2006) .....................................................8, 11

*McFadin v. Gerber*,
    587 F.3d 753 (5th Cir. 2009) .....................................................8, 16

*Michiana Easy Livin' Country, Inc. v. Holten*,
    168 S.W.3d 777 (Tex. 2005).....................................................8, 11

*Miss. Interstate Express, Inc. v. Transpo., Inc.*,
    681 F.2d 1003 (5th Cir. 1982) .....................................................11

*Monkton Ins. Servs. Ltd. v. Ritter*,
    768 F.3d 429 (5th Cir. 2014) ........................................................7

*Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. de C.V.*,
    516 F. Supp. 3d 633 (W.D. Tex. 2021)..............................................8

*Paz v. Brush Engineered Materials, Inc.*,
    445 F.3d 809 (5th Cir. 2006) ........................................................6

*Quick Technologies, Inc. v. Sage Group PLC*,
    313 F.3d 338 (5th Cir. 2002) ........................................................6

*Sangha v. Navig8 ShipManagement Private Ltd.*,
    882 F.3d 96 (5th Cir. 2018) ..........................................................5

*Savvy Rest, Inc. v. Sleeping Organic, LLC*,
    No. 3:18-cv-00030, 2019 WL 1435838 (W.D. Va. Mar. 29, 2019) ......................................13

*Seiferth v. Helicopteros Atuneros, Inc.*,
    472 F.3d 266 (5th Cir. 2006) ......................................................................................7

*Silicon Solar Housing Solutions, Inc. v. Farrell*,
    2007 WL 162772 (N.D.Tex. Jan. 22, 2007) .............................................................17

*Speedfit LLC v. Woodway USA, Inc.*,
    642 F. Supp. 3d 429 (S.D.N.Y. 2022)..........................................................................5

*State v. Emeritus Corp.*,
    466 S.W.3d 233 (Tex. App.—Corpus Christi 2015, pet. denied)..........................17

*State v. Volkswagen Aktiengesellschaft*,
    669 S.W.3d 399 (Tex. 2023)....................................................................8, 15, 16

*Stuart v. Spademan*,
    772 F.2d 1185 (5th Cir. 1985) ..................................................................................11

*In re Toyota Hybrid Brake Litigation*,
    No. 4:20-cv-127, 2021 WL 2805455 (E.D. Tex. July 6, 2021) ..........................9, 10

*Trinity Indus., Inc. v. Myers & Assocs., Ltd.*
    41 F.3d 229 (5th Cir. 1995) ........................................................................................7

*Walden v. Fiore*,
    571 U.S. 277 (2014)....................................................................................................7

*Zoch v. Magna Seating (Germany) GmbH*,
    810 F. App'x. 285 (5th Cir. 2020) ............................................................................10

**Statutes**

28 U.S.C. §1332(a) .........................................................................................................5

Class Action Fairness Act, 28 U.S.C. §1332(d)(8).......................................................5

DTPA ................................................................................................................... *passim*

Tex. Bus. & Com. Code §17.44(a) .................................................................................2

Texas's Deceptive Trade Practices-Consumer Protection Act ......................................2

**Other Authorities**

United States Constitution Due Process Clause..............................................................6

## I.    INTRODUCTION

1.    Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA") is meant to "protect consumers against false, misleading, and deceptive business practices, [and] unconscionable actions." Tex. Bus. & Com. Code §17.44(a).  It requires companies to be truthful when advertising their products.  3M must be held accountable for its failure to meet its obligations to Texans, who—along with the legitimate business community operating in Texas— were negatively impacted by 3M's persistent misrepresentations and omissions in marketing its products in the Texas economy.

2.    3M, the multinational chemical company, developed certain man-made chemicals known as per- and polyfluoralkyl substances ("PFAS"), including PFOS and PFOA, in the 1940s.  Over the next sixty years, 3M became a prolific manufacturer and seller of consumer products that contained PFAS.  Despite 3M having early knowledge that PFAS posed a major threat to human health, it proceeded to flood Texas's marketplace with products that it knew contained these toxic chemical compounds.  3M marketed and promoted PFAS aggressively, affirmatively concealed known PFAS dangers, hired scientists to suppress science about PFAS risks, and misled regulators.  Through this conduct, 3M created and sustained a large market for its PFAS products, blunted regulatory scrutiny, and deliberately misinformed consumers about the safety of PFAS.  3M did this to maximize its profits and reward its shareholders.

3.    3M's manufacture, marketing, promotion and sale of these toxic chemicals, as well as their concealment of their hazards, was not limited to its state of incorporation.  Nor were the injuries that 3M's acts or omissions caused.  3M does not claim its activities were not directed to Texas.  3M's arguments propose an unduly mechanical requirement for personal jurisdiction that have been soundly rejected in both state and federal court.  This Court should do the same.

2

4. For these reasons and those explained below, 3M's Motion should be denied. Alternatively, the State should be permitted limited jurisdictional discovery.

## II.     FACTUAL BACKGROUND

### A.     3M Has Been Aware of the Toxicity of PFAS For Over 60 years

5. 3M developed PFAS chemicals, including PFOS and PFOA in the 1940s. *See* Pet. ¶ 21. Over the course of the next 60 years, 3M engaged in affirmative wrongful conduct going beyond mere manufacturing and sales. Namely, 3M knew about the dangers of PFAS, and products that contained PFAS, but deliberately deceived about and concealed these dangers:

- By 1956, 3M knew that PFAS binds to proteins in human blood, causing bioaccumulation. *See* Pet. ¶ 50;

- By 1960, 3M was aware that PFAS waste could leach into groundwater and otherwise enter the environment. *Id.* ¶ 50;

- By 1963, 3M knew that PFAS did not degrade after disposal. *Id.* ¶ 50;

- By the 1970s, 3M started to worry about PFAS exposure in the general population. *Id.* ¶ 54. For example, in 1975, 3M found that there was a "universal presence" of PFAS in blood serum samples taken from individuals across the United States. *Id* ¶ 50*;*

- In 1976, 3M began actively monitoring the blood of its employees for PFAS, i*d.* ¶ 55, and in 1978, 3M conducted animal studies which showed that "PFOS and PFOA affected the liver and gastrointestinal tract" of study participants. *Id.*

- The 1980s brought even more evidence that PFAS was persistent, bioaccumulative, and toxic in the environment, and also were affecting 3M's own employees. *Id.* ¶ 57.

6. Despite this knowledge, 3M actively "suppressed scientific research on the hazards associated with [PFAS] and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, effects to human health, and ecologic risks of PFAS." *See* Pet. ¶ 60. 3M funded scientists with the express purpose of keeping unfavorable papers about the dangers

of PFAS outside of the scientific literature. *Id.* 3M also withheld knowledge from and misled regulators. *Id.*

7.      3M continued to actively market its PFAS products, including in Texas, despite the known health risks associated with these chemical compounds:

- In 1961, five years after it knew that PFAS binds to proteins in human blood, causing bioaccumulation, 3M promoted the benefits of Scotchgard, which 3M made using PFOS, without discussing an negative health implications. *See* Pet. ¶ 50-51;

- In 1965 and 1967, 3M marketed Scotchgard as safe for use around children. This advertisement was made after 3M knew that PFAS would not degrade after disposal. ¶¶ 50, 52-53;

- In the 1980s, 3M marketed Scotchgard as making "living a little easier" for mothers and families. These advertisements were made *after* 3M found that there was a "universal presence" of PFAS in blood serum samples taken from individuals across the United States and that PFAS was affecting 3M's own employees. ¶¶ 56-58.

8.      3M's deceptive conduct continued after it announced that it would phase out of PFAS production. *See* Pet. ¶ 62. In 2000, around the time 3M allegedly phased out PFOS and PFOA production, 3M falsely asserted that "our products are safe." *Id.* ¶ 61. This statement was made even though by the late 1990s, 3M was well aware that the average level of PFOS being found in the blood of the general population of the United States was approximately 30 times higher than what their own toxicologist had calculated was "safe." *Id.*

9.      Even today, 3M continues to deceptively advertise its PFAS-based products as "safe" and "effective for their intended uses." *See* Pet. ¶¶ 62-63, 67.

### III.    PROCEDURAL BACKGROUND

10.      On December 11, 2024, the State filed its Petition in Johnson County and was assigned to the 18th Judicial District.[2] The Petition named four corporate defendants and alleges

---

[2] The action was docketed as No. DC-C202400996.

violations of four specific provisions of Texas's DTPA. *See* Pet. ¶¶ 8-11, 106-109. These allegations are premised on Defendants' false, deceptive, and misleading acts and practices done in connection with the marketing and sale of PFAS-containing products. *Id.* ¶¶ 106-109. These acts and practices occurred in Texas and were directed to Texas consumers. *Id.* ¶¶ 1, 6, 12, 106-109. Accordingly, the State seeks civil penalties up to $10,000 per violation of the DTPA, as well as pre- and post-judgment interest, a permanent injunction, attorneys' fees and costs, and any other relief the court orders. *Id.* ¶¶ 111-113.

11.    On January 16, 2025, Defendant 3M removed this action to this Court, arguing that this Court has jurisdiction pursuant to either the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d)(8) or general principles of diversity of citizenship, 28 U.S.C. §1332(a). *See* ECF No. 1. All defendants consented to removal. *Id.* at 11.

12.    On February 5, 2025, the State filed its Motion to Remand. *See* ECF Nos. 14-15. The Court should exercise its discretion and remand this matter to state court before it is required to expend considerable judicial resources deciding issues related to personal jurisdiction, as well as merit-based arguments, that have been raised here. The Fifth Circuit has advised as much. *See Sangha v. Navig8 ShipManagement Private Ltd.,* 882 F.3d 96, 100 (5th Cir. 2018) ("[H]owever, neither *Ruhrgas* nor *Sinochem* change the general expectation that courts address subject-matter jurisdiction at the outset in the 'mine run of cases' and reach other issues first only where the jurisdictional issue is 'difficult to determine' ***and*** the other grounds are relatively 'less burdensome.'") (emphasis added); *Speedfit LLC v. Woodway USA, Inc.,* 642 F. Supp. 3d 429, 439 (S.D.N.Y. 2022) ("[B]ecause fundamental principles of American jurisprudence forbid the Court from acting in the absence of subject matter jurisdiction, plaintiffs' motion to remand must be examined before any other matter.").

## IV.    LEGAL STANDARD

13.    The State bears the burden of establishing this Court's jurisdiction over 3M. *See Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 343 (5th Cir. 2002) (citations omitted).  When the district court rules on a motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing or in the absence of jurisdictional discovery, the plaintiff may bear this burden by presenting a *prima facie* case that personal jurisdiction is proper. *Innova Hosp. San Antonio, L.P. v. Blue Cross and Blue Shield of Georgia, Inc.,* 995 F. Supp. 2d 587, 615 (N.D. Tex. 2014) (citing *Quick Technologies, Inc.,* 313 F.3d at 343-44).

14.    Where the allegations in the pleading support the exercise of personal jurisdiction and the defendant does not contradict plaintiff's allegation with sworn testimony, the plaintiff is entitled to have its allegations taken as true. *See Paz v. Brush Engineered Materials, Inc.,* 445 F.3d 809, 812 (5th Cir. 2006) (citations omitted). Thus, in determining whether jurisdiction exists, the Court must accept all of the State's uncontroverted allegations as true, and deny 3M's Motion if the State's allegations are sufficient to establish jurisdiction.

15.    Texas's long-arm statute allows courts to exercise specific personal jurisdiction over non-resident defendants to the full extent permitted by the Due Process Clause of the United States Constitution. Accordingly, "[b]ecause the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Johnston v. Multidata Sys. Int'l Corp.,* 523 F.3d 602, 609 (5th Cir. 2008). The Fifth Circuit has articulated a three-step test for specific jurisdiction analysis:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purportedly directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there;

> (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and

(3) whether the exercise of personal jurisdiction is fair and reasonable.

*Monkton Ins. Servs. Ltd. v. Ritter,* 768 F.3d 429, 433 (5th Cir. 2014) (quoting *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 271 (5th Cir. 2006)).   If the plaintiff establishes the first two steps, "[t]he burden shifts to the defendant to show that the exercise of personal jurisdiction would be unfair or unreasonable." *E. Concrete Materials, Inc. v. ACE Am. Ins. Co.,* 948 F.3d 289, 296 (5th Cir. 2020).

16.    Here, the State far exceeds the requirements for establishing personal jurisdiction and has, at a minimum, made a *prima facie* showing of specific jurisdiction.

## V.    ARGUMENT

### A.    The State Has Established That 3M Has Minimum Contacts with Texas

17.    "The contacts needed for [specific] jurisdiction often go by the name 'purposeful availment.'" *Ford Motor Co. v. Montana Eighth Judicial District Court.,* 592 U.S. 351, 359 (2021). To plead such contacts, a plaintiff must show that the nonresident defendant has "purposefully directed [its] activities at the residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). A nonresident defendant does not necessarily have to "physically enter the forum State" to establish minimum contacts. *Id.* at 476; *see also Walden v. Fiore*, 571 U.S. 277, 283 (2014) (recognizing that "a nonresident's physical presence within the territorial jurisdiction of the court is not required" to give rise to specific jurisdiction.)

18.    A court is instructed to undertake a "highly realistic approach" in deciding whether a defendant has established the requisite minimum contacts with the forum state. *Trinity Indus., Inc. v. Myers & Assocs., Ltd.* 41 F.3d 229, 230 (5th Cir. 1995).   This inquiry is fact intensive and no one element is decisive. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).

7

The touchstone of the inquiry, however, is whether the defendant's conduct shows that it "could reasonably anticipate being haled into court there." *Id.* at 759.    As the Supreme Court has consistently upheld, "[w]hen a corporation has 'continuously and deliberately exploited [a State's] market, it must reasonably anticipate being haled into [that State's] court[s]' to defend actions 'based on' products causing injury there. *Ford*, 592 U.S. at 364 (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 (1984)).

> ### i.    The State has Established Minimum Contacts Through a Stream-of-Commerce Analysis

19.    The notion that a defendant may submit to a forum's jurisdiction without physically entering the forum state is "unexceptional." *State v. Volkswagen Aktiengesellschaft,* 669 S.W.3d 399, 416 (Tex. 2023); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) ("[a] nonresident need not have offices or employees in a forum state" to purposefully avail itself of the forum.") A paradigmatic example is when "manufacturers or distributors 'seek to serve' a given [s]tate's market." *Id.* (quoting *J. McIntyre Mach., Ltd. v. Nicastro,* 564 U.S. 873, 882 (2011)) (plurality opinion). When a product is sold or manufactured by a foreign defendant, a court will apply a "stream of commerce" approach to personal jurisdiction. *Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. de C.V.,* 516 F. Supp. 3d 633, 644 (W.D. Tex. 2021) (citing *Ainsworth v. Moffett Eng'g, Ltd.,* 716 F.3d 174 (5th Cir. 2013)).

20.    Though typically applied in the product liability context, the Fifth Circuit allows stream-of-commerce personal jurisdiction to be implicated "where the same public policy concerns that justify use of the stream-of-commerce principle in the products liability context are present." *Luv N'care, Ltd. v. Insta-Mix, Inc.,* 438 F.3d 465, 473 (5th Cir. 2006) (internal citation omitted); *see also In re Toyota Hybrid Brake Litigation,* No. 4:20-cv-127, 2021 WL 2805455 at

*9 (E.D. Tex. July 6, 2021) ("[T]he stream-of-commerce subspecies of specific jurisdiction is far-reaching, encompassing myriad iterations of transactional arrangements and commercial activities.").

21.     Here, the difference, if any, between a manufacturer who puts a toxic product into the stream of commerce and a manufacturer who puts a deceptive advertisement about its toxic product into the stream of commerce is theoretical rather than substantive. The public policy concern, the determinative factor outlined by the 5th Circuit, is one and the same – recompense for injury caused by a defendant whose actions caused a toxic product to enter Texas's marketplace.[3] Utilizing a stream of commerce analysis in this context fully comports with due process because, as Justice Brennan articulated in *Asahi*, "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi Metal Indus. Co. v. Superior Court of Cal*., 480

---

[3]  The fact that this lawsuit is not being brought on behalf of the consumer who purchased the defective product is of no import. In *Choice Healthcare, Inc. v. Kaiser Foundation Health Plan of Colo.,* the Fifth Circuit articulated that "[t]he important feature of Justice Brennan's concurrence is the nature of the case to which the stream of commerce theory applies to permit a plaintiff to obtain personal jurisdiction over a foreign defendant." 615 F.3d 364, 373 (5th Cir. 2010). To that end, Justice Brennan stated in *Asahi*:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacturer to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor would the litigation present a burden for which there is not corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State or engages in additional conduct directed toward that State. (*Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102, 117 (1987)).

*Id.* Relying on Justice Brennan's interpretation, the Fifth Circuit noted that the stream of commerce model has been applied to cases, other than product liability cases, "where a defendant places a product in the stream of commerce as part of a sales or distribution network designed to market its products nationwide (or at least outside of its home state) where it would derive financial benefit from sales in the forum." *Id.* As such, "deriving revenue from such commercial activity is the quid pro quo for requiring the defendant to suffer a suit in the foreign forum."

U.S. 102, 117 (1982). That is why courts have allowed personal jurisdictional inquiries on false advertising claims to be analyzed under a stream-of-commerce theory. *See e.g. In re Toyota Hybrid Brake Litigation*, 2021 WL 2805455 at *14 ("[N]eedless to say, the same public policy concerns that justify use of the stream-of-commerce principle in the products liability context are present as to Counts II [DTPA] and V."); *Lapin v. EverQuote, Inc.,* No 4:22-cv-4058, 2023 WL 2072059, at *4 (D.S.D. Feb. 17, 2023) ("[T]hus, just as a manufacturer places a defective product into a stream of commerce with a distributor, and such products eventually make their way to an end-user who can sue the manufacturer for any defects, advertisers of commercial emails place its emails into the stream of commerce with various senders, who then send out such advertisements to recipients who can sue such advertisers for non-complaint emails. The court finds it appropriate to analyze personal jurisdiction using the stream of commerce theory.").

22.     The stream-of-commerce doctrine "[r]ecognizes that a defendant may purposefully avail itself of the protection of a state's laws – and thereby will subject itself to personal jurisdiction – by sending its goods rather than its agents' into the forum." *In re Deputy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.,* 888 F.3d 753, 778 (5th Cir. 2018) (internal quotes and citations omitted).  "The Fifth Circuit has found this doctrine and thus minimum contacts satisfied so long as the court determines that the defendant delivered the product in to the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state." *Zoch v. Magna Seating (Germany) GmbH*, 810 F. App'x. 285, 290 (5th Cir. 2020).  Texas permits the exercise of jurisdiction over a corporate entity when it engages in "additional conduct" that evinces "an intent or purpose to serve the market in the forum state, whether directly or indirectly." *Luciano v. SprayFoamPolymers.com, LLC*, 625

S.W.3d 1, 10 (Tex. 2021) (internal quotes and citations omitted); *Luv N'care Ltd.,* 438 F.3d at 470. This test is sometimes termed "stream of commerce plus." *See Ethridge v. Samsung SDI Co., Ltd.,* 617 F. Supp. 3d 638, 653 n. 5 (S.D. Tex. 2022). Evidence of such additional conduct "[m]ay include ***advertising in the forum state***[;] soliciting business through salesperson[;] or creating, controlling, or employing the distribution system that brought the product into the forum state." *Luciano*, 625 S.W.3d at 10 (citations omitted) (emphasis added).

23.     Here, the Petition describes in detail how 3M was aware, for decades, that PFAS was toxic to humans, but omitted this information in its marketing and continued to affirmatively advertise its products as "safe" to consumers in Texas. *See* Pet. ¶¶ 1-2, 22-23. This is sufficient at this stage. *See Luciano*, 625 S.W.3d at 14 ("[P]lacing its product into the stream of commerce in conjunction with its 'additional conduct' of soliciting business and distributing its product in Texas is sufficient to hold that [defendant] purposefully availed itself of the Texas market.")

> ***ii.***     *In the Alternative, 3M Purposefully Availed itself of Texas's Marketplace Under a Traditional Analysis*

24.     Traditionally, the minimum contacts analysis requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities in the forum State, thus invoking the benefits and protections of its laws. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex. 2005). A court must consider the totality of the circumstances when making the purposeful availment inquiry, as "no single factor, particularly the number of contacts, is determinative." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). Whether "the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state." *Miss. Interstate Express, Inc. v. Transpo., Inc.,* 681 F.2d 1003, 1006 (5th Cir. 1982). At this stage, the

State need only make a prima facie showing that 3M sought "[a] benefit, advantage, or profit from the forum market" in order to establish purposeful availment. *In re Christianson Air Conditioning & Plumbing, LLC,* 639 S.W.3d 671, 679 (Tex. 2022). The State has met its burden.

25.    For decades, 3M manufactured products that they knew contained toxic chemical compounds that were harmful to humans. They then advertised and sold these products in Texas, while deliberately concealing the hazards inherent in their products. The fact that 3M conducted an extensive deceptive advertising scheme that spanned across the country does not negate its purposeful contacts with Texas. *See Luciano,* 625 S.W.3d at 10 (citing *Keeton v. Hustler Mag., Inc.,* 465 U.S. 770, 779-80 (1984)). For example, a defendant, like 3M, will "purposefully direct their activities to forum residents when [they] generate income from forum residents." *Andra Grp., LP v. BareWeb, Inc.,* No. 4:17-cv-00815, 2018 WL 2848985, at *6 (E.D. Tex. June 11, 2018). Additionally, "when defendants perform additional acts to purposefully avail themselves of the forum state, such as advertising, conducting business transactions with residents of the forum state, and soliciting funds from residents in the forum state, there is sufficient support to find [specific] personal jurisdiction over the defendants." *Id.*

26.    Here, the Petition describes in detail how 3M was aware, for decades, that PFAS was toxic to humans, but nonetheless concealed that information with the intent to induce consumers into purchasing their products, and continued to affirmatively advertise its products as "safe" to consumers in Texas. *See* Pet. ¶¶ 1-2, 22-23.

27.    Accordingly, the Court should find the 3M purposefully availed itself of the Texas Forum.

**B.    The State's DTPA Claim Arises Out of 3M's Contact with the Forum**

28.     Specific jurisdiction may exist "over a nonresident defendant whose contacts with the forum state are singular or sporadic only if the cause of action asserted arises out of or is related to those contacts." *Int'l Energy Ventures Mgmt, LLC v. United Energy Grp., Ltd.,* 818 F.3d 193, 212 (5th Cir. 2016). As the Supreme Court has recently clarified, "arise out of" and "relate to" are two separate methods of evaluating the connection between forum and controversy. *Ford Motor Co.*, 592 U.S. at 362 ("[O]ur most common formulation of the rule demands that the suit arise out of *or relate* to the defendant's contacts with the forum. The first half of that standard asks about causation; but the back half, after the 'or' contemplates that some relationships will support jurisdiction without a causal showing.") (internal citations omitted) (emphasis in original).  Simply put, the specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Keeton,* 465 U.S. at 775.

29.     The State's DTPA claim arises out of or relates to 3M's contacts in Texas because it is through those contacts, and false statements, that Texas consumers purchased products in the forum. The Petition establishes that 3M marketed, promoted, manufactured, distributed, and sold a wide array of PFAS products in Texas. These included commonplace items like Scotchgard stain repellent, food packaging, and textile treatments. Pet. ¶¶ 47-49, 51-53, 56, 58, 64. Absent an evidentiary hearing, the State need not show more at this stage. *See AT&T Mobility LLC v. T-Mobile USA Inc.* No. 4:22-cv-760, 2023 WL 186809, at *7 (E.D. Tex. Jan. 13, 2023) (citing *Savvy Rest, Inc. v. Sleeping Organic, LLC,* No. 3:18-cv-00030, 2019 WL 1435838, at *6 (W.D. Va. Mar. 29, 2019) (concluding that plaintiff's false advertising claims arose from defendant's forum-related activities when the defendant "used false or misleading representations" to sell products in the forum state.)); *Best Glide Aviation Survival Equipment, Inc. v. Tag-Z, LLC*, No. 1:23-cv-1080, 2024 WL 3488129, at *5 (W.D. Tex. July 19, 2024) ("[D]efendant has allegedly

'deceived its audience,' which includes Texas consumers. Defendant's alleged deception of Texas consumers relates to Plaintiff's claim of false advertising, false designation, and unfair competition claims, which is enough to show a sufficient connection between Defendant's forum contacts and Plaintiff's claims.").

30.    3M's reliance on the Thirteenth Court's decision in *Google* is misplaced.[4] In the Thirteenth Court's view, Texas lacked jurisdiction because Google's misrepresentations – which misled its Texas users into divulging sensitive information to feed Google's targeted advertising services in Texas – were overseen by Google employees working outside of Texas. *See Google LLC v. State*, 2025 WL 52611, at *6-7 (Tex. App.–Corpus Christi-Edinburg Jan. 9, 2025, pet. pending). Specifically, the Thirteenth Court held that:

> The principal complaint that the terms of service and disclosures made by appellant were misleading requires that the overwhelming evidence be directed at events outside of Texas. Stated differently, appellee has not identified an "activity or occurrence…that takes place in" Texas."

*Id.* at *7. In effect, the Thirteenth Court accepted Google's invitation to treat this as a wandering plaintiff case in which Google could not be held liable in Texas for merely making misrepresentations that were *passively* available on its website which was viewed by consumers in Texas. Here, the State is seeking to hold 3M accountable for the proliferation of deceptive advertising that entered in the Texas marketplace. Thus, the concerns held by the Thirteen Court, that events that took place outside of Texas will "consume most if not all of the litigation's attention" or that "the overwhelming majority of the evidence [would] be directed" at events outside of Texas, are simply not present here. *Id.* The factual distinctions between the actions

---

[4] Given the misapplication of established federal and state caselaw, the State filed a Petition for Review before the Supreme Court of Texas on February 24, 2025.

the State has brought against Google and 3M render *Google* inapplicable. Yet, this Court should disregard the holding regardless as it is predicated on a misapplication of law.

31.    First, in *TV Azteca v. Ruiz*, the Supreme Court of Texas, employing reasoning later articulated in *Ford*, held that a Mexican TV station was subject to personal jurisdiction in Texas arises from a claim that it defamed a Texan through programming broadcast from Mexico but viewable in Texas. 490 S.W.3d 29, 35-36 (Tex. 2016).  In that instance, the Court held that the viewability of the program in Texas, combined with the defendant's *additional* conduct aimed at Texas – marketing, advertisements, and revenue from Texas – made jurisdiction constitutional. *Id.* at 46-47, 53-54. Importantly, the Court made this jurisdictional holding even though the additional conduct did not give rise to the defamation claims at issue in the suit. *Id.* Here, those additional conducts *directly* relate to the State's DTPA claim because that *is* the State's claim. 3M misrepresented the safety of their product and sent those misrepresentations into Texas in order to market their products to Texas consumers.  *Google* simply disregards this analysis.

32.    Second, in *Volkswagen*, the Supreme Court of Texas held that a party cannot concoct artificial barriers between itself and Texas in order to avoid jurisdiction, but must instead "structure[e] its transactions" so as to avoid "profit[ing] from the forum's laws." 669 S.W.3d at 426 (citation omitted).  In *Volkswagen*, the foreign manufacturer failed in this respect because they were ultimately responsible for software installed on cars in Texas, benefited from that installation in Texas, and where Texas served as a substantial market for their cars. *Id.* at 426-27. So too here.  3M intentionally sent deceptive advertisements *into Texas*, so that it could benefit from *Texas consumers* purchasing PFAS products *in Texas*.

15

33. This Court's assumption of the Thirteenth Court's unpublished holding, which did not adequately address *Ford, Tv Azteca,* or *Volkswagen* will give foreign defendants a roadmap to violate Texas consumer-protection laws with impunity.

34. Based on the above, the State has properly satisfied its jurisdictional burden.

**C.    Exercising Jurisdiction Over 3M is in Line with Due Process**

35. Exercising personal jurisdiction over Movants "comport[s] with fair play and substantial justice." *Burger King Corp.*, 471 U.S. at 462. To defeat jurisdiction based on this fairness inquiry, a defendant bears the burden of presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. at 477.  This Court may consider several factors in this inquiry, including:

the burden of the nonresident defendant;

the forum state's interests;

the plaintiff's interest in securing relief;

the interest of the interstate judicial system in the efficient administration of justice; and

the shared interest of the several states in furthering fundamental social policies.

*McFadin v. Geber*, 587 F.3d 753, 760 (5th Cir. 2009) (citation omitted). 3M's analysis of these factors is unavailing for one key reason—***it is wholly missing from their brief***.  As such, it is impossible for 3M to argue that they have met their burden in demonstrating that this Court's exercise of jurisdiction would violate the notions of fair play and substantial justice. Regardless, if those arguments had even been made, they would be hollow.

36. Here, these factors establish that exercising jurisdiction over 3M is reasonable. The fact that the State is the plaintiff in this case weighs heavily in favor of exercising jurisdiction over 3M, for several reasons. First, Texas has a strong interest in protecting the prosperity of its economy and its citizens from deceptive business practices. This is especially

true where, as here, the State brought this action pursuant to Section 17.47 of the DTPA, a statutory provision that was *specifically* designed to ensure that matters of "public interest" could be enforced by the Attorney General. *See State v. Emeritus Corp.,* 466 S.W.3d 233, 240 (Tex. App.—Corpus Christi 2015, pet. denied). The State seeks to hold 3M accountable for violations of the DTPA through the imposition of civil penalties and to prevent, by way of injunctive relief, future illegal acts. Though this action is not being brought to recover restitution on behalf of its citizens, the benefits of, among other things, maintaining a marketplace free from the deceptive acts of 3M will invariably also be reaped by the citizens themselves. *See Lewis v. BT Inv. Managers, Inc.* 447 U.S. 27, 38 (1980) ("…[h]onest financial practices are essential to the health of any State's economy and to the well-being of its people.).

37.    Texas has an interest in the efficient resolution of all controversies in the State, but particularly those that the State brings to address significant, and long-standing, deceptive acts on the part of corporate actors. Indeed, in certain cases, like this one, the forum State's interest in adjudicating the dispute, obtaining requisite relief, and furthering substantive social policies "serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King*, 471 U.S. at 777.

38.    Moreover, 3M, incorporated in Delaware, would not be overly burdened by defending these actions in Texas. *See, e.g.*, *Silicon Solar Housing Solutions, Inc. v. Farrell*, 2007 WL 162772, at *5 (N.D.Tex. Jan. 22, 2007) ("While Farrell will suffer more of a financial burden by participating in litigation in Texas than he would if the action were pending in New York, such a burden would certainly be no greater on Farrell than would be the burden on Blake if he were to be required to litigate his claims against Farrell in a New York court.").

17

**D.    In the Alternative, the State Should be Permitted Jurisdictional Discovery**

39.    At the pleading stage, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Innova Hosp. San Antonio, L.P.*, 995 F. Supp. 2d at 615.  No jurisdictional discovery is needed here because the State has established a *prima facie* case for specific jurisdiction. However, to the extent the Court is inclined to grant the Motion, the State requests limited jurisdictional discovery. *See Heller v. Marriott Vacations Worldwide Corp.*, 2023 WL 12027439 at *4 (W.D. Tex. Apr. 26, 2023) ("[T]o that end, district courts have broad discretion in all discovery matters and generally allow plaintiffs to conduct limited jurisdictional discovery provided they have made a preliminary showing of jurisdiction.") (internal quotes and citations omitted).

40.    The State would seek jurisdictional discovery by way of interrogatory requests, requests for production of documents, and limited 30(b)(6) depositions related to, among others, the following topics:

- profits obtained by 3M from the sale of PFAS products in Texas and a comparison of profits obtained in other States;

- contracts entered into with regional/local television and newspaper organizations that were responsible for broadcasting and or disseminating 3M's advertisements of PFAS products;

- contracts entered into with third-party entities that manufactured, sold, licensed, or distributed PFAS products in Texas

- internal memorandum related to advertising practices and specific state markets that were targeted;

- names and details for any office buildings, substations, and/or any other facilities that were maintained by 3M in Texas while they were advertising PFAS products;

- third-party entities responsible for the transportation of PFAS products into Texas;

## VI.    CONCLUSION

41.    The State of Texas filed this suit in order to hold Defendants accountable for decades of illegal conduct that resulted in significant damage to the State and its citizens. It is clear that Defendants prioritized earnings over being forthright with Texas consumers and now seek to avoid responsibility for their actions. 3M does not deny that its products contained toxic chemical compounds.  3M does not deny that it continued to market and sell their products in Texas despite knowing of their harmful effects.  This is precisely the type of conduct prohibited by the DTPA.  But instead, 3M argues that because the State has not detailed every material misrepresentation made over several decades that this matter should be dismissed in its infancy. That is not the law. That is not justice.

42.    As such, the State respectfully requests that the Court deny 3M's Motion to Dismiss.  In the alternative, the Court should grant jurisdictional discovery.

Dated:  March 20, 2025                          Respectfully Submitted,


**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

**BRENT WEBSTER**
FIRST ASSISTANT ATTORNEY GENERAL

**RALPH MOLINA**
DEPUTY FIRST ASSISTANT ATTORNEY GENERAL

**AUSTIN KINGHORN**
DEPUTY ATTORNEY GENERAL FOR CIVIL LITIGATION


*/s/ Jennifer Roscetti*                          */s/ Katie B. Hobson*


**JONATHAN STONE**                          **KELLIE E. BILLINGS-RAY**
CHIEF, CONSUMER PROTECTION DIVISION                          CHIEF, ENVIRONMENTAL PROTECTION DIVISION

**Jennifer Roscetti**                          **Katie B. Hobson**
State Bar No. 24066685                          State Bar No. 24082680
**Kelley Owens**                          **Brittany E. Wright**
State Bar No. 24118105                          State Bar No. 24130011
Assistants Attorney General                          **Jake Marx**
Jennifer.roscetti@oag.texas.gov                          State Bar No. 24087989
Kelley.owens@oag.texas.gov                          Assistants Attorney General
                          Katie.hobson@oag.texas.gov
                          Brittany.wright@oag.texas.gov
OFFICE OF THE TEXAS ATTORNEY GENERAL                          Jake.marx@oag.texas.gov
Consumer Protection Division
P.O. Box 12548, MC-010                          OFFICE OF THE TEXAS ATTORNEY GENERAL
Austin, Texas 78711-2548                          Environmental Protection Division
Tel: (512) 463-2185                          P.O. Box 12548, MC-066
Fax: (512) 473-8301                          Austin, Texas 78711-2548
                          Tel: (512) 463-2012
                          Fax: (512) 320-0911


20

*/s/ Bill Jackson*

**WILLIAM J. JACKSON**
**JENNIFER C. BARKS**
**LAUREN H. SHAH**
**MARIA F. PIMIENTA**
**KELLEY DRYE & WARREN LLP**
515 Post Oak Blvd., Suite 900
Houston, Texas 77027
Tel: (713) 355-5000
Fax: (713) 355-5001
bjackson@kelleydrye.com
jbarks@kelleydrye.com
lshah@kelleydrye.com
mpimienta@kelleydrye.com

*/s/ Glenn Graham*

**DAVID I. ZALMAN**
**GLENN T. GRAHAM**
**ELIZABETH N. KRASNOW**
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
dzalman@kelleydrye.com
ggraham@kelleydrye.com
ekrasnow@kelleydrye.com

Mark Lanier
Alex Brown
**THE LANIER  LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N., Suite 100
Houston, Texas 77054
Tel: (713) 659-5200
Fax: (713) 659-2204
mark.lanier@lanierlawfirm.com
alex.brown@lanierlawfirm.com

*/s/ Scotty MacLean*

Scotty MacLean
**MACLEAN LAW FIRM, P.C.**
State Bar No. 00787942
4916 Camp Bowie Blvd.
Fort Worth, Texas 76107
Tel: 817-529-1000
Fax: 817-698-9401
smaclean@macleanfirm.com

Robert A. Bilott
**TAFT STETTINIUS & HOLLISTER LLP**
425 Walnut Street, Suite 1800
Tel: (513) 381-2838
Fax: (513) 381-0205
bilott@taftlaw.com

**ATTORNEYS FOR THE STATE OF TEXAS**

**CERTIFICATE OF SERVICE**

I certify that on this 20th day of March 2025, a true and correct copy of the foregoing document was served by email and/or by electronic filing service on all counsel of record via the Court's CM/ECF system.


    /s/        *Glenn Graham*
GLENN GRAHAM

22